DAN RAYFIELD
Attorney General
ALLIE M. BOYD #163478
BRIAN SIMMONDS MARSHALL #196129
LAUREN ROBERTSON #124362
Senior Assistant Attorneys General
KATE E. MORROW #215611
YOUNGWOO JOH #164105
Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: allie.m.boyd@doj.oregon.gov
        brian.s.marshall@doj.oregon.gov
        lauren.robertson@doj.oregon.gov
        kate.e.morrow@doj.oregon.gov
        youngwoo.joh@doj.oregon.gov


Attorneys for the State of Oregon

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| STATE OF OREGON, et al., | No. 6:25-cv-02409-MTK |
| Plaintiffs, | REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT |
| v. | |
| ROBERT F. KENNEDY, JR., in his official capacity as the Secretary of the Department of Health and Human Services, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.    ADDITIONAL FACT SUMMARY ..................................................................... 2

III.    ARGUMENT ....................................................................................................... 8

   A.   The Kennedy Declaration Purports to Override Existing Standards of Care, and Defendants' Litigation Position to the Contrary Should be Disregarded ................... 8

   B.   This Case Is Ripe ............................................................................................. 13

   C.   The Kennedy Declaration Is Final Agency Action ........................................ 17

   D.   The Kennedy Declaration Exceeds the Secretary's Statutory Authority ........................ 19

   E.   The Kennedy Declaration Violates Notice and Comment Requirements ........................ 21

      1.   The Medicare Act requires notice and comment ........................................ 21

      2.   The APA requires notice and comment ...................................................... 23

   F.   The Kennedy Declaration Is Contrary to the Medicaid Act ............................ 25

      1.   The Kennedy Declaration is contrary to the federally approved Medicaid and Children's Health Insurance Program (CHIP) plans of the Plaintiff States ................. 26

      2.   The Kennedy Declaration is contrary to the Medicaid Act's free choice of provider requirement ................................................................................ 26

   G.   Defendants' Arguments Still Lack Merit Under Their Post Hoc Litigation Position ....... 28

   H.   Plaintiff States Are Entitled to the Full Suite of Remedies ............................ 29

      1.   The Court should hold the Kennedy Declaration unlawful and set it aside ................. 29

      2.   The Court should issue a declaratory judgment ........................................... 30

      3.   The Court should enjoin defendants from enforcing, implementing, or relying on the Kennedy Declaration ................................................................ 31

IV.    CONCLUSION ................................................................................................. 35

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967)........................................................................................ 13

*Agendia, Inc. v. Becerra*,
  142 S. Ct. 898 (2022)...................................................................................... 22

*Agendia, Inc. v. Becerra*,
  4 F.4th 896 (9th Cir. 2021)........................................................................ 22, 23

*Alaska v. Dep't of Transp.*,
  868 F.2d 441 (D.C. Cir. 1989) ....................................................................... 24

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982)........................................................................................ 14

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ....................................................................... 30

*Allina Health Servs. v. Price*,
  863 F.3d 937 (D.C. Cir. 2017) ....................................................................... 22

*Am. Mining Cong. v. Mine Safety & Health Admin*,
  995 F.2d 1106 (D.C. Cir. 1993) ..................................................................... 24

*Azar v. Allina Health Servs.*,
  587 U.S. 566 (2019)........................................................................................ 21

*Becerra v. Dep't of Interior*,
  276 F. Supp. 3d 953 (N.D. Cal. 2017) ........................................................... 31

*Bennett v. Spear*,
  520 U.S. 154 (1997)........................................................................................ 17

*Biden v. Missouri*,
  595 U.S. 87 (2022).......................................................................................... 26

*Biden v. Nebraska*,
  600 U.S. 477 (2023)........................................................................................ 14

*Bilbrey by Bilbrey v. Brown*,
  738 F.2d 1462 (9th Cir. 1984)........................................................................ 31

*Boe v. Children's Hosp. Colo.*,
  Case No. 26CV30232, (Dist. Ct. City & Cnty. of Denver Co. Feb. 13, 2026)
  (unpublished) (hyperlink not available) (attached to Declaration of Lauryn K.
  Fraas as Exhibit 30) ....................................................... 11, 14, 16, 33, 34

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012).......................................................................... 30

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*Califano v. Sanders,*
    430 U.S. 99 (1977).................................................................................. 13

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024)................................................................. 20

*Cmty. Nutrition Inst. v. Young,*
    818 F.2d 943 (D.C. Cir. 1987)............................................................. 24

*Cnty. of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................................. 3

*Colwell v. Dep't of Health & Human Servs.,*
    558 F.3d 1112 (9th Cir. 2009) ............................................................. 13

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024).............................................................................. 29

*Dent v. West Virginia,*
    129 U.S. 114 (1889)....................................................................... 15, 35

*Dep't of Educ. v. Career Colls. & Schs. of Tex.,*
    145 S. Ct. 1039 (2025).......................................................................... 20

*Dep't of Educ. v. Career Colls. & Schs. of Tex.,*
    146 S. Ct. 59 (2025).............................................................................. 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.,*
    591 U.S. 1 (2020).................................................................................. 12

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006).............................................................................. 32

*Erickson v. U.S. ex rel. Dep't of Health & Hum. Servs.,*
    67 F.3d 858 (9th Cir. 1995).................................................................. 16

*Freedom to Travel Campaign v. Newcomb,*
    82 F.3d 1431 (9th Cir. 1996).......................................................... 13, 15

*Gonzales v. Oregon,*
    546 U.S. 243 (2006).............................................................................. 21

*Griffin v. HM Fla.-ORL, LLC,*
    144 S. Ct. 1 (2023)............................................................................... 29

*Hemp Indus. Ass'n v. DEA,*
    333 F.3d 1082 (9th Cir. 2003)............................................................. 24

*Hillsborough Cnty., Fla. v. Auto. Med. Labs., Inc.,*
    471 U.S. 707 (1985).............................................................................. 15

*Illinois v. FEMA,*
    801 F. Supp. 3d 75 (D.R.I. 2025)........................................................ 32

*Indus. Customers of Nw. Utilities v. Bonneville Power Admin.,*
    408 F.3d 638 (9th Cir. 2005)............................................................... 17

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*,
   510 U.S. 1301 (1993) ........................................................................................ 34

*Kennedy v. Braidwood Mgmt., Inc.*,
   606 U.S. 748 (2025) .......................................................................................... 9

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) .......................................................................................... 23

*Lykins v. Hohnbaum*,
   No. CIV. 01-63-JO, 2002 WL 32783973 (D. Or. Feb. 22, 2002) ...................... 13

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ..................................................................... 23, 24

*Mansor v. Citizenship & Immigr. Servs.*,
   685 F. Supp. 3d 1000 (W.D. Wash. 2023) ....................................................... 31

*Medina v. Planned Parenthood S. Atl.*,
   606 U.S. 357 (2025) ..................................................................................... 26, 27

*Mont. Wildlife Fed'n v. Haaland*,
   127 F.4th 1 (9th Cir. 2025) .......................................................................... 29, 30

*Morrison v. Olson*,
   487 U.S. 654 (1988) .......................................................................................... 19

*Nat. Grocers v. Rollins*,
   157 F.4th 1143 (9th Cir. Oct. 31, 2025) ...................................................... 29, 30

*Nat'l Ass'n of Broadcasters v. FCC*,
   39 F.4th 817 (D.C. Cir. 2022) .......................................................................... 20

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ................................................................... 29, 32

*Nguyen v. Scott*,
   796 F. Supp. 3d 703 (W.D. Wash. 2025) ........................................................... 3

*Nw. Res. Info. Ctr., Inc. v. Nw. Power & Conservation Council*,
   730 F.3d 1008 (9th Cir. 2013) .......................................................................... 13

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ....................................................................... 17, 19

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*,
   122 F.4th 825 (9th Cir. 2024) .......................................................................... 15

*Pollinator Stewardship Council v. EPA*,
   806 F.3d 520 (9th Cir. 2015) ........................................................................... 30

*Rice v. Sante Fe Elevator Corp.*,
   331 U.S. 218 (1947) .......................................................................................... 15

*Thomas v. Anchorage Equal Rights Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) .......................................................................... 15

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ................................................................................ 29, 34

*Twitter, Inc. v. Paxton*,
   56 F.4th 1170 (9th Cir. 2022) .......................................................................... 13

*Ukiah Valley Med. Ctr. v. FTC*,
   911 F.2d 261 (9th Cir. 1990) ............................................................................ 18

*Washington v. Dep't of Transp.*,
   No. 2:25-CV-00848-TL, 2026 WL 183584 (W.D. Wash. Jan. 23, 2026) ............... 31

*Washington v. FDA*,
   108 F.4th 1163 (9th Cir. 2024) ........................................................................ 14

*Washington v. Trump*,
   145 F.4th 1013 (9th Cir. 2025) ........................................................................ 35

## Constitutional Provisions

U.S. Const. art. II, § 1, cl. 1 ................................................................................ 9

## Statutes

28 U.S.C. § 2201 ................................................................................................. 30

42 U.S.C. § 1320a-7(b) ....................................................................................... 12

42 U.S.C. § 1395 ................................................................................................. 19

42 U.S.C. § 1395hh ............................................................................................. 22

5 U.S.C. § 404 ..................................................................................................... 12

5 U.S.C. § 703 ..................................................................................................... 32

## Regulations

42 C.F.R. § 1001.2 ............................................................................................. 25

42 C.F.R. § 1001.2001 ....................................................................................... 12

42 C.F.R. § 1001.2002 .................................................................................. 12, 15

42 C.F.R. § 1001.701 .................................................................................... 12, 16

## Other Authorities

11A Wright & Miller's Federal Practice & Procedure § 2944 (3d. ed. 1995) .............................. 32

Becca Most, *Tacoma children's hospital closes gender-affirming care clinic*, The News Tribune
   (Jan. 27, 2026) ................................................................................................ 6

*Children's Bureau: Child Welfare Outcomes Report Data, Child Population Data*, U.S. Dep't of
   Health & Hum. Servs. ..................................................................................... 7

Children's Minnesota, Gender Health .................................................................. 5

Page v - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Elise Takahama, *Mary Bridge leaders cite 2 federal threats behind gender clinic closure*, The Spokesman-Review (Feb. 4, 2026) ........................................................................ 6, 14

HHS Rapid Response (@HHSResponse), X (Dec. 18, 2025, at 8:35 am), ........................... 18, 20

HHS Rapid Response (@HHSResponse), X (Jan 18, 2026, at 10:00 am), .................. 5, 14, 18 20

Joe Schulz, *Children's Wisconsin, UW Health stop providing gender-affirming treatments for minors*, Wisconsin Public Radio (Jan. 13, 2026), ........................................................................ 6

Joseph Goldstein, *Manhattan Hospital Ends Medical Treatment for Transgender Youth*, N.Y. Times (Feb. 23, 2026), ........................................................................ 6

