# Exhibit 30

<table>
<tr><td colspan="2"><strong>DISTRICT COURT, CITY & COUNTY OF DENVER, COLORADO</strong><br>1437 Bannock Street<br>Denver, Colorado 80202</td></tr>
</table>

| **DISTRICT COURT, CITY & COUNTY OF DENVER, COLORADO**<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED<br>February 13, 2026 6:20 PM<br>CASE NUMBER: 2026CV30232 |
|---|---|
| | ▲ **COURT USE ONLY** ▲ |
| **Plaintiff**: BELLA BOE, by and through her mother Becky Boe; CHLOE COE, by and through her father Clark Coe; DANIELLE DOE, by and through her mother Denisha Doe; GABRIELLA GOE, by and through her mother Grace Goe; All of whom are minor patients and their parents, as representatives of a class of similarly situated individuals,<br><br>v.<br><br>**Defendant**: CHILDREN'S HOSPITAL COLORADO. | **Case Number**:  26CV30232<br><br>**Courtroom**:  424 |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ON CLASS PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This case came on for a hearing to the Court February 4 and 5, 2026. The Court, having considered the evidence, the briefs, and the applicable legal authority, makes the following findings of fact and conclusions of law and issues the following order.

## I.    PROCEDURAL BACKGROUND

1.    On January 20, 2026, Plaintiffs filed their Complaint, alleging two counts of violations of the Colorado Anti-Discrimination Act ("CADA") pursuant to section 24-34-601, C.R.S.  Plaintiffs allege discrimination in a place of public accommodation based on disability, sex, and gender identity.

2.    Also on January 20, 2026, Plaintiffs filed Class Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

3.    On January 21, 2026, Defendant filed its Memorandum in Opposition to Motion for Temporary Restraining Order.

4.    Also on January 21, 2026, the Court held a hearing on the Motion for Temporary Restraining Order. The Court denied the Motion for Temporary Restraining Order and set a hearing on the Motion for Preliminary Injunction.

5.     On January 30, 2026, Defendants filed their Opposition to Plaintiffs' Motion for Preliminary Injunction.

6.     Plaintiffs filed their Reply in Support of Motion for Preliminary Injunction on February 4, 2026.

7.     On February 4 and 5, 2026, the Court held a hearing on the Motion for Preliminary Injunction.

8.     At the hearing, Plaintiffs were represented by counsel Paula Greisen and John McHugh.  Defendant was represented by counsel Stanley Garnett, Patrick O'Rourke, Leah Regan-Smith, and Kristin Arthur.  The Court admitted exhibits 1-3, 5-7, A, B, E, and F.

9.     On February 5, 2026, Defendant filed its Supplemental Brief Regarding Availability of Class-Wide Relief.

10.     Also on February 5, 2026, Plaintiffs filed Class Plaintiffs' Statement of Additional Authorities in Response to Defendant's Supplemental Brief.

## II.     FINDINGS OF FACT

The Court finds the following facts were proven by a preponderance of the evidence for the purposes of the hearing on preliminary injunction:[1]

11.     Plaintiffs are a group of individuals who identify as transgender youth.  Each has sought care from the TRUE Center at Children's Hospital Colorado ("CHC"). The Plaintiffs filed under pseudonyms with the Court's permission.

12.     Defendant CHC is a hospital that provides primarily pediatric care in the Colorado region.

### A.     Stipulations

13.     The provision of medical gender-affirming care is lawful in the State of Colorado, and the American Medical Association ("AMA") and American Academy of Pediatrics ("AAP") have endorsed gender-affirming care to be both safe and effective. CHC provides all care in compliance with Colorado law, and consistent with posted recommendations provided by the AMA and AAP.

14.     CHC and, since its founding, the TRUE Center, has followed the World Professional Association for Transgender Health's ("WPATH") internationally-accepted medical

---

[1] All findings of fact and conclusions of law made in this order are based on what the Court finds to be a preponderance of the admissible, credible, persuasive evidence. Since the Court sat as the factfinder in this case, in assessing credibility, the Court has applied the same standards that jurors are permitted to apply as set forth in CJI-Civ. 3:16.

standards of care, including the medical standards of care regarding adolescents who experience gender dysphoria.

15.     The TRUE Center only prescribes medical gender-affirming care (including puberty blockers and hormone therapy) when it has been determined to be medically necessary for the treatment of gender dysphoria.

16.     The TRUE Center saw 1140 patients under 18 in 2025. Of those, 257 patients were prescribed puberty blockers and 549 patients were prescribed hormone therapy. In 2024, the TRUE Center saw 1203 patients under 18. Of those, 260 were prescribed puberty blockers and 549 were prescribed hormone therapy.

17.     On January 20, 2025, the President issued Executive Order 14,168 (the "Gender Ideology EO"), announcing that "[i]t is the policy of the United States to recognize two sexes, male and female[.]" The Gender Ideology EO declares the lived experience of transgender individuals to be a "false claim" under the moniker of "gender ideology" and purports to deny the reality that transgender people exist.

18.     On January 28, 2025, the President issued Executive Order 14,187 (the "Medical Services EO"), announcing that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures." This EO uses the term "chemical and surgical mutilation" to reference the use of puberty blockers and sex hormones.

19.     On February 5, 2025, CHC announced it would cease providing all medical gender-affirming care to minor patients. At that time, CHC stated it would provide current patients with a one-time prescription for six months of medication.

20.     On February 19, 2025, CHC announced it was resuming providing medical gender-affirming care for minors previously treated by CHC in the State of Colorado.

21.     On December 18, 2025, the Secretary of Health and Human Services ("HHS") Robert F. Kennedy, Jr., issued a declaration, known as the "Kennedy Declaration," claiming that "[s]ex rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria[.]"

22.     The legality of that declaration was promptly challenged in *Oregon v. Kennedy*, No. 6:25-cv-02409-MTK (D. Or.). Plaintiffs, including Colorado, have subsequently moved for summary judgment.

23.     On December 30, 2025, HHS's General Counsel announced he was referring CHC "for investigation" to the Office of Inspector General ("OIG") at HHS for providing gender affirming care in violation of the Kennedy Declaration.

24.     On or about January 6, 2026, HHS agreed to not issue notices of intent to exclude (42 C.F.R. § 1001.2001) or notices of exclusion (42 C.F.R. § 1001.2002) to CHC until the earlier

of the court's decision on the motion for summary judgment or 30 days after the hearing on the motion for summary judgment in *Oregon v. Kennedy*.

