# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| STATE OF OREGON; STATE OF WASHINGTON; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF RHODE ISLAND; STATE OF VERMONT; and STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 6:25-cv-02409<br><br>March 19, 2026<br><br>Eugene, Oregon |
|---|---|---|
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ROBERT F. KENNEDY, JR., in his official capacity as the Secretary of the Department of Health and Human Services; THOMAS MARCH BELL, in his official capacity as Inspector General of the Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE OF INSPECTOR GENERAL; and the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**TRANSCRIPT OF PROCEEDINGS**
(Oral Argument)
BEFORE THE HONORABLE MUSTAFA T. KASUBHAI
UNITED STATES DISTRICT COURT JUDGE

KELLIE M. HUMISTON -- (503) 544-2459

2

**A P P E A R A N C E S - i**

FOR THE PLAINTIFF STATE OF OREGON:
                          OREGON DEPARTMENT OF JUSTICE
                          By:  Allie M. Boyd
                          100 SW Market Street
                          Portland, OR 97201


FOR THE PLAINTIFF STATE OF OREGON:
                          OREGON DEPARTMENT OF JUSTICE
                          By:  Kate E. Morrow
                          100 SW Market Street
                          Portland, OR 97201


FOR THE PLAINTIFF STATE OF WASHINGTON:
                          OFFICE OF THE ATTORNEY GENERAL OF
                          THE STATE OF WASHINGTON
                          By:  William McGinty
                          800 Fifth Avenue
                          Suite 2000
                          Seattle, WA 98104


FOR THE PLAINTIFF STATE OF WASHINGTON:
                          OFFICE OF THE ATTORNEY GENERAL OF
                          THE STATE OF WASHINGTON
                          By:  Lauryn K. Fraas
                          800 Fifth Avenue
                          Suite 2000
                          Seattle, WA 98104

**A P P E A R A N C E S - ii**

FOR THE DEFENDANTS:
                    U.S. DEPARTMENT OF JUSTICE
                    By:  Kathryn Alkire
                    1100 L Street, NW
                    Washington, DC 20005


FOR THE DEFENDANTS:
                    U.S. DEPARTMENT OF JUSTICE
                    By:  Michelle R. Bennett
                    1100 L Street, NW
                    Washington, DC 20005


**COURT REPORTER:**
Kellie M. Humiston, RMR, CRR
(503) 326-8186
Kellie_Humiston@ord.uscourts.gov

THE COURT:  I have to determine a final agency action.  And what I want to -- really want -- what I'm going to want to hear from everybody is when final agency action can be legally realized.  And from what I'm hearing you say is that it's not a final agency action until OIG has adjudicated a decision.

MS. ALKIRE:  What I'm saying is that the Kennedy Declaration is not final agency action, which is the only document that's challenged in this case.

THE COURT:  Okay.  So what would final agency action look like?  Maybe I'll ask it that way.  So in a hypothetical world, what would final agency action look like in this context?

MS. ALKIRE:  The regulations require OIG to make a determination, and once they make a determination, it's then subject to both administrative and judicial review.  And so once OIG has made a determination, then that would surely constitute an agency action that could be challenged.

THE COURT:  Okay.  So the determination -- the agency determination would be exclusion?  Is that the -- is that the decision, or that final action that could then be appealed or for which additional review could be sought?

MS. ALKIRE:  Well, so, Your Honor, what -- it depends what type of review you're asking.  Within the agency and the regulation structure themselves, OIG first issues a notice of

intent to exclude, and at that point there's no exclusion that's happened yet.  OIG has just made a determination to open up an investigation to decide -- to collect information and decide whether it will move to exclude the provider.  And so once a provider receives a notice of intent to exclude, they have the opportunity to present evidence to OIG.

THE COURT:  So can we -- let me stop there.  So once OIG sends a notice to a provider, a notice to exclude or intent to exclude, is that the final agency action?

MS. ALKIRE:  I would say -- I would say no, Your Honor.

THE COURT:  So then once the -- once OIG makes a decision to exclude, that becomes a final agency action?

MS. ALKIRE:  So after the -- after OIG has reviewed all of the evidence from the provider, after it's reviewed all the evidence that the regulations list within the different types of evidence that it would consider, OIG would then send the provider a notice of exclusion.  From that notice of exclusion, the provider can then appeal that to an administrative law judge, to the Department of Appeal Board, and then it's subject to judicial review.

