UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

STATE OF OREGON, *et al.*,

        Plaintiffs,

   v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of the Department of Health and Human Services, et al.*,

        Defendants.

Case No. 6:25-cv-02409-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

Unserious leaders are unsafe. There is nothing more serious than our leaders' dedication to the rule of law so that we might maintain the integrity of our constitutional democracy. This case highlights a leader's unserious regard for the rule of law. This case demonstrates how disregard for the rule of law does not merely result in an abstract infraction. Rather, and tragically, this case is one of a long list of examples of how a leader's wanton disregard for the rule of law causes very real harm to very real people.

This Court can and does judge the lawfulness of the process (or lack thereof) by which any policy choice might be made. Here, the Secretary of Health and Human Services, Robert F. Kennedy, Jr., unlawfully issued a declaration threatening to cut federal funding to medical providers who provided gender-affirming care to minors. If such a declaration could have been

Page 1 — OPINION AND ORDER

enacted lawfully, there might have been ample time and opportunity for medical providers, families, and children—all people and institutions of our great nation—to seek out other alternatives and options. Secretary Kennedy's utter failure to promulgate rules in accordance with statutory authority, but instead threaten to cease federal funding to medical providers almost immediately after the declaration, caused chaos and terror for all those people and institutions of our great nation. Secretary Kennedy's unlawful declaration harmed children. This case illustrates that when a leader acts without authority and in the absence of the rule of law, he acts with cruelty.

Plaintiffs filed this lawsuit alleging that Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), by issuing a declaration entitled "Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents." Am. Compl. Ex. A, ECF No. 28. Before the Court is Plaintiffs' Motion for Summary Judgment, ECF No. 32, and Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 73. For the reasons below, Plaintiffs' motion is granted, and Defendants' motion is denied.

## BACKGROUND

Plaintiffs are several states (along with the District of Columbia) who administer Medicaid health insurance programs funded by the federal government and whose eligible residents are entitled to medical coverage under the federally administered Medicare program. On December 18, 2025, Defendant Health and Human Services Secretary Robert F. Kennedy, Jr. ("Secretary Kennedy"), issued a "Declaration" entitled "Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents" which declares

that gender-affirming care[1] in "children and adolescents" ("minors") "fail to meet professional [sic] recognized standards of health care." Am. Compl. Ex. A at 9 ("Kennedy Declaration"). Plaintiffs allege that the Kennedy Declaration allows the Department of Health and Human Services ("HHS") to exclude healthcare providers from federal healthcare programs solely for providing minors with gender-affirming care, and that it is both procedurally and substantively unlawful under the APA.

## I.    Federal Healthcare Programs

This case implicates funding under federal healthcare programs, including Medicaid and Medicare. The Court begins by summarizing those programs and the relevant legal framework governing healthcare providers' exclusion from those programs.

### A.    Overview of Medicaid and Medicare

Under Medicaid, the federal government provides funding to state programs that offer healthcare to qualifying low-income individuals and families. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a), 1396b. States administer Medicaid programs, retaining discretion to design Medicaid plans so long as they comply with the statute. *Id.* § 1396a(a); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323 (2015) ("Medicaid offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions"). The HHS Secretary "shall approve" any plan that complies with the statutory conditions, and "shall pay" Medicaid funds to states with approved plans. 42 U.S.C. §§ 1396a(b), 1396b(a). The HHS Secretary may stop making payments after

---

[1] Throughout their briefs and supporting documentation, Defendants use the term "sex-rejecting procedures." In this Court all people will be treated with dignity. The Court will use the appropriate term "gender-affirming care."

"reasonable notice and opportunity for hearing" if the HHS Secretary finds that a state's Medicaid plan no longer complies with the statutory conditions. 42 U.S.C. § 1396c.

While Medicaid is not a mandatory program, all fifty states and the District of Columbia have Medicaid plans, collectively covering nearly seventy million Americans. Fraas Decl. Ex. 25, ECF No. 83. As relevant to this lawsuit, each Plaintiff's Medicaid plan provides coverage for gender-affirming care. Sandoe Decl. ¶¶ 10-13 (Oregon), ECF No. 33; Zerzan-Thul Dec. ¶¶ 9-13 (Washington), ECF No. 34; Faiella Decl. ¶¶ 8-9 (New York), ECF No. 38; Southard Decl. ¶¶ 7–8 (California), ECF No. 39; Flores-Brennan Decl. ¶¶ 8-11 (Colorado), ECF No. 40; Halsey Decl. ¶¶ 10-13 (Connecticut), ECF No. 41; Wilson Decl. ¶¶ 9-14 (Delaware), ECF No. 42; Hall Decl. ¶¶ 6-9 (District of Columbia), ECF No. 44; Nichols Decl. ¶¶ 9-11 (Hawai'i), ECF No. 45; Phelan Decl. ¶¶ 16-21 (Illinois), ECF No. 46; Probert Decl. ¶¶ 10-13 (Maine), ECF No. 47; Briskin Decl. ¶¶ 9-12 (Maryland), ECF No. 48; Marqusee Decl. ¶¶ 5-6 (Massachusetts), ECF No. 49; Groen Decl. ¶¶ 7-9 (Michigan), ECF No. 50; Connolly Decl. ¶¶ 3, 10-13 (Minnesota), ECF No. 51; Ireland Decl. ¶¶ 3-4, Ex. 1 at 4-5, Ex. 2 (Nevada), ECF No. 52; Adelman Decl. ¶¶ 9-12 (New Jersey), ECF No. 53; Dancis Decl. ¶¶ 8-10 (New Mexico), ECF No. 54; Kozak Decl. ¶¶ 11-15 (Pennsylvania), ECF No. 55; Sousa Decl. ¶¶ 10-12 (Rhode Island), ECF No. 56; Olson Decl. ¶¶ 10-12 (Vermont), ECF No. 57; Standridge Decl. ¶¶ 9-11 (Wisconsin), ECF No. 58.

Medicare provides health insurance for adults over the age of sixty-five and disabled adults under the age of sixty-five. *See* 42 U.S.C. § 1395 *et seq*. Unlike Medicaid's state-level administration, Medicare's administration remains at the federal level. The HHS Secretary administers Medicare through Centers for Medicare and Medicaid Services, which in turn contracts with private administrative contractors to administer certain functions of the Medicare program. *See* 42 C.F.R. § 400.200; 42 U.S.C. § 1395kk-1. HHS directly pays

Page 4 — OPINION AND ORDER

participating healthcare providers for services provided to Medicare beneficiaries. 42 U.S.C. § 1395g. Healthcare providers must apply to enroll in Medicare and comply with HHS conditions. 42 U.S.C. § 1395cc(a); 42 C.F.R. §§ 424.505; 424.510.

Medicare provides payment only for services that are "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). The HHS Secretary may make national coverage determinations defining what services Medicare will cover, provided that the HHS Secretary complies with public notice and comment requirements, has advisory committee meetings on the record, considers applicable information in the coverage determination, and provides a clear statement of the basis for the determination. *Id.* §§ 1395ff, 1395y(a), 1395y(l). Absent a national coverage determination regarding a particular service, Medicare contractors may issue a local coverage determination for that service or make payments on a case-by-case basis. 42 U.S.C. §§ 1395ff(f)(2)(B), 1395y(a)(1)(A). There are no existing national or local coverage determinations for provision of gender-affirming care to minors.

### B.      Exclusion From Federal Healthcare Programs

The HHS Secretary can exclude healthcare providers from federal healthcare programs, either on a mandatory or permissive basis. *Id.* § 1320a-7. When a healthcare provider is excluded, it will receive no payment from any federal healthcare program, including Medicare and Medicaid. 42 C.F.R. § 1001.1901(b)(1). The HHS Secretary has delegated the authority to exclude to the Office of the Inspector General ("OIG") within HHS. *Id.* § 1001.1(b). OIG has considerable discretion to pursue permissive exclusions, which can be imposed for reasons including program fraud, criminal convictions, and license revocation. *See id.* §§ 1001.201-1001.1701. Among the permissive grounds for exclusion is the one at issue here: OIG may exclude an individual or entity that has provided "any items or services . . .  of a quality that fails

to meet professionally recognized standards of health care." *Id.* § 1001.701(a)(2). "Professionally recognized standards of health care" means

> Statewide or national standards of care, whether in writing or not, that professional peers of the individual or entity whose provision of care is an issue, recognize as applying to those peers practicing or providing care within a State. When the Department has declared a treatment modality not to be safe and effective, practitioners who employ such a treatment modality will be deemed not to meet professionally recognized standards of health care. This definition will not be construed to mean that all other treatments meet professionally recognized standards.

*Id.* § 1001.2.

Exclusion is subject to procedures governed by statute and regulations. First, OIG must send a written "notice of intent to exclude" to the provider facing exclusion. *Id.* § 1001.2001(a). The provider facing exclusion may submit documentary evidence and a written argument to oppose exclusion, and for some forms of permissive exclusion, may request oral argument before an OIG official. *Id.* § 1001.2001(a)-(b). In determining whether a healthcare provider fails to meet professionally recognized standards of care, OIG considers reports from the regional Utilization and Quality Control Quality Improvement Organization, licensing authorities, fiscal agents, contractors, insurance companies, professional societies, and "[a]ny other sources deemed appropriate by the OIG." *Id.* § 1001.701(b). If OIG determines that exclusion is warranted, it must submit a written "notice of exclusion" to the provider. *Id.* § 1001.2002. Exclusion runs for a minimum of one year and presumptively for three years "unless aggravating or mitigating factors . . . form a basis for lengthening or shortening the period." *Id.* § 1001.701(d)(1).