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Feb. 3, 2026, at 7:24 pm), ................................................. 4, 5, 11, 14, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Feb. 4, 2026, at 2:48 pm) ........................................................................ 5, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Dec. 26, 2025, at 3:29 pm) ........................................................................ 2, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Dec. 30, 2025, at 1:08 pm) ........................................................................ 2, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Feb. 11, 2026, at 10:16 am), ........................................................................ 3, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Feb. 3, 2026, at 3:25 pm), ........................................................................ 3, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Feb. 3, 2026, at 7:46 pm) ........................................................................ 11, 15, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Jan. 15, 2026, at 3:40 pm) ........................................................................ 3, 11, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Jan. 5, 2026, at 3:35 pm) ........................................................................ 2, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Jan. 9, 2026, at 1:46 pm) ........................................................................ 3, 4, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X, (Jan. 25, 2026, at 5:37 am) ........................................................................ 4, 14, 18, 20

Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X, (Jan. 31, 2026 at 1:29 pm), ........................................................................ 11, 14, 18, 20

*October 2025 Medicaid & CHIP Enrollment Data Highlights*, Medicaid.gov, ........................... 7

Press Release, U.S. Department of Health and Human Services, HHS Acts to Bar Hospitals from Performing Sex-Rejecting Procedures on Children (Dec. 18, 2025) .............. 20

Supersede, *Black's Law Dictionary* (12th ed. 2024) ........................................................................ 10

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Theresa Gaffney, *Amid federal pressure, more hospitals stop gender-affirming care for minors*, STAT News (Feb. 5 2026) ........................................................................ 6

Tony Gorman, *Youth gender affirming case suspended at Children's Hospital Colorado and Denver Health*, Colorado Public Radio (Jan. 2, 2026) ............................................ 6

U.S. Dep't of Health & Hum. Servs. Off. of the Inspector Gen., Special Advisory Bulletin on the Effect of Exclusion from Participation in Federal Health Care Programs (May 8, 2013) ............................................................................................ 16

U.S. Department of Health and Human Services, *Protecting Children* (YouTube, Dec. 18, 2025) ................................................................................................ 20

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## MEMORANDUM OF LAW

## I.    INTRODUCTION

Defendants seek to have it both ways—on the one hand wielding the Kennedy Declaration to terrorize providers into terminating the provision of transgender health care, and boasting when it has its intended effect—and on the other, insisting before this Court that it has no effect because it's just the opinion of one man who happens to disagree with that care. To agree with Defendants' litigation position, though, this Court would have to ignore that the one man is the Secretary of Health and Human Services, the "opinion" purports to set a national standard of care that by rule would supersede all other established standards of care, and the threatened consequence for ignoring the "opinion"—provider exclusion from Medicare and Medicaid—poses serious harms to States' provider networks. And this Court also would have to overlook the fact that the Secretary calls the Declaration a "clear directive" and that HHS has referred at least 17 hospitals and health centers for potential exclusion for violating that "opinion" and vowed that it won't stop "fighting" until "every single hospital system stops" providing transgender health care to youth.

While Plaintiff States would prefer the Declaration be the mere opinion of one man so they did not have to sue over it, it just isn't the case. The text of the Declaration, the legal consequences it spells out, and HHS's statements everywhere but in their legal brief force the Plaintiff States to seek relief. And this relief is desperately needed, notwithstanding Defendants' post hoc representations in litigation, as providers are being intimidated into stopping care at an alarming clip. Relief is also warranted; Defendants hardly defend the legality of the Declaration.

On jurisdiction, this case is ripe and the Kennedy Declaration is final agency action. Defendants have plainly exploited the Declaration to intimidate providers, including some of the leading children's hospitals in the nation, by publicly referring major hospitals and health centers to HHS-OIG for exclusion from Medicare and Medicaid solely because they provide—as a tiny fraction of the services they offer—transgender health care in contravention of the Declaration. Unsurprisingly, many institutions have taken Defendants at their word and complied with the

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Declaration's unequivocal command, causing harm to Plaintiff States' Medicaid provider networks and their authority to regulate the practice of medicine.

On the merits, Plaintiff States are entitled to summary judgment on their claims. Defendants ignore the plain text of the Declaration, which announces that it is setting a standard of care that supersedes established, professionally recognized standards of care in the Plaintiff States and purports to set a new substantive legal standard that could be used to categorically exclude providers for violating it. This goes well beyond a general statement of policy and thus would require notice and comment. Defendants point to no statutory authority to justify the Declaration, let alone the kind of unequivocal delegation of authority that would be necessary to intrude on the regulation of the practice of medicine. Defendants likewise offer no serious rebuttal to arguments that the Declaration violates the Medicaid Act because it violates the terms of States' Medicaid and CHIP plans and would devastate States' abilities to maintain adequate provider networks. On these grounds, this court should grant Plaintiff States' motion for summary judgment.

## II.    ADDITIONAL FACT SUMMARY

Since Plaintiff States filed their motion for summary judgment, HHS has continued referring prominent medical institutions within Plaintiff States to HHS-OIG for potential exclusion from Medicaid and Medicare based on their provision of transgender health care to youth.[1] In each

---

[1] HHS has referred at least 13 hospitals and 4 health centers to HHS-OIG for potential exclusion from Medicaid and Medicare, including: Seattle Children's Hospital, Children's Hospital Colorado, Children's Hospital Minnesota, Children's Hospital of Orange County, UCSF Hyde Hospital, Benioff Children's Hospital, Boston Children's Hospital, Doernbecher Children's Hospital, Lurie Children's Hospital of Chicago, Nemours Children's Hospital, New York University–Langone Health, Children's Hospital of Philadelphia, Johns Hopkins Hospital and Health System, Whitman-Walker Health Center, Callen-Lorde Community Health Center, Los Angeles LGBT Center, and the Institute for Family Health. Declaration of Lauryn K. Fraas (Fraas Decl.), Ex. 1, Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Dec. 26, 2025, at 3:29 pm), https://x.com/HHSGCMikeStuart/status/2004695988242710776; *id.*, Ex. 2, Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Dec. 30, 2025, at 1:08 pm), https://x.com/HHSGCMikeStuart/status/2006110061114851333; *id.*, Ex. 3, Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Jan. 5, 2026, at 3:35 pm), https://x.com/HHSGCMikeStuart/status/2008321502765093348; *id.*, Ex. 4, Mike Stuart, HHS

Page 2 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

case, HHS's General Counsel cited the Kennedy Declaration as the basis for the referrals. For instance, in referring Johns Hopkins Hospital and Health System on February 3, 2026, the HHS General Counsel wrote:[2]

> @SecKennedy's declaration made clear that sex-rejecting procedures for children and adolescents are not safe and not effective. Far from it. Sex-rejecting procedures are incredibly damaging and contrary to acceptable standards of healthcare. @HHSGov, @SecKennedy, and @HHSOGC will continue to take all necessary actions to protect our children from "sea to shining sea." Our children deserve it.

Similarly on January 15, 2026, in referring six prominent children's hospitals for potential exclusion from Medicaid and Medicare, HHS's General Counsel posted:[3]

---

General    Counsel    (@HHSGCMikeStuart),    X    (Jan.    9,    2026,    at    1:46    pm), https://x.com/HHSGCMikeStuart/status/2009743491189674620; *id.*, Ex. 5, Mike Stuart, HHS General    Counsel    (@HHSGCMikeStuart),    X    (Jan.    15,    2026,    at    3:40    pm), https://x.com/HHSGCMikeStuart/status/2011946547005833419; *id.*, Ex. 6, Mike Stuart, HHS General    Counsel    (@HHSGCMikeStuart),    X    (Feb.    3,    2026,    at    3:25    pm), https://x.com/HHSGCMikeStuart/status/2018828343144010025; *id.*, Ex. 7, Mike Stuart, HHS General    Counsel    (@HHSGCMikeStuart),    X    (Feb.    11,    2026,    at    10:16    am), https://x.com/HHSGCMikeStuart/status/2021649628639240524; *see also* ECF 32 at 18-19 & nn.6-7 (discussing initial three referrals). This Court may take judicial notice of statements made by government officials on social media and to the press. *See Nguyen v. Scott*, 796 F. Supp. 3d 703, 733 (W.D. Wash. 2025) (taking judicial notice of social media statements and videos); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 n.4, n.6, n.7 (N.D. Cal. 2017) (taking judicial notice of press conference and interview statements).

[2] Fraas Decl., Ex. 6.

[3] Fraas Decl., Ex. 5; *see also id.*, Ex. 7 (social media post referring additional medical institutions and explaining that "@SecKennedy, @HHSGov, and legitimate medical professionals from across the nation have been exceedingly clear" that "[s]ex-rejecting procedures are not acceptable forms of healthcare" and that "@HHSGov, @SecKennedy, and @HHSOGC will continue to take all necessary actions to protect our children from life-altering, damaging and fake healthcare treatments").

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000



And on January 9, 2026, in referring three California hospitals, HHS's General Counsel explained that he was referring the hospitals for "full investigation" because the hospitals "continue to operate outside recognized standards of health care and entirely outside @SecKennedy's easy to understand declaration that sex-rejecting procedure for children and adolescents are not safe nor effective."[4]

HHS has also been clear in the goal of the referrals: to end transgender health care for adolescents, writing on January 5, 2026:



Indeed, HHS has celebrated the federal pressure currently being exerted on medical institutions to stop providing this care.[5]

---

[4] Fraas Decl., Ex. 4.
[5] Fraas Decl., Ex. 8, Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Feb. 3, 2026, at 7:24 pm), https://x.com/HHSGCMikeStuart/status/2018888249104531523; *see also id.*, Ex. 11, Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X, (Jan. 25, 2026, at 5:37 am), https://x.com/HHSGCMikeStuart/status/2015418646450090475?s=20.

Page 4 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT



This federal pressure campaign has been effective. According to HHS, "dozens" of hospital systems across the country have stopped providing gender affirming care to young people "over the past few weeks."[6] These hospitals include three institutions that were referred to HHS-OIG for potential exclusion,[7] as well as institutions that fear referral to HHS-OIG or other retribution from the federal government based on the provision of transgender health care to youth, including

---

[6] Fraas Decl., Ex. 10, Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Feb. 4, 2026, at 2:48 pm), https://x.com/HHSGCMikeStuart/status/2019181341158277378; *see also id.*, Ex. 8.

[7] *See* ECF 59-6 (Children's Hospital Colorado, explaining in a press statement that it decided to suspend care "due to the threatened impact of the HHS investigation and the overall declaration"); Fraas Decl., Ex. 18, Joseph Goldstein, *Manhattan Hospital Ends Medical Treatment for Transgender Youth*, N.Y. Times (Feb. 17, 2026), https://www.nytimes.com/2026/02/17/nyregion/nyu-hospital-transgender-youth.html (NYU Langone stopping care, citing "the current regulatory environment" after being referred for possible exclusion); Fraas Decl., Ex. 20, Children's Minnesota, Gender Health, https://www.childrensmn.org/services/care-specialties-departments/gender-health/ (Children's Minnesota, explaining that it was pausing care due to "an increase in federal actions").