25.    Oral argument on the plaintiff's motion for summary judgment as to the legality of the Kennedy Declaration in *Oregon v. Kennedy* is set for March 19, 2026.

**B.    Dr. Daniel Reirden**

26.    The Court heard testimony from Dr. Daniel Reirden.  Dr. Reirden is the interim medical director for Rensselaer Polytechnic Institute.  Dr. Reirden was accepted by the Court as an expert in the provision of medical gender affirming care.

27.    Gender identity is defined as the experience of gender by the self.  Sex is a biological finding based on reproductive organs.

28.    Gender dysphoria may be diagnosed when an individual has extreme distress due to the difference between gender identity and the gender or sex assigned at birth.

29.    Gender affirming care has an expansive definition.  It ranges from the choice of pronouns and preferred name to hormonal treatment and surgery.

30.    Puberty blockers are a type of gender affirming medical care in which medical hormones are used to block the natural onset of puberty. Puberty blockers temporarily pause sexual development.  Youth may take puberty blockers to allow themselves time to explore their identity. When puberty blockers are stopped, puberty proceeds in accordance with biology.

31.     Going through puberty causes irreversible physical changes that are difficult to reverse.  Some changes may require surgery to reverse.

32.    Puberty blockers are often administered by implant.  The implant is replaced every twelve months until the patient decides to allow puberty to proceed.

33.    A patient will work with a medical provider to determine when puberty is beginning and then start the blockers within a couple of weeks.  The medical provider typically needs to physically observe the patient for changes.  This is not easily accomplished by telehealth.

34.    After some time on puberty blockers, the patient may undergo hormone therapy to allow puberty of the chosen gender.  The decision is made with the medical provider, patient, and parents.  This usually occurs in middle teens.

35.    A medical provider providing gender affirming care needs a level of expertise, including regarding growth patterns, what is involved in puberty, and family treatment.

36.    Puberty blockers and hormones are considered medically necessary gender affirming care.

37.    From 2007-2023, Dr. Reirden was a physician at CHC, providing gender affirming care.  He helped start the TRUE Center at CHC.  The TRUE Center was designed to be a multi-

disciplinary medical practice, including doctors, psychiatrists, social workers, among others, providing care to adolescents to young adults. The TRUE Center treats patients from all over Colorado and the Rocky Mountain region, including Wyoming, New Mexico, Kansas, Montana, and other states. Patients come from across the country and internationally.

38.     The TRUE Center had 1000 to 1200 unique patient visits per year.

39.     Physicians need to develop a personal relationship with their patients. The relationship develops over time, not just one visit. This is a stressful period of time for patients. It would cause lots of psychological stress on patients if they were not able to receive care.

40.     The TRUE Center and gender affirming care have helped many patients who are now living happy lives as another gender. Medical gender affirming care is lifesaving and lifechanging.

41.     If puberty blockers are stopped, the body will start producing gonadotrophins within months. Puberty will resume. If hormone therapy is stopped, there may be irreversible changes to the body.

42.     For each named Plaintiff, Dr. Reirden has not met the patient, the patients' parents, nor reviewed any medical records. He opined that each Plaintiff would experience the negative effects of stopping medical gender affirming care, including irreversible physical and psychological harm.

43.     Doctors must make their own independent medical decisions, including what to prescribe to an individual patient. The doctor will make decisions specific to the patient.

44.     One-half of CHC's patients are Medicaid recipients. When Dr. Reirden was at CHC, he recalled that the percentage of patients at the TRUE Center on private pay was approximately two-thirds, which is more than the hospital in general.

45.     Dr. Reirden currently has no hospital privileges. When he did have privileges, he, like all doctors, had to certify that he was not excluded from being a Medicaid provider.

**C.     Dr. Dan Karasic**

46.     The Court heard testimony from Dr. Dan Karasic. Dr. Karasic provides mental health care to transgender youth and adults. He was previously employed by the University of California San Franciso as a professor of psychology. From 2003 to 2020, Dr. Karasic was a psychologist for transgender youth ages twelve to twenty-five at Dimensions Clinic. Some of his patients at Dimensions were on Medicaid.

47.     Dr. Karasic co-authored WPATH standards.

48.     Dr. Karasic was accepted by the Court as an expert in the mental health needs of individuals with gender dysphoria.

49.     Dr. Karasic currently sees patients in his private practice.  None of his current patients are on Medicaid.

50.     Dr. Karasic has no question that gender affirming care is safe and effective.  No reputable medical association has found otherwise.  No reputable research supports the Kennedy Declaration.

51.     Gender identity is the deep-seated sense of gender a person has.  Cisgender refers to individuals whose gender identity aligns with their birth sex.  Transgender refers to individuals who do not experience such alignment.

52.     To be diagnosed with gender dysphoria, an individual needs to experience two of approximately seven symptoms of discomfort and distress.  If the distress is severe, the patient needs mental and medical health treatment.

53.     Severe psychological symptoms can be disabling. Gender dysphoria can cause disability by affecting life activities such as learning, reading, concentrating, ability to socialize, and going to school.

54.     As a clinician, Dr. Karasic completes disability forms.

55.     A goal of medical gender affirming care is to bring the body more in congruence with gender identity to relieve stress.

56.     Cisgender youth may also need puberty blockers or hormones.

57.     Medical providers need education and training to develop expertise regarding gender affirming care.  Most general pediatricians do not provide gender affirming care.

58.     Youth are not typically on puberty blockers for long.  They can usually start after age ten.  They might start on hormones younger than age fifteen. There may be a period of overlap with puberty blockers and hormones.

59.     A study showed that in states where gender affirming care has been banned for youth, the number of youth who attempted suicide increased at a rate of between thirty-three and forty-nine percent in the last year.

60.     A recent article in the United Kingdom studied a period in which the country restricted access to gender affirming care and the percentage of suicides for transgender youth was higher than the percentage of the population that identifies as transgender.

61.     Many transgender youth need mental health treatment.  Gender affirming care assists in alleviating mental health issues.

62.     It is Dr. Karasic's opinion that the Kennedy Declaration is flawed.  The drafters are not experts but activists.  The Declaration is based on politics and ideology, not a rational, clinical basis.

63.     The mental health of youth who go through puberty of the sex with which they do not identify can suffer.

64.     Dr. Karasic opined that it is more likely than not that when a patient is forced to stop gender affirming care abruptly, immediate and irreparable harm will result.