So I would say that the decision -- when OIG decides to exclude a provider, that would be the point of an agency action, because there's been a determination of what the standard of care is, that the provider has violated that

standard of care, and that OIG has exercised its permissive exclusion authority to exclude the provider.

THE COURT:  All right.  So your argument isn't an exhaustion of remedies -- administrative remedies argument, in that they would have to go all the way through the review process and get a final decision from the highest level of review within the agency before they can seek review to the court?

MS. ALKIRE:  If that's the point that the case is in front of us that we're arguing, that would create a different circumstance than what we have right now, because what we have right now is we're reviewing the Kennedy Declaration as opposed to a hypothetical future enforcement action, which is -- which has not happened and is not before the Court in this case.  So, you know, in the world that we're speaking, that creates a different set of circumstances.

Would that provider be required to exhaust administrative remedies before seeking judicial review? That's surely what the regulations state, but that's not to say that the provider would be prohibited from seeking judicial review before -- you know, once they receive a notice of exclusion before an exclusion takes effect.  You know, we cite some case law in our briefs that talk about a waiver of the exhaustion of administrative remedies and that there is -- there is a method for that so that a provider could seek --

this is an imperfect comparison.  Somebody can move against an indictment or a charging instrument because it somehow fails in alleging certain elements necessary to charge a crime, but they haven't yet been found guilty of anything.

So in the sense of how far -- how early can something -- can a review process be -- how early can a review process be before it is no longer -- it isn't yet ripe or a final agency action?

It seems to me that somebody can move against an indictment, for example, before there's a trial and before there's a finding of guilt or not guilt.  So there are steps along the way well before a final determination, for example, in a criminal case, a finding of guilt, that a defendant can move against that charging instrument.  So there are steps -- there are very concrete steps that people can take to avoid appropriately some future final determination that may have also more significant consequences attached to that, and what I'm trying to explore here is where that is in this case.  And at the end of the day, you're saying it's really the notice of exclusion.

MS. ALKIRE:  Yes, Your Honor.

THE COURT:  Which I think in my analogy, I'm comparing to a verdict of guilty.

MS. ALKIRE:  Notwithstanding my inexperience with criminal law, Your Honor, that seems like a relevant

comparison here.  The only difference is, you know, I suppose when someone is arrested, maybe they're released on, you know, pretrial release with some sort of conditions before that guilt determination has been made.

In this circumstance, once a provider receives a notice of intent to exclude, there's not a similar punishment involved.  It's an investigative period so that OIG can determine whether it is going -- whether the provider has provided services that failed to meet the standard of care, but then there's also a permissive authority part to this.

You know, similar to a prosecutor who doesn't have to bring charges even if there's a crime here, OIG has the discretion to -- even if a provider has failed to meet the standard of care, the OIG does not have to exclude the provider under the standard of care exclusion.  Certainly there are other types of exclusion that are mandatory exclusions from OIG, but the specific type of exclusion here at issue is not a mandatory exclusion of providers.

THE COURT:  Okay.  We've put off talking about the Declaration for a bit now.  I take it from your briefs that you just -- the government's position is that there's just simply no way that that can be construed as a final agency action.  Tell me why.

MS. ALKIRE:  So the Declaration -- the Declaration does not change the process by which OIG conducts exclusion

proceedings, and it's not dispositive of the first decision OIG has to make, which is what the relevant professionally recognized standard of care is.  It's not dispositive of OIG --

THE COURT:  You're saying that it isn't -- on the first part, that the Declaration doesn't provide sort of a binding rule or a standard that must now be applied by OIG?

MS. ALKIRE:  That's correct, Your Honor.  It does not apply -- it does not create a binding standard on OIG at all.

Under the regulations, OIG must consider multiple sources of information before -- to be able to figure out what the professionally recognized standard of care is and whether a provider has violated it.  Those sources of information --

THE COURT:  So you're saying that the OIG could, even despite the Declaration and the language in the Declaration that indicates that gender-affirming care is not best medical practice, that it could disregard it?

MS. ALKIRE:  Absolutely.  Yes, Your Honor.  The agency is free to disregard the substance of the Kennedy Declaration, because it does not create a binding legal effect.

THE COURT:  OIG is under HHS, right?

MS. ALKIRE:  Yes, Your Honor.