Once a provider has received a notice of exclusion, it will not be eligible to receive any payment from federal healthcare programs. Excluded providers may request reconsideration by an Administrative Law Judge, appeal to the Departmental Appeals Board, and ultimately (after

exhausting administrative remedies) seek judicial review. *Id.* §§ 1001.2007, 1005.21; 42 U.S.C. §§ 405(g), 1320a-7(f)(1).

Even after the exclusion period has ended, reinstatement is not automatic. Excluded providers must request reinstatement and submit any information OIG requests in order to make its reinstatement determination. 42 C.F.R. § 1001.3001. OIG will authorize reinstatement after the exclusion period has expired if "[t]here are reasonable assurances that the types of actions that formed the basis for the original exclusion have not recurred and will not recur" and there are no additional bases to continue the exclusion. *Id.* § 1001.3002(a). If OIG denies reinstatement, the provider has thirty days to submit additional material for OIG's consideration. *Id.* § 1001.3004(a). Once denial of reinstatement is final, the provider cannot make another request for reinstatement until at least one year after the denial. 42 C.F.R. § 1001.3004(b). "The decision to deny reinstatement will not be subject to administrative or judicial review." *Id.* § 1001.3004(c).

Exclusion is a harsh punishment for healthcare providers, many of which depend on funding through federal healthcare programs. "It has been stated that exclusion from federal health care programs can be a 'financial death sentence' for those in the health care industry who depend on these programs for business." *See* Jennifer A. Staman, Cong. Rsch. Serv., RS22743, Health Care Fraud and Abuse Laws Affecting Medicare and Medicaid: An Overview 2 n.9 (2016). Exclusion is also an exceptionally rare sanction, as the HHS website shows that only six hospitals have ever been excluded. Marshall Decl. ¶ 3, Ex. 1, ECF No. 59. Only one of those hospitals was excluded specifically for providing services falling below professionally recognized standards of healthcare. *Id.* That occurred in 1979, when the small 28-bed Alondra Community Hospital in Bellflower, California, was found to have "gross and flagrant deviations"

from standards of care, "repeated failures of documentation to support medical necessity and quality," "repeated instances of lack of care by physicians," and "continual conflict between the admission diagnosis and the subsequent treatment rendered." *Id.* Ex. 5.

## II.     The Kennedy Declaration

On December 18, 2025, Secretary Kennedy issued a Declaration titled "Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents." The Kennedy Declaration begins with a "Background and Authority" section which notes a "substantial increase in gender dysphoria diagnoses among young people in the United States" along with a corresponding increase in "children and adolescents receiving medical interventions for gender dysphoria." Kennedy Declaration 1. That section concludes that "current medical evidence does not support a favorable risk/benefit profile for the use of chemical or surgical procedures in children to treat gender dysphoria." The Kennedy Declaration then includes a statement of "Legal Authority for This Declaration":

> This declaration is issued pursuant to the authority vested in the HHS Secretary, and is informed by 42 CFR § 1001.2, which provides that "when the Department has declared a treatment modality not to be safe and effective, practitioners who employ such a treatment modality will be deemed not to meet professionally recognized standards of health care." As such, this declaration supersedes "Statewide or national standards of care, whether in writing or not, that professional peers of the individual or entity whose provision of care is an issue, recognize as applying to those peers practicing or providing care within a State." For reasons explained in this Declaration, standards of care recommended by certain medical organizations are unsupported by the weight of evidence and threaten the health and safety of children with gender dysphoria.

*Id.* at 2-3.

The Kennedy Declaration includes purported summaries of research and findings relating to gender-affirming care for minors. Section II of the Kennedy Declaration summarizes the methodology and findings of a November 2025 HHS report that concluded that "medical interventions pose unnecessary, disproportionate risks of harm, [and that] healthcare providers

Page 8 — OPINION AND ORDER

should refuse to offer them even when they are preferred, requested, or demanded by patients."

*Id.* at 3-5. Section III of the Kennedy Declaration criticizes guidelines about gender-affirming care for minors from various medical professional associations. *Id.* at 5-7. Section IV of the Kennedy Declaration summarizes findings from various European nations that align with HHS's findings. *Id.* at 7-9.

The Kennedy Declaration concludes with Section V, which is the formal "Declaration" itself. Secretary Kennedy "declare[s]" that, based on the information summarized in the prior sections of the Kennedy Declaration,

> Sex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, fail to meet professional [*sic*] recognized standards of health care. For the purposes of this declaration, "sex-rejecting procedures" means pharmaceutical or surgical interventions, including puberty blockers, cross-sex hormones, and surgeries such as mastectomies, vaginoplasties, and other procedures, that attempt to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex.

*Id.* at 9. Secretary Kennedy then invokes his statutory power to exclude healthcare providers from federal healthcare programs:

> Under 42 U.S.C. § 1320a-7(b)(6)(B), the Secretary "may" exclude individuals or entities from participation in any Federal health care program if the Secretary determines the individual or entity has furnished or caused to be furnished items or services to patients of a quality which fails to meet professionally recognized standards of health care.

*Id.* The Kennedy Declaration then states that it "does not constitute a determination that any individual or entity should be excluded from participation," referring to the existing process for healthcare providers' exclusion under 42 C.F.R. § 1001.701. *Id.*

### III.    Implementation of the Kennedy Declaration

On December 18, 2025, the day he signed the Kennedy Declaration, Secretary Kennedy appeared at a press conference and announced that the Kennedy Declaration was "a clear directive to providers to follow the science and the overwhelming body of evidence that these

procedures hurt—not help—children" and that "medical professionals or entities providing sex-rejecting procedures to children are out of compliance with these standards of healthcare." Fraas Decl. Ex. 27. HHS's press release from the same day provided that the Kennedy Declaration found that gender-affirming care for minors "do[es] not meet professionally recognized standards of health care" and that "[u]nder the declaration, practitioners who perform sex-rejecting procedures on minors would be deemed out of compliance with those standards." Fraas Decl. Ex. 28.

HHS began implementing the Kennedy Declaration just eight days after its issuance. On December 26, 2025, HHS General Counsel Mike Stuart announced the department's first action on social media, noting that he had referred Seattle Children's Hospital to OIG for exclusion for failing to meet professionally recognized standards of healthcare, specifically invoking the Kennedy Declaration:



**HHS General Counsel Mike Stuart** ☑ ⚡
@HHSGCMikeStuart

Today I referred Seattle Children's Hospital to @OIGatHHS for failure to meet recognized standards of health care as according to Sec Kennedy's declaration that sex-rejecting procedures for children and adolescents are neither safe nor effective. Our kids safety is critical!

3:29 PM · Dec 26, 2025 · **715** Views

Fraas Decl. Ex. 1.

Over the course of January 2026, HHS General Counsel Stuart announced the referral of eleven more children's hospitals for exclusion, each time invoking the Kennedy Declaration:



Today I again referred for investigation to @OIGatHHS another hospital for failure to meet recognized standards of health care per the @HHSGov @SecKennedy declaration that sex-rejecting procedures for children and adolescents are neither safe nor effective - Children's Hospital Colorado. Sadly, it may not be the last referral.

@HHSOGC will always take every possible action to ensure children all across the nation are safe and protected.

1:08 PM · Dec 30, 2025 · **28.8K** Views

Fraas Decl. Ex. 2.



Another day, another sad referral. When I say we will protect children, well, that's exactly what I mean.

Today, I referred for investigation to @OIGatHHS another hospital– Children's Minnesota including its Gender Health program– for failure to meet recognized standards of health care. According to claims data, the hospital has billed extensively for hormone therapy.

The HHS @SecKennedy declaration made clear that sex-rejecting procedures for children and adolescents are neither safe nor effective. @HHSOGC and @HHSGov will continue to take all necessary action to protect children all across the nation.

3:35 PM · Jan 5, 2026 · **66.3K** Views

Fraas Decl. Ex. 3.

Page 11 — OPINION AND ORDER



**HHS General Counsel Mike Stuart** ✔ 🏴
@HHSGCMikeStuart                                              •••

Today I referred to @OIGatHHS THREE California hospitals for full investigation – Children's Hospital of Orange County and the UCSF health system including its UCSF Hyde Hospital and Benioff Children's Hospitals.

California's Governor @GavinNewsom needs to do a better job protecting our kids from sex-rejecting procedures that cause permanent terrible harm.  These California hospitals continue to operate outside recognized standards of health care and entirely outside @SecKennedy 's easy to understand declaration that sex-rejecting procedure for children and adolescents are not safe nor effective.

Children's Hospital of Orange County operates the Gender, Puberty, And Sex Development Program and advertises cross-sex hormones and puberty blockers for minors on its website, though it states it not does not provide sex change surgeries. However, claims data shows the hospital has billed for sex change surgeries for minors as recently as 2023, as well as for "hormones and puberty blockers."