Page 5 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Children's Hospital Wisconsin, Denver Health in Colorado, and Mary Bridge Children's Hospital in Washington.[8] As reflected in the statements of these institutions, they are unwilling to continue providing this care to minors amid the federal government's escalating threats. Looming large among these threats is the Kennedy Declaration, which poses an existential threat to institutions and individual providers of medically necessary health care for transgender minors because of the harsh consequences that flow from exclusion from federal programs.[9]

Excluding the referred pediatric hospitals from Medicaid would devastate pediatric health care delivery in many of the Plaintiff States. These hospitals provide critical pediatric services to multi-state regions and often serve as safety-net providers, supplying pediatric care to huge swaths

---

[8] Fraas Decl., Ex. 21, Joe Schulz, *Children's Wisconsin, UW Health stop providing gender-affirming treatments for minors*, Wisconsin Public Radio (Jan. 13, 2026), https://www.wpr.org/news/childrens-wisconsin-uw-health-stop-providing-gender-affirming-treatments-minors; *id.*, Ex. 19, Tony Gorman, *Youth gender affirming case suspended at Children's Hospital Colorado and Denver Health*, Colorado Public Radio (Jan. 2, 2026), https://www.cpr.org/2026/01/02/youth-gender-affirming-care-suspended-childrens-hospital-denver-health/; *id.*, Ex. 22, Becca Most, *Tacoma children's hospital closes gender-affirming care clinic*, The News Tribune (Jan. 27, 2026), https://www.thenewstribune.com/news/local/article314477495.html; *id.*, Ex. 23, Elise Takahama, *Mary Bridge leaders cite 2 federal threats behind gender clinic closure*, The Spokesman-Review (Feb. 4, 2026), https://www.spokesman.com/stories/2026/feb/04/mary-bridge-leaders-cite-2-federal-threats-behind-/; *see also id.*, Ex. 24 Theresa Gaffney, *Amid federal pressure, more hospitals stop gender-affirming care for minors*, STAT News (Feb. 5 2026), https://www.statnews.com/2026/02/05/hospitals-stop-gender-care-minors-trump-administration-pressure (cataloguing the health care institutions that have stopped providing transgender health care to minors since December 2025).

[9] *See, e.g.*, ECF 59-6 (statement by Children's Colorado explaining, "[t]his referral threatens Children's Colorado's Medicare and Medicaid funding, risking care for hundreds of thousands of children"); Fraas Decl., Ex. 22 ("Due to recent escalations at the federal level to eliminate medical interventions to treat gender dysphoria for minors nationwide, as well as investigations and significant penalizations of health care organizations that provide such care, MultiCare Health System has made the difficult choice to close the MultiCare Mary Bridge Children's Gender Health Clinic."); *id.*, Ex. 21 (citing "escalating legal and federal regulatory risk" and "recent federal actions" as the reason two major medical institutions in Wisconsin stopped providing gender affirming care to minors); *id.*, Ex. 19 (explaining that its decision to suspending gender affirming care on January 2, 2026 was "made necessary by the actions of HHS, [which] substantially affect access to critical health services").

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

of low-income children in Plaintiff States.[10] For instance, Medicaid is a major payor to Seattle Children's Hospital—which provides specialized pediatric care (including cancer care, intensive cardiac care, and intensive neonatal care) to the sickest children in a five-state region—and is the *only* hospital in Washington approved to provide pediatric organ transplants. *See* ECF 62 ¶¶ 6, 7, 9, 10. Similarly, Children's Hospital of Colorado, which is the premier children's hospital in Colorado and the Rocky Mountain Region, has the only dedicated Level 1 trauma center in the region, and is the only hospital in Colorado approved to provide pediatric organ transplants. Flores-Brennan Suppl. Decl. ¶¶ 4-5. Boston Children's Hospital serves as the referral center for the sickest children in the New England region, providing specialized care for conditions such as congenital heart disease, childhood cancers, cerebral palsy, epilepsy, spina bifida, and stroke, and provided care to more than 86,500 MassHealth (Medicaid and CHIP) patients in 2025. Marqusee Suppl. Decl. ¶¶ 14, 17-18. Children's Hospital of Philadelphia, which has the largest pediatric oncology research program in the country as well as one of the largest pediatric cardiac centers in North America, is a critical provider of pediatric care in the mid-Atlantic region, and provided care to over 168,500 Medicaid patients in state fiscal year 2025. Kozak Suppl. Decl. ¶¶ 7-9, 17-19. Lurie Children's Hospital of Chicago is a leading pediatric provider in the Midwest region and served nearly 90,000 Medicaid and CHIP patients in state fiscal year 2025. *See* Phelan Suppl. Decl. ¶ 5. And Children's Minnesota, which is one of the largest freestanding pediatric health systems in the country, serves a five-state region, providing both a Level 1 Trauma Center and a Level 1 Children's Surgery Center to the more than 167,000 patients it served in 2024. Connolly Suppl. Decl. ¶¶ 3-4. Exclusion of these prominent entities from Medicaid would leave state health care

---

[10] Nearly half of the approximately 73 million children in the United States are on Medicaid or CHIP. *See* Fraas Decl., Ex. 25, *October 2025 Medicaid & CHIP Enrollment Data Highlights*, Medicaid.gov, https://www.medicaid.gov/medicaid/national-medicaid-chip-program-information/medicaid-chip-enrollment-data/october-2025-medicaid-chip-enrollment-data-highlights (last visited Feb. 24, 2026) (providing Medicaid data); *id.*, Ex. 26, *Children's Bureau: Child Welfare Outcomes Report Data, Child Population Data*, U.S. Dep't of Health & Hum. Servs., https://cwoutcomes.acf.hhs.gov/cwodatasite/population/index/ (last visited Feb. 24, 2026) (providing child population data).

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

authorities scrambling to provide care for millions of incredibly sick children, particularly those requiring specialized cancer treatment, cardiac care and heart surgery, treatment for neurological disorders, as well as organ transplants. *See* ECF 62 ¶ 12 (explaining there would be no way to timely provide specialized care to many medically-complicated Medicaid patients in Washington if Seattle Children's Hospital was excluded); Flores-Brennan Suppl. Decl. ¶ 9 (same for Colorado if Colorado Children's Hospital was excluded); Phelan Suppl. Decl. ¶ 5 (same for Illinois if Lurie Children's Hospital was excluded); Kozak Suppl. Decl. ¶¶ 17, 20-21 (same for Pennsylvania if Children's Hospital of Pennsylvania was excluded); Marqusee Suppl. Decl. ¶¶ 16-18 (same for Massachusetts if Boston Children's Hospital was excluded); Connolly Suppl. Decl. ¶ 8 (same for Minnesota if Children's Minnesota was excluded).

## III.    ARGUMENT

### A.    The Kennedy Declaration Purports to Override Existing Standards of Care, and Defendants' Litigation Position to the Contrary Should be Disregarded

Ignoring both the plain text of the Kennedy Declaration and the fact that the HHS General Counsel has already deployed it against health care providers, Defendants now describe the Declaration as merely a "non-binding policy position" (ECF 73 at 17), "non-binding opinion" (*id.* at 21), and a "non-binding policy view" (*id.* at 23). On this basis, they demur on each and every substantive challenge Plaintiff States bring here.[11] The Kennedy Declaration isn't in excess of his statutory authority, they say, because *anyone*, including the Secretary, can express his opinion. *Id.* at 38. They didn't need to go through notice and comment, they say, because the Kennedy Declaration doesn't set or change any legal standard. *Id.* at 35-36. The Declaration isn't contrary to law, they say, because it is legally irrelevant. *Id.* at 40. And for these same reasons, they say, the Kennedy Declaration isn't even agency action, and the case isn't ripe. *Id.* at 23, 28. But contrary

---

[11] Defendants filed two nearly identical briefs. One is a motion to dismiss or, in the alternative, summary judgment. ECF 73. The other is an opposition to Plaintiff States' motion for summary judgment. ECF 74. This omnibus response and reply will cite to Defendants' motion (ECF 73), but all arguments respond to both of Defendants' filings.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

to Defendants' post-hoc litigation position, the plain language of the Secretary's Declaration purports to establish a standard of care that health care providers must follow or risk exclusion. And because of that basic fact, every argument that Defendants now make in litigation fails.

To begin with, Secretary Kennedy does not state that the Declaration was made in his personal capacity. To the contrary, the Declaration proclaims at the top that it is issued "pursuant to [Secretary Kennedy's] authority and responsibilities under federal law" and includes HHS's seal. Subsequently, section I.D. is labeled "Legal Authority for This Declaration" and it claims it is "issued pursuant to the authority vested in the HHS Secretary." Such language typically refers to distinct grants of regulatory or adjudicatory power that Congress has given to a federal official or agency. *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 779-80 (2025) (holding Congress "vested the Secretary of HHS with" certain powers in statute); *see also* U.S. Const. art. II, § 1, cl. 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."). By contrast, sharing an opinion requires no grant of authority, and the Secretary does not typically open press conferences or op-eds with similar language.

The Declaration also expressly invokes 42 C.F.R. § 1001.2, which Defendants acknowledge "addresses situations in which HHS or a component agency has exercised specific statutory authority to determine that a treatment modality is not safe and effective." ECF 75 ¶ 6. The Declaration uses § 1001.2 to definitively determine that transgender health care is not safe and effective. True, Defendants have now backpedaled and conceded that 42 C.F.R. § 1001.2 *does not* give Secretary Kennedy the unilateral legal authority to set nationwide standards of care. ECF 73 at 39. But the Department of Justice's (DOJ's) representations to this effect in a legal brief cannot retroactively rewrite the Declaration itself. Nor do such representations provide any assurance to providers threatened with exclusion from federal health care programs or prevent HHS-OIG from applying the Declaration in exclusion decisions.

Page 9 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The remainder of the Declaration's language confirms that it purports to change substantive legal standards. For instance, after citing to and quoting from § 1001.2, the Declaration states: "As such" (that is, because it is issued under "authority vested in the HHS Secretary" and "informed by 42 CFR § 1001.2") "this declaration *supersedes* 'Statewide or national standards of care, whether in writing or not, that professional peers of the individual or entity whose provision of care is an issue, recognize as applying to those peers practice or providing care within a State.'" Kennedy Decl. § I.D (emphasis added). On its face, therefore, the Declaration purports to definitively declare that transgender health care is below the standard of care as defined by States or professional organizations, and that this Declaration "supersedes"—that is "annul[s], make[s] void, or repeal[s]"—the otherwise generally applicable definition of "professionally recognized standards of care" in 42 C.F.R. § 1001.2. *See* Supersede, *Black's Law Dictionary* (12th ed. 2024).[12]

Further, contrary to the Response's insistence that the Declaration will be one of the "multiple sources" that HHS-OIG is free to weigh and consult in exclusion proceedings (*see* ECF No. 73 at 2), the Declaration by its terms leaves no room for other, competing evidence about the appropriate standard of care. Notably, at least one court has even denied preliminary relief to maintain the prohibited medical services for transgender patients and their families on grounds that the hospital's fear of triggering exclusion proceedings under the Declaration was legitimate. *See Boe v. Children's Hosp. Colo.*, Case No. 26CV30232, Order at 21 (Dist. Ct. City & Cnty. of

---

[12] Defendants' read of the Declaration also flies in the face of the interpretation of Plaintiff States' witnesses, many of whom have decades of experience in the administration of public health care systems at the state and federal levels. According to them, the Kennedy Declaration "makes clear that the provision of [gender-affirming medical care] is, *per se*, a basis to exclude providers from federal health care programs." ECF 33 ¶¶ 16-23 (Oregon's Medicaid Director); *see also* ECF 39 ¶¶ 10-16 (California); ECF 40 ¶¶ 14-20 (Colorado); ECF 41 ¶¶ 16-24 (Connecticut); ECF 42 ¶¶ 16-24 (Delaware); ECF 45 ¶¶ 14-20 (Hawaiʻi); ECF 46 ¶¶ 23-30 (Illinois); ECF 47 ¶¶ 16-25 (Maine); ECF 48 ¶¶ 15-23 (Maryland); ECF 49 ¶¶ 11-20 (Massachusetts); ECF 50 ¶¶ 10-13 (Michigan); ECF 51 ¶¶ 16-22 (Minnesota); ECF 53 ¶¶ 14-20 (New Jersey); ECF 54 ¶¶ 14-22 (New Mexico); ECF 55 ¶¶ 18-25 (Pennsylvania); ECF 56 ¶¶ 15-21 (Rhode Island); ECF 57 ¶¶ 14-19 (Vermont); ECF 58 ¶¶ 14-20 (Wisconsin). This natural reading of the Kennedy Declaration is also borne out by the multitude of providers who have stopped providing medically necessary transgender health care due to its explicit threat. Fraas Decl., Ex. 7.