65.     Dr. Karasic agreed that medical care is intertwined with state and federal funding and insurance in a complex system.

66.     Dr. Karasic noted that increasingly, gender affirming care is being done outside the reimbursement system and/or in other countries.

**D.    The Plaintiffs**

67.     The Court heard testimony from Jessica Joe, the mother of Jacob (all pseudonyms). Jacob is not a named plaintiff.  Jacob is fourteen and lives in Durango.  Jacob identifies as a boy and has since he was a very young age.  Jacob has been diagnosed with gender dysphoria.

68.     Jacob received gender affirming care from the TRUE Center.  He is now on puberty blockers.  His current implant was placed in November 2024.  His current implant expired in November 2025.  Jacob had an appointment for January 2, 2026 but the hospital cancelled.

69.     Jacob's puberty blockers are medically necessary because he does not want to go through girl puberty.  Ms. Joe understands the maximum amount of time on puberty blockers is three years.

70.     Jacob and his family are on Medicaid.  There are restrictions on where they can get care.  For example, they cannot go to Albuquerque for care even though it would be more convenient in terms of location.

71.     Jacob was able to get a one-time pro bono appointment from another provider for gender affirming care for three weeks.  Ms. Joe testified they could not go back to the provider while on Medicaid.  It was not clear from her testimony whether Medicaid forbade going to another provider or if she meant they could not see another provider because it was not covered by Medicaid.

72.     If Jacob cannot obtain gender affirming care, he will develop breasts, have a period, and his body will not look how he has expected.  Jacob is researching other countries where he can get gender affirming care.  He has said he does not want to go to school.  Stopping gender affirming care will cause him irrevocable harm.

73.     The Court heard testimony from Grace Goe, mother of Gabriella (all pseudonyms).

74.     Gabriella is nine years old.  Gabriella was born with male sex traits.  When Gabriella was young, she asked if she could cut off her penis.  At that point, she began seeing a psychologist and her parents began reading books on the topic.

75.     By her fourth birthday, Gabriella transitioned to living as female.  Gabriella is female at school with peers.

76.     Gabriella has been diagnosed with gender dysphoria.  She began working with the TRUE Center when she was six.  She had been meeting with a pediatric endocrinologist.  She is expecting to be able to use puberty blockers to allow her more time to decide.  She is expecting that she can start puberty blockers in March or April 2026.

77.     Ms. Goe has not informed Gabriella that the TRUE Center will not provide Gabriella care.  Ms. Goe does not want to explain that the government thinks Gabriella is wrong.

78.     If Gabriella cannot get gender affirming care and has a testosterone-led puberty, she will be devastated.  She will not be what she wants to be.  It would be distressing.

79.     The Court heard testimony from Becky Boe, mother of Bella (all pseudonyms).  Bella lives in Denver.  She is fourteen.  She received care at the TRUE Center.  Bella was in foster care before being adopted by Ms. Boe.  In foster care, Bella lived in a chaotic situation, with drugs, abuse, and missed medical care.

80.     When Bella was ten in 2022, she came out.  Bella asked to change her name and began presenting socially as a girl.

81.     Bella has often had suicidal ideation.  At one point, she was admitted to the hospital for suicidal ideation.  The hospital put her with boys, who sexually assaulted her.

82.     Soon after her hospital stay, Bella started on puberty blockers with the TRUE Center.  At TRUE, Bella has had the same doctor since 2022 and she trusts the doctor.  The doctor has helped Bella with mental health issues.

83.     Bella's last puberty blocker was implanted in December 2024.  At age fourteen, Bella expected to start hormone therapy.  She had an appointment a couple of weeks ago.  The provider explained that the TRUE Center was unable to prescribe hormones.  Bella is currently not scheduled to receive another implant.

84.     Bella is frustrated, angry, distraught, and suicidal.  She now wishes she had not come out and is considering de-transitioning.  Bella really wants to start hormone therapy because it will be hard to go to school as a boy.

85.     Bella is on Medicaid; she is not allowed to go to non-Medicaid providers. The TRUE Center said it could not give referrals.

86.     The Court heard testimony from Denisha Doe, mother of Danielle (all pseudonyms).  Danielle lives in Denver.  She is a twin.  She and her family lived in Texas prior to Colorado.

87.     From the time Danielle could express herself, she said she was a girl.  Unlike her twin, Danielle liked all things feminine.  Danielle was very persistent.

88. Danielle first asked her parents when her penis would fall off. She then asked if she could cut it off. Her parents were alarmed, and saw a counselor in Texas.

89. As early as age three, Danielle presented as a girl.

90. Danielle has been diagnosed with gender dysphoria. She started on puberty blockers at age twelve.

91. Danielle's family moved to Colorado in 2023 because they wanted a place with robust protections.

92. Currently, Danielle is on an oral protocol. She takes her medication every other day.

93. Danielle is undergoing a procedure to extract sperm to cryofreeze for future use. Her hormones need to be monitored for the procedure.

94. Over time, Danielle has grown to trust the providers at the TRUE Center.

95. In early 2025, Danielle got notices that the TRUE Center was ceasing and then resuming care. The family became scared and worried during that time.

96. The family received the January 2026 notice from the TRUE Center about stopping care after the Kennedy Declaration. Danielle had an appointment on January 14, 2026 for blood work and measurements. The TRUE Center told Danielle it could not do the care.

97. Danielle is currently hospitalized at CHC in the psychiatric ward for a depressive episode. Danielle wrote her mother a letter that included suicidal ideation, she said she dreamt of de-transitioning, and said, "If I don't see you again, I love you." Danielle is looking for new coping skills.

98. Currently, CHC is administering Danielle gender affirming medication that the family brings in. CHC will not prescribe the medication.

99. Danielle's mental health has worsened. There is no doubt she will experience irreversible harm.

100. Danielle's doctor wrote in MyChart that gender affirming care would be helpful to Danielle.

**E.    Dr. David Brumbaugh**

101. The Court heard testimony from Dr. David Brumbaugh, a pediatric gastroenterologist at CHC. He is also a professor of pediatrics at the University of Colorado School of Medicine. He has practiced medicine for sixteen years.

102. Dr. Brumbaugh is the chief medical officer at CHC. He oversees 2,000 medical providers and works with the chief nurse regarding quality of care.