THE COURT:  Okay.  And is OIG basically sort of the administrative -- the ALJ sort of side of adjudicating

THE COURT:  And in the course of that explanation, it says, "We considered 20 things.  One was the directive or the information or the opinion that Senator Kennedy provided in his Declaration identifying the provision of gender-affirming care falls below the accepted practices -- falls below the accepted professional standards of care," and then -- and then goes on to talk about all the other 20 -- or 19 items for why it decided to exclude, are you saying that it doesn't matter because it's one of many as opposed to the only one?

MS. ALKIRE:  Both, Your Honor.  So if it's one of many, it's not the sole source of setting what the relevant standard of care is, but --

THE COURT:  It's one of them, but you're saying just because it's -- it may have played a 5 percent role in concluding that exclusion was appropriate, it doesn't have an impact?

MS. ALKIRE:  Maybe it would be helpful to clarify my -- my second point.  So if it's one of them or if it is the only one, which, again, our position is it's not dispositive, so it would not be the only one, if it is the only one, it still does not establish or change the substantive legal standard here.

The standard comes from the statute itself, which -- which sets that a provider who has furnished services which failed to meet professionally recognized standards of care

could be excluded.

The case -- the case law that we cite from the Ninth Circuit, *Gentiva*, it talks about local coverage determinations.  And when local -- a local coverage determination here did not establish or change the substantive legal standard, because the substantive legal standard came from the statute which says that Medicare can only cover services that are reasonably and -- reasonable and necessary. And the local coverage determination at issue here set the standard for exactly what was reasonable and necessary, and it was binding on the initial decision-making.

Our position is that the Kennedy Declaration does not set that standard and it's not binding on decision-making, but even if it was, the substantive legal standard does not change, just as it does not change with this local coverage determination.

If the Kennedy Declaration did not exist, there would still be this substantive legal standard in the statute. And just to clarify, plaintiffs do not challenge the statute or regulations in this case.

THE COURT:  So if the Declaration did modify that standard as you've described it, and I understand what you've defined is what the standard is here, if it didn't say anything about what that standard ought to be, would it then be subject to rule-making requirements?

MS. ALKIRE:  If the Kennedy Declaration did not reference the standard?

THE COURT:  No.  If it -- if it modified it in some way.

MS. ALKIRE:  If the Kennedy Declaration established or changed the substantive legal standard under the Medicare notice-and-comment rule-making, it would be subject to rule-making, but it does not here, because the substantive legal standard comes from the statute and regulations themselves.

THE COURT:  And what you're defining as the substantive legal standard is the language that describes providing medical treatment that drops below the professionally accepted standard of care?

MS. ALKIRE:  Well, Your Honor, the language comes from the statute, which is --

THE COURT:  Well, but I'm simply trying to confirm what we're talking about, because I think there's a definitional issue here as well.  And I think -- I think the government is asking me to understand that the standard is the language that you've described in the statute.  And what I understand from the plaintiffs is that the standard that you're describing is, in fact, being modified by reframing -- or actually not reframing, but by saying that as a matter of rule or matter of law, that only -- that any provision of

MS. BOYD:  Yes, particularly against or superseding the applicable standards of care for that particular provider. So, for example, a provider in one of the plaintiff states, say an Oregon provider, it is recognized under Oregon law, particularly House Bill 2002, that gender-affirming medical treatment is the standard of care.  If the Office of Inspector General, you know, goes in, they have to apply that statewide standard in order to determine whether that provider is falling below professionally recognized standards.

The concern is that the position taken by the defendants in the responsive briefing is that, no, the Office of the Inspector General could go ahead and decide that provision of that care falls below professionally recognized standards regardless of the fact that Oregon recognizes that as the standard.

THE COURT:  Okay.  Ms. Alkire, do you want to respond to that last point?

MS. ALKIRE:  Yes, Your Honor.  The statute and regulations allow OIG to exclude a provider who provides services that fail to meet the professionally recognized standards of care; that professionally recognized standards of care is decided within an exclusion proceeding using multiple sources of information, including things like statewide standards, but also things that are listed in the factors that we discussed earlier in this proceeding that I'm happy to

discuss again, but that determination of what the statewide standard is and whether a provider has failed to meet it is made on the basis of multiple factors, and the statutory authority for OIG to exclude a provider is not challenged in this case.

THE COURT: Let's go over it again. I'm going to ask you all to belabor a little bit more, because I want to make sure I'm tracking this.