Within the broader UCSF Health system, sex-rejecting procedures for minors is provided at the Child and Adolescent Gender Center at Benioff Children's Hospital.

Protecting our children is our solemn responsibility.  This isn't that hard. @HHSGov is stepping up and Governor Newsom needs to do the same and stop life-altering procedures that harm our children.

We are not sitting idle. We will continue to protect our children from sex-rejecting procedures.

1:46 PM · Jan 9, 2026 · **1,816** Views

Fraas Decl. Ex. 4.

Page 12 — OPINION AND ORDER



**HHS General Counsel Mike Stuart** ✔️
@HHSGCMikeStuart

SIX hospitals located in SIX different states...

It is truly unfortunate that today I referred to @OIGATHHS for full investigation SIX more hospitals from SIX different states for allegedly failing to protect our children from sex-rejecting procedures- procedures that cause permanent terrible harm.

These hospitals appear to continue to operate outside recognized standards of healthcare and entirely outside @SecKennedy's declaration that sex-rejecting procedures for children and adolescents are neither safe nor effective.

The SIX hospitals referred for investigation are:

Nemours Alfred I. DuPont Hospital for Children (DE)

Ann & Robert H. Lurie Children's Hospital of Chicago (IL)

Boston Children's Hospital (MA)

The Children's Hospital of Philadelphia (PA)

New York University – Langone Health (NY)

Doernbecher Children's Hospital  (OR)

There is no greater priority than protecting our children.  It is our solemn responsibility.  @HHSGov and this General Counsel will never stop doing all in our ability to protect our children from "sea to shining sea."  We must be a nation that values our children.  Life-altering procedures that do harm must end.

God Bless our children!  God Bless them all!

3:40 PM · Jan 15, 2026 · **34.5K** Views

Page 13 — OPINION AND ORDER

Fraas Decl. Ex. 5.

In February, HHS continued its referrals to OIG and its general counsel touted the success of the Kennedy Declaration, noting on February 3, 2026, that "more than 30 hospitals and hospital systems" had stopped providing gender-affirming care to minors:



**HHS General Counsel Mike Stuart** ✔ 🖋
@HHSGCMikeStuart

Today, I sadly made another major referral for investigation to @OIGatHHS– Johns Hopkins Hospital and Health System including, but not limited to, the Johns Hopkins Center for Transgender and Gender Expansive Health and the Johns Hopkins Emerge Gender and Sexuality Clinic– for failing to meet recognized standards of healthcare.

Over recent weeks, more than 30 hospitals and hospital systems including some of the largest in the nation have announced they are no longer performing sex-mutilating and sex-rejecting procedures for minors.  Those hospital systems are to be commended for making the right decision after making irreversible terrible decisions that harmed and permanently damaged children.  Sadly, other hospitals and hospital systems are continuing to perform heinous and horrific acts of intentional permanent harm to minors including, allegedly, Johns Hopkins Hospital and Health System. We will not stop until every single child is protected from the destruction of the integrity of God's chosen human body.

@SecKennedy's declaration made clear that sex-rejecting procedures for children and adolescents are not safe and not effective.  Far from it.  Sex-rejecting procedures are incredibly damaging and contrary to acceptable standards of healthcare.  @HHSGov, @SecKennedy, and @HHSOGC will continue to take all necessary actions to protect our children from "sea to shining sea." Our children deserve it.

3:25 PM · Feb 3, 2026 · **194.5K** Views

Fraas Decl. Ex. 6.

Page 14 — OPINION AND ORDER

Just over a week later, HHS referred several health centers to OIG and again commended healthcare providers that made the "right decision" to comply with Secretary Kennedy's "exceedingly clear" standard:



**HHS General Counsel Mike Stuart** ✔ 🇺🇸
@HHSGCMikeStuart

···

Healthcare system after healthcare system is changing course and stopping sex-rejecting procedures and gender mutilation of our children.

The @ASPS_News and AMA have made strong statements on this critical issue. The evidence is clear- sex rejecting procedures for children are not acceptable standards of healthcare.

In just the past few weeks, more than 40 hospital systems across the country have made the right decision to stop these heinous procedures. But there is far more work to do to protect our children.

Today, unfortunately, I made additional referrals for investigation to @OIGatHHS. These referrals are not for hospitals but, rather, for federally qualified health centers (FQHCs).

@HHSOGC referred for investigation the following FQHCs:

Whitman-Walker Health, Washington D.C.;

Community Health Project, Inc. (aka Callen-Lorde), Bronx, Brooklyn and New York, NY;

Los Angeles LGBT Center, Los Angeles, CA; and

The Institute for Family Health, Manhattan, Bronx, Brooklyn and Mid-Hudson Valley, NY.

@SecKennedy, @HHSGov, and legitimate medical professionals from across the nation have been exceedingly clear on this issue. Sex-rejecting procedures are not acceptable forms of healthcare.

@HHSGov, @SecKennedy, and @HHSOGC will continue to take all necessary actions to protect our children from life-altering, damaging and fake healthcare treatments.

10:16 AM · Feb 11, 2026 · **17.9K** Views

Fraas Decl. Ex. 7.

Official HHS social media also affirmed departmental goals with respect to the Kennedy Declaration, noting an intent to hold "EVERY provider" accountable to the standards announced in the Kennedy Declaration:


**HHS** ✓
@HHSGov

We will hold EVERY provider of sex-rejecting procedures for children and adolescents accountable for failure to meet recognized standards of health care.

> **HHS General Counsel Mike Stuart** ✓ ⚡ @HHSGCMikeStuart · Jan 5
> Another day, another sad referral. When I say we will protect children, well, that's exactly what I mean.
>
> Today, I referred for investigation to @OIGatHHS another hospital– Children's Minnesota including its Gender Health program– for failure to meet recogniz...

5:46 PM · Jan 5, 2026 · **60.3K** Views

Fraas Decl. Ex. 16.

In total, HHS referred at least seventeen healthcare providers to OIG for exclusion proceedings. OIG has not taken any formal steps to begin the administrative process for exclusion (i.e., by sending a notice of intent to exclude) because the parties to this litigation

negotiated an agreement that Defendants would not "issue notices of intent to exclude (42 C.F.R. § 1001.2001) or notices of exclusion (42 C.F.R. § 1001.2002) until the earlier of this Court's decision on the motion for summary judgment or 30 days after the hearing on the motion for summary judgment." ECF No. 43.

## IV.    Effect of the Kennedy Declaration

The mere threat of exclusion has profound impacts because exclusion impacts not only healthcare providers' ability to provide gender-affirming care, but also their ability to receive *any* funding from Medicaid and Medicare. Though citing HHS's responsibility to "take every possible action to ensure children all across the nation are safe and protected," Fraas Decl. Ex 2, Defendants' referral actions immediately threatened hospitals that provide critical care to children. *See, e.g.*, Flores-Brennan Suppl. Decl. ¶ 9 ("If [Children's Hospital Colorado] is lost as a Medicaid provider, some of Colorado's most complex patients who are children and youth suffering a myriad of complex conditions will have no other access to the treatment they need."), ECF No. 78; Phelan Suppl. Decl. ¶ 5 (similar with respect to Lurie's Children's Hospital in Illinois), ECF No. 79; Marqusee Suppl. Decl. ¶¶ 19-21 (similar with respect to Boston Children's Hospital in Massachusetts), ECF No. 80; Connolly Suppl. Decl. ¶¶ 6-8 (similar with respect to Children's Minnesota), ECF No. 81; Kozak Suppl. Decl. ¶¶ 17, 20-21 (similar with respect to Children's Hospital of Philadelphia in Pennsylvania), ECF No. 82.

Facing the possibility of losing federal funding and the attendant risks to children in need of critical care, many healthcare providers across the country suspended gender-affirming care for minors. By February 11, 2026, "more than 40 hospital systems across the country" had suspended gender-affirming care in minors. Fraas Decl. Ex. 7. These providers include several of those who HHS directly targeted. Children's Minnesota temporarily paused its programs effective February 27, 2026. Fraas Decl. Ex. 20. Children's Hospital Colorado suspended its

programs on January 2, 2026, only three days after HHS General Counsel Stuart announced his referral on social media. Fraas Decl. Ex. 19. In response to numerous healthcare providers suspending gender-affirming care, HHS touted the success of the Kennedy Declaration, declaring "It's working":



Fraas Decl. Ex. 17.

Page 18 — OPINION AND ORDER

## STANDARD

The Administrative Procedure Act ("APA") provides for judicial review of final agency action. 5 U.S.C. §§ 701-706. The Ninth Circuit endorses the use of Rule 56 summary judgment motions to resolve such claims. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). Under the APA, a court must hold unlawful and set aside agency actions if such actions are

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2). The Court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

Plaintiffs move for summary judgment on Counts 1-4 of their Amended Complaint. Defendants move to dismiss for lack of subject matter jurisdiction, respond substantively to Plaintiffs' motion, and move for summary judgment on the same counts. Because Defendants raise threshold jurisdictional questions, the Court begins by addressing Defendants' Motion to Dismiss before turning to the parties' cross-motions for summary judgment.