Page 10 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Denver Co. Feb. 13, 2026) (unpublished) (hereinafter Fraas Decl., Ex. 30) (denying preliminary injunction where it would require Children's Hospital Colorado to violate the Kennedy Declaration giving rise to "a very real threat of exclusion"). It strains credulity to think that both Plaintiff States—relying on the judgment of their seasoned Medicaid directors—and judges have fundamentally misunderstood the Declaration's import, as DOJ now insists.

Additionally, HHS has publicly treated the Kennedy Declaration as if health care providers were required to comply with it. In public post after public post, HHS's General Counsel has relied on the Declaration to refer hospitals and health centers to HHS-OIG for possible exclusion. *See supra* § II. According to HHS's General Counsel, they were referred because they "fail[ed] to meet professional recognized standards of health care as according to Secretary Kennedy's declaration" (ECF 59-2); (ECF 59-3) (same), "[t]he HHS [Secretary Kennedy] declaration made clear that sex-rejecting procedures for children and adolescents are neither safe nor effective" (ECF 59-4); (ECF 59-5) (same), and because medically necessary transgender health care is "entirely outside [Secretary Kennedy's] declaration" (Fraas Decl., Ex. 5).

Defendants make much of the fact that no notices of intent to exclude nor notices to exclude have been issued in response to these referrals (*see, e.g.*, ECF 73 at 29). The absence of notices of intent to exclude and notices to exclude has nothing to do with whether the Kennedy Declaration purports to create a new legal standard of care, but instead, is the result of a stipulation in this case in which Defendants agreed to refrain from doing so while this motion gets decided. *See* ECF 43. They also ignore the HHS General Counsel's repeated use of the Declaration as a cudgel to bully providers out of offering transgender health care.[13] Defendants also strain to suggest that the Secretary's proclamation will have only the weight that it can bear in any decision HHS-OIG might

---

[13] *See* Fraas Decl., Exs. 8, 11; *id.*, Ex. 9, Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X (Feb. 3, 2026, at 7:46 pm), https://x.com/HHSGCMikeStuart/status/2018893885791940712; *id.*, Ex. 12, Mike Stuart, HHS General Counsel (@HHSGCMikeStuart), X, (Jan. 31, 2026 at 1:29 pm), https://x.com/HHSGCMikeStuart/status/2017711840747516265.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

make regarding those referrals. *See* ECF 73 at 23. But that reading both contradicts the text of the Declaration itself and fails to address that HHS-OIG operates under authority delegated by the Secretary himself, rather than under authority granted independently by Congress. *See id.* at 14 (citing 76 Fed. Reg. 13618-19); 42 U.S.C. § 1320a-7(b) (granting power of exclusion to "[t]he Secretary"); *see also* 5 U.S.C. § 404 (independent "dut[ies] and responsibilit[ies]" of inspectors general do not include conducting exclusion or debarment proceedings).

To be sure, the Declaration does not exclude any specific provider from federal health care programs by its terms. But that is because exclusion requires administrative steps to be accomplished—not because OIG would treat the Declaration as anything other than superseding the Plaintiff States' standards of care in those proceedings.[14] *See* Kennedy Decl. § V (interpreting 42 U.S.C. § 1320a-7(b)(6)(B) to allow the secretary to "exclude individuals or entities . . . if the Secretary determines the individual or entity has furnished or caused to be furnished items or services to patients of a quality which fails to meet professionally recognized standards of health care."). For example, HHS-OIG must individually determine whether a particular provider has provided the prohibited services. But that does not make the Declaration any less final because, as Plaintiff States explained in the moving papers, the only thing left for HHS-OIG to do is to determine as a matter of fact that a provider "[f]urnished, or caused to be furnished, to patients" the prohibited services and begin exclusion proceedings. 42 C.F.R. §§ 1001.701(a)(2), 1001.2001, 1001.2002; *see also* ECF 32 at 22-23.

Defendants' attempt to walk back the clear import of the Kennedy Declaration is nothing more than a post hoc litigation position, transparently taken because the Declaration is indefensible on its face. The Court need give it no credence in assessing the legality of the action. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 22 (2020) (holding justifications for agency action were "impermissible *post hoc* rationalizations"); *Nw. Res. Info. Ctr., Inc. v. Nw.*

---

[14] Plaintiff States addressed this argument in their moving papers, *see* ECF 32 at 22-23, and Defendants' opposition offers no meaningful response.

Page 12 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Power & Conservation Council*, 730 F.3d 1008, 1019 (9th Cir. 2013) (same). Instead, this Court should read the Kennedy Declaration for what it is: a breathtakingly illegal attempt to wrest the regulation of the practice of medicine away from the states and "vest[] [it] in the HHS Secretary." Kennedy Decl. § I.D. And because Defendants make no attempt to defend the terms of the Kennedy Declaration, but instead rely on their mischaracterization to underlie each and every one of their arguments, this issue is dispositive of all others.[15]

**B.    This Case Is Ripe**

The ripeness doctrine has both constitutional and prudential components. Defendants' arguments on both grounds depend entirely on their assertion that the Kennedy Declaration represents only the Secretary's "non-binding opinion." That assertion is baseless, for the reasons stated above. Further, to the extent Defendants argue that the Declaration would become ripe only after HHS-OIG has initiated exclusion proceedings, it is well-established that agency actions are ripe for purely legal challenges, even if enforcement actions have not yet commenced. *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (case was ripe for adjudication where challenged regulation was "made effective upon publication, and the Assistant General Counsel for [the agency] stated in the district court that compliance was expected"); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1435 (9th Cir. 1996) (holding facial challenge to regulations ripe for judicial review); *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009) (finding challenge to policy guidance ripe where enforcement had never moved beyond a voluntary compliance stage).

1.    "The constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022)

---

[15] By relying solely on their argument that the Kennedy Declaration is nothing more than a"public[] articulati[on] [of] views" (*see* ECF 73 at 10), Defendants have waived any argument that if it does purport to establish a standard of care, binding on HHS-OIG in exclusion proceedings, it is within the Secretary's statutory authority and compliant with the law. *See Lykins v. Hohnbaum*, No. CIV. 01-63-JO, 2002 WL 32783973, at *3 (D. Or. Feb. 22, 2002) (holding failure to defend a claim on motion for summary judgment concedes it).

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

(quotation omitted). The Kennedy Declaration causes two concrete and imminent harms to the Plaintiff States' provider networks, one of which is already being felt. First, providers that refuse to comply with the Declaration risk exclusion from Medicaid, which would cause an unprecedented and alarming degree of disruption in the Plaintiff States' Medicaid provider networks, particularly in highly specialized areas like pediatric organ transplant, genetic disorders, and cancers. *See* ECF 62 ¶¶ 6-12; Flores-Brennan Suppl. Decl. ¶¶ 4-9; Kozak Suppl. Decl. ¶¶ 6-21; Phelan Suppl. Decl. ¶¶ 4-6; Marqusee Suppl. Decl. ¶¶ 11-20; Connolly Suppl. Decl. ¶¶ 3-8; Fraas Decl., Ex. 30 at 12. Providers that comply with the Declaration remove themselves from the network of practitioners available to deliver medically necessary transgender health care to State Medicaid clients, harming the Plaintiff States' proprietary interest in providing this care as a part of their Medicaid programs. *See*, *e.g.*, ECF 33 ¶¶ 20-23. A number of providers in the Plaintiff States have already sought to insulate themselves from the risk of exclusion by complying with the Declaration's command and ceasing provision of transgender health care to minors, a fact that Defendants trumpet at every opportunity. *See*, *e.g.*, ECF 59-6; Fraas Decl., Exs. 8, 11, 12, 17, 23. Defendants cannot claim credit for the Declaration having its intended effects while simultaneously asserting in this lawsuit that it is merely symbolic. The Declaration harms the Plaintiff States' Medicaid agencies in "the performance of [their] public function;" the Plaintiff States have Article III standing to challenge it. *See Biden v. Nebraska*, 600 U.S. 477, 494 (2023).

The Declaration also injures Plaintiff States' sovereign interest in the regulation of the practice of medicine. Medically necessary transgender health care is legal in each of the Plaintiff States and well within the standards of care under state law, yet the Kennedy Declaration says it "supersedes" Plaintiff States' standards. Kennedy Decl. § I.D. This impairs the Plaintiff States' interest in "the exercise of sovereign power over individuals and entities." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). "States have standing to vindicate their authority as sovereign entities with a governing prerogative that is separate from the federal government." *Washington v. FDA*, 108 F.4th 1163, 1176 (9th Cir. 2024). This is especially potent

Page 14 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

where regulation of the practice of medicine is concerned, which "is primarily, and historically, a matter of local concern." *Hillsborough Cnty., Fla. v. Auto. Med. Labs., Inc.*, 471 U.S. 707, 715 (1985) (citing *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218 (1947)); *see also Dent v. West Virginia*, 129 U.S. 114, 122 (1889) (recognizing the state's powers to regulate medical professions from "time immemorial").

      2.     Plaintiff States' challenge is also prudentially ripe. Under the doctrine of prudential ripeness, the Court considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc). Plaintiff States seek summary judgment arguing that the Kennedy Declaration exceeds the Secretary's statutory authority, was issued without required notice and comment procedures, and is contrary to law. *See generally* ECF 32. As a general matter, purely legal challenges such as these are "more likely to be ripe." *Freedom to Travel Campaign*, 82 F.3d at 1434; *see also Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 840 (9th Cir. 2024). These purely legal challenges are ripe because they do not depend on any facts that could be developed in any specific exclusion proceeding brought against a particular hospital or doctor. Further, withholding judgment would subject Plaintiff States to serious hardship. Plaintiff States' Medicaid programs and sovereign interests are being impaired *right now*. As HHS itself recognizes "[a]lmost daily, another major hospital system is ending" the provision of transgender health care to minors, making it more difficult for the Plaintiff States to maintain adequate provider networks for this care.[16]

      Defendants rely on the administrative remedies available to excluded providers to save them from the Declaration's immediate effect. *See* ECF 73 at 26. But those remedies confirm that withholding a judgment from the Plaintiff States is untenable. Under HHS's regulations, excluded providers do not have a right to a hearing before an ALJ before a notice of exclusion becomes effective. 42 C.F.R. § 1001.2002(b); *see also Erickson v. U.S. ex rel. Dep't of Health & Hum.*

---

[16] Fraas Decl., Ex. 9.