103.    In his administrative role, Dr. Brumbaugh makes strategic decisions for four different licensed hospitals.  He gives guidance on the scope of services and advice to CHC's board.  Dr. Brumbaugh is familiar with the legal framework for operating CHC.

104.    Dr. Brumbaugh was accepted by the Court as an expert in the field of hospital administration.

105.    Dr Brumbaugh is not an expert in gender affirming care.  He has become familiar with the area given his administrative role.  He disagrees with the Kennedy Declaration and its characterization of gender affirming treatment as "sex-rejecting treatment."

106.    Dr. Brumbaugh and CHC are proud of the TRUE Center.

107.    The UPL program was created by Medicaid to provide additional support to underserved patients.  The TRUE Center is part of the program which designated tens of millions of dollars to serve underserved patients.

108.    CHC applied for UPL funds to support clinical services at the TRUE Center.  The TRUE Center cannot survive without UPL funding.

109.    Dr. Brumbaugh agrees that any patient decisions are best made by the patient and family, not the federal government.  The federal government is taking actions in violation of the TRUE Center's core values.

110.    The TRUE Center provides a wide variety of gender affirming care, including for behavioral health, medical and occupational health, and speech.  Prior to January 2026, it included prescriptions for hormone therapy and puberty blockers.  Since January 2026, CHC no longer provides these drugs for those under eighteen for the purpose of gender affirming care.

111.    Dr. Brumbaugh believes the treatment the TRUE Center provided before January 2026 was safe and complied with the standard of care.  He agrees that denying gender affirming care can have adverse physical and mental health effects.  He understands that CHC's changes in care have caused distress to patients, families, doctors, and other medical providers.  He feels the changes are in the best interest of the hospital and whole patient population.

112.    The federal government is interfering with care in a way that is unprecedented during Dr. Brumbaugh's time in health care.

113.    In 2024, CHC received $182.6 million in funding, mostly from the federal government.  Some portion is related to research.

114.    CHC provides thousands of patients care at a scope that exceeds any other hospital in the region for pediatric care.  For example, CHC provides level one pediatric trauma care, the only such facility in the region.  It provides organ and bone marrow transplants and cancer treatment.

115.    Forty-seven percent of CHC's patients are Medicaid enrollees.

116.    CHC does not employ doctors.  The doctors have privileges so they can practice in their field at CHC.

117.    CHC does not make decisions on prescriptions, doctors do.  Doctors base their decisions on experience, expertise, the patient's history, the clinical exam, and the doctor's understanding of what is the best treatment available.

118.    CHC does not tell doctors that they have to prescribe a drug or offer a refill on a drug.

119.    The events of 2025 regarding gender affirming care, including the language of the President's first executive order, were distressing.  The order targeted research funding. A federal court enjoined the federal government from blocking federal research funding.  CHC decided to stop gender affirming care but then resumed.

120.    A memorandum issued by the U.S. Attorney General suggested that the federal government would use every means possible to stop gender affirming care.  The Department of Justice issued a broad subpoena to CHC, asking for massive amounts of protected information. CHC challenged the subpoena in federal court. CHC has not produced any records in response.

121.    On December 18, 2025, HHS issued two proposed rules regarding the conditions of participation and Medicaid funding for gender affirming care.  These are rules that hospitals have to follow to participate in the Center for Medicare and Medicaid Services' programs.  All commercial insurance companies require that the hospital meet conditions of participation in order to be qualified for contracts and to bill for services.

122.    CHC has joined with a coalition of children's hospitals to provide comments in opposition to the proposed rules to show the rules are contrary to the interests of children.

123.    Dr. Brumbaugh and CHC were surprised by the Kennedy Declaration. Dr. Brumbaugh has never seen anything like it before.  He disagrees with it.  However, the Declaration informed CHC's decision-making on gender affirming care.

124.    The Kennedy Declaration sets up the possibility of exclusion of CHC and providers' ability to participate in Medicaid funding, including the University of Colorado School of Medicine.  Such an exclusion would be devastating to pediatrics in the region.

125.    Dr. Brumbaugh is not aware of any court order invalidating the Kennedy Declaration.  Dr. Brumbaugh believes that CHC is bound by the Kennedy Declaration.

126.    The Kennedy Declaration defines "sex-rejecting procedures" to include puberty blockers, hormone therapy, and surgical intervention.  It states, "the Secretary may exclude individuals or entities from participation in any Federal health care program if the Secretary determines the individual or entity has furnished or caused to be furnished items or services to patients of a quality which fails to meet professionally recognized standards of health care."

127.    If excluded from federal health care programs such as Medicaid, CHC could not treat any patients enrolled in Medicaid—not just patients receiving gender affirming care.

128.    Currently, one half of CHC's patients are on Medicaid. Exclusion from federal funding would greatly impact pediatric health care in Colorado. There is no other facility for pediatric Medicaid patients to receive certain care like heart and bone marrow transplants or neurosurgery.

129.    CHC is required to attest to private commercial insurance companies that it is not excluded from federal payment programs in order for the insurance companies to pay for services at CHC. If CHC were excluded from federal payment programs, CHC could not serve patients who have commercial insurance.

130.    Exclusion from federal payment programs would cause CHC to drastically reduce its overall scope of service because there would be no revenue to support the provision of services.

131.    If CHC were excluded from federal payment programs, it would lose accreditation by the Colorado Department of Public Health and Environment ("CDPHE").

132.    If CHC were excluded from federal payment programs, the University of Colorado School of Medicine faculty could not provide services at CHC.

133.    The Kennedy Declaration states that individual doctors also face exclusion. If a doctor is excluded, the doctor cannot be credentialed and CHC cannot offer the doctor privileges. The School of Medicine could not employ the doctor. Exclusion for a doctor would be "career ending."

134.    In response to the Kennedy Declaration, CHC assessed risk and took the immediate step to stop providing medical gender affirming care such as puberty blockers and hormone therapy. CHC advised the doctors by a meeting in late December. CHC advised patients on January 5, 2026.

135.    A CHC doctor wrote a prescription for medical gender affirming care on December 19, 2025. Dr. Brumbaugh is concerned that additional prescriptions would cause a pattern of conduct that would be worse for CHC.

136.    HHS General Counsel Mike Stuart posted on X on December 30, 2025 that it referred CHC to the OIG for investigation. CHC took this post to mean that there was a significant escalation in risk to CHC and made decisions in response.