I know you outlined several other considerations that OIG can take up in determining whether to exclude, that being this Declaration is one of them?

MS. ALKIRE: Yes, Your Honor. This is one source of information that OIG may consider in a future exclusion proceeding.

THE COURT: And other considerations?

MS. ALKIRE: 24 C.F.R. Section 1001.701(b) lists the sources of information that the OIG uses to determine whether a provider has provided services that failed to meet the professionally recognized standards of care. They are the quality improvement organization for the area serviced by the individual or entity, state or local licensing or certification authorities, fiscal agents or contractors or private insurance companies, state or local professional societies, or any other sources deemed appropriate.

There is no one source of information that is

dispositive of the standard.

THE COURT:  So all of them, I think, for the last one, which was sort of a catch-all anything else deemed appropriate, was state-based sources.  Tell me -- maybe I missed something, but all those other considerations are state-based?

MS. ALKIRE:  One of these is fiscal agents or contractors or private insurance companies.  From my understanding, private insurance companies operate nationally.

THE COURT:  All right.  So fiscal agents or private -- or private insurance companies?  Is that what it says, "private"?

MS. ALKIRE:  Fiscal agents or contractors or private insurance companies.  This is subsection (3) of that regulation.

THE COURT:  So it's your contention that -- that -- that even though, you know, the standard of care is determined on a statewide level, that OIG could still exclude, taking into account something contrary to the state's determination of standard of care?

MS. ALKIRE:  Well, Your Honor, the standard of care is not determined just by a set statewide standard.  OIG takes into multiple -- multiple sources of information to determine both what the standard of care is and whether a provider has violated it.

THE COURT:  Do we have an example of anything that the OIG's done that -- that describes this consideration, this review?

MS. ALKIRE:  Not off the top of my head, Your Honor, but maybe some of the tension here comes from the definitional section that describes what the standard of care is as statewide or national standards, whether in writing or not, that we discussed earlier.

The definitional section is not the enforcement determination or the determination of what sets the statewide standards.  The definitional section describes what standards of care are, but the determination of what the actual standard of care is in an exclusion proceeding is done on a case-by-case basis underneath the regulations.

THE COURT:  Well, I mean, then there could be an instance where the OIG might regard the national standards of care in one circumstance and not in another.  I mean, it seems like there would be no -- there would be no uniformity to the -- and predictability of what OIG could be considering from one case to another when making a determination to exclude.

MS. ALKIRE:  Other than the factors of the different sources of information that are limited, you're essentially right, Your Honor.  This is a case-by-case factual determination that OIG does within the regulatory process,

which is subject to regulatory protections and administrative review and so on.  And maybe it would help to give an example of the difference between the definitional section and where it appears in the exclusion regulation.

THE COURT:  Yes.

MS. ALKIRE:  So, for example, the definitional provision that describes what standards of care are -- say it said the speed limit means the maximum lawful speed.  That's what the definitional section is saying.  It's telling you that the concept -- what the concept of a speed limit is, but it's not telling you what the -- what the actual speed limit is for a given area or for a given situation or whether someone was speeding.

In the same way, the definitional section of standard of care tells you what professionally recognized standards of care are as a concept, but it does not tell you what the standard of care is for a specific situation or whether that standard of care has been violated.  Those determinations require case-specific evaluations, and both of them occur at the same time within the exclusion regulations using those multiple sources of information listed in the regulations and any sources of information that the provider offers to OIG during that investigative process before an exclusion determination is made.

THE COURT:  If we're using this analogy that there's,

KELLIE M. HUMISTON -- (503) 544-2459

you know, a standard about maximum speed limit as sort of -- that being the standard generally described as sort of as a general approach, then if I'm extending that analogy to what I'm dealing with here in the Declaration, wouldn't the Declaration be, well, the speed limit's not 55, because it -- because Secretary Kennedy has indicated as much, that there is no gender-affirming care provided to youth that would -- that would rise above the -- the generally accepted professional standard of care?

MS. ALKIRE:  No, Your Honor.  So our position still is that the Declaration doesn't do that, but even assuming it does what Your Honor is describing, the Declaration would not be changing the -- the speed -- what speed limit means.

THE COURT:  Well --

MS. ALKIRE:  It would be making one of those first determinations of what the speed limit is or whether someone was speeding.

It's not making the decision that somebody was speeding, because it does not identify any providers that should be excluded.