I.        **Defendants' Motion to Dismiss**

Defendants move under Rule 12(b)(1) to dismiss this case for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citation omitted). As such, courts must presume "that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted); *see also Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022). The Court must dismiss any case over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *see also Pistor v. Garcia*, 791 F.3d 1104, 1110-11 (9th Cir. 2015) (noting that when a court lacks subject-matter jurisdiction, meaning it lacks the statutory or constitutional power to adjudicate a case, the court must dismiss the complaint, even *sua sponte* if necessary).

Defendants argue that this Court lacks jurisdiction because (A) the Kennedy Declaration is not final agency action subject to review under the APA; and (B) Plaintiffs' claims are not ripe.

A.        **Final Agency Action**

The APA limits judicial review to "final agency action." 5 U.S.C. § 704. An agency action is final when it marks (1) the "consummation of the agency's decisionmaking process," not merely a "tentative or interlocutory" decision, and is (2) an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted). In applying the *Bennett* test, the Ninth Circuit considers factors including "whether the action 'amounts to the agency's definitive statement of its position,'" whether the action had a direct and immediate effect on the subject party's daily operations, and whether the agency expects immediate

Page 20 — OPINION AND ORDER

compliance with the terms of the action. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *Nat'l Lab. Rels. Bd. v. Siren Retail Corp.*, 99 F.4th 1118, 1123 (9th Cir. 2024). Defendants contend that this case should be dismissed because the Kennedy Declaration reflects only Secretary Kennedy's "non-binding opinion" that lacks legal effect or consequence and is therefore not "final" and reviewable under the APA. Defs.' Mot. Dismiss 19, ECF No. 73.

### 1.    Consummation of the Decision-making Process

To satisfy the first prong of the *Bennett* test, the agency action must "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177-78 (internal citation and quotation marks omitted). Defendants argue that the Kennedy Declaration does not mark the consummation of HHS's decision-making process because it reflects only Secretary Kennedy's personal opinion. Instead, Defendants suggest that this Court can only review OIG's exclusion decision and argue that since OIG has made no exclusion decisions, there is nothing for this Court to review. Plaintiffs contend that Defendant's argument is contrary to the plain language of the Kennedy Declaration.

The Ninth Circuit has cautioned that "an agency's characterization of its action as being provisional or advisory is not necessarily dispositive." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094 (9th Cir. 2014). Instead, "'[i]t is the effect of the action and not its label that must be considered.'" *Oregon Nat. Desert Ass'n*, 465 F.3d at 985 (quoting *Abramowitz v. U.S. EPA.*, 832 F.2d 1071, 1075 (9th Cir. 1987)). For the reasons below, Defendants' reliance on their characterization of the Kennedy Declaration as non-binding is unavailing.

Defendants first insist that the Kennedy Declaration "reflects only the Secretary's non-binding opinion on the safety and efficacy of the identified pediatric and adolescent treatment modalities" and that it "does not establish the standard of care." Defs.' Mot. Dismiss 19. Yet, it is

strikingly apparent the Kennedy Declaration itself explicitly states a new standard of care: "Sex-rejecting procedures for children and adolescents are *neither safe nor effective as a treatment modality* for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, *fail to meet professional* [*sic*] *recognized standards of health care*." Kennedy Declaration 9 (emphasis added). The Kennedy Declaration also expressly "supersedes" other established standards of care. *Id.* at 2-3. By its own terms, the Kennedy Declaration both establishes a standard of care and supersedes existing standards.

Secretary Kennedy's press statement upon signing the Kennedy Declaration confirms its plain language. Secretary Kennedy stated that the Kennedy Declaration established that "sex-rejecting procedures are neither safe nor effective treatment for children with gender dysphoria," and that "medical professionals or entities providing sex-rejecting procedures to children are out of compliance with these standards of healthcare." Fraas Decl. Ex. 27. In other words, he directly referred to his conclusion regarding gender-affirming care to minors as a "standard[] of healthcare." He referred to the Kennedy Declaration as a "clear directive." *Id.* HHS's contemporaneous press release also referred to the Kennedy Declaration as having found that gender-affirming care fails to meet professionally recognized standards of care and announced a categorical intent that "[u]nder the declaration, practitioners who perform sex-rejecting procedures would be deemed out of compliance with those standards." Fraas Decl. Ex. 28. The Declaration's text, as well as Secretary Kennedy's and HHS's contemporaneous explanations of its effect, leave no room for doubt. Defendants have concluded that gender-affirming care for minors does not meet professionally recognized standards of care, and healthcare providers offering such care are subject to exclusion.

Defendants' subsequent public statements and actions further treat the Kennedy Declaration as the consummation of Defendants' decision to establish a standard of care that they expected healthcare providers to comply with immediately. HHS has already referred to OIG at least seventeen healthcare providers for exclusion proceedings for failure to comply with the standard of care announced in the Kennedy Declaration. HHS General Counsel Stuart explicitly cited the Kennedy Declaration as the new standard of care with each new referral action. *See* Fraas Decl. Ex. 1 (Seattle Children's Hospital failed to "meet recognized standards of health care as according to Sec Kennedy's declaration"); Fraas Decl. Ex. 2 (Children's Hospital Colorado failed to "meet recognized standards of health care" per the Kennedy Declaration); Fraas Decl. Ex. 3 ("The HHS @SecKennedy declaration made clear that sex-rejecting procedures for children and adolescents are neither safe nor effective"); Fraas Decl. Ex. 4 ("These California hospitals to continue to operate outside recognized standards of health care and entirely outside @SecKennedy's easy to understand declaration that sex-rejecting procedure for children and adolescents are not safe nor effective"). And HHS has made clear that it would "hold EVERY provider of sex-rejecting procedures for children and adolescents accountable for failure to meet recognized standards of health care." Fraas Decl. Ex. 16. Defendants' words and actions are clear and compelling evidence that Defendants have consummated their decision-making process that providing gender-affirming care to minors falls below professionally recognized standards of care.

Defendants argue that the Kennedy Declaration cannot mark the consummation of its decision-making because the ultimate decision regarding exclusion is made by OIG as part of exclusion proceedings under the regulations. Defendants point out that the Kennedy Declaration itself notes that exclusion would be subject to OIG's administrative process for exclusion and

OIG's "separate determination under 42 C.F.R. § 1001.701." Kennedy Declaration 9. Defendants emphasize that OIG's decision about whether a healthcare provider has provided services that fail to meet professionally recognized standards of healthcare—and is therefore subject to exclusion—is governed by a list of considerations. 42 C.F.R § 1001.701(b). In other words, Defendants contend that the Kennedy Declaration is only one piece of information OIG would consider in exclusion proceedings and therefore does not mark the consummation of its decision-making regarding the standard of care.

Incredibly, Defendants ask the Court to ignore the dispositive impact of the Kennedy Declaration's plain language. When one piece of information OIG considers is a categorical and unequivocal statement by the HHS Secretary that gender-affirming care falls below professionally recognized standards of care and that contrary standards of care are "superseded," then there can be no other outcome of OIG's proceeding but exclusion. Defendants' argument also ignores Secretary Kennedy's specific invocation of 42 C.F.R. § 1001.2, which provides that "[w]hen the Department has declared a treatment modality not to be safe and effective, practitioners who employ such a treatment modality will be deemed not to meet professionally recognized standards of health care." Defendants' briefing and supporting Declaration of Robert Penezic attempt to recast the Kennedy Declaration as "not purport[ing]" to exercise the authority referenced in 42 C.F.R. § 1001.2. Penezic Decl. ¶ 7, ECF No. 75. But Mr. Penezic's Declaration cannot alter the fact that Secretary Kennedy expressly invoked that purported authority in the Kennedy Declaration.

Under the Kennedy Declaration, any healthcare provider offering gender-affirming care to minors fails to meet professionally recognized standards of care and is subject to exclusion. Without any serious doubt, the Kennedy Declaration marks the consummation of the agency's

decision-making process leading to healthcare providers' exclusion from federal healthcare programs.

### 2. Legal Consequences or Obligations

To satisfy the second prong of the *Bennett* test, the action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177-78. The second prong provides several avenues for an agency action to meet the finality requirement, including the imposition of an obligation, denial of a right, or fixation of some legal relationship. *Oregon Nat. Desert Ass'n*, 465 F.3d at 986-87. The Ninth Circuit focuses on the "practical and legal effects" of the action and interprets finality in a "pragmatic and flexible manner." *Id.* at 982 (citation omitted). Courts must consider whether challenged agency actions have the "status of law or comparable legal force, and whether immediate compliance with its terms is expected." *Id.*

Defendants argue that the Kennedy Declaration has no legal effect or consequence because it is not a "'definitive statement' on the standard of care applicable in OIG exclusion proceedings." Defs.' Mot. Dismiss 20. Defendants contend that the legal consequence would only occur after OIG makes a separate determination that a healthcare provider failed to meet professionally recognized standards of care and then decides to exclude the provider on that basis. *Id.* Defendants' arguments, however, would again require the Court to ignore the plain language of the Kennedy Declaration and Defendants' words and actions related to it, and would ignore the real and ongoing consequences of the Kennedy Declaration and its effects on healthcare providers.