Page 15 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Servs.*, 67 F.3d 858, 864 (9th Cir. 1995) (holding health care providers not entitled to pre-deprivation hearing to contest exclusion). Exclusions have a presumptive term of three years, and "[i]n no case may the period be shorter than 1 year." 42 C.F.R. § 1001.701(d)(1).

Moreover, exclusion is a harsh penalty that bars a provider from practicing medicine in any context where they might be, even tangentially, involved in the provision of care to a person covered by Medicare or Medicaid. *See* U.S. Dep't of Health & Hum. Servs. Off. of the Inspector Gen., Special Advisory Bulletin on the Effect of Exclusion from Participation in Federal Health Care Programs at 6-7 (May 8, 2013) (hereinafter Fraas Decl., Ex. 29). A hospital excluded from federal health care programs would have to close its doors. *See* ECF 34 ¶ 18 ("I am not aware of any hospital, for example, that could stay in business without participating in Medicaid and Medicare."). Exclusion also has "significant collateral consequences" for providers, such as being placed on a publicly available list of excluded providers, which creates significant "barriers when seeking malpractice insurance, admissions to hospitals, and maintaining the practice of medicine," even if patients are limited to the privately insured. ECF 35 ¶ 34; *see also* Fraas Decl., Ex. 30 at 11 (declaration of hospital's chief of medicine, stating that "[a]ll commercial insurance companies require that the hospital meet conditions of participation in order to be qualified for contracts and to bill for services."). The consequences are so severe that "exclusion from participation in federal health care programs, like those threatened by the Kennedy Declaration, constitutes a de facto bar on the practice of medicine." ECF 34 ¶ 19.

Defendants demand that Plaintiff States wait for these exclusion proceedings to run their course disregards the degree of this threat, which has already coerced providers to cease providing medically necessary transgender health care to adolescents, and ignores the ongoing injury both to Plaintiff States' Medicaid provider networks to provide this care and to their sovereign interest in the regulation of the practice of medicine. Defendants also completely fail to explain why the pure questions of law presented in this case require further factual development and cannot be decided

Page 16 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

on this record. There is no serious dispute that this case is ripe, and this Court should adjudicate the merits of Plaintiff States' summary judgment motion.

## C.    The Kennedy Declaration Is Final Agency Action

Defendants' response to Plaintiff States' argument that the Kennedy Declaration is final agency action is that, in their view, the Declaration is merely an opinion that "does not establish the standard of care," and a separate administrative process is required to exclude a provider. ECF 73 at 27-29; *but see* ECF 32 at 19-23. The Kennedy Declaration purports to do more than merely express the Secretary's opinion, for the reasons stated above. *Supra* § III.A. And the Kennedy Declaration is undoubtedly final agency action.

Finality has two prongs: the consummation of an agency's decisionmaking process and legal effect. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). The "core question" in determining finality is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005)). In making that determination, the Ninth Circuit examines "whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party, or if immediate compliance with the terms is expected." *Id.* (citation modified) (quoting *Indus. Customers of Nw Utilities*, 408 F.3d at 646).

The Declaration is a definitive statement of the agency's position because, as argued above, the Declaration's plain language shows that it purports to "supersede" all contrary standards of care. *Supra* § III.A. This Court should thus reject Defendants' arguments that the Declaration is merely an opinion that does not establish a standard of care. *See* ECF 73 at 27-29. Moreover, far from being a "merely tentative" indication of likely future action, the Declaration purports to have examined evidence, considered the issues, and reached a final decision on the safety and effectiveness of medically necessary transgender health care for adolescents. *Or. Nat. Desert Ass'n*,

Page 17 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

465 F.3d at 984. Specifically, the Secretary relies on the alleged "comprehensive evidence review published by [HHS], documented risks of significant harm, markedly weak evidence of benefit, unfavorable risk-benefit profiles, inadequate existing clinical guidelines, growing international consensus among countries conducting rigorous evidence reviews, and applicable medical ethics principles." Kennedy Decl. § I.A. Based on the Secretary's alleged consideration of those things, the Kennedy Declaration purports to establish a binding standard of care by declaring an entire treatment modality "not to be safe and effective." Kennedy Decl. §§ I.D., V. Last, nothing in the Kennedy Declaration indicates that Defendants intended the Declaration to be "tentative" or "interlocutory." *Or. Nat. Desert Ass'n*, 465 F.3d at 984. The Declaration contains no conditional, qualified, or equivocal language. Instead, on its face, it purports to constitute a final and definitive statement about the professional standard of care, that is, HHS's "last word on the matter[.]" *Id.*

The Declaration also has a legal effect. In determining the "legal effect" of agency action, courts look to "whether the [action] has the status of law or comparable legal force, and whether immediate compliance with its terms is expected." *Id.* at 987 (quoting *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261 (9th Cir. 1990)). As argued above, that test is obviously met here, because the Kennedy Declaration purports to render the exclusion of a provider a foregone conclusion—if a provider provides medically necessary transgender health care to minors, they have provided care that falls below the professional standard of care, a determination that HHS-OIG has no discretion to dispute. *Supra* § III.A. Because the Kennedy Declaration predetermines the result of an exclusion proceeding, it is final agency action. Critically, HHS's actions after it issued the Kennedy Declaration demonstrate that it expected hospitals and providers to immediately comply with the Kennedy Declaration's determination that the prohibited medical services fall below the standard of care. *See supra* § II (collecting social media posts of the HHS General Counsel); Fraas Decl., Exs. 1-16; *id.*, Ex. 17, HHS Rapid Response (@HHSResponse), X (Jan 18, 2026, at 10:00 am), https://x.com/HHSResponse/status/2012948103117017172. Thus, the Kennedy Declaration was

intended to—and did—have an immediate legal effect and constitutes final agency action. *See Or. Nat. Desert Ass'n*, 465 F.3d at 982.

**D.    The Kennedy Declaration Exceeds the Secretary's Statutory Authority**

Because Defendants do not identify any statute permitting the challenged Declaration, summary judgment for Plaintiff States is warranted. Additionally, Defendants make no substantive response to Plaintiff States' arguments that States have primacy over the regulation of medicine unless unmistakably overridden by Congress; Congress did not delegate to the Secretary of HHS the authority to exercise control over the practice of medicine; and Congress went out of its way to state that no provision of the Social Security Act should be construed as authorizing the Secretary to exercise such control, *see* 42 U.S.C. § 1395. ECF 32 at 23-29. Defendants also fail to respond to, and thus concede, that the Declaration exceeds 42 U.S.C. §§ 1320a-7 and 1320c-5 because those statutes deal with the quality of health care services, rather than the category of care provided, and thus do not permit exclusion based solely on the provision of medically necessary transgender health care. ECF 32 at 28-31. These failures justify summary judgment for the Plaintiff States, for the reasons explained in their motion for summary judgment. *See id.* at 23-31.

Instead of making any substantive response to the Plaintiff States' motion, Defendants try to avoid the conclusion that Secretary Kennedy *used* (much less exceeded) his statutory authority in issuing the Declaration. Defendants again ask the Court to treat the Declaration like an op-ed criticizing gender-affirming care penned by an everyday citizen or a position statement from a professional organization. *See* ECF 73 at 38 ("The Secretary, just like anyone else, has the right to share his non-binding opinion on the safety and efficacy[.]"). "But this wolf comes as a wolf[,]" *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting), and, for substantially the same reasons as argued above (*supra* § III.A), this Court should reject Defendants' argument.

As described above, the face of the Declaration alone shows that Defendants do not regard the Declaration as a mere opinion. *See supra* III.A. The Court should take Secretary Kennedy at his word—that "this Declaration is a *clear directive* to providers to follow the science and the

Page 19 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

overwhelming body of evidence that these procedures hurt—not help—children."[17] Indeed, Defendants apparently tout the Declaration as authoritative in every setting but before this Court. For example, HHS's news release on the Declaration ran under the headline that HHS would bar hospitals from providing gender-affirming care, and announced, "Under the declaration, practitioners who perform sex-rejecting procedures on minors would be deemed out of compliance with those standards."[18]

Defendants also make the extraordinary argument that because the Declaration itself does not cite *any* specific statutory authority that could empower the Secretary to issue a dispositive declaration under 42 C.F.R. § 1001.2, *see* ECF 75 ¶¶ 6-7, the Declaration is lawful. But that argument gets it precisely backwards. *Cf. Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024) ("The Department may not justify the Rule by stating that the Higher Education Act does not foreclose the Department's approach."), *cert. granted in part sub nom. Dep't of Educ. v. Career Colls. & Schs. of Tex.*, 145 S. Ct. 1039 (2025), *and cert. dismissed*, 146 S. Ct. 59 (2025). Under DOJ's theory, all agency action, including agency action that cites no authority, would be presumed lawful unless the agency made the mistake of affirmatively citing *incorrect* legal authority. Instead, because agencies are creatures of statute an agency "must identify statutory authority for any action it takes," *Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022), and that the "agency's burden is to establish that its governing statute *enables* its regulations," *Career Colleges & Schs. of Tex.*, 98 F.4th at 254. Where the regulation of the practice of medicine is concerned, this is doubly true. *See Gonzales v. Oregon*, 546 U.S.

---

[17] U.S. Department of Health and Human Services, *Protecting Children*, at 3:50-4:30 (YouTube, Dec. 18, 2025), https://www.youtube.com/watch?v=aY1XfN6Tt0Q (emphasis added) (attached as Fraas Decl., Ex. 27); *see also* Fraas Decl., Ex. 13, HHS Rapid Response (@HHSResponse), X (Dec. 18, 2025, at 8:35 am), https://x.com/HHSResponse/status/2001692812534788190 (social media post reflecting the same).

[18] Press Release, U.S. Department of Health and Human Services, HHS Acts to Bar Hospitals from Performing Sex-Rejecting Procedures on Children (Dec. 18, 2025), available at https://www.hhs.gov/press-room/hhs-acts-bar-hospitals-performing-sex-rejecting-procedures-children.html (attached as Fraas Decl., Ex. 28); *see also* Fraas Decl., Exs. 1-17.

Page 20 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

243, 274-75 (2006) ("background principles of our federal system [] belie the notion that Congress would use [] an obscure grant of authority to regulate areas traditionally supervised by the States' police power" like the practice of medicine). Defendants' concession that the Kennedy Declaration is untethered to any statutory authority is an independent basis to award summary judgment to Plaintiff States.

The Court should grant summary judgment to Plaintiff States because it is uncontested that Secretary Kennedy's Declaration exceeded his statutory authority. No statute grants Secretary Kennedy authority to unilaterally declare that a treatment modality is not safe and effective and use that declaration as the basis for exclusion from federal health care programs.

### E.    The Kennedy Declaration Violates Notice and Comment Requirements

#### 1.    The Medicare Act requires notice and comment

Defendants argue that the Kennedy Declaration is exempt from Medicare notice and comment rulemaking requirements because it "does not 'establish' or 'change' the 'substantive legal standard.'" ECF 73 at 34-35. To make this argument, Defendants again rest on the assertion that the Kennedy Declaration is a "non-binding statement that merely articulates the Secretary's policy view [that] cannot establish or change a substantive legal standard." ECF 73 at 36. But they ignore the plain language of the Declaration and its unambiguous attempt to establish a substantive legal standard to exclude providers from Medicare. *See supra* § III.A.