137.    While the Oregon lawsuit is pending, the OIG has agreed to suspend any notices of exclusion but the agreement does not state that any current writing of prescriptions would not be considered in future decisions. As Chief Medical Officer, Dr. Brumbaugh believes that CHC and providers are still at risk for exclusion despite this agreement.

138.    On January 15, 2026, HHS General Counsel Mike Stuart posted on X that HHS reported six more hospitals to the OIG for investigation for providing gender affirming care. This post indicated to Dr. Brumbaugh that the federal government was not backing down.

139.    Given recent actions of the federal government, Dr. Brumbaugh does not believe it is beyond the realm of possibility that the federal government would exclude CHC and/or individual providers from Medicaid participation.

140.    CHC does not want to limit its scope of care to any patients, including those receiving gender affirming care.

141.    CHC made the decision to stop medical gender affirming care to protect its ability to serve all pediatric patients.

142.    To date, HHS has not excluded any hospital or providers for providing gender affirming care.  Dr. Brumbaugh does not have knowledge of HHS shutting down a hospital by exclusion from federal payment programs.

143.    If HHS only excluded doctors providing gender affirming care, it would shut down the TRUE Center but probably not the hospital as a whole.  CHC could continue providing medical care to other patients.

144.    Dr. Brumbaugh is not aware of any individual doctors who have been referred to the OIG for investigation.

145.    Dr. Brumbaugh understands that if CHC is excluded from federal payment programs, the hospital has limited appeal rights.

## III.    APPLICABLE LAW

### A.    The Colorado Anti-Discrimination Act

Section 24-34-601(2)(a), C.R.S. provides that

It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability . . . sex . . . [or] gender identity . . . the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation . . . .

A "[p]lace of public accommodation" means "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public, including but not limited to: . . . (VII) A dispensary, clinic, [or] *hospital* . . . ." § 24-34-600.3(1)(a), C.R.S. (emphasis added).

"Gender identity" means "an individual's innate sense of the individual's own gender, which may or may not correspond with the individual's sex assigned at birth." § 24-34-301(10), C.R.S. Further, "'[d]isability' has the same meaning as set forth in the federal 'Americans with Disabilities Act of 1990', 42 U.S.C. sec. 12101 et seq., and its related amendments and implementing regulations." *Id*. at -(7).

A person is disabled under CADA and the ADA if the person has a "physical or mental impairment that substantially limits one or more major life activities." *Id.*; 28 C.F.R. § 36.105(a)(1)(i).

Section 24-34-801(1)(c), C.R.S. provides that the policy of the State of Colorado is to assure that all individuals, regardless of impairment or disability, are entitled to full and equal access to places of public accommodation. Further, section 24-34-300.7(2), C.R.S. declares that Colorado has a long history of supporting freedom of choice for Coloradans, which includes the "choice to make decisions related to safely seeking health-care services, including legally protected health-care activities . . . that support mental, physical, and emotional well-being for Coloradans, their children, and their family members." Section 24-34-300.7(2) also makes clear that it is the public policy of the State of Colorado to ensure that these decisions can be made without unnecessary governmental interference. "Legally protected health-care activity" is defined to include seeking, providing, receiving, or referring for gender-affirming health-care services that are not unlawful in Colorado. §12-30-121(d), C.R.S.

To prevail on a discrimination claim under CADA, "plaintiffs must prove that, 'but for' their membership in an enumerated class, they would not have been denied the full privileges of a place of public accommodation." *Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272, 280 (Colo. App. 2015) (citing *Tesmer v. Colo. High Sch. Activities Ass'n*, 140 P.3d 249, 254 (Colo. App. 2006)), *rev'd on other grounds*, 584 U.S. 617 (2018). A plaintiff need not establish that membership in the enumerated class was the sole cause of the denial of services. *Id.* Rather, it is sufficient to show that the alleged discriminatory act "was based in whole or in part on their membership in the protected class." *Id.* A "but for" test "directs [courts] to change one thing at a time and see if the outcome changes." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 645 (2020). If it does, the court has identified a "but for" cause. *Id.* CADA does not require a showing of animus. *Craig*, 370 P.3d at 282.

## B.     Exclusion from Participation in Federal Health Care Programs

Under the federal Social Security Act, the Secretary of HHS may exclude from participation in federal health care programs "[a]ny individual or entity that the Secretary determines . . . has furnished or caused to be furnished items or services to patients . . . of a quality which fails to meet professionally recognized standards of health care . . . ." 42 U.S.C. § 1320a-7(b)(6)(B). Further, the OIG may exclude an individual or entity that has rendered services to patients "of a quality that fails to meet professionally recognized standards of health care." 42 C.F.R. § 1001.701(a)(2).

HHS regulations define "[p]rofessionally recognized standards of health care" as "[s]tatewide or national standards of care, whether in writing or not, that professional peers of the individual or entity whose provision of care is an issue, recognize as applying to those peers practicing or providing care within a State." 42 C.F.R. § 1001.2. The regulatory definition further provides that, when HHS "has declared a treatment modality not to be safe and effective,

practitioners who employ such a treatment modality will be deemed not to meet professionally recognized standards of health care." *Id*.

An agency such as HHS is not permitted to ignore or violate the plain language of its own regulations while the regulations are in effect. *Nat'l Env't Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1011 (D.C. Cir. 2014).

If the OIG proposes to exclude an individual or entity, the OIG "will send written notice of its intent, the basis for the proposed exclusion and the potential effect of an exclusion." 42 C.F.R. § 1001.2001(a). Within 30 days, the individual or entity may submit evidence and written argument regarding whether exclusion is warranted, and request a hearing to present oral argument to an OIG official. *Id*. at -(b). If the OIG determines that exclusion is warranted, it will send written notice of its decision, which "will be effective 20 days from the date of the notice." 42 C.F.R. § 1001.2002(a)-(b).

An excluded individual or entity may request a hearing before an ALJ, who may affirm, alter, or reverse the imposition of the exclusion. *See* 42 C.F.R. § 1005.2(a); 42 C.F.R. § 1005.20(b). However, the ALJ lacks authority to enjoin any act of the HHS Secretary; review the OIG's exercise of discretion to exclude an individual or entity, or determine the scope or effect of exclusion; or reduce a period of exclusion to zero, if the ALJ finds that the excluded individual or entity committed an act described in section 1320a-7(b). *See* 42 C.F.R. § 1005.4(c)(4)-(6). A party may administratively appeal the ALJ's decision and then seek judicial review in a U.S. Court of Appeals. *See* 42 C.F.R. § 1005.21(a),(k).