Under the explanation that the Court has offered and the description that the Court has made of the Kennedy Declaration, it would be saying what the speed limit is, but it would not be changing the definition of what a speed limit is as the maximum lawful speed.

KELLIE M. HUMISTON -- (503) 544-2459

safe or effective under a delegated statutory authority.

This Court should not be opining on what the whole entire power is of the Department to set standards for the various programs that it regulates, let alone ones that supersede statewide standards here.

In regard to this matter, if you rule against defendants, which of course our position is that that's not proper, but if you do, any relief should be limited to the only challenged action in this case, which is the Kennedy Declaration itself, and it should be limited to vacating the Kennedy Declaration, because if the Kennedy Declaration does not exist, if it is vacated, the agency has nothing to rely on. There's no other relief that is required here to remedy plaintiffs' alleged harms.

The Ninth Circuit has vacated injunctions that invalidate unchallenged agency decisions and unchallenged agency actions, including those that prohibit similar actions from being taken in the future. It would be improper to extend relief beyond the challenged Declaration here. It would be both overbroad and plaintiffs' -- plaintiffs' requested relief is also impermissibly vague under Rule 65(b)'s specificity requirements.

It's not clear enough for the agency to know what plaintiffs mean by "statewide standard of care" as they exist in the plaintiff states, because under the exclusion

regulations, how that term is used, it is not dispositive of one standard of care from a state.  It's a decision that's made using multiple sources of information like we've discussed, including those submitted by a provider.

So the exclusion regulations do not treat standards of care as fixed by any one of these single sources, including those from plaintiff states.  So issuing an order that prohibits plaintiffs from anything that relates to the standards of care in plaintiff states would be impermissibly vague.

THE COURT:  Would you agree that if the Declaration had -- I know it's turning everything in the reverse -- the Declaration, instead of indicating that gender-affirming care fell below the standard of care, it actually said in fact that gender-affirming care is the gold standard for providing care to this population of individuals, and then you had a state out there that said otherwise, medical providers have refused care.  I think the way that we're looking at this is that OIG could go ahead and exclude them if they were referred to OIG, correct?

MS. ALKIRE:  If it were a declaration that's similar to the Kennedy Declaration but says the inverse, it would still not be binding on OIG's authority to exclude a provider, and it would -- as we've described here, it would not be dispositive of what the standard of care is in any exclusion

proceeding, because that standard is set by the process of the regulations that take place using those multiple sources of information that's done on a case-by-case situation based on the facts of the individual cases.

THE COURT: Even if the state standards that were adopted by that particular state's legislature or local agency bodies indicated that -- that gender-affirming care is disallowed, prohibited, not -- it doesn't meet the minimum standard of care necessary for providing care?

MS. ALKIRE: Yes, Your Honor. Those are certainly part of the factors that OIG would consider on the sources of information, but it wouldn't be dispositive.

THE COURT: All right. Anything else on the relief?

MS. ALKIRE: Other than -- other than it being limited to the Kennedy Declaration and that vacatur is enough to satisfy plaintiffs' alleged injuries --

THE COURT: So nothing with respect to a declaratory judgment?

MS. ALKIRE: Correct, Your Honor.

THE COURT: And the enjoining of implementing, you know, the -- I think Ms. Boyd's pointed out that there's a reference in your brief that OIG could go ahead and do this anyway.

MS. ALKIRE: OIG -- so this is the structure of the statute itself on how that standard has not changed as to be

subject to rule-making, but the standard has not changed and plaintiffs do not challenge the legality of the statute that empowers OIG to exclude a provider or individual or entity from healthcare programs if it fails -- if it provides services that fail to meet standards of healthcare.

THE COURT: And we don't know of any instance in which OIG has done something like that when the states have identified that a particular -- a particular medical practice does meet that standard of care but OIG has found otherwise?

MS. ALKIRE: Well, that goes to the ripeness of the claim, which I don't know that we technically wrapped that up yet, but that's -- that's the thing, that OIG has not used the Kennedy Declaration or initiated an exclusion proceeding against any of the plaintiff -- providers in the plaintiff states for this type of care.

THE COURT: I asked more broadly there. No one's pointed to me, and if they have, I don't recall, if there's been an instance in which OIG has in fact determined that somebody -- some provider should be excluded because it falls below a standard of care that OIG has determined to be the case where -- where it was clear that the states determined that that treatment would have clearly been within the standard of care in that state.