The Kennedy Declaration is clear about the obligation on healthcare providers (that they must comply with the new standard of care) and the legal consequences flowing from a provider's failure to comply (the risk of exclusion from federal healthcare programs). It is not

Page 25 — OPINION AND ORDER

ambiguous. It does not provide conditions, options, or alternatives. Such a material modification of the standard of care has the "status of law or comparable legal force," as it presents healthcare providers with the Hobson's Choice to either stop providing gender-affirming care for minors or risk the loss of critical funding necessary to operate at all. The Kennedy Declaration's text, Secretary Kennedy's public comments at its announcement, the statements on HHS social media accounts, and HHS's actions since its enactment make clear that immediate compliance was demanded. Indeed, as noted above, HHS has already referred many healthcare providers to OIG for exclusion proceedings for failure to comply with the Kennedy Declaration.

The fact that no exclusion proceedings have been formally initiated or concluded by OIG does not render the Kennedy Declaration non-final because "[a]n agency action can be final even if its legal or practical effects are contingent on a future event." *Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1185 (9th Cir. 2019). Here, the risk of exclusion is not speculative or hypothetical. As already explained with respect to the first *Bennett* prong, the Kennedy Declaration's plain terms leave no room for OIG to draw any conclusion other than that healthcare providers offering gender-affirming care to minors "fail to meet professional [*sic*] recognized standards of health care." Kennedy Declaration 9. Failing to comply with the standard of care announced in the Kennedy Declaration carries the significant risk (i.e., legal consequence) of exclusion sufficient to meet the second prong of the *Bennett* test. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600 (2016) (agency declaration satisfied second *Bennett* prong because failure to abide by the determination made in the declaration carried "risk of significant criminal and civil penalties").

Moreover, the Kennedy Declaration's legal consequences have had direct and immediate impacts on the day-to-day business of healthcare providers. *See Oregon Nat. Desert Ass'n*, 465

F.3d at 987 ("[A]gency action may be final if it has a 'direct and immediate . . . effect on the day-to-day business' of the subject party.") (quoting *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 2006)). Several providers referred to OIG for exclusion suspended gender-affirming care for minors shortly after referral to OIG. Children's Hospital Colorado cited the "actions of HHS" when it suspended treatments on January 2, 2026. Fraas Decl. Ex. 19 at 3. Children's Minnesota cited "an increase in federal actions directed at health systems like ours that provide this care." Fraas Decl. Ex. 20 at 4. Even Mary Bridge Children's Hospital, which was not explicitly targeted by an HHS referral, suspended treatments because it "believe[d] the declaration is enforceable now" and continuing to offer treatment would put Mary Bridge "on the federal government's radar." Fraas Decl. Ex. 23 at 5. Each of these cases is similar. These impacts further underscore the legal consequences flowing from the Kennedy Declaration.

The Kennedy Declaration is final agency action subject to APA review.

**B.    Ripeness**

Ripeness is a requirement "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Ohio Foresty Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967)). "There are two ripeness considerations: constitutional and prudential." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1139 (9th Cir. 2024). Defendants argue that Plaintiffs' claims are not ripe because the Kennedy Declaration is only a "non-binding policy view" that lacks any "concrete legal consequences" and fully depends on "a speculative chain of future events that may never occur." Defs.' Mot. Dismiss 14.

<h3>1.    Constitutional Ripeness</h3>

Constitutional ripeness is "often treated under the rubric of standing" and frequently "coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). That prong requires the plaintiff to identify "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018) (internal quotation marks omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way. For an injury to be concrete, it must actually exist; in other words, it is real, and not abstract. Intangible harms and a risk of real harm can be sufficiently concrete." *Id.* at 809-10 (internal quotation marks and citations omitted).

Plaintiffs here identify two injuries that satisfy the ripeness inquiry. First, as already noted, the threat of exclusion has resulted in numerous healthcare providers discontinuing gender-affirming care for minors and adolescents. *See* Marshall Decl. Ex. 6 (Children's Hospital Colorado suspended gender-affirming care for minors because HHS's referral to OIG "threatens Children's Colorado's Medicare and Medicaid funding, risking care for hundreds of thousands of children"); Fraas Decl. Ex. 22 (MultiCare Health Systems ceased care because "continuing to provide gender-care-related medical treatment to minors puts our organization and our providers at too great a risk for government investigation and enforcement actions, including cutting off Medicare and Medicaid payments to MultiCare's entire health system"); Flores-Brennan Suppl. Decl. ¶ 10 ("In response to the [Kennedy Declaration and HHS referrals of other providers] . . . Denver Health made the decision in early January 2026 to suspend gender affirming care to youth"); Connolly Suppl. Decl. ¶ 9 ("I am aware that Children's Minnesota became so concerned about its ability to continue treating Medicaid patients, and the threats against Children's Minnesota by HHS citing the Kennedy Declaration, that it has announced it will pause certain

forms of gender affirming care on February 27, 2026"). As Plaintiffs point out, these suspensions of care harm Plaintiffs' interests in providing gender-affirming care as part of their Medicaid programs.

Defendants argue that Plaintiffs fail to show that these "voluntary actions were taken in response to the Kennedy Declaration, as opposed to other government action(s) or the broader policy objectives of the Trump Administration." Defs.' Reply 3, ECF No. 86. That argument is ironic in light of Defendants' public announcements crediting the Kennedy Declaration for forcing healthcare providers to stop providing gender-affirming care to minors. *See, e.g.*, Fraas Decl. Ex. 17 (HHS post stating "[i]t's working" in response to an article reporting that two healthcare providers had paused gender-affirming care for minors "after HHS directive"); Fraas Decl. Ex. 11 (taking credit for thirty hospitals suspending gender-affirming care in minors and vowing that "investigations are sadly not done" and that Defendants "will not stop until every child is safe and every hospital and doctor prioritizes 'do no harm'"). Defendants' argument is also puzzling considering the specific statements in the record—quoted above—that several providers explicitly attributed their suspension of gender-affirming care to the Kennedy Declaration and the referrals made under it. There is sufficient evidence in the record that the Kennedy Declaration has resulted in healthcare providers suspending treatments, demonstrating harm to Plaintiffs.

Second, Plaintiffs argue the Kennedy Declaration injures their "sovereign interest in the regulation of the practice of medicine." Pl. Reply 14, ECF No. 77. Case law is clear that "state lawmakers, not the federal government, are the primary regulators of professional medical conduct." *Oregon v. Ashcroft*, 368 F.3d 1118, 1124 (9th Cir. 2004) (internal quotations and citation omitted); *see also United States v. Skrmetti*, 605 U.S. 495, 524 (2025) (states retain

"wide discretion to pass legislation in areas where there is medical and scientific uncertainty") (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)); *Dent v. State of West Virginia*, 129 U.S. 114, 122 (1889) (states have regulated the practice of medicine "from time immemorial"). Defendants' response to this argument is their now familiar refrain that the Kennedy Declaration is only Secretary Kennedy's opinion and OIG "considers information from multiple sources" in deciding whether to exclude healthcare providers from federal healthcare programs. Defs.' Reply 5. This argument fails here for the same reasons the Court has already explained. The Kennedy Declaration explicitly purports to establish a standard of care and supersede existing ones. Thus, Plaintiffs' argument that the Kennedy Declaration represents a direct intrusion on their power to regulate the medical profession proves injury and demonstrates constitutional ripeness. *See Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1176 (9th Cir. 2024) ("States have standing to vindicate their authority as sovereign entities with a governing prerogative that is separate from the federal government").

## 2.    Prudential Ripeness

Prudential ripeness depends on both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1154 (9th Cir. 2017). Considerations of prudential ripeness are discretionary. *Id.*

As to the fitness of the issues for judicial decision, the Court looks to "whether the case presents a concrete factual situation or purely legal issues." *Id.* (internal quotations and citation omitted). Here, the questions presented by Plaintiffs' claims are purely legal, and do not depend on the outcome of any exclusion proceeding. Again, contrary to Defendants' arguments, the fact that OIG considers other information in deciding whether a particular provider offered services falling below professionally recognized standards of care is of no consequence when the Kennedy Declaration categorically answers that question. This case presents the purely legal

Page 30 — OPINION AND ORDER

questions of whether the Kennedy Declaration exceeded Secretary Kennedy's authority, was issued without required rulemaking procedures under the law, and is contrary to existing laws. There are no facts to be developed in exclusion proceedings or otherwise that would aid in answering these purely legal questions. The issues are fit for a judicial decision now.

The hardship to the parties likewise favors judicial review. As already explained in the context of constitutional ripeness, Plaintiffs are currently suffering injury as providers cease providing gender-affirming care to minors due to the threat of exclusion proceedings because of the Kennedy Declaration.

### C.    Conclusion

Defendants' jurisdictional arguments are based on the bald-faced lie that the Kennedy Declaration amounts to nothing more than one man's musings on gender-affirming care. This Court is not persuaded by Defendants' attempts to gaslight it into believing that the Kennedy Declaration does anything other than what it says: proclaims that gender-affirming care for minors falls below professionally recognized standards of care, supersedes state laws that say otherwise, and empowers OIG to exclude healthcare providers from federal healthcare programs if they provide such care.