Even assuming Defendants correctly characterize the Declaration (they do not), its issuance would still have violated notice and comment requirements. Defendants are correct that Medicare's notice and comment requirements are not coextensive with the Administrative Procedure Act's (APA's)—Medicare's are, in fact, far broader. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 573-79 (2019) (recognizing the Medicare Act requires notice and comment for interpretive rules and statements of policy that would not be required under the APA). Under the Medicare Act, an agency is required to conduct notice-and-comment rulemaking when promulgating any "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing

Page 21 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

. . . the payment for services" or "the eligibility of individuals, entities, or organizations to furnish

. . . services." 42 U.S.C. § 1395hh(a)(2). Here, the Declaration clearly establishes eligibility criteria

to "furnish . . . services." *See id.* Thus, even accepting Defendants' characterization of the Kennedy

Declaration as a mere statement of policy, Medicare's rulemaking requirements still apply.

Defendants attempt to avoid Medicare's rulemaking requirements by claiming the Kennedy

Declaration does not establish or change a substantive legal standard. Defendants argue that prior

to the Declaration, "individuals and entities were already subject to OIG's permissive authority to

exclude them from federal healthcare programs if they furnished care falling below 'professionally

recognized standards,'" and that "in the absence of the Declaration, individuals and entities would

still be subject to OIG's permissive authority to exclude them from [federal health care programs]

if they furnish care falling below 'professionally recognized standards.'" ECF 73 at 35. This

argument fails because the Declaration purports to establish a treatment modality which, as a legal

matter, HHS-OIG may (indeed, must) exclude providers for furnishing. The Kennedy

Declaration's statement that gender-affirming medical treatments are "neither safe nor effective"

for adolescents, and that providers of this care "will be deemed not to meet professionally

recognized standards of health care" (Kennedy Decl. §§ I.D, V) unambiguously declares a legal

standard. *See Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) (Kavanaugh, J.)

(holding HHS action changed "a substantive legal standard" applying to Medicare providers

because it "affect[ed] a hospital's right to payment"). As thoroughly shown above, the Kennedy

Declaration declares that it establishes a standard of care, superseding all others. *See supra* § III.A.

In arguing to the contrary, Defendants rely primarily on *Agendia, Inc. v. Becerra*, 4 F.4th

896, 900 (9th Cir. 2021), *cert denied*, 142 S. Ct. 898 (2022). But that reliance is misplaced. In

*Agendia*, the Ninth Circuit concluded that Medicare administrative contractors ("MACs") could

make so-called "local coverage determinations," *i.e.*, determinations about whether Medicare

would pay for the services in a particular geographic area, without going through notice-and-

comment rulemaking. In explaining why local coverage determinations did not establish or change

Page 22 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

a substantive legal standard, the court explained that a local coverage determination "governs only the issuing MAC's claims adjudications" and "is not binding at the higher levels of administrative review conducted by the qualified independent contractor, an ALJ, or the [Medicare Appeals] Council." *Id.* at 898. Here, by contrast, the Kennedy Declaration purports to apply nationwide *and* in higher levels of administrative review. *See supra* § III.A. In *Agendia*, moreover, the statute itself created a special notice-and-comment process just for national coverage determinations that was less imposing than for the broader Medicare rulemaking process. 4 F.4th 896, 901-02. Accordingly, the Ninth Circuit reasoned that Congress excluding national coverage determinations from Medicare rulemaking under § 1395hh and creating a separate, less burdensome notice-and-comment process was evidence that it did not intend local coverage determinations to be subject to the ordinary Medicare rulemaking requirements. *Id.* at 900. There is no comparative statutory scheme here, where the Kennedy Declaration seeks to subject providers of medically necessary transgender health care to adolescents to exclusion without any legal authority whatsoever.

2.    **The APA requires notice and comment**

Defendants contend that the Kennedy Declaration is likewise not subject to the APA's rulemaking requirements because it falls within the "general statement of policy exception," which applies to "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." ECF 73 at 30 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993)). Defendants assert that the Kennedy Declaration falls under this exception because it "operate[s] only prospectively," "does not evaluate past conduct, make findings about any specific entity or provider, apply facts to a regulatory standard, or trigger any enforcement consequences." ECF 73 at 31-32.

But whether a federal agency's directive is subject to APA notice-and-comment requirements does not depend on whether the directive is prospective, nor if it concerns future exercise of the agency's discretionary power. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987). Indeed, nearly all federal rulemakings operate prospectively. Rather,

Page 23 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

> "[t]he critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged directive leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the announced policy in an individual case."

*Id.* (citation modified). Only when a directive merely provides officials with guidance "while preserving their flexibility and their opportunity to make 'individualized determination[s],' [does] it constitute[] a general statement of policy" exempt from APA notice-and-comment requirements. *Id.*

Here, the Kennedy Declaration's mandatory language is a "powerful indication" that it purports to create a substantive legal standard, and is not merely guidance that leaves the discretion of agency officials intact. *See Alaska v. Dep't of Transp.*, 868 F.2d 441, 446 (D.C. Cir. 1989) (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987)). As discussed in Plaintiff States' motion for summary judgment, courts have repeatedly found rules that have such an effect are legislative rules subject to notice-and-comment requirements. *See* ECF 32 at 36; *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1084, 1088 (9th Cir. 2003) (DEA rule banning sale of particular hemp products was legislative because "the rule would force plaintiffs either to risk sanction or to forego the theretofore legal activity"); *Am. Mining Cong. v. Mine Safety & Health Admin*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (a rule is legislative when "in the absence of the rule there would not be an adequate legislative basis for enforcement action . . ."); *Alaska*, 868 F.2d at 445-47 (concluding that purported agency policy statement was a legislative rule, in part, because of binding nature of rule—which purported to "set forth bright-line tests to shape and channel agency enforcement"—and its impact on downstream agency discretion).

Defendants' claim that the Kennedy Declaration does not "establish a binding norm" or is not "finally determinative of the issues or rights it addresses" (ECF 73 at 32) ignores the plain language of the Declaration. Nothing in the text of the Declaration supports Defendants' claim that "OIG is 'free to exercise discretion to follow, or not to follow, the announced policy in an individual case.'" *See* ECF 73 at 32. Rather, the Declaration predetermines that a provider will be

Page 24 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

deemed to fall below the standards of care if they offer transgender health care to minors. Kennedy Decl. § V. And while the OIG ordinarily may consider various factors in determining whether a provider has failed to meet the professionally recognized standards of care, the Kennedy Declaration, by its terms, "supersedes" those factors. Kennedy Decl. § I.D.

Defendants also cannot accurately characterize the Kennedy Declaration as just a general statement of policy by arguing that "[b]efore the Declaration was issued, Congress had already empowered OIG to exclude providers for furnishing services that fail to meet professionally recognized standards of care." ECF 73 at 32. This argument ignores the nature of the Kennedy Declaration as compared to other sources of "professionally recognized standards of care." Without the Kennedy Declaration, OIG would have to consider exclusion for failure to meet professionally recognized standards of care by examining "Statewide or national standards of care, whether in writing or not, that professional peers of the individual or entity whose provision of care is at issue, recognize as applying to those peers practicing or providing care within a State." 42 C.F.R. § 1001.2. That is wholly different in nature from the Secretary of HHS declaring that gender-affirming medical care is categorically grounds for exclusion. And that is borne out by the fact that OIG has never excluded a provider for provision of gender-affirming medical care, or for provision of a specific type of care in general. *See* ECF 59-1. Prior to the Kennedy Declaration, neither CMS nor OIG had made a determination that these services warrant exclusion or that they fail to meet the requirements for reimbursement. Rather, CMS's historical reimbursement of this care is indicative that CMS previously considered that this care met the professionally recognized standards of care. The Kennedy Declaration is a stark departure from that practice.

## F.    The Kennedy Declaration Is Contrary to the Medicaid Act

Defendants also do not meaningfully respond to Plaintiff States' claims that the Kennedy Declaration violates the Medicaid Act. Because Defendants' failure to contest this issue renders it undisputed, summary judgment for the States on this point is appropriate.

Page 25 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1.      **The Kennedy Declaration is contrary to the federally approved Medicaid and Children's Health Insurance Program (CHIP) plans of the Plaintiff States**

Rather than responding to Plaintiff States' arguments that the Kennedy Declaration violates the terms of federally approved state Medicaid and CHIP plans that provide for transgender health care, *see* ECF 32 at 40-42, Defendants simply dance around the issue, arguing that "Plaintiffs' claim rests on a misunderstanding of the purpose and effect of the Kennedy Declaration." ECF 73 at 40-41. Not so. *See supra* § III.A. Instead, recognizing the very real purpose and impact of the Kennedy Declaration, Plaintiff States find themselves with no way to reconcile their Medicaid and CHIP plans, which provide coverage for gender-affirming care, with the Kennedy Declaration's newfound determination that providers of such care are now subject to exclusion from federal health care programs for providing such care. By unilaterally declaring that these covered services in Plaintiff States no longer meet professionally recognized standards, the Kennedy Declaration is contrary to the federally approved Medicaid and CHIP plans of the Plaintiff States.

2.      **The Kennedy Declaration is contrary to the Medicaid Act's free choice of provider requirement**

Defendants' sole argument that the Kennedy Declaration is not contrary to the Medicaid Act's free choice of provider provision relies on a misreading of *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025). But *Medina* does not control here and instead supports Plaintiff States' position. *Medina* involved whether Medicaid beneficiaries could bring a class action against state officials under 42 U.S.C. § 1983 for their purported failure to comply with the free choice of provider provision, 42 U.S.C. § 1396a(a)(23)(A), by not allowing Planned Parenthood to participate in the State's Medicaid program. *Id.* Here, Plaintiff States are not private individuals asking the court to recognize an implied private right of action against state officials to enforce federal law. Instead, plaintiffs are States suing the federal government under the Administrative Procedure Act (APA)—a statute that expressly provides a cause of action—to enforce their rights under federal law. *See* ECF 28 at 28-35 (listing causes of action); *Biden v. Missouri*, 595 U.S. 87, 92 (2022) (States brought APA lawsuit to challenge HHS interim final

Page 26 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

rule). Defendants' protest that the "free-choice-of-provider provision does not impose any duties on the federal government" (ECF 73 at 41) ignores their general duty to conform their actions to congressional mandates, and the cause of action granted under the APA for failure to do so.

Moreover, in determining that Congress did not create an individually enforceable right against state officials in that provision, the Supreme Court recognized the important role that Congress gave the states in determining which providers are qualified to furnish services under Medicaid, and observed that if 42 U.S.C. § 1396a(a)(23)(A) conferred an individually enforceable right *against* the States, it would eviscerate the control over providers that the statute plainly vested *with* the states. *Medina*, 606 U.S. at 379; *see also* *id.* at 364 (recognizing that "[t]he provision does not define the term 'qualified,' perhaps because States have traditionally exercised primary responsibility over 'matters of health and safety,' including the regulation of the practice of medicine"). Here, as Plaintiff States have demonstrated, the Kennedy Declaration usurps the States' authority to determine which providers are qualified to provide Medicaid services. And their appeal to the general exclusion authority in 42 U.S.C. § 1320a-7 cannot save them because, as Defendants effectively concede, the Kennedy Declaration exceeds the Secretary's authority under that statute. *See supra* III.D.