An excluded individual or entity is excluded from Medicare, Medicaid, and any other federal health care programs. *See* 42 C.F.R. § 1001.1901(a). The excluded individual or entity will not receive payment from Medicare, Medicaid, or any other federal health care program for any services rendered. *Id*. at -(b)(1). If excluded, the exclusion "will be for a period of 3 years, unless aggravating or mitigating factors . . . form a basis for lengthening or shortening the period. In no case may the period be shorter than 1 year . . . ." *See* § 1001.701(d)(1); § 1320a-7(c)(3)(F) ("[T]he period of exclusion shall be not less than 1 year.").

**C.     Standards on Preliminary Injunction**

Colo. R. Civ. P. 65 governs the issuance of preliminary injunctions. "A preliminary injunction is designed to preserve the status quo or protect rights pending the final determination of a cause." *City of Golden v. Simpson*, 83 P.3d 87, 96 (Colo. 2004); *see also Anderson v. Applewood Water Ass'n, Inc.*, 409 P.3d 611, 616 (Colo. App. 2016). A preliminary injunction is "an extraordinary remedy designed to protect a plaintiff from sustaining irreparable injury and to preserve the power of the district court to render a meaningful decision following a trial on the merits." *Rathke v. MacFarlane*, 648 P.2d 648, 651 (Colo. 1982); *see also Anderson*, 409 P.3d at 616 (holding the purpose of a preliminary injunction is "to prevent irreparable harm prior to a decision on the merits of a case."). Whether to grant or deny a preliminary injunction "lies within the sound discretion of the trial court." *Rathke*, 648 P.2d at 653. Injunctive relief should not be indiscriminately granted. *Id*. Rather, injunctive relief should be granted "sparingly and cautiously and with a full conviction on the part of the trial court of its urgent necessity." *Id.*

15

*Rathke* sets forth a six-part test for preliminary injunctions. The moving party must demonstrate each of the following:

1. Reasonable probability of success on the merits;
2. Danger of real, immediate, and irreparable injury which may be prevented by injunctive relief;
3. No plain, speedy, and adequate remedy at law;
4. The injunction will not disserve the public interest;
5. Balance of equities favors the injunction; and
6. Injunction will preserve the status quo pending trial on merits.

*Id*. at 653-54. If each criterion is not met, injunctive relief is not available. *Id*. at 654.

Pursuant to C.R.C.P. 65(d), every order granting an injunction shall be specific in its terms and describe in reasonable detail the acts sought to be restrained. Rule 65 is designed to provide fair notice to enjoined parties of precisely what conduct is prohibited, and to avoid finding parties in contempt based on orders that are too vague to be understood. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Accordingly, an injunction "must be sufficiently precise to enable the party subject to the injunction to conform his or her conduct to the injunction." *People v. Wunder*, 371 P.3d 785, 790 (Colo. App. 2016). An injunction that leaves important terms undefined may be impermissibly vague in violation of C.R.C.P. 65. *Id*.

An order granting an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." C.R.C.P. 65(d).

1. <u>Reasonable probability of success on the merits.</u>

To determine whether a plaintiff has a reasonable probability of success on the merits, a trial court is "obliged to assess the proper legal standard and applicable burden of proof which would be required at a subsequent trial on the merits." *Rathke*, 648 P.2d at 655. The court must substantively evaluate the issues as it would during trial. *Dallman v. Ritter*, 225 P.3d 610, 621 (Colo. 2010). When assessing the likelihood of success on the merits, "the court should not treat this factor as one that is merely considered and balanced with the comparative injuries of the parties." *Home Shopping Club, Inc. v. Roberts Broad. Co. of Denver*, 961 P.2d 558, 561 (Colo. App. 1998). Rather, the moving party must demonstrate a reasonable probability of success on the merits as a prerequisite for injunctive relief. *Rathke*, 648 P.2d at 654.

2. <u>Danger of real, immediate, and irreparable injury which may be prevented by injunctive relief.</u>

Irreparable harm is generally defined as "certain and imminent harm for which a monetary award does not adequately compensate." *Gitlitz v. Bellock*, 171 P.3d 1274, 1279 (Colo. App. 2007) (citation omitted). An injury may be irreparable where "monetary damages are difficult to ascertain or where there exists no certain pecuniary standard for the measurement of the damages." *Id*. The

plaintiff must show that she is "likely to suffer irreparable harm" without injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The irreparable harm inquiry focuses on future injury. *See Bd. of Cnty. Comm'rs of Pitkin Cnty. v. Pfeifer*, 546 P.2d 946, 949 (Colo. 1976). A court may grant injunctive relief as "a preventive and protective remedy, affording relief against *future*, rather than past, acts." *Anderson,* 409 P.3d at 616 (quoting *id*.) (emphasis original). However, an injunction cannot issue based on speculative harm to the plaintiff. *See Am. Invs. Life Ins. Co. v. Green Shield Plan, Inc.*, 358 P.2d 473, 475-76 (Colo. 1960).

Various U.S. District Courts have held that the denial of gender-affirming care for transgender individuals constitutes irreparable harm. *See e.g.*, *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021) (concluding that terminating access to puberty blocking hormones constitutes irreparable physical and psychological harm for transgender patients).

3.   No plain, speedy, and adequate remedy at law.

A preliminary injunction is a form of equitable relief. *Rathke*, 648 P.2d at 651. A trial court will not grant an injunction if a plaintiff has a plain, speedy, and adequate remedy at law. *Home Shopping Club*, 961 P.2d at 562. Injunctive relief is only available if there is no legal remedy that provides "full, complete, and adequate relief." *Gitlitz*, 171 P.3d at 1279. An action for damages is a remedy at law. *See Boglino v. Giorgetta*, 78 P. 612, 614 (Colo. App. 1904).

Relevant to the question whether an adequate remedy at law exists "include whether damages can be proven with reasonable certainty . . . whether the harm alleged is continuing or will require plaintiff to resort to multiple litigation to effect the legal remedy, and the difficulty of obtaining, by the use of money, a suitable substitute for the promised performance." *Benson v. Nelson*, 725 P.2d 71, 72 (Colo. App. 1986).