MS. ALKIRE: I think I'm following what you're saying, Your Honor. I'm not aware of any circumstances like

that.  And from my understanding, it's not been raised in the briefs, either.

THE COURT:  Okay.  All right.  What else on relief?  Anything?

MS. ALKIRE:  Nothing further, Your Honor.

THE COURT:  Okay.  Ms. Boyd?

MS. BOYD:  Yes, Your Honor.  I'd like to address two points, the first one being that it should be limited to vacating the Kennedy Declaration.  And we would push back on that simply because, again, the defendants have not disclaimed that the Office of Inspector General will turn around and start excluding these providers.

And I would point to the Plaintiffs' Exhibit 16, which is ECF 83-16, where HHS tweeted, quote, We will hold every provider of sex-rejecting procedures for children and adolescents accountable for failure to meet recognized standards of healthcare.

This is seemingly a broad policy.  We do not have any assurance that they will not effectuate this some other way.

THE COURT:  Well, that was the -- was that the general counsel for HHS?

MS. BOYD:  Nope.  That is the HHS official account.

THE COURT:  All right.

MS. BOYD:  So we think because of this position that the defendants continue to hold, that the Office of Inspector

General could potentially consider factors that are totally contrary to the state standards, it would be necessary to grant relief that more broadly enjoins not just application of the Kennedy Declaration, but any materially similar policy which purports to supersede the professionally recognized standards of care that exist in the plaintiff states.  So that is why we would be asking for that.

And that, as articulated, I think defeats any kind of argument that that would be impermissibly vague relief, because we are asking materially similar policy that does this particular thing, that is outside of the Secretary's authority to set a superseding standard of care.

THE COURT:  Okay.  Was there something else, Ms. Alkire?

MS. ALKIRE:  Yes, Your Honor.  I just want to reiterate two points:  first, that the Ninth Circuit has vacated similar relief, invalidating unchallenged agency action in light of there being no other challenged agency action here, including those that prohibits any similar actions from being taken.

I also want to just point out that --

THE COURT:  That has been happening in other litigation, you know, around the nation involving other agencies.  You know, I know that it's happened in the context of DOE -- cases litigating DOE defunding or unfunding certain

programs.  So I think there is a precedent for doing so.  I don't know if it's been -- if it's happened with HHS.

MS. ALKIRE:  I'm not aware of those cases, Your Honor.  I'm not a party to the -- you know, a party to those cases.

I also just want to mention that the relief that the plaintiffs seek about this analogy of the plaintiff states setting the speed limit, that would displace the OIG's unchallenged regulations here, which set the standard of care using those multiple sources of information.

THE COURT:  All right.

MS. ALKIRE:  And an order from this Court stating that OIG could never supersede statewide standards of care would be, respectfully, an advisory opinion.

THE COURT:  How so?

MS. ALKIRE:  OIG has not tried to exercise any type of authority to supercede statewide standards of care, and opining on whether they can, including in the context of the exclusion regulations --

THE COURT:  Okay.  And so whether you call it an advisory opinion or just simply overbroad, overreaching.

MS. ALKIRE:  Respectfully, correct, Your Honor.

THE COURT:  Which one?

MS. ALKIRE:  Whatever one you call it.  So the relief would be overbroad and it would be an impermissible advisory

opinion on the scope of the agency's authority when they have not taken an action.

THE COURT: All advisory opinions are impermissible or just this one?

MS. ALKIRE: This advisory opinion would be impermissible, Your Honor.

THE COURT: Okay. Well, I haven't made any advisory opinion yet.

MS. ALKIRE: Yes, Your Honor. I apologize. I did not mean to imply that you had or it was impermissive. Our position is that -- yeah.

THE COURT: And so --

MS. ALKIRE: Our position is that such a -- such an opinion or order here would be an impermissible advisory opinion.

THE COURT: All right. I know that we've had cross-motions and motions to dismiss and responses. This is the last call for the last word. If you have anything, we can take a recess in just a bit.

Ms. Boyd.

MS. BOYD: I don't think anything further, Your Honor.

THE COURT: All right. And Ms. Alkire.

MS. ALKIRE: Nothing further, Your Honor.

THE COURT: Okay. Then let's take 20 minutes. I'll

come back, and if I have -- I'm going to review my notes.  If I have any other questions, I'll pose them to you, and then we'll talk about the next steps.  Thank you.