Defendants' arguments are even more disingenuous given their words and actions since the day Secretary Kennedy signed the Kennedy Declaration. Despite repeatedly emphasizing their commitment and obligation to protect children, Defendants have sweepingly wielded the Kennedy Declaration to threaten children's hospitals that provide life-saving care to children. Citing the Kennedy Declaration, Defendants have exploited the threat of exclusion to bully healthcare providers into suspending gender-affirming care they would otherwise provide in compliance with statewide standards of care out of fear they will lose federal healthcare program funding and the attendant ability to provide any life-saving care to all children. The Kennedy

Page 31 — OPINION AND ORDER

Declaration is unquestionably final agency action that is ripe for adjudication. Defendants'

Motion to Dismiss is denied.

## II.        Motions for Summary Judgment

Plaintiffs move for summary judgment on Counts 1-4[2] of their Amended Complaint,

which allege (A) the Kennedy Declaration violates Medicare rulemaking and notice and

comment requirements (Count 1); (B) the Kennedy Declaration violates APA rulemaking and

notice and comment requirements (Count 2); (C) the Kennedy Declaration exceeds statutory

authority (Count 3); and (D) the Kennedy Declaration is not in accordance with law (Count 4).

Defendants cross-move for summary judgment on all counts.

### A.        Violation of Medicare Notice and Comment Requirements (Count 1)

The APA requires the Court to "hold unlawful and set aside agency action, findings, and

conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. §

706(2)(D). Plaintiffs' Count 1 alleges that the Kennedy Declaration violates the notice and

comment procedures required by the Medicare Act. The Medicare Act requires an agency to

provide notice and an opportunity to comment when a (1) "rule, requirement or other statement

of policy" (2) "establishes or changes a substantive legal standard" that (3) governs the eligibility

of healthcare providers "to furnish or receive services or benefits." 42 U.S.C. § 1395hh(a)(2).

Plaintiffs argue that the Kennedy Declaration is a rule that purports to establish a new legal

standard of care that governs payment or eligibility for services and thus violates the Medicare

Act's notice and comment requirements. Defendants again argue the Kennedy Declaration, as a

non-binding policy opinion, does no such thing.

---

[2] Plaintiffs do not move for summary judgment as to Count 5, which alleges Defendants violated the APA because the Kennedy Declaration is arbitrary and capricious and is an abuse of the Secretary's discretion.

First, with respect to the "rule, requirement, or other statement of policy" requirement, the Kennedy Declaration states that gender-affirming care for minors fails to meet professionally recognized standards of care and that the Kennedy Declaration supersedes any other state or national standard of care. This operates as a requirement for healthcare providers; if they are to meet professionally recognized standards of care, they cannot offer gender-affirming care to minors. Defendants' use of the word "Declaration," their attempted disclaimers, and their continuous arguments that the Kennedy Declaration is a "non-binding policy opinion" are not dispositive because it operates exactly like a rule would. *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019) ("Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements."). The Court has already rejected Defendants' contention that the Kennedy Declaration has no legal consequences. The Kennedy Declaration is a "rule, requirement, or other statement of policy" for purposes of 42 U.S.C. § 1395hh's notice and comment rulemaking requirements.

Second, the rule at issue must modify a "substantive legal standard." A substantive legal standard carries "a more expansive scope than that borne by the term 'substantive rule' under the APA." *Id.* at 578. Distinct from a procedural standard, "a substantive standard is one that creates duties, rights and obligations." *Id.* at 573 (internal quotations omitted). Plaintiffs argue that the Kennedy Declaration unilaterally establishes a substantive legal standard that never existed before: that healthcare providers offering gender-affirming care to minors fall below professionally recognized standards of care. Defendants argue that the "substantive legal standard" at issue here is the general one provided by 42 U.S.C. § 1320a-7(b)(6)(B): services "which fail[] to meet professionally recognized standards of health care," a determination guided by 42 C.F.R. § 1001.701. Because that general standard existed before the Kennedy Declaration,

Defendants argue, the Kennedy Declaration cannot have altered it. Defendants' argument is unavailing because—once again—it would require the Court to ignore the plain language of the Kennedy Declaration, which explicitly alters the standard of care, a substantive legal standard. By its plain terms, the Kennedy Declaration obliges OIG to find that healthcare providers offering gender-affirming care to minors fall below professionally recognized standards of care.

Finally, the substantive legal standard must govern the eligibility of entities to furnish or receive services or benefits. Here, by unilaterally defining a standard of care, and proclaiming that providing gender-affirming care falls short of this standard, the Kennedy Declaration prevents healthcare providers from providing gender-affirming care to minors if they wish to remain eligible for federal funding. This is sufficient to establish that the substantive legal standard at issue in the Kennedy Declaration governs healthcare providers' eligibility to furnish services. Medicare's notice and comment rulemaking requirements apply.

Defendants did not comply with Medicaid's procedural requirements because there is no dispute that Defendants failed to provide notice or an opportunity for comment. "[N]otice and comment [is] a matter not merely of administrative grace, but of statutory duty." *Allina Health Servs.*, 587 U.S. at 569. "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision." *Id.* at 582. Plaintiffs' Motion for Summary Judgment as to Count 1 is granted and Defendants' cross-motion is denied because the Kennedy Declaration violated Medicare's notice and comment requirements.

## B.    Violation of APA Notice and Comment Requirements (Count 2)

Also under 5 U.S.C. § 706(2)(D), Plaintiffs allege in Count 2 that the Kennedy Declaration violates the APA's notice and comment procedures. The APA requires "[g]eneral notice of proposed rule making" to be "published in the Federal Register." *Id.* § 553(b). This

notice period must generally last at least thirty days and include public "opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* §§ 553(c)-(d). Rulemaking requirements do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(A).

The parties dispute whether the Kennedy Declaration amounts to a rule subject to notice and comment requirements or a "general statement of policy" exempt from those requirements.

> The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case."

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987). Defendants again claim that the Kennedy Declaration is non-binding, and OIG is free to disregard it. Once again, despite the disclaimer in the Kennedy Declaration that OIG makes a "separate determination under 42 C.F.R. § 1001.701" during an exclusion proceeding about whether a healthcare provider falls below professionally recognized standards of care, the Kennedy Declaration is a conclusive mandate. It categorically establishes a standard of care and supersedes others. OIG cannot "consider" the Kennedy Declaration's plain language without concluding that healthcare providers offering gender-affirming care to minors fail to meet professionally recognized standards of care.

The Kennedy Declaration is subject to the APA's notice and comment requirements, and the Kennedy Declaration undisputedly did not go through that procedure. Defendants violated the APA's notice and comment requirements. Plaintiffs' Motion for Summary Judgment as to Count 2 is granted and Defendants' cross-motion is denied.

## C.        In Excess of Statutory Authority (Count 3)

Plaintiffs' Count 3 alleges that Defendants exceeded their statutory authority in violation

of 5 U.S.C. § 706(2)(C), which requires the Court to "hold unlawful and set aside agency action,

findings, and conclusions found to be . . .  in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right"). "Administrative agencies are creatures of statute," and

"accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus.*

*v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). An agency

"literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub.*

*Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Plaintiffs allege that Defendants lack the

authority to establish or supersede professionally recognized standards of healthcare and that

their attempt to do so in the Kennedy Declaration is therefore unlawful.

The Kennedy Declaration explicitly includes a statement of "Legal Authority for This

Declaration." Kennedy Declaration 2. That statement cites 42 C.F.R. § 1001.2, a definitional

regulation that includes in its definition of "Professionally recognized standards of health care"

the provision that "[w]hen the Department has declared a treatment modality not to be safe and

effective, practitioners who employ such a treatment modality will be deemed not to meet

professionally recognized standards of health care." But that provision is part of a definitional

regulation, not a statutory grant of authority. In turn, none of the statutory provisions cited by the

regulation provide Defendants with the unilateral authority to declare an entire treatment

modality unsafe and ineffective. "[S]tate lawmakers, not the federal government, are the primary

regulators of professional medical conduct." *Oregon v. Ashcroft*, 368 F.3d at 1124 (internal

quotations and citation omitted).  "[I]f Congress intends to alter the usual constitutional balance

between the States and the Federal Government, it must make its intention to do so unmistakably

clear in the language of the statute." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (internal quotations and citation omitted).

The Court agrees with Plaintiffs that Defendants have failed to invoke *any* statutory authority that authorizes the Kennedy Declaration, much less an "unmistakably clear" one that would be required to supplant states' authority to regulate medical conduct. Indeed, the Medicare statute specifically states that it *shall not* "be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395.

Defendants do not substantively respond to Plaintiffs' arguments or cite any statutory authority. Instead, they parrot their argument that the Kennedy Declaration does not have legal consequences because it is merely Secretary Kennedy's non-binding personal opinion. According to Defendants, they do not need to rely on any statutory authority because they did not exercise any authority at all. Defendants also argue that finding the Kennedy Declaration unlawful would "interfere with Secretary Kennedy's right to express his views on the safety and efficacy of emerging and controversial medical practices" and hinder debate on matters of public importance. Defs.' Reply 14.