As noted above, the Kennedy Declaration's mass disqualification of pediatric providers in Plaintiff States will also have a devasting impact on States' ability to maintain adequate provider networks, particularly in medically complex areas. For instance, disqualification of Children's Hospital Colorado would prevent Colorado (and states in the surrounding region) from determining that the more than 3,000 pediatric specialists at Children's Hospital Colorado are qualified to treat Medicaid or Medicare patients—impeding Colorado's ability to effectively operate a Medicaid system. *See* Flores-Brennan Suppl. Decl. ¶¶ 4-9; *see also infra* § III.H.3. When viewed in this context, there is simply no way to read a Declaration that is being used a basis to disqualify scores of major hospitals and their thousands of providers of pediatric care "in harmony" with a state's ability to run a functioning Medicaid system. ECF 73 at 33. Nor is there a way to

Page 27 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

read a Declaration that deems transgender health care as not meeting professionally recognized standards "in harmony" with state laws that declare just the opposite. *Id.*; *see also* ECF 32 at 12-13. By attempting to hijack the Plaintiff States' ability to determine whether hospitals and providers are qualified to provide Medicaid services within their borders, the Kennedy Declaration is contrary to the free choice of provider requirement.

## G.    Defendants' Arguments Still Lack Merit Under Their Post Hoc Litigation Position

Plaintiff States would still be entitled to summary judgment even if this Court were to reject the evidence of its eyes and ears—the plain text of the Kennedy Declaration and HHS's referrals of hospitals and health centers for violating the Declaration—and accept only the legal arguments of Defendants. As Defendants would have it, the Kennedy Declaration is just one opinion of many, which HHS-OIG may consider in exercising its discretionary authority in making case-by-case decisions about exclusion actions. *See* ECF 73 at 33 ("The Declaration does not trigger exclusion because it is not dispositive of the standard of care applicable in OIG exclusion proceedings and is instead only one piece of information OIG may consider."); ECF 75 ¶ 10 ("[T]he Declaration is only one factor that OIG may consider in any exclusion proceeding."). But, even if the Kennedy Declaration isn't "dispositive" in an exclusion proceeding (*but see supra* § III.A), Defendants never point to where Congress has given the Secretary the power to make a per se finding about treatment modalities to influence the professionally recognized standards under which exclusions are judged. Neither 42 U.S.C. § 1395 nor 42 U.S.C. §§ 1320a-7 and 1320c-5 give the Secretary that power. And a non-dispositive Declaration still would need to go through rulemaking because it would change substantive legal standards for providers' eligibility to participate in the Medicaid and Medicare programs if they provide transgender health care. *See supra* § III.E. Even under the most charitable view of Defendants' arguments, Plaintiff States are entitled to summary judgment.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**H.    Plaintiff States Are Entitled to the Full Suite of Remedies**

**1.    The Court should hold the Kennedy Declaration unlawful and set it aside**

This Court should vacate the Kennedy Declaration because the APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of an unlawful agency action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826-27 (2024) (Kavanaugh, J., concurring); *see also Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (vacatur is the "default remedy under the APA"). "When a federal court sets aside an agency action, the federal court vacates that order in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post, Inc.*, 603 U.S. at 830 (Kavanaugh, J., concurring). The vacated "agency action is treated as though it had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., respecting denial of stay). This means the parts of the agency action held unlawful are vacated as a whole— "not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); see also *Corner Post, Inc.*, 603 U.S. at 830-31 (Kavanaugh, J., concurring) (collecting cases affirming decisions that "vacated the challenged agency rules rather than merely providing injunctive relief . . . [for] the specific plaintiffs").[19] This traditional APA remedy is appropriate here.

While courts "retain[] equitable discretion in limited circumstances to remand a decision without vacatur while the agency corrects its errors," *Mont. Wildlife Fed'n*, 127 F.4th at 50, those "limited circumstances" are not met here. In deciding whether to deviate from the usual remedy of vacatur, courts consider two factors: (1) "how serious the agency's errors are," and (2) "the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against*

---

[19] *See also Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) (stating that "[n]othing" in that decision "resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action"); *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170 (9th Cir. Oct. 31, 2025) (holding Ninth Circuit precedent regarding vacatur of unlawful agency action is reconcilable with intervening Supreme Court precedent).

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Here, both factors support vacatur.

First, as described above, the Kennedy Declaration wholly lacks any statutory authority, and Defendants have identified none. The Secretary of HHS simply does not have the power to override the standards of care applicable in the Plaintiff States by declaration or otherwise. The power to exclude providers in 42 U.S.C. §§ 13201-7(b)(6)(B) and 1320c-5(a)(2) does not extend to a general prohibition on the practice of medically necessary transgender health care for adolescents. As described in Plaintiff States' motion, HHS has no authority to dictate the content of "professionally recognized standards of health care." *See* ECF 32 at 20. Moreover, the statute permits the Secretary only to exclude providers for providing services that fail to meet a standard of *quality*, not for providing a certain category of medical services. *Id.* at 21. Because the Secretary has no authority to issue the Kennedy Declaration, or anything like it, the Secretary's failure to act within his statutory authority is a "fundamental flaw[]" that cannot be corrected on remand. *Nat. Grocers*, 157 F.4th at 1170 (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)).

And there can be no dispute that the Declaration itself is massively disruptive, causing providers and provider systems across the country to change their practices, degrading the Plaintiff States' Medicaid provider networks, and infringing on Plaintiff States' sovereign right to regulate the practice of medicine. *See supra* § II; *see also* ECF 32 at 17-19. Vacating the Declaration, and making it clear that the Secretary cannot arrogate for himself the power to regulate medicine in the United States, would ease this disruption, not cause more of it. There is no basis to except the Declaration from the "default remedy" under the APA. *Mont. Wildlife Fed'n*, 127 F.4th at 51-52.

## 2.    The Court should issue a declaratory judgment

Plaintiff States' requested declaratory relief is appropriate because this case presents an "actual controversy," thus vesting the Court with discretion to declare the parties' rights. 28 U.S.C. § 2201; *see, e.g.*, *Washington v. Dep't of Transp.*, No. 2:25-CV-00848-TL, 2026 WL 183584, at

Page 30 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*26 (W.D. Wash. Jan. 23, 2026) ("In recent cases involving APA violations by executive agencies of the current administration, courts have granted declaratory relief without finding the need for extensive explanation."). Declaratory relief is appropriate where an agency expresses an intent to effectuate the same unlawful policy by some other means. *See Becerra v. Dep't of Interior*, 276 F. Supp. 3d 953, 960 (N.D. Cal. 2017) (holding declaratory relief was available where the likelihood that the agency was going to repeat its unlawful action through another mechanism was "not remote"); *Mansor v. Citizenship & Immigr. Servs.*, 685 F. Supp. 3d 1000, 1015 (W.D. Wash. 2023) (accepting argument that vacatur of agency action "would only address Defendants' current policy, whereas a declaratory judgment could affirmatively establish their rights.").

Here, in their revisionist account of the Declaration, Defendants insist that they maintain the authority to exclude providers from federal health care programs for the provision of medically necessary transgender health care to adolescents even if the Declaration is set aside. ECF 73 at 21 ("[E]ven in the absence of the Declaration, providers would still be subject to OIG's permissive authority to exclude them from [federal health care programs] if they furnished care falling below professionally recognized standards."). Because of this, and in light of Defendants' expansive overreach that is wholly untethered from the governing statutes, this Court should enter declaratory judgment to clarify that Defendants lack the authority to establish superseding standards of care to exclude providers from federal health care programs. This declaratory relief would alleviate the significant uncertainty caused by their conduct. *See Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470-71 (9th Cir. 1984) (declaratory judgment appropriate to afford relief from uncertainty).

### 3.    The Court should enjoin defendants from enforcing, implementing, or relying on the Kennedy Declaration

Defendants should be enjoined from enforcing, implementing, giving effect to, or relying on the Kennedy Declaration—or a materially similar policy which supersedes or purports to supersede the professionally recognized standards of care that exist in the Plaintiff States—against

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

any provider in the Plaintiff States. *See* 5 U.S.C. § 703 (authorizing actions for "prohibitory or mandatory injunction" in addition to vacatur).

In APA cases, once a court concludes that a "rule was indeed illegal," there is "no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Min. Ass'n*, 145 F.3d at 1409 (quoting 11A Wright & Miller's Federal Practice & Procedure § 2944 (3d. ed. 1995)); *see also Illinois v. FEMA*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025) (same). Indeed, given the "broad discretion in awarding injunctive relief" available to district courts, "express findings as to the elements necessary for a permanent injunction" are unnecessary to enjoin implementation of an illegal rule. *Nat'l Min. Ass'n*, 145 F.3d at 1408. As argued above, the Secretary of HHS does not have any legal authority to supersede the standards of care applicable in the Plaintiff States, and imposing such a standard of care via administrative fiat impairs the Plaintiff States' Medicaid provider networks as well as the Plaintiff States' sovereign interests in regulating the practice of medicine, and an injunction against it is entirely appropriate.

Applying the familiar test for injunctive relief yields the same result. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (setting out the test for permanent injunction). The Plaintiff States are likely to suffer (and, in fact, many have already begun to suffer) irreparable injury to their proprietary interests in operating a viable Medicaid provider network. For instance, as the number of providers providing gender-affirming care continues to dwindle due to mounting fear of exclusion from federal health care programs, it is becoming increasingly difficult for Plaintiff States to provide such care to Medicaid patients in their states, notwithstanding their obligations to provide such medically-necessary care under state law and to maintain an adequate network of providers to meet the needs of enrollees under federal law. *See, e.g.*, ECF 33 ¶¶ 19-22 (discussing the Kennedy Declaration's irreparable damage to [Oregon Health Plan]'s network of medical providers; explaining that "even before [exclusion] occurs, some providers will likely choose to cease participating in those programs based on this threat," which will "make it very

Page 32 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

difficult if not impossible for OHP to find health care providers willing to provider gender affirming care to OHP clients"); ECF 34 ¶¶ 17-18, 21-22; ECF 39 ¶¶ 13-16; ECF 40 ¶¶ 18-19; ECF 41 ¶¶ 19-22; ECF 42 ¶¶ 18-22; ECF 44 ¶¶ 8-10; ECF 45 ¶¶ 17-19; ECF 46 ¶¶ 25-28; ECF 47 ¶¶ 18-22; ECF 48 ¶¶ 17-21; ECF 49 ¶¶ 14-20; ECF 50 ¶¶ 12-13; ECF 51 ¶¶ 19-22; ECF 53 ¶¶ 16-19; ECF 54 ¶¶ 16-19; ECF 55 ¶¶ 20-23; ECF 56 ¶¶ 17-20; ECF 57 ¶¶ 16-19; ECF 58 ¶¶ 16-19; *see also* Fraas Decl., Ex. 30 at 19 (recognizing that there were "limited options for alternate providers offering gender affirming care" in Colorado if Children's Hospital Colorado stopped providing such care).