4.   The injunction will not disserve the public interest.

A court will only grant injunctive relief if the injunction will not disserve the public interest. *Rathke*, 648 P.2d at 654. When analyzing whether to enjoin a party from violating a state statute, a court may consider the "design of the statute" and its impact on the public interest. *See Kourlis v. Dist. Ct., El Paso Cnty.*, 930 P.2d 1329, 1336 (Colo. 1997). Violation of state law "imbued with great public importance" constitutes an "injury" to the public interest. *See Lloyd A. Fry Roofing Co. v. State Dep't of Health Air Pollution Variance Bd.*, 553 P.2d 800, 808 (Colo. 1976).

However, an injunction that "could create a greater risk to a greater number of individuals" may "adversely affect the public interest." *See Trinidad Area Health Ass'n v. Trinidad Ambulance Dist.*, 562 P.3d 928, 936 (Colo. App. 2024). In *Trinidad*, the Colorado Court of Appeals upheld the denial of a preliminary injunction where compelling an ambulance district to perform around-the-clock interfacility transfers would have inhibited the ambulance district's ability to promptly respond to 911 calls. *Id*. The court found that compelling the ambulance district to provide these services could create a greater risk to a greater number of individuals, which would adversely affect the public interest. *Id.*

5.   Balance of equities favors the injunction.

The balance of equities favors injunctive relief if "the threatened injury to the plaintiff outweighs the threatened harm the preliminary injunction may inflict on the defendant." *Rathke*, 648 P.2d at 654. When weighing the balance of the equities, a court may consider "equitable considerations having to do with [the public] interest." *Kourlis*, 930 P.2d at 1337.

6.   Injunction will preserve the status quo pending trial on merits.

The purpose of an injunction is to preserve the status quo. *Home Shopping Club*, 961 P.2d at 563. In cases involving newly enacted rules or regulations, the appropriate "status quo is the status quo ante, that is the status quo before the rule was enacted." *Sanger v. Dennis*, 148 P.3d 404, 419 (Colo. App. 2006) "The status quo is the last uncontested status between the parties which preceded the controversy." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,* 269 F.3d 1149, 1155 (10th Cir. 2001).

## IV.   ANALYSIS

### A.   Reasonable Probability of Success on the Merits.

Having considered the written record and the testimony and argument during the preliminary injunction hearing, the Court concludes that Plaintiffs have demonstrated a reasonable probability of success on the merits on both of their CADA claims. Relevant to both claims, pursuant to CADA's plain text, hospitals are places of public accommodation. CADA precludes CHC, a hospital, from discriminating against an individual or group because of sex, gender identity, or disability.

The central issues at trial will include (1) whether CHC denied Plaintiffs full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations on the basis of sex, gender identity or disability; and (2) whether gender dysphoria is a disability under CADA.

The Court found compelling Ms. Boe's testimony that CHC refused to prescribe Bella Boe, a transgender girl who has been diagnosed with gender dysphoria, hormones or offer referrals to other providers. The TRUE Center told Danielle Doe at an appointment that it would not provide care (i.e., bloodwork and measurements) for to a fertility preservation procedure related to gender affirming care. According to Ms. Doe, CHC will not write Danielle another prescription for puberty blockers related to her gender identity. Non-party Jacob Joe was similarly denied care when the TRUE Center canceled his appointment to replace his puberty blocker implant.

There is no dispute that CHC ceased offering prescriptions for hormone therapy and puberty blockers to minor patients for the purpose of gender affirming care. CHC continues to offer hormone therapy and puberty blockers to cisgender youth for purposes not related to gender affirming care. Refusing to offer these treatments to transgender patients for the purpose of gender affirming care facially differentiates between transgender and cisgender patients.

Further, the Court found compelling the testimony of Dr. Karasic that gender dysphoria can cause a disability in that it can substantially limit life activities.   Whether CHC has

18

discriminated against Plaintiffs on the basis of sex was not explored at the preliminary injunction hearing.

CHC argues that its decision to suspend medical gender affirming care was not discriminatory because it has a legitimate, non-discriminatory reason for doing so: it is complying with the Kennedy Declaration to avoid potential exclusion from federal health care programs. Regardless of CHC's stated reasons for ceasing care, the Court finds that if this case were to proceed to trial, Plaintiffs have demonstrated a probability that they will succeed on the merits of their claims under CADA because the testimony and evidence at the preliminary injunction hearing tended to demonstrate that CHC has ceased offering medical gender affirming care at least *in part* due to Plaintiffs' gender identity and/or disability.

## B.     Danger of Real, Immediate, and Irreparable Injury Which May Be Prevented by Injunctive Relief.

Plaintiffs have established that they face a danger of real, immediate, and irreparable injury.

Plaintiffs face a danger of irreparable injury from undergoing an unwanted puberty based on their sex at birth. The harm is not speculative; indeed, it is certain that when Plaintiffs cease taking puberty blockers, they will undergo puberty in accordance with biology.  Plaintiffs are likely to experience irreversible physical changes to their bodies inconsistent with their gender identity that may require surgery to reverse. In addition, stopping hormone therapy may cause irreversible changes to the body.  The Court credits the testimony of Dr. Reirden and Dr. Karasic that Plaintiffs are likely to experience immediate, irreversible physical and psychological harm from stopping gender affirming care.

The danger to Plaintiffs is also imminent. Plaintiffs are at imminent risk of psychological stress from stopping care, including an elevated risk of suicidal ideation. CHC's announcement that it will cease offering gender affirming care is already causing Plaintiffs ongoing distress. The evidence shows that Plaintiffs are likely to suffer further imminent psychological harm from the discontinuation of care. The Court finds that monetary damages are unlikely to adequately compensate Plaintiffs for such harm. It would be difficult to ascertain monetary damages for the injuries Plaintiffs face.

The evidence shows that Plaintiffs have limited options for alternate providers offering gender affirming care. Most pediatricians do not offer such care, and it is not easily provided via telehealth. Medicaid may also impose limitations on Plaintiffs' access to gender affirming care from other providers. However, gender affirming care may be available outside the reimbursement system and/or in other countries. The Court also heard testimony that other providers in the area may be able to provide care.

The Court recognizes the serious nature of the harm that Plaintiffs are likely to face if they are forced to stop gender affirming care. However, the Court notes that the requested injunction may not stop this harm from occurring. It is possible that an injunction could cause CHC or the TRUE Center to close, certain doctors to lose privileges, or CHC's and/or the providers' exclusion from Medicaid, which would result in the unavailability of medical gender affirming care from Defendant. Thus, Plaintiffs would suffer the very harm they seek to prevent. Regardless, the Court

finds that Plaintiffs have demonstrated that they face a danger of real, immediate, and irreparable injury from CHC's cessation of gender affirming care.