(Recess:  2:29 - 2:57)

THE COURT:  Counsel, thank you all for taking the time today to walk me through the legal arguments, the issues that on one level might at first seem clear, but I think you've all been able to help ensure that its complexity was fully presented to me today, and I appreciate that.

I also appreciate your willingness both to answer the questions and belabor some of the points to make sure that it stuck for me, because I think that's important and why I value oral argument, not just an exercise of hearing your presentation, but more of an interactive discussion.

I've had the chance to review the briefs, think about them quite a bit, and in consideration of the arguments that both of you have made, I am going to be denying the motion to dismiss, grant -- the defendants' motion to dismiss and will be granting summary judgment in favor of the -- of the several states plaintiffs.

With respect to *ultra vires*, I'm going beyond the scope and authority of the Secretary to declare that which is declared in the -- in the document, the Declaration itself, in violation of Medicare rule-making requirements, violation of the APA rule-making requirements.

Now, with respect to Count 4, I haven't decided exactly how I'm going to approach that. And because it is sort of two steps removed from perhaps sort of the direct considerations that are associated with APA rule -- APA and Medicare rule-making requirements, and certainly the *ultra vires*, which, frankly, on its face is about as clear as -- as a -- clear proof of claim as there can be, the Count 4 considerations, I do want to take under advisement and give some further thought about how -- how I need to address them or treat them in some particular way.

The relief that I will order is vacating the Declaration. The declaratory judgment -- the request for a declaratory judgment as requested on page 31 of the plaintiffs' reply that in light of the defendants' extensive reach that is not adequately and appropriately tethered to the governing statutes, the judgment will clarify the defendants lack authority to establish superseding standards of care to exclude providers from federal healthcare programs.

With respect to the request to enjoin enforcement, implementation, or reliance on the Kennedy Declaration, I'm going to ask that there be an additional supplement -- supplemental briefing to help me understand why that would be needed above and beyond declaratory action, as well as more specific language that the plaintiffs would ask that I include in the judgment. And the supplemental briefing, I invite the

defendants to provide supplemental briefing to help me understand why that -- that relief should not be ordered.

I'll ask that -- that plaintiffs submit proposed language for the judgment outlining the -- the vacatur declaratory judgment and the language that you would like me to consider with respect to enjoining enforcement, implementation, or reliance on the Kennedy Declaration or a materially similar policy as the plaintiffs have asked.

The more detailed and specific reasons advancing and identifying the factual bases will be provided in a written opinion that lays out my analysis and reasoning far more -- in far more detail than I'm going to be able to provide here orally. It will take into account the many statements in both declarations, the -- the characterizations that have been made through the communications that defendants have provided over the course of these many months since the Declaration's been issued, along with the explanation based on case law and my reasoning and the application of the facts to that case law as to why the Declaration is *ultra vires* and why rule-making is necessary by virtue of this being a final agency action that implicates a substantive change in rule.

I do want to point out a couple of -- maybe one point, perhaps two, but there was a significant distinction between the way in which the parties have been discussing the standard -- the standard that would need to be regarded.

On one level, aside from the point that I think as, Ms. Boyd, you pointed out, the Declaration doesn't quite track the language of the standard, potentially modifies it some, but the standard is, as the defendants rely on, have -- it was not explicitly modified or changed by the Declaration. I can appreciate that -- that understanding, but the Declaration also provides some very explicit, unequivocal statements about what is not -- what falls below the standard -- the professionally recognized standard of care as it relates to gender-affirming care. It is not ambiguous. It does not provide for conditions or options or alternatives. It is clear that gender-affirming care does not fall within that which is professionally recognized as standards of care.

What that amounts to is a modification. By declaring that as a matter of sort of indelible fact, it has effectively eliminated any consideration of any standard of care for people who are seeking gender-affirming care in the plaintiff states. So it is not merely an opinion. It has materially modified how -- not even how the standard of care might apply in gender-affirming care, but that there is no standard of care that can be applied for even considering the provision of gender-affirming care in those plaintiff states.

And it goes -- and that point, I think it speaks to a broader theme and issue. And -- and this is sort of my opportunity to just provide some commentary and observation.

# C E R T I F I C A T E

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

DATED this 23rd day of March 2026.


/s/ Kellie M. Humiston

Kellie M. Humiston, RMR, CRR
Official Court Reporter
Certificates Expire:  9/2027