The Court has already rejected Defendants' "non-binding" personal opinion argument for the reasons set forth many times in this Opinion. To make it abundantly clear to Defendants, this Court is compelled to repeat and reinforce its reasoning so Defendants cannot later claim that they did not understand the scope of this decision. Again, the Kennedy Declaration's plain language and Defendants' statements and actions since its issuance make clear that it is more than Secretary Kennedy's mere opinion on the general question of gender-affirming care for minors. It declares that (1) providing gender-affirming care to minors falls below professionally

Page 37 — OPINION AND ORDER

recognized standards of care, (2) standards of care to the contrary are superseded, and (3) healthcare providers who provide such care are subject to exclusion from federal healthcare programs. As already explained earlier in this Opinion, the fact that exclusion would occur only after an OIG determination does not alter the far reaching and profound impact and harm the Kennedy Declaration causes.

The Kennedy Declaration exceeds Defendants' statutory authority and is held unlawful and set aside in accordance with 5 U.S.C. § 706(2)(C). Plaintiffs' Motion for Summary Judgment on Count 3 is granted, and Defendants' cross-motion is denied.

### D.    Not in Accordance with Law (Count 4)

Finally, Plaintiffs' Count 4 alleges that the Kennedy Declaration is not in accordance with the law and therefore in violation of 5 U.S.C. § 706(2)(A), which requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." Plaintiffs offer two theories as to why the Kennedy Declaration is contrary to law: (1) that it violates the terms of federally approved state Medicaid plans and (2) that it violates Medicaid's statutory requirement of a free choice of provider.

With respect to Plaintiffs' first theory, Plaintiffs argue that the Kennedy Declaration unlawfully amends their approved Medicaid Plans. "Spending Clause legislation like Medicaid is much in the nature of a contract." *Armstrong*, 575 U.S. at 332 (internal quotations omitted). Plaintiffs contend that they each maintain such a contract—a Medicaid Plan—under which the statute obligates the HHS Secretary to pay. Pls.' Mot. for Summ. J. 31-32 (citing 42 U.S.C. § 1396b(a)). Because each Plaintiffs' approved Medicaid Plan includes gender-affirming care, and because the Kennedy Declaration effectively precludes payment for these services by subjecting healthcare providers to exclusion for offering them, Plaintiffs contend that the Kennedy Declaration violates Medicaid's requirement to pay for services under approved plans.

The Court agrees. The statute does provide for HHS to disallow payment under approved Medicaid plans after "reasonable notice and opportunity for hearing" if the HHS Secretary finds that a state's Medicaid plan no longer complies with the statutory conditions. 42 U.S.C. § 1396c. Here, however, HHS has not provided notice or an opportunity for hearing, and it has made no finding that any Plaintiffs' Medicaid plan does not comply with statutory conditions. The Kennedy Declaration violates the HHS Secretary's obligation to pay under approved Medicaid plans by subjecting providers to exclusion for providing care that is covered under approved Medicaid plans without complying with the statutory and regulatory requirements governing disallowance of payments. 42 U.S.C. § 1396b. The only argument Defendants offer in opposition to this theory is their now familiar one that the Kennedy Declaration is a non-binding personal opinion. That argument fails for all the same reasons discussed ad infinitum throughout this Opinion.

Because the Court's conclusion as to Plaintiffs' first theory is dispositive, the Court does not reach Plaintiffs' second theory. Plaintiffs' Motion for Summary Judgment as to Count 4 is granted and Defendants' cross-motion is denied.

### E.     Conclusion

This Court can scarcely recall an APA action that has come before it in which the agency's action was so clearly unlawful. Indeed, many of Defendants' arguments rest on the same falsehoods about the Kennedy Declaration and its effects that the Court already rejected in response to Defendants' jurisdictional arguments. Defendants' merits briefing takes these absurd arguments a step further by suggesting that finding the Kennedy Declaration unlawful would impinge Secretary Kennedy's First Amendment right to express his views and hinder public debate on a matter of public importance.

Defendants cannot bully or gaslight this Court into ignoring the many procedural and legal flaws of the Kennedy Declaration by invoking one of the most sacred principles of our constitutional democracy—the freedom of speech—when that principle comes nowhere close to being implicated. Plaintiffs' claims do not contest Secretary Kennedy's rights to express his views on gender-affirming care, and their lawsuit does not seek to limit Secretary Kennedy's ability to speak generally about gender-affirming care for minors. Rather, Plaintiffs' claims challenge Secretary Kennedy's authority to unilaterally, categorically, and without any process, supersede professional standards of care regarding gender-affirming care that apply in the Plaintiff states. Secretary Kennedy's First Amendment rights are not even at issue, much less offended. However, several other principles sacred to our constitutional democracy are both implicated and offended: the rule of law and state sovereignty. The Kennedy Declaration exceeded Defendants' statutory authority, flouted applicable notice and comment rulemaking procedures, and impeded Plaintiffs' rights to regulate the medical profession and their discretion to design their own statutorily-compliant Medicaid plans.

## III.    Remedies

Plaintiffs request several forms of relief, including (A) vacatur of the Kennedy Declaration, (B) a declaratory judgment that Defendants lack the authority to supersede professionally recognized standards of care for gender-affirming care, and (C) a permanent injunction preventing Defendants from implementing the Kennedy Declaration or a similar policy against any provider in Plaintiff states.

### A.    Vacatur

Plaintiffs first ask the Court to vacate the Kennedy Declaration. The APA requires the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are unlawful under 5 U.S.C. § 706(2)(A)-(F), which includes all the provisions that Plaintiffs

Page 40 — OPINION AND ORDER

raised here. Vacatur is the presumptive remedy for unlawful agency action. *All. for the Wild Rockies v. U. S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). While there are some circumstances under which remand without vacatur may be appropriate, *see California Communities Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012), Defendants have not argued that deviation from the presumptive remedy is appropriate here. Indeed, Defendants did not appear to contest vacatur as a remedy in their briefing or at oral argument. The Court vacates the Kennedy Declaration.

## B.    Declaratory Relief

Plaintiffs also ask the Court to declare that Defendants lack the authority to establish superseding standards of care regarding the provision of medical treatments so as to exclude providers from federal healthcare programs. Defendants object, arguing (1) that Plaintiffs waived their right to request this broader declaratory relief by not seeking it in their Amended Complaint or in their opening brief; and (2) that such relief is unwarranted because the only challenged action is the Kennedy Declaration itself.

First, with respect to waiver, the Court looks to the Complaint to determine whether the relief was properly requested. Plaintiffs' Amended Complaint prayed for "such additional relief as the interests of justice may require." Am. Compl. 36. The declaratory relief Plaintiffs seek falls under that request. Defendants have also had a fair opportunity to brief the issue, as Plaintiffs' more specific request for broader declaratory relief was made in an omnibus response and reply to which Defendants had the opportunity to respond, and did. Likewise, Defendants had the opportunity to present argument in opposition during oral argument, which they also did. The Court finds that consideration of Plaintiffs' requested declaratory relief is therefore appropriate.

Page 41 — OPINION AND ORDER

Second, Defendant argues that expanding declaratory relief beyond the Kennedy Declaration itself is inappropriate because such relief goes beyond the specific action challenged in this litigation. Requested declaratory relief is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co.*, 873 F.2d 229, 231 (9th Cir. 1989) (citation omitted). The Court finds that a declaratory judgment is appropriate here because such relief will serve a useful purpose in clarifying and settling the question of Defendants' authority to unilaterally establish a superseding standard of care for the provision of gender-affirming care to minors. It will also afford Plaintiffs relief from the uncertainty, insecurity, and controversy caused the Kennedy Declaration's unprecedented overreach of authority, intrusion upon state sovereignty, and damage to Plaintiffs' provider networks and one of their most vulnerable populations: transgender minors.

The Court's judgment will declare as follows: Defendants lack the authority to unilaterally establish standards of care that supersede professionally recognized standards of care for provision of gender-affirming care recognized in the Plaintiff States. Defendants also lack the authority to exclude providers from federal healthcare programs based on their provision of gender-affirming care in a manner and quality consistent with the professionally recognized standards of care in the Plaintiff States.

## C.    Injunctive Relief

Plaintiffs seeking injunctive relieve must demonstrate "(1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

Page 42 — OPINION AND ORDER

disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "When, like here, the nonmovant is the government, the last two . . . factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). An injunction is a "drastic and extraordinary remedy" that courts should not issue "as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

Plaintiffs here ask the Court to enter the following permanent injunction:

> The Court permanently ENJOINS Defendants and their officers, agents servants, employees, and attorneys, including those at the Office of Inspector General (HHS-OIG), from initiating enforcement action, enforcing, implementing, giving intent to, or relying, in whole or in part, on the Kennedy Declaration—or any materially similar policy which supersedes or purports to supersede the professionally recognized standards of care for gender-affirming care that exist in the Plaintiff States—against any provider in the Plaintiff States.

Pls.' Proposed Order ¶ 5, ECF No. 90-1. Defendants argue that (1) Plaintiffs have waived their request for injunctive relief that goes beyond the Kennedy Declaration; (2) injunctive relief is unnecessary; (3) the requested injunction is impermissibly vague; and (4) the requested injunction improperly seeks to regulate unchallenged agency action.