These proprietary harms would be radically compounded if major providers of pediatric care in Plaintiff States are excluded from Medicaid and Medicare due to their provision of gender affirming care as Plaintiff States' would be unable to run a functioning Medicaid system. To date, at least 13 major hospitals have been referred to HHS OIG for potential exclusion from Medicaid and Medicare. *Supra* § II. If exclusion occurred, these hospitals could not treat *any* patients enrolled in Medicaid or Medicare—not just minor patients receiving transgender health care. And in these specialized hospitals often provide pediatric services that no other hospital in their state can provide. For instance, in Washington, Seattle Children's Hospital (referred for exclusion on December 26, 2025) is the only hospital in the state approved to provide pediatric organ transplants. ECF 62 ¶ 7. In Colorado, if Children's Hospital Colorado is excluded (referred on December 30, 2025), "[t]here is no other facility for pediatric Medicaid patients to receive certain care like heart and bone marrow transplants or neurosurgery." Fraas Decl., Ex. 30 at 12. And in Pennsylvania, if Children's Hospital of Philadelphia is excluded (referred on January 15, 2026), "some of Pennsylvania's most complex patients who are children and youth suffering a myriad of complex conditions, including pediatric genetic disorders and cancers, will have reduced access, and in some instances no access, to the treatment they need." Kozak Suppl. Decl. ¶ 21. There can be no doubt that exclusion of major pediatric hospitals would result in "potentially devastating public impact on public care" to patients in their regions and undermine impacted states' ability to

Page 33 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

run a functioning Medicaid system. Fraas Decl., Ex. 30 at 21; *see also, e.g.*, ECF 62 ¶ 12 (explaining there would be no way to timely provide specialized care to many medically-complicated Medicaid patients in Washington if Seattle Children's Hospital was excluded); Flores-Brennan Suppl. Decl. ¶ 9 ("If CHCO is lost as a Medicaid provider, some of Colorado's most complex patients who are children and youth suffering a myriad of complex conditions will have no other access to the treatment they need."); Connolly Suppl. Decl. ¶¶ 6-8 (explaining that because Children's Minnesota is a regional provider of specialized pediatric care, "there is no other facility or group of facilities that could take its place" and it would "undermine the state's pediatric healthcare system"); Phelan Suppl. Decl. ¶ 5 (explaining that if Lurie's Children's was unable to serve Medicaid patients, "some of Illinois's children and youth suffering a myriad of complex conditions may have no other access to the treatment they need"); Kozak Suppl. Decl. ¶¶ 17, 20-21 (exclusion of Children's Hospital of Philadelphia would "undermine the state's pediatric healthcare system in southeastern Pennsylvania . . . , where almost half a million children enrolled in Medicaid and CHIP reside" and leave some children with "complex conditions" with no or reduced access to the treatment they need); Marqusee Suppl. Decl. ¶ 18 ("If Boston Children's Hospital were no longer able to care for Medicaid clients, MassHealth would lose a trusted partner and provider for some of the highest acuity and most vulnerable pediatric patients in the Commonwealth.").

In addition, the impairment of the Plaintiff States' government interest in regulating the practice of medicine is straightforwardly irreparable injury. *Cf. Trump*, 606 U.S. at 859 (holding that the improper intrusion "on a coordinate branch of Government" constitutes irreparable harm (quoting *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor J., in chambers) (internal quotation marks omitted))). Here, as described above *(supra* § III.B.1), the Kennedy Declaration infringes on the States' right to regulate the practice of medicine—including setting and enforcing the standards of care for physicians and hospitals within their states, a prerogative they have enjoyed since "time immemorial." *Dent*, 129 U.S. at

Page 34 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

122. And the balance of equities and public interest clearly favor an injunction here, where the Secretary's Declaration has no grounding in lawful authority whatsoever. *See Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (holding injunctive relief served the public interest where it enjoined government action that was "beyond its authority").

Accordingly, the Court should enjoin Defendants and their officers, agents, servants, employees, and attorneys, including those at HHS-OIG, from enforcing, implementing, giving effect to, or relying on the Kennedy Declaration—or a materially similar policy which supersedes or purports to supersede the professionally recognized standards of care that exist in the Plaintiff States—against any provider in the Plaintiff States.

## IV.    CONCLUSION

The Court should grant summary judgment to the Plaintiff States, deny Defendants' motion to dismiss, hold the Kennedy Declaration unlawful and set it aside, and enter a permanent injunction.

DATED this 24th day of February 2026.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Respectfully submitted,

**DAN RAYFIELD**
Attorney General
State of Oregon

By: _s/ Allie M. Boyd_
ALLIE M. BOYD #163478
BRIAN SIMMONDS MARSHALL #196129
LAUREN ROBERTSON #124362
Senior Assistant Attorneys General
KATE E. MORROW #215611
YOUNGWOO JOH #164105
Assistant Attorneys General
Tel (503) 947-4700
Fax (503) 947-4791
allie.m.boyd@doj.oregon.gov
brian.s.marshall@doj.oregon.gov
kate.e.morrow@doj.oregon.gov
youngwoo.joh@doj.oregon.gov
lauren.robertson@doj.oregon.gov

_Attorneys for the State of Oregon_

**LETITIA JAMES**
Attorney General
State of New York

By: _s/ Matthew Faiella_
MATTHEW FAIELLA
Special Counsel for LGBTQIA Rights
GALEN SHERWIN
Special Counsel for Reproductive Rights
RABIA MUQADDAM
Chief Counsel for Federal Initiatives
TRAVIS W. ENGLAND
Deputy Chief, Civil Rights Bureau
ELIZABETH A. BRODY
Assistant Solicitor General
VICTORIA OCHOA
Assistant Attorney General
28 Liberty St.
New York, NY 10005
Tel (212) 416-8000

**NICHOLAS W. BROWN**
Attorney General
State of Washington

By: _s/ William McGinty_
WILLIAM MCGINTY
CRISTINA SEPE
MARSHA CHIEN
Deputy Solicitors General
LAURYN K. FRAAS
MOLLY POWELL
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel (206) 464-7744
william.mcginty@atg.wa.gov
cristina.sepe@atg.wa.gov
marsha.chien@atg.wa.gov
lauryn.fraas@atg.wa.gov
molly.powell@atg.wa.gov

_Attorneys for the State of Washington_

**ROB BONTA**
Attorney General
State of California

By: _s/ Crystal Adams_
CRYSTAL ADAMS
Deputy Attorney General
NELI PALMA
Senior Assistant Attorney General
NIMROD PITSKER ELIAS
Supervising Deputy Attorney General
HILARY BURKE CHAN
Deputy Attorney General
1515 Clay St., Suite 2000
Oakland, CA 94612
Tel (408) 679-7010
crystal.adams@doj.ca.gov
neli.palma@doj.ca.gov
nimrod.elias@doj.ca.gov
hilary.chan@doj.ca.gov

Page 36 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

matthew.faiella@ag.ny.gov
galen.sherwin@ag.ny.gov
rabia.muqaddam@ag.ny.gov
travis.england@ag.ny.gov
elizabeth.brody1@ag.ny.gov
victoria.ochoa@ag.ny.gov

*Attorneys for the State of New York*

*Attorneys for the State of California*

**PHILIP J. WEISER**
Attorney General
State of Colorado

By: *s/ Sarah H. Weiss*
SARAH H. WEISS, CBA #61914
Senior Assistant Attorney General
MICHAEL D. MCMASTER, CBA #42368
Assistant Solicitor General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
Tel (720) 508-6000
sarah.weiss@coag.gov
michael.mcmaster@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
Attorney General
State of Connecticut

By: *s/ Alma Nunley*
ALMA NUNLEY
Special Counsel for Reproductive Rights
165 Capitol Ave
Hartford, CT 06106
Tel (860) 808-5020
alma.nunley@ct.gov

*Attorney for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: *s/ Ian R. Liston*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Tel (302) 683-8899
ian.liston@delaware.gov
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General
District of Columbia

By: *s/ Samantha Hall*
SAMANTHA HALL
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
Tel (202) 788-2081
samantha.hall@dc.gov

*Attorneys for the District of Columbia*

Page 37 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**KWAME RAOUL**
Attorney General
State of Illinois

By: *s/ Aleeza Strubel*
ALEEZA STRUBEL
Complex Litigation Counsel
ELIZABETH B. SCOTT
Assistant Attorney General
ELENA S. METH
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
Tel (773) 914-3046
aleeza.strubel@ilag.gov
elizabeth.scott@ilag.gov
elena.meth@ilag.gov

*Attorneys for the State of Illinois*

**AARON M. FREY**
Attorney General
State of Maine

By: *s/ Kevin J. Beal*
KEVIN J. BEAL, Maine Bar No. 7294
Assistant Attorney General
Office of the Attorney General
111 Sewall Street, 6th Floor
6 State House Station
Augusta, ME 04333-0006
Tel (207) 626-8800
kevin.beal@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

By: *s/ Lauren Gorodetsky*
LAUREN GORODETSKY
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
Tel (410) 576-7057
lgorodetsky@oag.maryland.gov

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

By: *s/ Allyson Slater*
ALLYSON SLATER
Director, Reproductive Justice Unit
ADAM M. CAMBIER
JAK KUNDL
CHLOE CABLE
MORGAN CARMEN
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
Tel (617) 963-2811
allyson.slater@mass.gov
adam.cambier@mass.gov
jak.kundl@mass.gov
chloe.cable@mass.gov
morgan.carmen@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**DANA NESSEL**
Attorney General
State of Michigan

By: *s/ Neil Giovanatti*
NEIL GIOVANATTI
DANIEL PING
Assistant Attorneys General
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
Tel (517) 335-7603
giovanattin@michigan.gov
pingd@michigan.gov

*Attorneys for the State of Michigan*

**AARON D. FORD**
Attorney General
State of Nevada

By: *s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorneys for the State of Nevada*

**RAÚL TORREZ**
Attorney General
State of New Mexico

By: *s/ Amy Senier*
AMY SENIER, MBA# 672912
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Tel (505) 490-4060

**KEITH ELLISON**
Attorney General
State of Minnesota

By: *s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
Tel (651) 300-0711
lindsey.middlecamp@ag.state.mn.us

*Attorneys for the State of Minnesota*

**JENNIFER DAVENPORT**
Acting Attorney General
State of New Jersey

By: *s/ Lauren E. Van Driesen*
LAUREN E. VAN DRIESEN
JESSICA L. PALMER
Deputy Attorneys General
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel (609) 696-5279
lauren.vandriesen@law.njoag.gov
jessica.palmer@law.njoag.gov

*Attorneys for the State of New Jersey*

**JOSH SHAPIRO in his official capacity as Governor of the Commonwealth of Pennsylvania**

By: *s/ Aimee D. Thomson*
JENNIFER SELBER
General Counsel
AIMEE D. THOMSON
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200

Page 39 - REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

asenier@nmdoj.gov

*Attorneys for the State of New Mexico*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

By: *s/ Julia C. Harvey*
JULIA C. HARVEY, RI Bar No. 10529
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2103
jharvey@riag.ri.gov

*Attorneys for the State of Rhode Island*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

By: *s/ Jody J. Schmelzer*
JODY J. SCHMELZER
Assistant Attorney General
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
(608) 266-3094
jody.schmelzer@wisdoj.gov

*Attorneys for the State of Wisconsin*

Harrisburg, PA 17101
Tel (223) 234-4986
aimeethomson@pa.gov

*Attorneys for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General
State of Vermont

By: *s/ Jonathan T. Rose*
JONATHAN T. ROSE
Solicitor General
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Attorneys for the State of Vermont*

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000