**C.    No Plain, Speedy, and Adequate Remedy at Law.**

The Court finds there is no plain, speedy, and adequate remedy at law in this Court that would address Plaintiffs' ongoing and future harm. Litigation is likely to be protracted.

The Court notes, however, that the pending litigation in *Oregon v. Kennedy* may provide the Plaintiffs the remedy they seek: an invalidation of the Kennedy Declaration. That litigation is set for a hearing on summary judgment on March 19, 2026.

**D.    The Injunction Will Not Disserve the Public Interest.**

Granting the requested injunctive relief would serve the public interest by protecting Plaintiffs and other vulnerable transgender and gender-diverse youth in the region. Protecting the Plaintiffs' access to medical care that is lawful in Colorado serves the public interest. However, if injunctive relief is granted and CHC or individual providers at the TRUE Center are excluded from participating in Medicaid, CHC could no longer offer gender affirming care, despite this Court's order. Therefore, granting injunctive relief may not protect the public's access to gender affirming care—and has a serious and substantial risk of ceasing the availability of all pediatric care from CHC.

The Court finds based on the evidence, written record, and argument at the preliminary injunction hearing that granting the requested injunctive relief would pose a grave danger to the public interest that is greater than the danger to Plaintiffs.

Outside of the TRUE Center, CHC provides specialized pediatric care to thousands of pediatric patients in the Rocky Mountain Region, regardless of gender identity. CHC offers a myriad of pediatric care including organ transplants, neurosurgery, and cancer treatment. A substantial percentage of CHC's patient population is on Medicaid and continuing to provide gender affirming care puts CHC at significant risk of exclusion. Exclusion of CHC would mean that in addition to not receiving Medicaid funds, it could not participate in commercial insurance. Further, exclusion could cause loss of accreditation by CDPHE. A hospital cannot operate without revenue or accreditation.

Further, even if CHC does not close but instead drastically reduces its services, the public across the Rocky Mountain Region would lose access to a wide range of pediatric care. This undoubtedly poses a grave danger to large populations of children and families. CHC provides critical services to underserved patients, including nearly half of its patient population enrolled in Medicaid (including some of Plaintiffs). CHC's exclusion could pose a particular risk to underserved and/or low-income patients in the state of Colorado.

Plaintiffs contend that CHC does not face an actual threat of enforcement and is unlikely to face exclusion. The Court does not this argument compelling for several reasons.

First, Plaintiffs contend that HHS' agreement to forgo issuing notices of intent to exclude or notices of exclusion mitigates the actual risk of exclusion. However, HHS has only agreed not to exclude CHC until the pending motions are resolved in *Oregon v. Kennedy*. Regardless of Plaintiffs' view of the merits of that case, it is not appropriate for the Court to speculate about how the U.S. District Court for the District of Oregon will resolve the pending motions. It is possible that HHS will prevail and the Kennedy Declaration will remain binding on CHC, in which case CHC will face a very real threat of exclusion.

Next, Plaintiffs argue that CHC has already violated the Kennedy Declaration by providing gender affirming care in the days after the issuance of the Declaration. Dr. Brumbaugh testified that he is concerned that additional prescriptions would cause a pattern of conduct that could increase the likelihood of exclusion. The Court agrees that continuing to provide gender affirming care could place CHC at a greater risk of exclusion.

Plaintiffs further contend that CHC could appeal its exclusion or obtain an injunction to prevent its exclusion. However, federal regulations provide limited post-exclusion remedies and it would be inappropriate for this Court to base its analysis on whether another court would grant CHC an injunction in a hypothetical future case.

Plaintiffs essentially ask the Court to call the bluff of the federal government and order CHC to take action in violation of federal law.[2] The Court cannot discount the very real possibility that the federal government will take enforcement action against CHC. The current administration has indicated that it will use every means possible to stop gender affirming care and has interfered with care in a way that is unprecedented. HHS has already suggested that CHC has been referred to the OIG for investigation, along with other hospitals.

Accordingly, the Court treats the threatened harm to CHC as a very real possibility. Given the potentially devastating public impact on pediatric care in the region, the Court finds that the requested injunction could create a greater risk to a greater number of individuals, which would adversely affect the public interest.

**E.     Balance of Equities Favors the Injunction.**

For the same reasons the public interest is not served by granting the requested injunctive relief, the balance of equities disfavors an injunction.

**F.     Injunction will preserve the status quo pending trial on merits.**

Plaintiffs have requested an order "prohibit[ing] [CHC] from refusing to provide medically necessary care to transgender patients." CHC argues that the requested injunctive relief is overly broad, impermissibly vague, and requests relief for which no manageable standards exist. Plaintiffs contend that courts routinely issue such injunctions.

---

[2] The Court recognizes the competing interests of state vs. federal law. While the Court does not condone a violation of any law, the Court is particularly concerned with affirmatively ordering a party to violate a law in the face of significant consequences. Indeed, the Court questions its authority to make such an order.

The Court agrees with CHC that the terms of the proposed injunction are not sufficiently specific. Because the proposed injunction does not define the term "medically necessary care," it does not specify what, if any, specific medical care must be provided or when CHC must provide such treatment. Consequently, because the proposed injunction does not describe in reasonable detail the acts sought to be restrained, it will not enable CHC to conform its conduct to the injunction. Further, the requested injunctive relief would bind CHC but the Court questions whether it would bind the medical providers at the TRUE Center, who are not employees of CHC. If individual doctors at the TRUE Center refuse to write prescriptions for gender affirming care, it is unclear whether the proposed injunction form a valid basis for holding those providers in contempt. Because the requested relief is not sufficiently specific, the Court finds that it is not clear whether an injunction would preserve the status quo pending trial on the merits.

Because the Court has concluded that Plaintiffs have not demonstrated all the *Rathke* factors, the Court finds that it need not address arguments at this time regarding bonds, availability of a class-wide injunction prior to class certification, or the political question doctrine.

## V.     ORDER

For the foregoing reasons and authorities, Class Plaintiffs' Motion for Preliminary Injunction filed January 20, 2026 is DENIED.

SO ORDERED: February 13, 2026.

BY THE COURT:

_____
Hon. Ericka F. H. Englert
District Court Judge

22