1.    Waiver

Defendants first argue Plaintiffs have waived any request for injunctive relief that goes beyond the Kennedy Declaration by not requesting it in their Amended Complaint or in their opening brief. Defendants' arguments on the issue of waiver are flawed for the same reasons discussed with respect to declaratory relief. Defendants' arguments are even weaker with respect to injunctive relief. The Amended Complaint requests injunctive relief against "the Kennedy Declaration *in any form*." Am. Compl. 35 (emphasis added), which the Court finds encompasses Plaintiffs' request here. Moreover, Defendants have had ample opportunity to present arguments in opposition to the requested relief via supplemental briefing. *See* ECF No. 89. Plaintiffs have not waived their request for injunctive relief.

2.    Necessity of Injunctive Relief

Defendants next argue that, because the Court is vacating the Kennedy Declaration, injunctive relief is not necessary to redress Plaintiffs' alleged harms. The Supreme Court has explained that courts should not issue injunctive relief if it "does not have any meaningful practical effect independent of . . . vacatur." *Monsanto*, 561 U.S. at 165. Here, the requested injunctive relief does have a practical effect independent of vacatur. Plaintiffs ask the Court to enjoin not only the implementation of the Kennedy Declaration, but also of "any materially similar policy." Pls.' Proposed Order ¶ 5. The Court finds that Plaintiffs have sufficiently demonstrated likelihood of future harm from a similar policy. As Plaintiffs' supplemental briefing notes, Defendants made numerous statements in their briefing and during oral argument suggesting that they believe OIG would still be able to exclude healthcare providers for providing gender-affirming care to minors even in the absence of the Kennedy Declaration. Moreover, Secretary Kennedy's public statements and HHS social media posts leave no room for doubt that Defendants will attempt to circumvent this Court's vacatur of the Kennedy Declaration.

Defendants also argue that an injunction is unnecessary in light of the Court's declaratory relief because "the federal government is presumed to follow the law as declared by courts." Defs.' Suppl. Br. 5 (citing *Comm. on Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (per curiam) ("[W]e have long presumed that officials of the Executive Branch will adhere to the law as declared by the court.")), ECF No. 89. The record here is more than sufficient to overcome such a presumption. First, Defendants' patently incredible arguments in this case leave the Court with no confidence that Defendants will adhere to the Court's declaration. Second, administrative agencies under the current administration have a significant and troubling history of evading or flouting prior court orders. *See, e.g.*, McGinty

Decl. Exs. D-G, ECF No. 91; *New York v. United States Dep't of Energy*, 2025 WL 3140578, at *18 (D. Or. Nov. 10, 2025) (noting that the Department of Energy had issued a policy despite other courts declaring substantially similar policies unlawful or enjoining them); *Nat'l Tr. for Hist. Pres. in the U.S. v. Nat'l Park Serv.*, Case No. 25-cv-04316, at 3 (D.D.C. April 16, 2026), (government's reading of preliminary injunction was described as "to say the least, incredible, if not disingenuous"); *Hueso v. Soto*, No. 26-1455, 2026 WL 539271, at *3 (D. N.J. Feb. 26, 2026) (U.S. Attorney's Office conceded to violating 72 court orders just in New Jersey); *D.V.D. v. U.S. Dept. of Homeland Sec.*, 786 F. Supp. 3d 223, 227 (D. Mass. 2025) ("By racing to get six class members onto a plane to unstable South Sudan, clearly in breach of the law and this Court's order, [the government] gave this Court no choice but to find that they were in violation of the Preliminary Injunction."); *Jose Antonio Perez-Funez  v. Dept. of Homeland Sec.*, No. CV 81-01457, 2026 WL 982362 at *3 (C.D. Cal. April 6, 2026) ("[T]he Government has substantially violated the letter and spirit of the Injunction."). These cases are only a small sample of many more in which agencies under the current administration have disregarded court orders and the rule of law.

As noted at oral argument, the Court has observed that in the area of administrative law, a consistent theme has emerged in which agencies under the current administration have adopted a "break it and see if they can get away with it" approach. *See, e.g.*, *Am. Acad. of Pediatrics v. Kennedy*, No. 25-11916, -- F. Supp. 3d --, 2026 WL 733828, at *2 (D. Mass. March 16, 2026) (stating that the government's circumvention of procedural rules "undermine[s] the integrity of its actions"); *Doe v. Trump*, 784 F. Supp. 3d 1297, 1303 (N.D. Cal. 2025) ("The actions that give rise to Plaintiffs' claims reflect an instinct that has become prevalent in our society to effectuate change: move fast and break things. That instinct must be checked when it conflicts with

Page 45 — OPINION AND ORDER

established principles of law."). The Defendants' unserious approach to governance stumbles far below the necessary commitment to a constitutional democracy that requires the rule of law to be regarded, respected, and honored as sacred.

Considering Defendants' arguments in this case and this administration's repeated flouting of court orders and the rule of law, the Court finds that declaratory relief alone is insufficient; injunctive relief is warranted here because, unlike declaratory relief, it is "backed by the power of contempt." *See United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1031 (9th Cir. 2023). Accordingly, the Court finds that Plaintiffs have made an adequate showing of irreparable harm,[3] that future harm is likely, and that an injunction is necessary to prevent it.

### 3.    Specificity of the Requested Injunction

Next, Defendants argue that Plaintiffs' requested injunction violates Rule 65(d)'s requirement that an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Rule 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Melendres v. Skinner*, 113 F.4th 1126, 1139 (9th Cir. 2024). According to Defendants, Plaintiffs' proposed injunction would "subject HHS to the threat of contempt without proper notice of prohibited conduct."

---

[3] The Court's findings regarding injury to Plaintiffs are set forth in the "Constitutional Ripeness" Section of this Opinion, and those same conclusions support a finding of irreparable harm here. A policy categorically superseding professionally recognized standards of care as to gender-affirming care causes irreparable harm to Plaintiffs' interests and obligations under state law to ensure access to gender-affirming care, and interferes with their sovereign interest in the regulation of the practice of medicine.

Defs.' Suppl. Br. 6. Defendants also contend that exposure to that threat results in the balance of hardships weighing against an injunction.

Plaintiffs' requested language is more than sufficient to put Defendants on notice of what conduct is prohibited: any materially similar policy which supersedes or purports to supersede the professionally recognized standards of care for gender-affirming care that exist in the Plaintiff States. Defendants' argument that they do not know what "professionally recognized standards of care that exist in the Plaintiff States" means, Defs.' Suppl. Br. 7, represents an incredible demonstration of feigned ignorance and performative victimhood that only underscores the need for injunctive relief. First, "Professionally recognized standards of care" have a regulatory definition. 42 C.F.R. § 1001.2. Second, OIG's regulations likewise require it to determine state standards in exclusion proceedings. *See* 42 C.F.R. § 1001.701(b). Third, the facts of this litigation—what the Kennedy Declaration did and why the Court found it unlawful— provide additional context giving ample notice of prohibited conduct. *See Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 (9th Cir. 1989) (In deciding whether an injunction is impermissibly vague under Rule 65(d), the court is "not limited to the language of the injunction," and must also consider "'the circumstances surrounding [the injunction's] entry: the relief sought by the moving party, the evidence produced at the hearing of the injunction, and the mischief that the injunction sought to prevent.'") (quoting *United States v. Christie Indus., Inc.,* 465 F.2d 1000, 1007 (3d Cir. 1971). Finally, the language of the requested injunction is more specific than Defendants complain, because it specifies the type of policy prohibited: one which supersedes or purports to supersede the professionally recognized standards of care for gender-affirming care.

Defendants have substantial notice of what conduct is prohibited by the injunction, and it meets Rule 65(d)'s specificity requirement. The Court finds that the balance of equities and public interest weighs in favor of the injunction because Defendants lack the authority to unilaterally and categorically supersede professionally recognized standards of care for gender-affirming care. *See Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (finding equitable factors weighed in favor of injunction where the enjoined government action was "beyond its authority").

4.      Scope of Injunctive Relief

Finally, Defendants argue that the requested injunctive relief improperly attempts to regulate unchallenged agency action. Rather than provide the standard that governs the proper scope of injunctive relief, Defendants simply cite myriad cases in which courts have vacated injunctions which "purport to invalidate agency decisions that were never challenged in litigation." Def. Suppl. Br. 8-10. But for each case Defendants cite, Plaintiffs cite another case which enjoined federal defendants from enacting future policies similar to those specifically challenged. *See* Pl. Suppl. Br. 10-11, ECF No. 90. Defendants' spaghetti-at-the-wall case law citation is unhelpful. An injunction must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Court has already explained why relief going beyond the Kennedy Declaration is necessary here. The Court incorporates that same reasoning here and finds that for those same reasons it is not more burdensome than necessary to prevent irreparable harm to Plaintiffs. Indeed, the relief the Court orders is specific to the issues raised and decided in this litigation. Defendants lack the legal authority to unilaterally and categorically supersede statewide standards of care governing gender-affirming care. That is what the Court now enjoins Defendants from attempting to do again.

**CONCLUSION**

For the reasons discussed above, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 73) is DENIED. Plaintiffs' Motion for Summary Judgment (ECF No. 32) is GRANTED.

DATED this <u>18th</u> day of April 2026.

<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI (he/him)
United States District Judge

Page 49 — OPINION AND ORDER