# ATTACHMENT 2

DEPARTMENT OF HEALTH & HUMAN SERVICES · USA

MAKE AMERICA HEALTHY AGAIN

2026

# WOLVES IN WHITE COATS:

## How Doctors and Hospitals Pushed and Profited from the Fraud of “Gender Medicine”



## TABLE OF CONTENTS


Contributors .......... 3

Introduction .......... 5

Chapter 1: Hospitals Gained Unique and Lifelong Revenue Streams for Sex-Rejecting Procedures .......... 7

I. Captive Patients .......... 7

II. Healthcare Institutions .......... 9

Chapter 2: Hospitals Misuse Diagnostic and Procedural Codes to Ensure Payment for Pediatric Sex-Rejecting Interventions .......... 10

I. The Function and Importance of Medical Coding .......... 10

II. Medical Coding for Gender Dysphoria .......... 12

A. Endocrine Disorder and Precocious Puberty .......... 13

1. Background - Endocrine Disorder, Unspecified .......... 13

2. Central Precocious Puberty (CPP) .......... 16

III. Advocates of Sex-rejecting Interventions Encourage the Use of Vague or False Coding .......... 19

A. Presentations to the World Professional Association of Transgender Health .......... 19

B. Public Statements by Members of the Healthcare Industry .......... 21

C. Promotion of billing practices by advocacy organizations .......... 24

D. Evidence From Whistleblowers. .......... 27

IV. Conclusion and Recommendations .......... 29

Chapter 3: Hospitals Were Subject to the Biden Administration's Promotion of Sex-Rejecting Procedures .......... 31

I. Promotion and Access .......... 31

II. Federal Funding and Facilitation .......... 35

Chapter 4: Elite Professional Society Bias Infected Hospital Personnel .......... 41

Chapter 5: First-Hand Accounts from Patients and Parents .......... 45

I. Sydney Aviles .......... 45

II. Lily Burns .......... 46

III. Rose Marie .......... 47

IV. Clementine Breen .......... 48

V. Layla Jane .......... 49

VI. Christy Davidson .......... 50

VII. Soren Aldaco .......... 52

VIII. Luke Healy .......... 53

Conclusion .......... 55

Appendix: Nationwide Claims-Based Analysis of Signals in Sex-Rejecting Procedures on Minors .......... 56

***Wolves in White Coats: How Doctors and Hospitals Pushed and Profited from the Fraud of "Gender Medicine,"*** **is a report commissioned by the U.S. Department of Health and Human Services.**

## Contributors

Aaron Baer, President, Center for Christian Virtue

Victoria Coley, Independent Women's Forum

Neeraja Deshpande, Independent Women's Forum

Eithan Haim, MD

Jordan Jantz, IW Features at Independent Women's Forum

Aaron Kheriaty, MD, Ethics and Public Policy Center

May Mailman, Director, Independent Women's Law Center

Andrea Mew, IW Features at Independent Women's Forum

Rachel Morrison, Fellow, Ethics and Public Policy Center

Quentin Van Meter, MD

Aaron Baer is President of the Center for Christian Virtue (CCV), one of the largest state-based public policy centers in the country. Prior to leading CCV, Aaron served as public policy advisor to Arizona Attorney General Mark Brnovich, and as vice president at the Center for Arizona Policy.

Victoria Coley is Senior Vice President for communications at Independent Women's Forum, where she leads the organization's communications, marketing, media relations, and storytelling initiatives through IW Features – the grassroots storytelling arm of Independent Women's Forum. Previously, she worked at Fox News Channel.

Neeraja Deshpande is a Policy Analyst at Independent Women's Forum, where she primarily works on education and gender; and as a senior contributor to IW Features, the grassroots storytelling arm of Independent Women's Forum. Her work has been published in the Free Press, City Journal, the Spectator, and more.

Dr. Eithan Haim is a general surgeon and trauma surgeon at Hunt Regional Medical Center in Greenville, Texas. He attended the University of South Florida for his undergraduate degree and completed his residency in general surgery at Baylor College of Medicine in Houston, Texas. In May 2023, he anonymously exposed Texas Children's Hospital's secret transgender program – which helped spur the passage of state legislation banning pediatric sex-rejecting interventions. Dr. Haim also led to an investigation by the Texas Attorney General that culminated in a $10 million healthcare fraud settlement with Texas Children's Hospital and the establishment of the nation's first detransitioner clinic in May 2026.

Jordan Jantz is the assistant editor at IW Features and writes the Champion Women series. Her work has also appeared in The Daily Wire, The Federalist, and more.

Aaron Kheriaty, MD, is the Director of the Bioethics, Technology, and Human Flourishing Program at the Ethics and Public Policy Center. A physician specializing in psychiatry, he has published over one hundred articles and five books, including most recently, "Making the Cut: How to Heal Modern Medicine." Dr. Kheriaty has testified before the United States Senate and the California Senate on critical topics related to public policy and healthcare.

May Mailman is the Director of the Independent Women's Law Center and a former senior White House official for President Donald J. Trump's first and second terms. She previously served as Deputy Solicitor General for the state of Ohio. Ms. Mailman holds a JD from Harvard Law School and a B.S. from the University of Kansas.

Andrea Mew is the managing editor and documentary producer for IW Features, and a contributing writer for Evie Magazine. Her work has appeared in National Review, The Daily Wire, The Federalist, and more.

Rachel N. Morrison is an attorney and Fellow at the Ethics and Public Policy Center (EPPC), where she directs EPPC's Administrative State Accountability Project. She holds a JD from Pepperdine University School of Law. Ms. Morrison has published and spoken on issues related to sex-rejecting procedures, nondiscrimination, and federal executive action.

Quentin Van Meter is a board-certified pediatric endocrinologist with 46 years of continuous clinical experience. His pediatric residency was at the Naval Regional Medical Center Oakland/University of California, San Francisco, and he completed his pediatric endocrine fellowship at Johns Hopkins. Dr. Van Meter served in the U.S. Navy Medical Corps for 20 years and has been in private practice for the past 35 years in Atlanta. He has held clinical faculty positions, most recently at the Emory and Morehouse schools of Medicine.

## Introduction

In the late 2010s and early 2020s, healthcare providers began subjecting children to experimental sex-rejecting procedures in rapidly increasing numbers, despite a paucity of adequate evidence for long-term safety and efficacy for these interventions.[1] Such a large-scale medical shift requires the blessing of large institutional actors like hospitals. This report exposes, for the first time, the involvement of hospitals in promoting life-altering drugs and surgeries for children who express discomfort with their sex.

The stories of young boys and girls who sought to course-correct from the medical journeys designed to stunt and maim their natural bodies and functions all tell the same tale: there was no course-correction available. The harm to America's youth is more fully documented in this report.

The policies of President Donald J. Trump have discouraged hospitals from providing these interventions. But how was this madness allowed to fester under America's hospital system? This report concludes that a litany of political and financial incentives led providers to offer, and indeed urge, the prescription of sex-rejection drugs and surgeries for minors.

*First*, as will be explained in detail in subsequent chapters, healthcare providers were able to turn a tidy profit from these procedures: children who "transitioned" were placed on a course that would require expensive drugs, surgeries, and *lifelong* medical interventions. While not necessarily limited to these providers or institutions, we will cite examples of clinics from multiple states situated within major academic medical centers, large private hospital systems, and community-based clinics. These institutions and providers participate in federal programs including Medicaid and Medicare that treat children, adolescents, and adults. Doctors and entities that provide these services could profit immensely. And this report highlights evidence that healthcare providers may have secured insurance coverage for these procedures, increasing their bottom lines, through potentially fraudulent means. In particular, there is reason to believe that some (perhaps many) providers of sex-rejecting procedures systemically diagnose minors with physical conditions they did not have in order to secure insurance coverage for "treatments" (like breast removal or hormonal treatment) that insurers (including Medicaid and Medicare) might not otherwise have covered had they been provided with full and accurate information. *See* Chapter 2. If true, the entities that took these steps face potentially serious criminal and civil liability.

*Second*, medical institutions have been captured by ideology. This report contains first-hand accounts from children, and from the parents of children, pressured to undergo sex-rejecting procedures. These stories, and the data showing the explosion in sex-rejecting interventions, suggest that children suffering from gender dysphoria are likely to encounter an ideologue at gender clinics predisposed to embrace the child's story. This, combined with the financial incentive to provide sex-rejecting procedures, creates a dangerous mix: ideologically driven doctors encourage sex-rejecting procedures, while the financial incentives give hospitals and gender clinics a reason to offer such interventions and to excuse or overlook inaccurate diagnoses.

*Third*, the federal government actively pushed acceptance of sex-rejecting procedures for minors under the Biden Administration.

This report does not claim to be comprehensive; there are likely other pressures and dynamics

[1] For a thorough review of the scientific evidence regarding safety and efficacy of these procedures, see "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices," U.S. Department of Health and Human Services (HHS), https://opa.hhs.gov/gender-dysphoria-report.

hospitals faced in their complicity with sex-rejecting procedures. But this report contains evidence of *these* causes, lays that evidence out in a way that may be useful to policymakers, and suggests some next steps for policymakers interested in rooting out child mutilation.

## Chapter 1: Hospitals Gained Unique and Lifelong Revenue Streams for Sex-Rejecting Procedures

The provision of sex-rejecting procedures for minors expanded rapidly within U.S. pediatric healthcare systems, often under the questionable banner of medical necessity. What began as a handful of specialized clinics in the early 2010s grew into programs at over 225 hospitals and health systems nationwide by the early 2020s.[2]

Financial incentives may explain at least some of this development. Pediatrics remains the lowest-paid medical specialty, with average physician compensation significantly below that of surgical or procedural fields.[3] Thus, pediatric departments in large academic medical centers and hospital systems traditionally generate thinner margins—and thus presumably wield less influence—compared to adult cardiology, oncology, orthopedics, and other medical and surgical specialties. Gender clinics changed that calculus by introducing a novel source of revenue: they promised a new stream of continuous revenue for pediatrics, endocrinology, and surgical specialties by taking physiologically healthy young people—who otherwise would not need to seek medical attention, and rendering them dependent for life on the medical system.

### I. Captive Patients

This "captive patient" dynamic stands in stark contrast to patterns typical of routine pediatric care, which tends to focus on acute or self-limited conditions according to data from the National Center for Health Statistics.[4] For example, a single pediatric clinic visit might be to treat an ear infection, or a one-time hospitalization to treat an acute rotavirus infection. One outpatient study examining data between 2008 and 2013 found 82% of pediatric patients had no chronic conditions; those with multiple chronic conditions had more visits but represented a minority of patients seen in this setting.[5] In contrast to typical one-time visits for acute conditions or well-child checkups, a child or adolescent presenting with gender dysphoria enters a pipeline of regular endocrinology visits, laboratory monitoring for hormone levels and side effects (bone density, liver function, lipid profiles, fertility counseling), mental-health follow-ups, and potential escalation to irreversible surgical procedures. For example, the Endocrine Society's Clinical Practice Guideline (2017) recommends for those on puberty blockers or cross sex hormones a clinical assessment every 3-6 months, laboratory draws every 6-12 months, and bone density scans every 1-2 years

[2] "Does My Hospital Transition Kids?" Stop the Harm Database, https://stoptheharmdatabase.com/. NOTE: This document contains links to non-United States Government websites. We are providing these links because they contain additional information relevant to the topic(s) discussed in this document or that otherwise may be useful to the reader. We cannot attest to the accuracy of information provided on the cited third-party websites or any other linked third-party site. We are providing these links for reference only; linking to a non-United States Government website does not constitute an endorsement by CMS, HHS, or any of their employees of the sponsors of the information and/or any products presented on the website. Also, please be aware that the privacy protections generally provide by the United States Government websites do not apply to third-party sites.

[3] "Medscape Physician Compensation Report 2025," Medscape, https://www.medscape.com/slideshow/2025-compensation-report-6018630.

[4] "Physician Office Visits by Children for Well and Problem-focused Care: United States, 2012," NCHS Data Brief, https://www.cdc.gov/nchs/data/databriefs/db248.pdf.

[5] "Multiple Chronic Conditions Among Outpatient Pediatric Patients, Southeastern Michigan, 2008-2013," Preventing Chronic Disease – Public Health Research, Practice, and Policy, https://pmc.ncbi.nlm.nih.gov/articles/PMC4329952/pdf/PCD-12-E18.pdf.

into adulthood.[6] Likewise, the World Professional Association of Transgender Health's Standards of Care Version 8 (2022) similarly recommends regular clinical assessments, laboratory monitoring every three months for at least a year, then every 6-12 months, with sustained multidisciplinary team assessments on an ongoing basis through adulthood.[7]

While these guidelines and recommendations will be subject to critique in subsequent chapters of this report, they illustrate the typical pathway of chronic care that young patients are funneled down by clinics embracing the practice of sex-rejecting procedures. Each step generates billable encounters, prescriptions, and facility fees. Once initiated—often with puberty blockers or cross-sex hormones in early adolescence—the patient requires ongoing care for decades. Insurance reimbursements, whether private or public, create a predictable, high-margin stream for pediatric endocrinology, adolescent medicine, plastic surgery, urology, and gynecology departments.

Cost data estimates illustrate the scale of these revenues. According to a comprehensive 2022 analysis of commercially insured transgender patients using claims data spanning nearly three decades, cross-sex hormone therapy entails average yearly payer costs per patient ranging between $545 (androgens), $735 (estrogens), and $16,385 (for the more costly puberty-blocker GnRH).[8] Lifetime totals for a patient starting as a minor can reach $25,000-$75,000 even without surgeries.[9] For context, we can compare this to average healthcare spending for children under the age of 18, which is typically around $3,000.[10] These figures represent health-plan-paid amounts and exclude patient out-of-pocket costs, which can push total expenses higher. While modest on a per-year basis, these expenses recur annually for the patient's entire adult life, creating compounding revenue for health systems.

Surgical interventions dramatically amplify the financial upside. "Top surgery" (mastectomy with chest masculinization for females) carries a per-procedure mean health-plan-paid cost of $12,680, with additional out of pocket costs of $2,244. Similarly, mammoplasty costs insurers $17,426 per patient with an additional $1,223 out of pocket. "Bottom surgeries"—vaginoplasty for males and phalloplasty for females—are more complex and often staged over multiple episodes. Average total costs per person reach $53,645 for vaginoplasty and $133,911 for phalloplasty. These represent mean health-plan-paid amounts (payer perspective), excluding out-of-pocket costs, which added roughly $2,624 for vaginoplasty and $3,982 for phalloplasty on average.[11] In addition, these procedures may require revisions for complications (urethral strictures, fistulas, loss of sensation, or cosmetic adjustments), each generating additional operating-room time, hospital stays, and follow-up care. These one-time or multi-staged interventions deliver high-margin

---

[6] Hembree, WC., Cohen-Kettenis, PT., Gooren, L., Hannema, SE., Meyer, WJ., Hassan, M. et al. 2017. "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism* 102(11): 3869–3903.
[7] Coleman, E., Radix, AE., Bouman, WP., Brown, GR., de Vries, AL C., Deutsch, MB. et al. (2022). "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8." *International Journal of Transgender Health*, 23(sup1): S1–S259.
[8] Kellan Baker & Arjee Restar. 2022. *Utilization and Costs of Gender-Affirming Care in a Commercially Insured Transgender Population*. Journal of Law, Medicine & Ethics 3: 456-463. For these and additional cost numbers see Table 2.2 on p. 463.
[9] "Are Transgender-Inclusive Health Insurance Benefits Expensive?," Human Rights Campaign, accessed March 11, 2026, https://www.thehrcfoundation.org/professional-resources/are-transgender-inclusive-health-insurance-benefits-expensive.
[10] "Children's Health Services 2020 Report," Health Care Cost Institute, https://healthcostinstitute.org/all-hcci-reports/children-s-health-services-2020-report/. According to the Health Care Cost Institute, in 2020 this number was $2,966.
[11] "Utilization and Costs of Gender-Affirming Care in a Commercially Insured Transgender Population," PMC Pubmed Central, https://pmc.ncbi.nlm.nih.gov/articles/PMC9679590/#app1. Table 2.3

procedural revenue to surgical specialties that otherwise might see fewer elective cases in pediatric settings.

The lifetime economic footprint for a single patient beginning these interventions as a minor is substantial even without surgery. According to the Human Rights Campaign, an organization that advocates for transgender healthcare, estimates place total costs between $25,000 and $75,000 over a lifetime.[12] When surgeries are included, individual lifetime spending on surgical interventions can easily exceed $100,000 and approach $170,000.[13] These figures do not account for indirect costs such as fertility preservation (egg or sperm banking), voice therapy, hair removal, or later interventions for regret or complications—services that further embed the patient in the medical system. This dependency model mirrors chronic-disease management programs (e.g., diabetes, HIV, or oncology), but unlike treatment for those diseases, sex-rejecting procedures start with physically healthy minors who would otherwise have generated negligible lifetime revenue.

## II. Healthcare Institutions

Scaled across thousands of patients, the aggregate revenue becomes significant for hospital systems and clinics. Watchdog analyses tracking billed charges for minors from 2019 onward estimate almost $120 million in total hospital and clinic billings nationwide, encompassing over 5,500 surgical procedures and 8,500 courses of hormones or blockers.[14] Individual flagship programs have reported multimillion-dollar annual billings. For example, certain large children's hospitals have seen gender-clinic revenue streams balloon in recent years. According to Do No Harm, Mount Sinai Medical Center in NY and Boston Children's Hospital are cited as the top-grossing providers nationwide, with over $8.2 million and $6.5 million respectively in total billed charges for such services to minors during the 2019–2023 period.[15] This equates to well over $1 million per year across those five years. In an era of razor-thin pediatric margins and pressure on hospital reimbursements, this new patient cohort—young, insured or Medicaid-eligible, and requiring perpetual follow-ups—represented a strategic area of growth. Endocrinology and surgery departments gained volume and prestige, while hospital administrators gained a reliable revenue line that helps subsidize lower-margin services.

In summary, pediatric gender clinics have functioned as a revenue booster for pediatrics and allied departments situated within hospitals and outpatient clinics. This financial architecture helps explain both the rapid proliferation of pediatric gender programs and the institutional resistance to reevaluation in the face of new and very concerning evidence regarding the poor safety and efficacy of these procedures.

---

[12] "Are Transgender-Inclusive Health Insurance Benefits Expensive?" Human Rights Campaign, accessed March 11, 2026, https://www.thehrcfoundation.org/professional-resources/are-transgender-inclusive-health-insurance-benefits-expensive.

[13] "Utilization and Costs of Gender-Affirming Care in a Commercially Insured Transgender Population," PMC Pubmed Central, https://pmc.ncbi.nlm.nih.gov/articles/PMC9679590/#app1. For surgical costs see Table 2.3. These estimates are based on the average costs of, for example, combining phalloplasty ($133,911) with hysterectomy ($14,538), orchiectomy ($6,927), and mastectomy ($12,680) for natal females (total surgical costs, excluding out-of-pocket costs = $168,056).

[14] "What We Found," Stop the Harm Database, accessed March 12, 2026, https://stoptheharmdatabase.com/about/. ($119,791,202 in total submitted charges; 5,747 minors had sex change surgeries; 8,579 minors received hormones and puberty blockers).

[15] "The Dirty Dozen," Stop the Harm Database, accessed March 12, 2026, https://stoptheharmdatabase.com/. *Cf. also* "Boston Children's Hospital," Stop the Harm Database, accessed March 12, 2026, https://stoptheharmdatabase.com/hospital/boston-childrens-hospital/ (profiling Boston Children's Hospital in greater detail).

## Chapter 2: Hospitals Misuse Diagnostic and Procedural Codes to Ensure Payment for Pediatric Sex-Rejecting Interventions

As evidence in this chapter will suggest, pediatric gender clinics and children's hospitals used misleading or potentially fraudulent diagnostic and procedural codes in securing insurance coverage for sex-rejecting interventions. In addition to inflating billing volumes, these practices may have expedited the adoption by hospitals and clinics of unproven interventions, including puberty blockers, cross-sex hormones, and risky surgeries, despite scant long-term efficacy data and serious concerns about safety.

### I. The Function and Importance of Medical Coding

To understand this chapter, it is critical to understand information about diagnostic (ICD) and procedural (CPT) codes. This section provides that background.

ICD codes document the clinical rationale for treatment. The initials, ICD, reflect the name of the guide from which the codes are taken: the *International Classification of Diseases* (now in its Tenth Edition, or ICD-10). "The ICD is a classification system developed collaboratively between the World Health Organization (WHO) and 10 international centers so that the medical terms reported by physicians...can be grouped together for statistical purposes."[16] Guidelines promulgated by the Centers for Medicare & Medicaid Services (CMS) mandate the use of accurate ICD codes in dealings with Medicare and Medicaid. Specifically, these guidelines mandate that doctors "[c]ode all documented conditions that coexist at the time of the encounter/visit and that require or affect patient care, treatment or management."[17] All accompanying "documentation should describe the patient's condition, using terminology which includes specific diagnoses as well as symptoms, problems, or reasons for the encounter."[18] Furthermore, the Healthcare Portability and Accountability Act of 1996 (HIPAA) Administrative Simplification rules[19] require the use of ICD-10 codes in certain electronic health care transactions between HIPAA covered entities.

CPT® codes, for their part, indicate the treatment the doctor will administer (or has administered). CPT codes are promulgated by the American Medical Association (AMA)," which owns a copyright on the CPT code system.[20] The HIPAA Administrative Simplification rules likewise require, in certain electronic health care transactions between HIPAA covered entities, the use of CPT codes

---

[16] "Frohn v. Globe Life and Accident Insurance Company, No. 23-3530" FindLaw, https://caselaw.findlaw.com/court/us-6th-circuit/116107048.html.
[17] "ICD-10-CM Official Guidelines for Coding and Reporting: FY 2025 – UPDATED April 1, 2025 (April 1, 2025 - September 30, 2025)," ("CMS Guidelines") at 113, CDC, https://tinyurl.com/CMS-Gdlines.
[18] "Statement of Interest, Doe v. Georgia Department of Corrections, et al., Case No. 1:23-cv-5578-MLB" (claiming failure to provide "medically necessary gender-affirming surgery" violated Eighth Amendment), U.S. Department of Justice, https://www.justice.gov/d9/2024-01/statement_of_interest-doe_v._georgia_department_of_corrections_0.pdf; "Statement of Interest, Diamond v. Owens," (arguing failure to provide "adequate treatment" for gender dysphoria "constitutes cruel and unusual punishment under the Eighth Amendment"), U.S. Department of Justice, https://www.justice.gov/file/443086/dl .
[19] "45 CFR Part 162 – Administrative Requirements," Code of Federal Regulations," https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-C/part-162. 45 CFR Part 162, enforced by CMS, specifically requires this for health care transactions for which HHS has adopted a transactions standard (1) for certain conditions (diseases; injuries; impairments; other health problems and their manifestations; and causes of injury, disease, impairment, or other health problems) and (2) for certain procedures or other actions taken for disease, injuries, and impairments on hospital inpatients reported by hospitals (prevention; diagnosis; treatment; and management).
[20] *Practice Mgt. Information Corp. v. Am. Med. Assn*, 121 F.3d 516, 517 (9th Cir. 1997), *amended,* 133 F.3d 1140 (9th Cir. 1998).

for physician services and other healthcare services.[21]

Together, these codes represent the common language that doctors and insurers use to communicate with each other. Doctors submit medical codes so that insurers can understand what physicians did (the treatment or CPT code) and why they did it (the diagnosis or ICD code). If the treatment (CPT code) is medically necessary for the diagnosis (reflected by the ICD code), then the insurer will more likely reimburse the provider for the service.[22] Similarly, if the treatment is *not* medically necessary for the diagnosis, the insurer is less likely to provide coverage.

Healthcare providers can misuse this common language to defraud insurers. They could, for example, record an inaccurate – or less specific – diagnostic code to increase the odds of coverage for the treatment provided. But serious consequences can be caused by such misconduct. When healthcare providers use fraudulent medical coding to obtain payment from the federal government, they may be liable under the federal False Claims Act,[23] which carries fines and imposes damages of "3 times the amount of damages which the government sustains."[24] Healthcare providers may trigger this law's application by using false diagnostic codes in bills submitted to government insurance programs such as Medicaid and Medicare.[25] Such practices may also trigger liability under state laws barring the submission of false claims. And the same practices may violate 18 U.S.C. §1347, which prohibits knowingly defrauding *any* "health care benefit program," a phrase defined to include even *private* health insurers.[26]

The federal government has vigorously enforced these and related laws. Several recent cases illustrate this:

- In 2024, the United States secured a $98 million settlement with defendants accused of "knowingly submitting or causing the submission of invalid diagnosis codes to Medicare for Medicare Advantage Plan enrollees to increase payments that Independent Health received from Medicare."[27]

---

[21] 45 CFR Part 162 – Administrative Requirements, "Code of Federal Regulations," https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-C/part-162. Electronic claims for payment for healthcare services is one of the transactions which requires the use of ICD-10 and CPT codes. 45 CFR 162.1001-1002.
[22] *Fohn*, 99 F.4th at 895 (ICD codes); *Singer v. Reali*, 883 F.3d 425, 430 (4th Cir. 2018) (CPT codes).
[23] False Claims Act (FCA), 31 U.S.C. §§ 3729 – 3733. See "The False Claims Act," U.S. Department of Justice, https://www.justice.gov/civil/false-claims-act, for a summary of this statute; see Medicare Advantage provider Independent Health to pay up to $98m to settle False Claims Act suit," United States Attorney's Office, Western District of New York, accessed December 20, 2025, https://tinyurl.com/IndHealthRelease, for an example of application of this law to Medicare billing fraud.
[24] False Claims Act (FCA), 31 U.S.C. §§ 3729 – 3733. See Sutter Health and Affiliates to Pay $90 Million to Settle False Claims Act Allegations of Mischarging the Medicare Advantage Program," Archives, U.S. Dept. of Justice, https://tinyurl.com/SutterRelease, for another example of such damages awarded.
[25] "Sutter Health and Affiliates to Pay $90 Million to Settle False Claims Act Allegations of Mischarging the Medicare Advantage Program," Archives, U.S. Dept of Justice, https://www.justice.gov/archives/opa/pr/sutter-health-and-affiliates-pay-90-million-settle-false-claims-act-allegations-mischarging.
[26] "18 U.S.C. §24(b)," House.gov, https://uscode.house.gov/view.xhtml?req=granuleid:USC-2000-title18-section24&num=0&edition=2000, (emphasis added); *See, e.g.*, *United States v. Stevens*, 605 F.Supp.2d 863, 868 (W.D.Ky. 2008).
[27] "Medicare Advantage provider Independent Health to pay up to $98m to settle False Claims Act suit," Dept. of Justice https://www.justice.gov/usao-wdny/pr/medicare-advantage-provider-independent-health-pay-98m-settle-false-claims-act-suit .

- In 2021, the United States and Sutter Health entered a $90 million settlement in another case under the False Claims Act. There, the defendant was accused of having knowingly submitted unsupported diagnosis codes.[28] In announcing the settlement, the government stated that providers seeking reimbursement must "submit accurate information to ensure proper payment."[29]

## II. Medical Coding for Gender Dysphoria

A provider who submits any CPT code on an insurance claim for the management of a patient with gender dysphoria should use the gender-related diagnosis codes, which include the F64 or Z87 family of diagnosis codes.

**Group 1** (5 Codes)

Group 1 Paragraph

The following diagnosis codes are considered covered when applicable criteria have been met:

Group 1 Codes

| Code | Description |
|---|---|
| F64.1 | Dual role transvestism |
| F64.2 | Gender identity disorder of childhood |
| F64.8 | Other gender identity disorders |
| F64.9 | Gender identity disorder, unspecified |
| Z87.890 | Personal history of sex reassignment |

In an article titled, *Navigating Gender-Affirming Care in a Shifting Legal Landscape: Documentation, Coding, and Compliance Strategies*,[30] Penny Jefferson, a coding expert, affirms the importance of relying on the F64 and Z87 diagnosis codes for gender dysphoria patients and warns against "coding errors":

> Appropriate diagnostic coding is essential in this context. For instance, using F64.0 (transsexualism) or F64.1 (dual-role transvestism) with specificity is

[28] "Sutter Health and Affiliates to Pay $90 Million to Settle False Claims Act Allegations of Mischarging the Medicare Advantage Program," Dept of Justice, https://tinyurl.com/SutterRelease.
[29] "Sutter Health and Affiliates to Pay $90 Million to Settle False Claims Act Allegations of Mischarging the Medicare Advantage Program," Dept. of Justice, https://www.justice.gov/archives/opa/pr/sutter-health-and-affiliates-pay-90-million-settle-false-claims-act-allegations-mischarging.
[30] "Navigating Gender-Affirming Care in a Shifting Legal Landscape: Documentation, Coding, and Compliance Strategies," ICD10monitor, https://medlearn.com/icd10monitor/navigating-gender-affirming-care-in-a-shifting-legal-landscape-documentation-coding-and-compliance-strategies/.

> preferable over vague designations like F64.9 (gender identity disorder, unspecified). Coding errors, such as selecting generalized endocrine disorder codes like E34.9 in place of gender dysphoria, may trigger audits or denials.

Evidence already available to the public suggests health providers are not heeding this advice—indeed, many may be using incorrect ICD codes either to secure insurance coverage, to protect patient "privacy," or for some other reason. This section begins by focusing on two particular diagnosis codes that it appears doctors are misusing. It then explores statements from advocacy groups, medical providers, whistleblowers, and court filings that raise further red flags about the ubiquity of this practice.

### A. Endocrine Disorder and Precocious Puberty.

#### 1. Background - Endocrine Disorder, Unspecified

CMS Guidelines require that ICD codes be submitted "to the highest level of specificity documented in the medical record"[31] and caution that "unspecified" diagnosis codes should only be used "when the information in the medical record is insufficient to assign a more specific code."[32] The Guidelines further state:

> Unspecified codes should be reported when they are the codes that most accurately reflect what is known about the patient's condition at the time of that particular encounter. *It would be inappropriate to select a specific code that is not supported by the medical record documentation or conduct medically unnecessary diagnostic testing in order to determine a more specific code*.[33]

In practical application, "unspecified" ICD codes are meant to be used during the early stages of a diagnostic workup when the underlying pathology is still unknown — "when the information in the medical record is insufficient to assign a more specific code."[34] The Guidelines' reference to "information in the medical record" refers to a physician's documentation of a clinical history, physical exam, and relevant laboratory or imaging tests. Once a diagnostic workup is performed and the pathology determined, the appropriate ICD code to submit for billing purposes is the one that defines the diagnosis with "the highest level of specificity."

With this in mind, consider the ICD codes (E00–E90) relating to "Endocrine, nutritional and metabolic diseases."[35] This broad class contains codes that "indicate either functional activity by

[31] "ICD-10-CM Guidelines for Coding and Reporting, FY 2025 – Updated October 1, 2024 (October 1, 2024 – September 30, 2025), section IV.F.3." CMS.gov, Centers for Medicare & Medicaid Services, MED.
[32] "ICD-10-CM Official Guidelines for Coding and Reporting, FY 2022 – Updated April 1, 2022 (October 1, 2021 - September 30, 2022), section I.A.9.b." IV.F.3." CMS.gov, Centers for Medicare & Medicaid Services, https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf.
[33] "ICD-10-CM Official Guidelines for Coding and Reporting FY 2025 – Updated October 1, 2024 (October 1, 2024 - September 30, 2025), section 1.B.18." CMS.gov, Centers for Medicare & Medicaid Services, https://www.cms.gov/files/document/fy-2025-icd-10-cm-coding-guidelines.pdf.
[34] ICD-10-CM Guidelines for Coding and Reporting, FY 2025 – Updated October 1, 2024 (October 1, 2024 – September 30, 2025), section I.9." CMS.gov, Centers for Medicare & Medicaid Services, https://www.cms.gov/files/document/fy-2025-icd-10-cm-coding-guidelines.pdf.
[35] "ICD-10- Tabular List of Diseases and Injuries, pg. 192 (July 2007 release)," U.S. Centers for Disease Control and Prevention. Accessed March 5, 2026, https://ftp.cdc.gov/pub/health_statistics/nchs/publications/ICD10CM/2007/i10tab0707.pdf.

neoplasms and ectopic endocrine tissue or hyperfunction and hypofunction of endocrine glands associated with neoplasms and other conditions classified elsewhere."[36] Endocrine glands refer to those such as the thyroid or adrenal glands that release hormones. Diagnoses within this category include carcinoid syndrome (E34.0), ectopic hormone secretion (E34.2), and primary insulin-like growth factor deficiency (E34.321).

Within this category, one finds "Endocrine disorder, unspecified," coded as E34.9.[37] Using this code in place of a gender-related diagnosis (e.g., gender identity disorder, F64.0) violates CMS guidelines for the simple reason that gender dysphoria is not an endocrine disorder, since it exhibits no hormonal abnormalities. In fact, the only endocrine disorders these patients have are the ones created by their doctors through the use of sex-rejecting interventions.

Yet it appears that healthcare providers *are* misusing this code. In a 2016 study titled "Identifying the Transgender Population in the Medicare Program," CMS's Office of Minority Health acknowledged that proxy diagnosis codes are being substituted for gender dysphoria.[38] In the methods section, the authors explain that they included the ICD-9 diagnosis code for Unspecified Endocrine Disorder in their analysis because it is "frequently used by the transgender community to combat the perceived stigma of a GID diagnosis."[39] According to the paper, "among the most commonly used non-transgender-specific diagnosis codes is ICD-9 code 259.9 (Unspecified Endocrine Disorder)."[40]

A 2023 study from the University of Iowa Hospitals and Clinics, published in the *Journal of American Medical Informatics Association* suggests the same.[41] The study analyzed diagnosis coding patterns in "gender-expansive" patients. To identify patients who were "gender-expansive," the authors looked for, among other things, "ICD-10 codes related to gender dysphoria *or unspecified endocrine disorder*."[42] Why look for patients with unspecified endocrine disorder? Because "the ICD-10 code E34.9 (endocrine disorder, unspecified)…was sometimes [used] instead of ICD-10 codes related to gender dysphoria." The authors never explain why this occurs, only that it occurs "sometimes." But in fact, the study's numbers show this code is used (misused, really) with great frequency: the report's numbers suggest that, of the 1,480 patients who were diagnosed with endocrine disorder, unspecified, *only 71 patients* (4.7%) had an actual endocrine condition.[43]

---

36 "ICD-10- Tabular List of Diseases and Injuries, pg. 192 (July 2007 release)," U.S. Centers for Disease Control and Prevention. Accessed March 5, 2026, https://ftp.cdc.gov/pub/health_statistics/nchs/publications/ICD10CM/2007/i10tab0707.pdf.

37 "ICD-10- Tabular List of Diseases and Injuries, pg. 224 (July 2007 release)," U.S. Centers for Disease Control and Prevention. Accessed March 5, 2026. https://perma.cc/LS4U-FYV5.

38 "Identifying the Transgender Population in the Medicare Program," PubMed, https://pubmed.ncbi.nlm.nih.gov/28861539/.

39 "Identifying the Transgender Population in the Medicare Program," PubMed, https://pubmed.ncbi.nlm.nih.gov/28861539/. ICD-9 was the required code set until October 1, 2015, when ICD-10 replaced it. See 45 CFR 162.1002(a)-(c).

40 Identifying the Transgender Population in the Medicare Program," PubMed, https://pubmed.ncbi.nlm.nih.gov/28861539/.

41 "Patterns of gender identity data within electronic health record databases can be used as a tool for identifying people and estimating the prevalence of gender-expansive people," PMC PubMed Central, https://pmc.ncbi.nlm.nih.gov/articles/PMC10290553/pdf/ooad042.pdf.

42 "Patterns of gender identity data within electronic health record databases can be used as a tool for identifying people and estimating the prevalence of gender-expansive people," PMC PubMed Central, https://pmc.ncbi.nlm.nih.gov/articles/PMC10290553/pdf/ooad042.pdf.

43 "Patterns of gender identity data within electronic health record databases can be used as a tool for identifying people and estimating the prevalence of gender-expansive people," PMC PubMed Central, https://pmc.ncbi.nlm.nih.gov/articles/PMC10290553/pdf/ooad042.pdf, ("ICD-10 code E34.9 (endocrine

Despite the magnitude of this practice remaining largely unknown to the general population, skeptics of sex-rejecting interventions have slowly begun to take notice. In October 2025, Leor Sapir Ph.D., one of the authors of the peer-reviewed *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*,[44] published an article entitled, *Insurance Fraud is Widespread in Transgender Medicine*.[45] In the article, Sapir discusses a Manhattan Institute analysis of all-payer claims data, which documented a 30% rise in E34.9 diagnoses among minors from 2020–2022. Sapir concludes that this trend is not likely due to a genuine increase in endocrine disorders. Rather, it reflects a "greater willingness of gender clinicians to use endocrine disorder (E34.9) codes instead of gender identity disorder (F64) codes."[46] He goes on to comment on the deliberate nature of the practice:

> In short, the decision by leaders in the field of gender medicine to use "endocrine disorder" codes for patients who lack such disorders was deliberate and is well documented. Indeed, the openness, even pride, with which they discuss this practice shows their confidence that neither the medical establishment nor the insurance industry would dare challenge the field on this critical matter.

To verify the hypothesis that such miscoding is occurring, we conducted our own analysis from a nationwide health insurance claims database for the years 2015-2025. We found that public and private insurance was billed nearly $50 million for puberty blocking drugs in patients aged 9-17 with Endocrine Disorder diagnoses (excluding precocious puberty, the typical indication for puberty blockers, as explained in the next section)[47]:

---

disorder, unspecified) was used in nearly as many patients (*N* = 1,480) as the six ICD-10 codes related to gender dysphoria. However, there was substantial overlap of use of these codes, leading to a total of 1,891 patients that had any of the six ICD-10 codes related to dysphoria and/or ICD-10 code E34.9, of which 1,817 (96.0%) were gender-expansive and 1,455 (76.9%) were receiving gender-affirming hormones") (sic).

The authors drive the point home further by determining how many patients with a diagnosis of endocrine disorder, unspecified diagnosis were not self-identified as "gender-expansive":

The inclusion of ICD-10 code E34.9 identified 73 patients that did not have any sexual orientation and gender identify (SOGI) field differences in the electronic health record or any of the six ICD-10 codes related to gender dysphoria. From chart review, only two of these 73 (2.7%) patients were self-identified as "gender-expansive" and receiving cross-sex hormones. The remaining 71 patients did not have gender dysphoria, with the E34.9 code documenting an endocrine condition unrelated to gender dysphoria.

[44] "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices," HHS.gov, accessed November 19, 2025, https://opa.hhs.gov/gender-dysphoria-report.

[45] "Insurance Fraud is Widespread in Transgender Medicine," City Journal, accessed March 2, 2026, https://www.city-journal.org/article/insurance-fraud-transgender-medicine.

[46] "Insurance Fraud is Widespread in Transgender Medicine," City Journal, accessed March 2, 2026, https://www.city-journal.org/article/insurance-fraud-transgender-medicine.

[47] This analysis is based on nationwide medical claims data for 2015–2025, limited to minor patients. Patient age was estimated from birth year alone, with July 1 assigned as a default birthdate, so all age values are approximate. Reported claim charges reflect billed amounts captured in the source data; because some claims (for example, value-based care arrangements) may record charges as null, the totals shown are likely an under-representation of actual charges and therefore represent a conservative estimate. Consistent with the source data's limitations, all results are treated as directional signals rather than findings and require verification against the underlying records.

We identified claims for puberty blockers (GnRH agonists) carrying an endocrine-disorder diagnosis (E34x) on the same claim. To isolate endocrine-coded use, we required that the claim carry no gender-related diagnosis (F64x) and no central precocious puberty diagnosis (E301). This cohort was summarized two ways: by payer channel (commercial, Medicaid, payer unknown, Medicare, and other government) and by the specific E34x diagnosis code billed on the claim.

**Claim Charges for Claims for Puberty Blockers with Endocrine Disorder Diagnosis (E34x) on the Same Claim with No Gender Diagnosis (F64x) and No Precocious Puberty (E301) Diagnosis on Claim (2015-2025; Patient Age 9-17)**

| Payer Channel | Puberty Blocker Patients | Total Claim Charge |
|---|---|---|
| Commercial | 298 | $37,508,006.61 |
| Medicaid | 55 | $7,785,792.09 |
| Payer Unknown | 36 | $1,996,647.69 |
| Medicare | 2 | $247,335.00 |
| Other Government | 2 | $97,183.59 |
| **Total** | **393** | **$47,634,964.98** |

Most of these claims were for the E34.9 diagnosis, Endocrine Disorder, Unspecified, accounting for over $40 million in billing for puberty blockers in these adolescents, as shown here:

**Breakdown of E34x Diagnosis for Puberty Blockers with Endocrine Disorder Diagnosis (E34x) on the Same Claim with No Gender Diagnosis (F64x) and No Central Precocious Puberty (E301) Diagnosis on Claim (2015-2025; Patient Age 9-17)**

| E34x Code | Puberty Blocker Patients | Total Claim Charge |
|---|---|---|
| E349 (Endocrine Disorder, Unspecified) | 239 | $42,589,630.91 |
| E348 (Other Specified Endocrine Disorders) | 50 | $2,465,232.69 |
| E343 (Androgen Insensitivity Syndrome, Unspecified) | 48 | $1,752,734.72 |
| E34321 (Primary IGF-1 Deficiency) | 3 | $494,534.89 |
| E3430 (Short Stature Due to Endocrine Disorder, Unspecified) | 4 | $217,952.57 |
| E344 (Constitutional Tall Stature) | 3 | $73,637.04 |
| E342 (Ectopic hormone secretion, not elsewhere classified) | 1 | $32,288.20 |
| E3431 (Constitutional Short Stature) | 2 | $13,307.08 |
| E34329 (Unspecified Genetic Causes of Short Stature) | 1 | $3,770.32 |
| E34 (Other Endocrine Disorders) | 1 | $292.00 |

As described in previous reports mentioned above, this data strongly suggests a pattern of potentially fraudulent billing that relies on miscoding for endocrine disorders to justify the prescription of puberty blockers.

### 2. Central Precocious Puberty (CPP)

Another category of diagnosis codes that appears to be widely used as an inaccurate proxy for gender-related diagnoses are the ICD codes for "precocious puberty." Precocious puberty has well-defined diagnostic criteria that must be supported by the provider's documentation. The "traditional" age of diagnosis is before age 8 in girls or age 9 in boys, while treatment with puberty blockers is usually ended at about ages 10 or 11.[48] Puberty occurring within the normal time range is not precocious; it is simply puberty.

The United States Department of Justice (DOJ) has alleged that health providers misused the ICD code for precocious puberty to secure coverage for sex-rejecting interventions like puberty blockers. For example, one declaration submitted in support of an investigation into Children's

[48] Ana Claudia Latronico, *et al*. 2016. "Causes, diagnosis, and treatment of central precocious puberty," *The Lancet* 4(3): 265, 271.

Hospital of Philadelphia (CHOP) contains the following revelation:

> Such practices include, but are not limited to, providers (i) using the incorrect diagnosis and/or billing code (e.g., "endocrine disorder, unspecified" instead of "gender dysphoria" to prescribe cross sex hormones, or "precocious puberty" instead of "gender dysphoria" to prescribe puberty blockers).
>
> … Based on diagnosis codes, it appears that between 2017 and 2024, there were almost 250 minors first diagnosed at CHOP or a CHOP affiliate with central precocious puberty at age 10 or older, including numerous teenagers aged 14 to 18. *This is well beyond the age at which children are typically diagnosed with precocious puberty.*[49]

DOJ court filings reveal the government's suspicions of similar practices at Boston Children's Hospital (BCH). In one filing, the government wrote that there was "no clear explanation for why BCH would go from diagnosing almost no 11-year-olds with CPP [central precocious puberty] for the years 2017-19 to diagnosing 50 11-year-old patients with CPP in 2022."[50] The sharp increase in diagnosis is illustrated by the following chart, which appears in the same declaration:




Because of the rare incidence of precocious puberty, publicly available claims data has been used to identify abnormal trends that raise the suspicion for inappropriate coding and billing practices

[49] Declaration of Lisa K. Hsiao 341, 35, Ex. A to Supp. Brief in Support of Motion to Limit *Subpoena Duces Tecum* Issued on June 12, 2025 (July 8, 2025), In re Administrative Subpoena 25-1431-014, No. 25-mc-00039 (E.D. Pa.). cf. Wendy Ruderman, "CHOP transgender care under scrutiny for 'fraudulent billing practices,' DOJ says," The Philadelphia Inquirer, accessed Oct. 8, 2025, https://www.inquirer.com/health/childrens-hospital-justice-department-transgender-billing-20251008.html.

[50] Gov's Memo. in Support of its Mot. to Alter or Amend at 9 (Oct. 7, 2025), *In re Administrative Subpoena No. 25-1431-019*, No. 25-mc-91324 (D. Mass.), 9.

in gender clinics. A salient example of this came from reporter Meg Brock, who obtained data from the Pennsylvania Department of Human Services. That data revealed a "more than 2100% increase in reimbursement for puberty blocker claims using the E30.1 code (precocious puberty) between 2013 to 2017."[51]




Graph showing annual reimbursement paid by Pennsylvania for puberty blockers for minors under 18 using the billing code for precocious puberty. Data Source: Pennsylvania Department of Human Services.

Another feature of precocious puberty that permits analysis through publicly available claims data is the narrow therapeutic window for puberty blockers in precocious puberty. As previously stated, when doctors treat children suffering from precocious puberty, puberty blockers are generally discontinued at 10 or 11 years old. The diagnosis of precocious puberty, by definition, cannot apply to a patient population above this age since puberty cannot be considered "precocious" when it occurs at the natural age for puberty.

The data Brock uncovered, however, showed a significant number of insurance claims in minors *over* 11 years of age. Data obtained from the Pennsylvania Medical Assistance on four commonly prescribed puberty-blocking medications—Goserelin, Histrelin, Leuprolide and Triptorelin—was evaluated for patients 18 and under between Jan. 1, 2020, to Dec. 31, 2024. The data reportedly showed there were more than 1,900 claims for puberty blockers for children aged 10 to 13 and over 1,000 claims for puberty blockers for children aged 14 to 18. The total spent on puberty blockers for patients 18 and under by the state of Pennsylvania was $76 million, with the average cost per claim being over $11,200.

To confirm these trends beyond these specific institutions or States, we conducted our own analysis using an all-payer claims database. Between 2015-2025 we found nearly $11 million billed for puberty blockers, including to Medicaid and Medicare, for hundreds of patients between the age

---

[51] "EXCLUSIVE: Unearthed Data Makes Pennsylvania's Puberty Blocker Payouts Look Even Sketchier," Daily Caller, accessed Jan. 16, 2026, https://dailycaller.com/2026/01/16/exclusive-unearthed-data-pennsylvania-puberty-blocker-payouts/.

of 13 and 17 with a diagnostic code for precious puberty.[52] As explained above, by definition, anyone 13 or older cannot actually have a diagnosis of precocious puberty and should not be given puberty blockers at that age for this indication.

**Claim Charges for Claims for Puberty Blockers with Precocious Puberty Diagnosis (E301) on the Same Claim (2015-2025; Patient Age 13-17)**

**Note:** Patients can have multiple payers on a single claim, therefore, totals shown are distinct counts across all payers, not summations of the column

| Payer Channel | Puberty Blocker Patients | Total Claim Charge |
|---|---|---|
| Commercial | 265 | $9,042,369.00 |
| Medicaid | 42 | $1,251,677.00 |
| Payer Unknown | 13 | $698,089.00 |
| Medicare | 3 | $28,783.00 |
| Other Government | 2 | $67,117.00 |
| **Total** | **300** | **$11,088,036.00** |

This data is consistent with the DOJ declaration and the Pennsylvania data obtained by Brock, noted earlier in this section. Combined with our conservative estimates of costs, this strongly suggests that at least tens of millions of dollars have been spent on puberty blockers by private and public health insurance based on clearly false diagnostic codes.

## III. Advocates of Sex-rejecting Interventions Encourage the Use of Vague or False Coding

Another key piece of evidence lending credence to concerns of potentially fraudulent coding is that gender-medicine advocates *encourage* the use of these or similar practices.

### A. Presentations to the World Professional Association of Transgender Health

The World Professional Association of Transgender Health (WPATH) is a key organization publishing "standards of care" for patients undergoing sex-rejecting interventions. A full discussion of WPATH's history and role normalizing the affirmation of gender dysphoria is beyond the scope of this report but is documented elsewhere.[53]

[52] This analysis is based on nationwide medical claims data for 2015–2025, limited to minor patients. Patient age was estimated from birth year alone, with July 1 assigned as a default birthdate, so all age values are approximate. Reported claim charges reflect billed amounts captured in the source data; because some claims (for example, value-based care arrangements) may record charges as null, the totals shown are likely an under-representation of actual charges and therefore represent a conservative estimate. Consistent with the source data's limitations, all results are treated as directional signals rather than findings and require verification against the underlying records.
We identified claims for puberty blockers carrying a central precocious puberty diagnosis (CPP; E301) on the same claim, restricting the population to patients aged 13–17. We focused on this older age band because most patients are no longer treated for CPP with a GnRH agonist at those ages. This cohort was summarized by payer channel.
[53] "Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best Practices," HHS.gov OASH, https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf. The reader is directed to the HHS Report section 9.2.3 on pp. 946 and Chapter 10 on pp. 157-186. See also, "The WPATH Files, Pseudoscientific Surgical and Hormonal Experiments on Children, Adolescents, and Vulnerable Adults," Environmental Progress, https://environmentalprogress.org/big-news/wpath-files.

Most relevant is what those associated with WPATH have to say about coding. Begin with a 2021 training presentation by two physicians, entitled "Insurance Coverage and Coding Considerations."[54] This presentation is best read as promoting the misleading use of several ICD-10 codes.[55]







The presentation includes recommendations of the ICD-10 codes for Endocrine Disorder, Unspecified (E34) and Hypogonadism (E23/E29) on a slide titled "Other encounter diagnostic codes." The presentation also includes the E-34.9 ICD-10 code (which is, again, the code for endocrine disorder, unspecified) on a slide titled "Care of Transgender/Gender Diverse Adolescents."




54 "Applying and Understanding the WPATH Standards of Care (SOC) Through the Healthcare Providers Lens," WPATH, World Professional Association for Transgender Health, accessed March 2, 2026, https://wpath.org/wp-content/uploads/2024/11/Combined_Handouts.pdf.
55 "Applying and Understanding the WPATH Standards of Care (SOC) Through the Healthcare Providers Lens," WPATH, World Professional Association for Transgender Health, accessed March 2, 2026, https://wpath.org/wp-content/uploads/2024/11/Combined_Handouts.pdf.




In another lecture entitled "Insurance Coverage of Gender Affirming Healthcare: WPATH SOC8 Updates," a prominent WPATH member, Dr. Nick Gorton, states the issue plainly: "Linkage of ICD to CPT can be problematic," apparently referring to the natural discordance between the CPT codes for the desired interventions and the ICD codes for gender-related diagnoses, which are classified as mental health disorders.[56]




### B. Public Statements by Members of the Healthcare Industry

Fenway Health, one of the country's most prominent gender clinics, is a close academic affiliate of Harvard Medical School (every physician working at Fenway Health carries an academic

[56] "Insurance Coverage of Gender Affirming Healthcare: WPATH SOC8 Updates," WPATH World Professional Association for Transgender Health, accessed March 2, 2026, https://wpath.org/wp-content/uploads/2025/05/WPATH-Insurance-coding-and-EBM-Jaffe-and-Gorton-2023-Copy.pdf, slide 30.

appointment at Harvard[57]) and Boston Children's Hospital.[58] Fenway Health openly admits to the use of vague diagnosis codes while also acknowledging this practice could carry criminal and civil consequences:

> We can sometimes use another, more vague diagnosis code if it is on your list (for example, Hormone Disorder), but we cannot guarantee there will not be any issues with insurance coverage. It is not legal for us to use codes that may be considered clinically inaccurate under the Federal False Claims Act.[59]

The group goes on to explain how it is working to develop alternative diagnoses to be used as proxies: "Given the new administration and possible policy changes, Fenway is working with policy makers and Massachusetts insurances to recognize alternative codes to reduce any potential risk to patients."[60]

It's noteworthy that Boston Children's Hospital was one of the children's hospitals subpoenaed by the DOJ as part of a federal investigation into fraudulent billing practices, specifically the use of endocrine disorder, unspecified as a proxy for gender-related diagnoses. One declaration filed by the federal government states that the investigation:

> *includes allegations and evidence of fraudulent billing practices to secure insurance coverage/payment. Such practices include, but are not limited to, providers (i) using the incorrect diagnosis and/or billing code (e.g., "endocrine disorder, unspecified" instead of "gender dysphoria") …because they know that certain insurance plans may not cover the off-label prescription of puberty blockers or cross-sex hormones for gender-related treatment.*[61]

Fenway Health is not alone. Dr. Crystal Beal, the founder of Queer Doc, a telemedicine clinic that offers "gender affirming medical care from queer and gender diverse providers"[62] as a way to "disrupt the cis-hetero-paternalistic status quo of healthcare,"[63] acknowledges the practice of using the E34.9 ICD-10 code for the purpose of insurance coverage.[64] Her website states, "[s]ome providers use the code E34.9, Endocrine disorder, unspecified. E34.9 can sometimes be used for labs, prescriptions, and visits."

QueerDoc was also subpoenaed by the DOJ in 2025 as part of an investigation into fraudulent

---

57 Cf. section, "How We Offer a High-Quality Experience for all Patients," Fenway Health, https://fenwayhealth.org/care/.

58 "The Fenway Institute Partners with Boston Children's Hospital GeMS Clinic to Provide Training on Clinical Care for Transgender Youth in New York City," Fenway Health, accessed March 15, 2026, https://fenwayhealth.org/the-fenway-institute-partners-with-boston-childrens-hospital-gems-clinic-to-provide-training-on-clinical-care-for-transgender-youth-in-new-york-city/.

59 "Gender-Affirming Care Patient & Community FAQs," Fenway Health, accessed March 2, 2026, https://fenwayhealth.org/care/medical/transgender-health-faqs/.

60 Ibid. Cf. section, "Should I remove gender dysphoria from my diagnosis or problems list in my medical records?" Fenway Health, https://fenwayhealth.org/care/medical/transgender-health-faqs/.

61 "Declaration of Lisa K. Hsiao," Case 1:25-mc-91324-MJJ Document 37, accessed March 2, 2026, https://storage.courtlistener.com/recap/gov.uscourts.mad.286628/gov.uscourts.mad.286628.37.0.pdf.

62 "Telemedicine Services," QueerDoc, accessed March 2, 2026, https://perma.cc/3ZS9-SAXB.

63 "Sustaining Care, Together: Updates to QueerDoc's Sliding Scale Pricing," QueerDoc, accessed March 2, 2026, https://queerdoc.com/sustaining-care-together-updates-to-queerdocs-sliding-scale-pricing/.

64 *Tips for Talking to Insurance: Procedures, Policies, Payments, and Appeals:* QueerDoc (Dec. 20, 2021), https://queerdoc.com/tips-for-talking-to-insurance-procedures-policies-payments-and-appeals/.

billing practices, with the DOJ seeking "All documents reflecting communications among Company employees...relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes."[65]

Similarly, Planned Parenthood of Southeastern Pennsylvania explicitly endorses this practice.[66] According to a report in the *Washington Examiner*, "Planned Parenthood's facilities in southeastern and western Pennsylvania describe giving insurance providers the billing code for 'endocrine disorder, unspecified' when prescribing transgender drugs."[67] Planned Parenthood of Southeastern Pennsylvania's website states, "In order to meet the needs of most insurance companies and patients, we typically use the code E34.9 (endocrine disorder, unspecified) and occasionally will use F64.9 (gender identity disorder, unspecified) if necessary."[68] The language on the website also admits, "We recognize that much of the language around billing for gender affirming care is troublesome." The website of Planned Parenthood's western Pennsylvania location likewise says it may use the endocrine disorder code, offering the following disclaimer: "Note that while we don't like the wording used in many of these codes, they are used by insurers and medical billers on a national basis and we are unfortunately required to keep the wording the same when using them because of that."[69]

The blog *Confessions of a Pediatric Practice Management Consultant* includes a March 2025 post entitled "Coding and Billing for Transgender Care While Protecting Patient Confidentiality."[70] The blog's owner, Chip Hart is a pediatric practice management consultant who has worked with organizations like the American Academy of Pediatrics (AAP) and the Medical Group Management Association (MGMA).[71] He is also a member of a working group that advises the CDC on

---

[65] "QueerDoc, PLLC's Motion to Quash Subpoena Duces Tecum," QueerDoc, PLLC v. U.S. Dept. of Justice, 2:25-mc-00042, accessed March 2, 2026, https://storage.courtlistener.com/recap/gov.uscourts.wawd.350058/gov.uscourts.wawd.350058.1.0.pdf.

[66] "Gender Affirming Hormone Therapy – Frequently asked questions about gender affirming care," Planned Parenthood Southeastern Pennsylvania, https://www.plannedparenthood.org/planned-parenthood-southeastern-pennsylvania/patients/transgender-health-care/gender-affirming-care-faq.

[67] "Planned Parenthood accused of possible fraud over sex-change 'care'," *Washington Examiner,* Accessed July 16, 2026, https://www.washingtonexaminer.com/news/investigations/4628676/planned-parenthood-accused-possible-fraud-over-sex-change-care/.
The report notes: "Planned Parenthood of Western Pennsylvania received more than $4.1 million in taxpayer funds between July 2020 and June 2025, while Planned Parenthood of Southeastern Pennsylvania received more than $10.7 million, tax filings show. The endocrine coding guidance has been live on the southeastern facility's website since at least February 2023, and on the western location's site since January 2021."

[68] "Gender Affirming Hormone Therapy – Frequently asked questions about gender affirming care," Planned Parenthood Southeastern Pennsylvania, https://www.plannedparenthood.org/planned-parenthood-southeastern-pennsylvania/patients/transgender-health-care/gender-affirming-care-faq

[69] Cited in Crozier, "Planned Parenthood accused of possible fraud over sex-change 'care'." The archived Planned Parenthood web pages are available at:
https://www.plannedparenthood.org/planned-parenthood-southeastern-pennsylvania/patients/transgender-health-care/gender-affirming-care-faq#;
https://www.plannedparenthood.org/planned-parenthood-western-pennsylvania/patients/introducing-hormone-therapy/preparing-your-hormone-therapy-visit.

[70] "Coding and Billing for Transgender Care While Protecting Patient Confidentiality," Confessions of a Pediatric Practice Management Consultant, accessed March 2, 2026, https://chipsblog.pcc.com/coding-and-billing-for-transgender-care-while-protecting-patient-confidentiality.

[71] "About Chip Hart," Confessions of a Pediatric Practice Management Consultant, accessed March 2, 2026, https://chipsblog.pcc.com/.

EMR functionality in pediatric medicine.[72]

The introduction before the blog post claims that its "content…comes entirely from the IPRCM crew via my old friend, Susanne Morgana Brennan." Brennan is co-founder of Independent Practice Revenue Cycle Management Services (IPRCM), a business that claims to be a "leading provider of medical billing services."[73] The blog itself contains what appear to be emails sent by "IPRMC Billing Crew."[74] Those apparent emails describe "the challenges pediatric providers face when coding and billing for gender-affirming care," and stress that "ensuring proper payment while safeguarding patient confidentiality is paramount, particularly in states where transgender healthcare is subject to increased governmental scrutiny." The post advises pediatric providers to "consider whether alternative coding strategies meet medical necessity while maintaining confidentiality."[75] And the emails contain the following recommendation: "when ordering labs or prescriptions related to gender-affirming care, consider whether a general endocrinology, adolescent medicine, or mental health-related diagnostic code is appropriate."

The Community Equity, Data & Information (CEDI) lab is part of the University of North Carolina College of Information. CEDI created a "Toolkit for LGBTQQIA+ Young Adults Seeking Mental Health Services in North Carolina."[76] In the section titled "LGBTQQIA+ Mental Health Care, Diagnosis Codes, and Insurance," the authors say that "medical providers like a doctor or nurse practitioner, can use a code to cover hormones that do not relate to gender dysphoria, but this is at the discretion of the doctor."[77]

### C. Promotion of billing practices by advocacy organizations

Publications by other organizations play a significant role in all of this.

Consider first a resource guide from the Campaign for Southern Equality, entitled "Trans in the South: A Guide to Resources and Services." In it, one finds a section called "Insurance Coding Alternatives For Trans Healthcare."[78] In that section, the guide contains a table titled "Diagnosis codes commonly rejected by insurance," listing the gender-related ICD codes, along with another table entitled "Codes That Are Commonly Accepted by Insurance Providers," which lists a number

---

[72] "About Chip Hart," Confessions of a Pediatric Practice Management Consultant, accessed March 2, 2026, https://chipsblog.pcc.com/.

[73] "Comprehensive Billing Solutions for Independent Medical Practices," IPRCM, accessed March 2, 2026, https://iprcm.support/. Quote is found in the following blog post: "Coding and Billing for Transgender Care While Protecting Patient Confidentiality," Confessions of a Pediatric Practice Management Consultant, https://chipsblog.pcc.com/coding-and-billing-for-transgender-care-while-protecting-patient-confidentiality.

[74] "Coding and Billing for Transgender Care While Protecting Patient Confidentiality," Confessions of a Pediatric Practice Management Consultant," https://chipsblog.pcc.com/coding-and-billing-for-transgender-care-while-protecting-patient-confidentiality.

[75] "Comprehensive Billing Solutions for Independent Medical Practices," IPRCM, accessed March 2, 2026, https://iprcm.support/.

[76] "Toolkit for LGBTQQIA+ Young Adults Seeking Mental Health Services in North Carolina," CEDI Lab @UNC, accessed March 2, 2026, https://cedi.umd.edu/wp-content/uploads/2023/08/LGBTQQIA_Mental_Health_Toolkit-1.pdf.

[77] "Toolkit for LGBTQQIA+ Young Adults Seeking Mental Health Services in North Carolina," CEDI Lab @UNC, accessed March 2, 2026, https://cedi.umd.edu/wp-content/uploads/2023/08/LGBTQQIA_Mental_Health_Toolkit-1.pdf.

[78] "Trans in the South: A Guide to Resources and Services," Campaign for Southern Equality, accessed March 2, 2026, https://southernequality.org/wp-content/uploads/2017/12/TransintheSouth12082017.pdf.

of alternative diagnosis codes that are unrelated to gender dysphoria but have overlapping treatments.[79]

**CODES THAT ARE COMMONLY REJECTED BY INSURANCE PROVIDERS**

| CODE | CONDITION | COMMENTS |
|---|---|---|
| F64 | Gender Dysphoria/Gender Identity Disorder | Rarely covered in North Carolina but employers can request expansion. |
| Q56.3 | Intersex code requires chromosomal documentation | Typically diagnosed in childhood and allow for full spectrum of gender surgery |

**A note about F64: Some insurance providers will require this code for gender affirming surgeries. It is also often required for adolescents to get hormone interventions covered.*

**CODES THAT ARE COMMONLY ACCEPTED BY INSURANCE PROVIDERS**

| CODE | CONDITION | COMMENTS |
|---|---|---|
| E34.9 | Endocrine disorder, unspecified | Hormone replacement therapy |
| Z79.899 | Other long term (current) drug therapy | Labs related to hormone therapy including potassium, kidney and liver function, and blood counts |
| N62 | Breast hypertrophy | Breast reduction/mastectomy |
| N64.4 | Mastodynia | Mastectomy |
| N65 | Deformity of reconst. Br | Mastectomy or reconstruction |
| N94.1 | Dyspareunia (pain with sex) | Hysterectomy |
| N92.6 | Irregular menses | Hysterectomy/IUD |
| N94.6 | Painful menses | Hysterectomy/Hormonal therapies/IUD |
| N83.2 | Ovarian cyst | Removal of ovaries |
| R10.2 | Pelvic pain | Hysterectomy/removal of ovaries |
| N90.89 | Hypertrophy of the clitoris | Clitoroplasty |
| N90.69 | Labial hypertrophy | Labiaplasty |
| N94.819.2 | Vulvar pain | Vulvoplasty |
| N50.819 | Orchialgia | Orchiectomy |

The purpose of this guide is to coach providers regarding which diagnosis codes to use: "This fact sheet provides information about ICD-10 insurance codes and corresponding diagnoses and treatments the codes are related to.... This information can help guide providers about insurance codes for trans healthcare that are commonly accepted and rejected."[80]

The alternative diagnoses are useful for insurance purposes because their diagnostic criteria are more subjective. For example, the "alternative diagnoses" pelvic pain and dyspareunia (vaginal pain during sexual intercourse), rely on a patient's subjective reporting of symptoms rather than objective clinical data, like laboratory testing or imaging. Additionally, because these diagnoses

---

[79] "Trans in the South, a Guide to Resources and Services," Campaign for Southern Equality, accessed March 2, 2026, https://southernequality.org/wp-content/uploads/2017/12/TransintheSouth12082017.pdf.

[80] "Trans in the South, a Guide to Resources and Services," Campaign for Southern Equality, accessed March 2, 2026, https://southernequality.org/wp-content/uploads/2017/12/TransintheSouth12082017.pdf, pg. 51.

are also potential side-effects of some sex-rejecting procedures,[81] they can be used after the fact to justify a misleading diagnosis and surgery, as in the case of a hysterectomy for pelvic pain. The harm caused by the treatment creates a diagnosis that justifies further treatment. The additional treatment does not cure underlying pathology that was present prior to medical inventions, but only causes additional harm.

An example of these alternative diagnosis codes employed for insurance purposes can be seen in a 2022 article entitled "Medical Coding Creates Barriers to Care for Transgender Patients." The article addresses the case of Tim Chevalier, whose insurance denied coverage for a hair removal procedure the patient claimed was necessary as part of a phalloplasty.[82] The article details the issues that the ICD-10 classification system poses for providers seeking reimbursement for sex-rejecting interventions, stating that insurance companies "question mental health claims more rigorously than those for physical illnesses." The author goes on to include an anecdote from Dr. Gorton, whom this report mentioned above in the discussion of WPATH, illustrating how the limitations of ICD-10 can be circumvented. Dr. Gorton is quoted as citing an example where she used the alternative diagnosis, pelvic pain, to get insurance coverage for a hysterectomy:

> For years, some physicians helped trans patients get coverage by finding other medical reasons for their trans-related care. Gorton said that if, for instance, a transgender man wanted a hysterectomy, but his insurance didn't cover gender-affirming care, Gorton would enter the ICD-10 code for pelvic pain, as opposed to gender dysphoria, into the patient's billing record. Pelvic pain is a legitimate reason for the surgery and is commonly accepted by insurance providers, Gorton said. But some insurance companies pushed back, and he had to find other ways to help his patients.

The Santoro article includes a hyperlink to the toolkit "Insurance Coding Alternatives For Trans Healthcare" from the Campaign for Southern Equality.[83] The alternative diagnosis code, "pelvic pain"—the one Dr. Gorton describes using in the article to get her patient's hysterectomy covered by insurance—is listed in the toolkit's table for alternative diagnoses.

Dr. Eithan Haim, one of the contributors to this report, explained the purpose of the toolkit to Texas Representative Brandon Gill during a Congressional hearing in April 2025:

> This is really important because, when you type in "gender-affirming care diagnosis codes," on Google, this is one of the top search results. What this document does is inform doctors at these clinics how to get insurance companies, whether private or government, to cover interventions without revealing that it's being used for gender dysphoria, right.
>
> How do you do a mastectomy, but then bill an insurance company and not raise any red flags…you bill it as breast reduction instead of a mastectomy, right. This guide is

---

[81] See, e.g., "Pelvic pain and persistent menses in transgender men," Gender Affirming Health Program UCSF, accessed March 6, 2026, https://transcare.ucsf.edu/guidelines/pain-transmen; "Pelvic Pain in Transgender People Using Testosterone Therapy," Sage Journals, accessed March 6, 2026, https://journals.sagepub.com/doi/epub/10.1089/lgbt.2022.0187.

[82] "Medical coding creates barriers to care for transgender patients," HealthNews Florida, accessed March 2, 2026, https://www.wusf.org/health-news-florida/2022-09-17/medical-coding-barriers-care-transgender-patients.

[83] "Trans in the South – A Guide to Resources and Services," Campaign for Southern Equality, accessed March 2, 2026, https://southernequality.org/wp-content/uploads/2017/12/TransintheSouth12082017.pdf.

> essentially a template for how to commit medical fraud. We should all remember that this is something that people go to prison for. This is a major deal.[84]

In the days following the hearing, the Campaign for Southern Equality webpage displaying the alternative diagnosis toolkit was taken down.[85]

### D. Evidence From Whistleblowers.

One of the first people to publicly raise the alarm on fraudulent billing practices and Medicaid fraud in gender clinics was Vanessa Sivadge, a nurse who worked in Texas Children's Hospital's (TCH) gender clinic. She went public as a whistleblower in June 2024,[86] alleging TCH was "illegally billing Medicaid for transgender procedures," specifically naming two TCH pediatric endocrinologists, Dr. Paul David and Dr. Richard Roberts, the Co-Medical Directors of the Transgender Care Program.

These were shocking claims given the fact that since 2019, the Texas Health and Human Services Commission barred Medicaid from covering any "sex change operations," which encompassed not only surgical interventions but also hormones and blockers.[87]

Sivadge explained in testimony to Texas House Judiciary Subcommittee on the Constitution and Limited Government how TCH's Transgender Health Program bypassed Texas Medicaid's exclusion without raising any red flags:

> *I saw how the hospital had also misdiagnosed patients for the purpose of justifying those treatments, labeling a biological male with an estrogen deficiency in order to justify to prescription of estrogen, and labeling a biological female with a testosterone deficiency in order to justify the prescription of testosterone. I witnessed how the hospital would falsify medical records by listing the preferred gender identity of the patient on the medical record instead of the birth sex, creating a web of confusion and lies making the fraudulent billing difficult to detect.*[88]

Sivadge's allegations suggest that omission of the gender-related diagnosis (F64.0) from TCH's Medicaid claims fraudulently concealed the true reason for the hormone interventions from claims analysts.

A few months after Sivadge went public with her allegations of fraud, Texas Attorney General Ken

[84] "Hearing Before the Subcommittee on the Constitution and Limited Government of the Committee on the Judiciary, U.S. House of Representatives," Congress.gov, accessed April 9, 2025, https://www.congress.gov/119/chrg/CHRG-119hhrg60070/CHRG-119hhrg60070.pdf, pg. 81.
[85] "Page Not Found," Campaign for Southern Equality, https://southernequality.org/wp-content/uploads/2019/03/InsuranceCoding.pdf.
[86] "The Murky Business of Transgender Medicine," City Journal, https://www.city-journal.org/article/the-murky-business-of-transgender-medicine
[87] "Texas Medicaid Provider Procedures Manual, February 2021, Volumes 1 & 2," Texas Health and Human Services, https://www.tmhp.com/sites/default/files/file-library/resources/provider-manuals/tmppm/archives/2021-02-TMPPM.pdf.
[88] "Statement of Vanessa Sivadge, RN – Pediatric Nurse and Whistleblower before the Subcommittee on the Constitution and Limited Government, April 9, 2025," 1813, https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/sivadge-testimony.pdf.

Paxton sued two gender doctors, Drs. May Lau[89] and Brett Cooper,[90] both of the University of Texas Southwestern Medical Center (UTSW), for allegedly violating SB-14 by prescribing hormones for "gender affirmation" after the date the law went into effect. The lawsuits also claimed Dr. Lau and Cooper used false diagnosis codes, including precocious puberty and endocrine disorder, unspecified, instead of gender-related diagnosis codes for the purpose of fraudulently obtaining insurance coverage.

In December 2025, the Texas AG's Office filed additional healthcare fraud claims against Dr. Lau and Cooper, alleging that the false, misrepresentative, and misleading billing codes constituted billing fraud to "secure Medicaid reimbursement for services that Texas law and Texas Medicaid explicitly do not allow."[91]

In February 2025, the Texas AG's Office announced a landmark lawsuit against Children's Health System of Texas ("Children's") and a pediatric gynecologist at UTSW doctor, Dr. Jason Jarin.[92] The lawsuit alleged a "massive healthcare fraud scheme to bill Texas Medicaid—and the Texas taxpayers—for gender interventions on children" after SB-14 went into effect on September 1, 2023.[93] The Petition and Request for Injunctive Relief claims that Jarin and Children's falsely billed sex-rejecting interventions to Medicaid by classifying them as "endocrine disorders," administered puberty blockers in otherwise healthy children under the guise of "precocious puberty," and prescribed young boys cross-sex estrogen implants by changing the legal sex in the medical record then submitting the claims as "contraception" implants.[94]

The petition also claims Dr. Jarin along with Drs. Lau and Cooper repeatedly met with hospital leadership to discuss compliance measures mandated by SB-14, when in actuality they were "crafting pretextual protocols to justify the continued, illegal prescription of cross-sex hormones and puberty blockers to children."[95] The most notable example is the "wean protocol" which the lawsuit claimed developed methods to subvert compliance with SB-14:

---

89 "Plaintiff's Verified Original Petition and Request for an Application for Temporary and Permanent Injunction," Texas Office of the Attorney General, accessed March 2, 2026, https://southernequality.org/wp-content/uploads/2019/03/InsuranceCoding.pdf.

90 Plaintiff's Verified Original Petition and Request for Temporary and Permanent Injunction," Texas Office of the Attorney General, accessed March 2, 2026, https://www.texasattorneygeneral.gov/sites/default/files/images/press/Dr%20Cooper%20SB%2014%20Petition%20File%20Stamped.pdf.

91 "Attorney General Paxton Files Landmark Healthcare Fraud Lawsuit Against Doctors Who Illegally Forced 'Gender Transition' Drugs on Kids," Ken Paxton, Attorney General of Texas, accessed March 2, 2026, https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-files-landmark-healthcare-fraud-lawsuit-against-doctors-who-illegally-forced.

92 "Attorney General Ken Paxton Files Land-mark Lawsuit Against Children's Health and Dallas-Area Doctor for Hurting Kids by Illegally 'Transitioning' Them and Defrauding Medicaid," Ken Paxton, Attorney General of Texas, accessed March 6, 2026, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-files-landmark-lawsuit-against-childrens-health-and-dallas-area-doctor.

93 "Attorney General Ken Paxton Files Land-mark Lawsuit Against Children's Health and Dallas-Area Doctor for Hurting Kids by Illegally 'Transitioning' Them and Defrauding Medicaid," Ken Paxton, Attorney General of Texas, accessed March 6, 2026, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-files-landmark-lawsuit-against-childrens-health-and-dallas-area-doctor.

94 "Texas's Petition and Request for Injunctive Relief," Ken Paxton, Attorney General of Texas, accessed March 6, 2025, https://www.texasattorneygeneral.gov/sites/default/files/images/press/Petition_9.pdf.

95 "Texas's Petition and Request for Injunctive Relief," Ken Paxton, Attorney General of Texas, accessed March 6, 2025, https://www.texasattorneygeneral.gov/sites/default/files/images/press/Petition_9.pdf.

> (1) weaning patients over a long period of time with miniscule interval changes to doses so as to maintain the same or similar physiological effect until the patients reached 18 years of age, (2) designing the protocol so that medical exceptions were determined based on the…hormonal reference range for the patient's opposite sex, and (3) creating broad, pretextual, and medically unsupported exceptions for "bone health" and "mental health stability" that ensured patients would never actually have to wean at all.[96]

On May 15, 2026, Texas Attorney General Ken Paxton and the U.S. Department of Justice announced that Texas Children's Hospital would pay a $10 million dollar fine—the second largest healthcare fraud settlement in the history of pediatric medicine—"for billing Texas Medicaid for unallowable and illegal 'gender-transition' interventions, including by using false diagnosis codes."[97] As part of the settlement, Texas Children's agreed to terminate the employment of five doctors who performed these harmful medical interventions and amend its bylaws to trigger automatic relinquishment of privileges for any physician who violates Texas's prohibition on sex rejecting procedures. The settlement also included the formation of the country's first Detransition Clinic, and for the first five years "all services provided through the Detransition Clinic will be funded by Texas Children's and be free of charge to patients."[98] Less than a month later on June 5, the Department of Justice announced that the Cleveland Clinic Foundation likewise reached a monetary settlement to resolve allegations regarding false billings submitted to public and private payers to secure insurance coverage for sex-rejecting procedures on minors. As part of the resolution, Cleveland Clinic also committed $2 million to provide restorative care for detransitioners regardless of their insured status or ability to pay.[99]

## IV. Conclusion and Recommendations

As these cases confirm, government actors—Congress, state legislators, and executive branch officials at the state and federal levels—have the tools needed to investigate and prosecute health care fraud. State Medicaid programs should do periodic reviews of claims associated with the ICD codes mentioned in this chapter. States should ensure that they can justify, through claims and documentation, that their providers are not submitting false claims and are in alignment with federal and state laws and regulations. They should also ensure that managed care organizations have similar internal controls. If suspicious coding or billing is identified, states should follow

---

[96] "Texas's Petition and Request for Injunctive Relief," Ken Paxton, Attorney General of Texas, accessed March 6, 2025, https://www.texasattorneygeneral.gov/sites/default/files/images/press/Petition_9.pdf.

[97] "Attorney General Paxton Makes History by Securing a Landmark Healthcare Fraud Settlement that Creates the Nation's First-Ever Detransition Clinic and Secures $10 Million from Texas Children's Hospital for 'Transitioning' Kids," Texas Attorney General, accessed May 15, 2026, https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-makes-history-securing-landmark-healthcare-fraud-settlement-creates-nations.
See also "Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic," Department of Justice, accessed May 15, 2026, https://www.justice.gov/opa/pr/justice-department-secures-landmark-resolution-end-pediatric-gender-affirming-care-and.

[98] "Attorney General Paxton Makes History by Securing a Landmark Healthcare Fraud Settlement that Creates the Nation's First-Ever Detransition Clinic and Secures $10 Million from Texas Children's Hospital for 'Transitioning' Kids," Texas Attorney General, accessed May 15, 2026, https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-makes-history-securing-landmark-healthcare-fraud-settlement-creates-nations.

[99] "Justice Department Secures Resolution with Cleveland Clinic to End Pediatric 'Gender-Affirming Care'," Department of Justice, accessed June 5, 2026, https://www.justice.gov/opa/pr/justice-department-secures-resolution-cleveland-clinic-end-pediatric-gender-affirming-care.

federal regulations about referrals to their states' Medicaid Fraud Control Units, state Attorney Generals' offices or U.S. Attorney's Offices, other law enforcement, etc.[100] There is also a role to be played by the private bar, which can potentially pursue judgments by identifying false billing practices and filing suit under the False Claims Act.

---

[100] Section 1902(a)(61) of the Medicaid Act, Social Security, https://www.ssa.gov/OP_Home/ssact/title19/1902.htm#act-1902-a-61, requires that a State Medicaid plan must provide for the operation of a Medicaid Fraud Control Unit (MFCU) that effectively carries out its functions (as determined by standards from the HHS Office of Inspector General), unless the state demonstrates it is not cost-effective due to minimal fraud and adequate beneficiary protections exist without one. This establishes the framework for states to maintain MFCUs as part of their Medicaid program integrity obligations. Sections 1903(a)(6), 1903(b)(3), and 1903(q) of the Medicaid Act [42 U.S.C. § 1396b] govern federal matching funds for MFCU operations and set standards for effective performance, including investigation and prosecution (or referral for prosecution) of Medicaid provider fraud. States must comply to receive federal financial participation. MFCUs are generally housed in (or closely coordinated with) state Attorneys General offices and have statewide authority to investigate and prosecute. Cf. "Medicaid Fraud Control Units," Office of Inspector General, https://oig.hhs.gov/fraud/medicaid-fraud-control-units-mfcu/.

## Chapter 3: Hospitals Were Subject to the Biden Administration's Promotion of Sex-Rejecting Procedures

Immediately upon taking office, President Biden's administration made it a policy priority to protect and expand access to sex-rejecting procedures and interventions.

### I. Promotion and Access

Throughout President Biden's lone term, his administration sought to impose, unilaterally, gender ideology through reinterpreting Federal civil rights law.

Just hours after Biden was sworn in as President on January 20, 2021, he issued a sweeping executive order stating "It is the policy of my Administration to prevent and combat discrimination on the basis of gender identity…."[101] The order called on federal agencies to implement this policy through "orders, regulations, guidance documents, policies, programs, or other agency actions."[102] As Biden later explained on "Transgender Day of Visibility," his entire administration was "committed to advancing transgender equality … everywhere," including in "our … health care systems."[103]

Executive branch agencies acted accordingly. In May 2021, the Biden HHS issued a notification announcing that HHS's Office for Civil Rights would "interpret and enforce" Section 1557—the Affordable Care Act's nondiscrimination provision, which includes *sex* discrimination—as prohibiting discrimination based on gender identity.[104] Under the administration's view, healthcare professionals could engage in impermissible sex discrimination by refusing to provide access to sex-rejecting procedures. Similarly, health insurance companies (and employers and states that provide health insurance) could be deemed to violate the prohibition on sex discrimination by refusing to cover such procedures. Sex discrimination allegations opened the door to investigation and enforcement actions by HHS.

HHS reiterated that the Office for Civil Rights was investigating complaints involving the denial of care or coverage for sex-rejecting procedures and enforcing any violations of Section 1557. In a March 2022 "notice and guidance" document on "gender affirming care, civil rights, and patient privacy,"[105] HHS explained:

> Categorically refusing to provide treatment to an individual based on their gender identity is prohibited discrimination. Similarly, federally-funded covered entities restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their health care provider solely on the basis of their

[101] "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation," Federal Register, https://www.federalregister.gov/documents/2021/01/25/2021-01761/preventing-and-combating-discrimination-on-the-basis-of-gender-identity-or-sexual-orientation.
[102] "Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation," Federal Register, https://www.federalregister.gov/documents/2021/01/25/2021-01761/preventing-and-combating-discrimination-on-the-basis-of-gender-identity-or-sexual-orientation.
[103] President Biden (@POTUS), Twitter (Mar. 31, 2022, 10:04 AM), https://tinyurl.com/bde3pnwp.
[104] "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972," U.S. Dept of Health and Human Services, https://www.hhs.gov/sites/default/files/ocr-bostock-notification.pdf.
[105] Office for Civil Rights, U.S. Department of Health & Human Services., "HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy," https://web.archive.org/web/20250124083347/https://www.hhs.gov/sites/default/files/hhs-ocr-notice-and-guidance-gender-affirming-care.pdf.

sex assigned at birth or gender identity likely violates Section 1557.[106]

In October 2022, a federal court declared the gender identity-related portions of the guidance unlawful and vacated those provisions.[107] Undeterred by the vacatur of the sub-regulatory guidance, HHS issued a final rule adopting the same theory in May 2024.[108] A federal court would vacate the final rule's gender identity-related provisions.[109]

In October 2021, HHS's Centers for Medicare & Medicaid Services (CMS) approved Colorado's essential health benefits benchmark plan. That plan would require certain insurance plans to cover the full range of sex-rejecting procedures.[110] Biden-nominated CMS Administrator Chiquita Brooks-LaSure stated Colorado was a "model for other states to follow" and "invite[d] other states to follow suit."[111] In January 2022, CMS proposed a rule that would have effectively mandated affected insurance plans to cover sex-rejecting procedures if similar procedures are covered for non-sex-rejecting purposes.[112] This mandate was formally adopted by HHS in its May 2024 final rule.[113]

Although the Food and Drug Administration has never approved puberty blockers or cross-sex hormones as safe or effective for sex-rejecting purposes, HHS's Office of Population Affairs issued a guidance document in March 2022 titled "Gender Affirming Care and Young People" that endorsed puberty blockers, cross-sex hormones, and "top" and "bottom" sex-rejecting surgeries starting in early adolescence.[114]

---

[106] "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972," U.S. Dept of Health and Human Services, https://www.hhs.gov/sites/default/files/ocr-bostock-notification.pdf.
[107] Texas v. EEOC, 633 F. Supp. 3d 824 (N.D. Tex. 2022).
[108] "Nondiscrimination in Health Programs and Activities," Federal Register, https://www.federalregister.gov/d/2024-08711.
[109] *Tennessee v. Kennedy*, 2025 WL 2982069, at *11 (S.D. Miss. Oct. 22, 2025).
[110] "Benefits for Health Care Coverage: Colorado Benchmark Plan," Colorado Department of Regulatory Agencies, https://drive.google.com/file/d/1CqiepamfYTz16KSc5mp2hJJ9WC6ODjZq/view. These services would include, "at minimum": puberty blockers; cross-sex hormones; genital and non-genital surgical procedures (hysterectomy, penectomy, mastectomy); blepharoplasty (eye and lid modification); face/forehead and neck tightening; facial bone remodeling for facial feminization; genioplasty (chin width reduction); rhytidectomy (cheek, chin, and neck); cheek, chin, and nose implants; lip lift/augmentation; mandibular angle augmentation/creation/reduction (jaw); orbital recontouring; rhinoplasty (nose reshaping); laser or electrolysis hair removal; and breast/chest augmentation, reduction, construction.
[111] "Biden-Harris Administration Greenlights Coverage of LGBTQ+ Care as an Essential Health Benefit in Colorado," CMS.gov, https://www.cms.gov/newsroom/press-releases/biden-harris-administration-greenlights-coverage-lgbtq-care-essential-health-benefit-colorado.
[112] "Patient Protection and Affordable Care Act; HHS Notice of Benefits and Payment Parameters for 2023," Federal Register, https://www.federalregister.gov/d/2021-28317.
[113] "Nondiscrimination in Health Programs and Activities," Federal Register,https://www.federalregister.gov/d/2024-08711.
[114] "Gender-Affirming Care and Young People," OASH Office of Population Affairs, https://opa.hhs.gov/sites/default/files/2023-08/gender-affirming-care-young-people.pdf. *But see* "Fact-Checking the HHS, 'Gender-Affirming Care and Young People' contains a number of errors and misrepresentations," SEGM, https://segm.org/fact-checking-gender-affirming-care-and-young-people-HHS (debunking the "many highly inaccurate" claims made in HHS's "Gender-Affirming Care and Young People" document); "Treatment of Gender Dysphoria for Children and Adolescents," Florida Department of Health, https://content.govdelivery.com/accounts/FLDOH/bulletins/3143d4c (issuing guidelines clarifying treatment of pediatric gender dysphoria should not include sex-rejecting procedures and interventions based on "the lack of conclusive evidence, and the potential for long-term, irreversible effects").

The same month, the Biden DOJ sent a letter to state attorneys general "reminding them of federal constitutional and statutory provisions" that allegedly protect youth (and others) who seek sex-rejecting procedures.[115]

Under the Biden administration, DOJ, HHS, and the Department of Education took the position in guidance, regulations, and litigation that prohibitions on disability-based discrimination (the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Section 1557 of the Affordable Care Act) may apply to individuals with *gender dysphoria*, even though by law "gender identity disorders not resulting from a physical impairment" are not protected disabilities.[116] According to these agencies' position, healthcare professionals would, in practice, have to provide sex-rejecting procedures and insurance coverage of those procedures if similar procedures are provided or covered for non-sex-rejecting purposes to avoid discriminating against qualifying individuals with gender dysphoria.

The Equal Employment Opportunity Commission (EEOC)—the federal agency tasked with preventing and remedying employment discrimination—similarly took the position that it would be sex and disability discrimination for an employer to exclude coverage of sex-rejecting procedures,

---

[115] "Justice Department Reinforces Federal Nondiscrimination Obligations in Letter to State Officials Regarding Transgender Youth," U.S. Department of Justice https://www.justice.gov/archives/opa/pr/justice-department-reinforces-federal-nondiscrimination-obligations-letter-state-officials; Letter, Kristen Clarke, Assistant Attorney General, Civil Rights Div., U.S. Department of Justice, to State Attorneys General (Mar. 31, 2022), https://www.justice.gov/archives/opa/press-release/file/1489066/dl?inline=.

[116] *See, e.g.*, "Letter from Kristen Clarke, Assistant Attorney General, Civ. Rights Div., DOJ, to State Attorneys General.," U.S. Department of Justice, https://www.justice.gov/opa/press-release/file/1489066/dl; Statement of Interest, Doe v. Ga. Department of Corrections., No. 23-5578 (N.D. Ga. Jan. 8, 2024); Letter from Rebecca B. Bond, Chief, Disability Rights Sect., Civ. Rights Div., DOJ, to Brian Redd, Exec. Dir., Utah Department of Corrections, and Dan Bokovoy, Asst. Utah Attorney Gen., re: "The United States' Findings and Conclusions Based on Its Investigation of the State of Utah Department of Corrections under Title II of the Americans with Disabilities Act, DJ # 204-77-88," U.S. Department of Justice, https://www.justice.gov/d9/2024-03/letter_of_findings-utah_department_of_corrections.pdf; "Complaint, *United States v. Utah*, No. 2:24-cv-00241," U.S. Department of Justice, https://www.justice.gov/crt/media/1346436/dl; "HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy," HHS.gov, https://web.archive.org/web/20250124083347/https://www.hhs.gov/sites/default/files/hhs-ocr-notice-and-guidance-gender-affirming-care.pdf ("Gender dysphoria may, in some cases, qualify as a disability under [Section 504 and the ADA]. Restrictions that prevent otherwise qualified individuals from receiving medically necessary care on the basis of their gender dysphoria, gender dysphoria diagnosis, or perception of gender dysphoria may, therefore, also violate Section 504 and Title II of the ADA."); Memorandum from Catherine E. Lhamon, Asst. Sec'y for Civ. Rights, ED, to OCR Regional Dirs. re: Opening Cases Potentially Involving Allegations of Gender Dysphoria (Nov. 14, 2022); Letter from OCR, HHS, to S.C. Department of Health & Human Services. (Aug. 22, 2023); "Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; Clarification," Federal Register, https://www.federalregister.gov/documents/2025/04/11/2025-06127/nondiscrimination-on-the-basis-of-disability-in-programs-or-activities-receiving-federal-financial ("[R]estrictions that prevent, limit, or interfere with otherwise qualified individuals' access to care due to their gender dysphoria, gender dysphoria diagnosis, or perception of gender dysphoria may violate section 504.").

pushing this interpretation through enforcement actions,[117] consent decrees,[118] amicus briefs,[119] and administrative decisions for federal employees.[120]

Biden's DOJ also claimed in litigation that denying prisoners access to sex-rejecting procedures is "cruel and unusual punishment" in violation of the Eighth Amendment.[121] Biden's Secretary of State Anthony Blinken called the denial of sex-rejecting procedures "violence."[122]

In a March 2022 executive order, Biden directed the HHS Secretary to "work with States on expanding access to gender-affirming care."[123] At the same time, the Biden administration opposed state laws that prohibit medical professionals from providing children with sex-rejecting procedures and prohibit state funding and insurance coverage of such procedures. When these state laws were challenged in federal court, the Biden DOJ issued statements of interest and intervened in the cases, claiming the laws violated federal nondiscrimination laws and the Equal Protection Clause of the Fourteenth Amendment.[124] In June 2025, the Supreme Court rejected the

---

[117] *See* "Wal-Mart Loses Perfect LGBTQ Rating Because of Transgender Harassment," SHRM, https://www.shrm.org/topics-tools/employment-law-compliance/wal-mart-loses-perfect-lgbtq-rating-transgender-harassment; *see also* "Walmart Subsidiary Discriminated Against Transgender Worker, EEOC Finds," NBC NEWS, https://www.nbcnews.com/feature/nbc-out/walmart-subsidiary-discriminated-against-transgender-worker-eeoc-finds-n790696.

[118] *See* "Deluxe Financial to Settle Sex Discrimination Suit on Behalf of Transgender Employee," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/newsroom/deluxe-financial-settle-sex-discrimination-suit-behalf-transgender-employee; "Consent Decree, (January 20, 2016), Equal Employment Opportunity Commission v. Deluxe Financial Services, Inc. (U.S. District Court for the District of Minnesota)," Civil Rights Litigation Clearinghouse, https://clearinghouse.net/doc/81176/.

[119] *See* "Amicus Br., Robinson v. Dignity Health," United States District Court, Northern District of California, *https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/litigation/briefs/robinson.html* ; Religious Sisters of Mercy v. Azar, 513 F. Supp. 3d 1113, 1142 (D. N.D. 2021) ("The EEOC has never disavowed an intent to enforce Title VII's prohibition on gender-transition exclusions in health plans against the CBA or its members. At the same time, the EEOC has enforced that very interpretation against other employers.").

[120] *See* "Darin B. v. U.S. Off. of Pers. Mgmt.," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/sites/default/files/migrated_files/decisions/0120161068.txt; "Lawrence v. Off. of Pers. Mgmt.," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/sites/default/files/decisions/2024_06_04/0120162065%20DEC.pdf; "Allene R. v. Shriver, EEOC Appeal No. 0120181416," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/sites/default/files/decisions/2024_12_09/0120181416.pdf, at 5.

[121] *See* "Statement of Interest, Doe v. Ga. Department of Corrections," United States District Court, Northern District of Georgia, https://www.justice.gov/crt/media/1333226/dl (claiming failure to provide "medically necessary gender-affirming surgery" violated Eighth Amendment); "Statement of Interest of the United States, Diamond v. Owens," United States District Court for the Middle District of Georgia," https://www.justice.gov/file/443086/dl (arguing failure to provide "adequate treatment" for gender dysphoria "constitutes cruel and unusual punishment under the Eighth Amendment").

[122] "On Transgender Day of Visibility – Press Statement, Anthony J. Blinken, Secretary of State," U.S. Department of State, https://web.archive.org/web/20220403000913/https://www.state.gov/on-transgender-day-of-visibility-2/.

[123] "Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals," Federal Register, https://www.federalregister.gov/documents/2022/06/21/2022-13391/advancing-equality-for-lesbian-gay-bisexual-transgender-queer-and-intersex-individuals.

[124] See "Statement of Interest of the United States, Brandt v. Rutledge," United States District Court for the Eastern District of Arkansas,https://www.justice.gov/crt/case-document/file/1468236/dl ; "Complaint in Intervention, Eknes-Tucker v. Alabama," Justice.gov, https://www.justice.gov/file/1224476/dl?inline=; "United States v. Skrmetti," Supremecourt.gov, https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf.

constitutional argument in *United States v. Skrmetti*.[125]

In April 2024, HHS issued a final rule on patient privacy that created onerous new procedures limiting the ability of healthcare providers to comply with lawful requests for health information relating to procedures (including sex-rejecting procedures) affecting an individual's reproductive system or health.[126] HHS transparently acknowledged that this rule will "make it more difficult for law enforcement officials to investigate whether reproductive health care was unlawful under the circumstances in which it was provided…."[127] The rule's provisions related to reproductive health care were later vacated by a federal court.[128]

## II. Federal Funding and Facilitation

In response to a June 2021 executive order directing federal agencies to provide federal employees with healthcare coverage for "comprehensive gender-affirming care,"[129] the Office of Personnel Management (OPM) directed federal employees health-benefits-program carriers to cover sex-rejecting procedures. OPM prohibited these carriers from categorically declining to cover "services related to gender affirming care, such as hormone therapy, genital surgeries, breast surgeries, and facial gender affirming surgeries."[130]

---

[125] "United States v. Skrmetti," Supremecourt.gov, https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf.

[126] "HIPAA Priv. Rule to Support Reproductive Health Care Privacy," Federal Register, https://www.federalregister.gov/documents/2024/04/26/2024-08503/hipaa-privacy-rule-to-support-reproductive-health-care-privacy. The rule applies to certain uses and disclosures of protected health information potentially related to "reproductive health care." "Reproductive health care" is defined as including "health care…that affects the health of an individual in all matters relating to the reproductive system and to its functions and processes." *See* "45 C.F.R. § 160.103," Code of Federal Regulations, https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-C/part-160/subpart-A/section-160.103. Public comments both in support and opposition to the proposed rule pointed out that HHS' proposed definition of "reproductive health care" would cover sex-rejecting procedures that impact an individual's reproductive system. *See, e.g.*, "Comment from American Academy of Family Physicians, HHS-OCR-2023-0006, HHS-OCR-2023-0006-0001, 2023-07517," Regulations.gov, https://www.regulations.gov/comment/HHS-OCR-2023-0006-0062; EPPC Scholars Comment Opposing "HIPAA Privacy Rule To Support Reproductive Health Care Privacy," RIN 0945-AA20, at 7 (June 16, 2023), https://media.eppc.org/2023/07/EPPC-Scholars-Comment-Opposing-the-HIPAA-Privacy-Reproductive-Health-Care-NPRM.pdf. The final rule confirmed that "reproductive health care" should be "interpreted broadly and inclusive of all types of health care related to an individual's reproductive system" and that it "encompasses the full range of health care related to an individual's reproductive health." See "HIPAA Privacy Rule to Support Reproductive Health Care Privacy," Federal Register, https://www.federalregister.gov/documents/2024/04/26/2024-08503/hipaa-privacy-rule-to-support-reproductive-health-care-privacy.

[127] "HIPAA Privacy Rule to Support Reproductive Health Care Privacy," Federal Register, https://www.federalregister.gov/documents/2024/04/26/2024-08503/hipaa-privacy-rule-to-support-reproductive-health-care-privacy.

[128] "Purl v. U.S. Department of Health & Human Services et al, No. 2:2024cv00228 - Document 110 (N.D. Tex. 2025)," United States District Court for the Northern District of Texas Amarillo Division, https://law.justia.com/cases/federal/district-courts/texas/txndce/2:2024cv00228/395990/110/. Certain provisions of the rule unrelated to reproductive health care were severed by the court and remain in effect.

[129] "Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce," Federal Register, https://www.federalregister.gov/documents/2021/06/30/2021-14127/diversity-equity-inclusion-and-accessibility-in-the-federal-workforce.

[130] "Coverage for Gender Affirming Care and Services," U.S. Office of Personnel Management Healthcare and Insurance, https://www.opm.gov/healthcare-insurance/carriers/fehb/2023/2023-12.pdf; see also "Federal Employees Health Benefits Program Call Letter," U.S. Office of Personnel Management Healthcare and Insurance, https://www.opm.gov/healthcare-insurance/carriers/fehb/2022/2022-

In response to another Biden executive order concerning gender identity and service in the armed forces,[131] the Department of Defense, now the Department of War, provided taxpayer-funded coverage of sex-rejecting procedures.[132] The Biden Department of Veterans Affairs also announced (but never finalized) a policy change to cover sex-rejecting surgeries for veterans and their beneficiaries.[133]

In April 2024, HHS's Administration for Children and Families issued a final rule that could be read as requiring the Office of Refugee Resettlement to facilitate access to sex-rejecting procedures for unaccompanied illegal alien minor children.[134]

The National Institutes of Health, or "NIH," has spent millions of taxpayer dollars on research related to sex-rejecting procedures. For example, NIH paid nearly $10 million for one study on

---

03.pdf; "Subject: Technical Guidance and Instructions for 2023 Benefit Proposals, U.S. Office of Personnel Management Healthcare and Insurance, https://www.opm.gov/healthcare-insurance/carriers/fehb/2022/2022-04.pdf ; U.S. Off. of Pers. Mgmt., Federal Employee Health Benefits Program Call Letter, Letter No. 2023-04 (Mar. 1, 2023), https://www.opm.gov/healthcare-insurance/carriers/fehb/2023/2023-04.pdf. OPM told carriers that their coverage decisions must be consistent with "up-to-date standards of care" and pointed carriers to the World Professional Association of Transgender Health (WPATH), the Endocrine Society, and the Fenway Institute. See "Subject: Coverage of Gender Affirming Care and Services," U.S. Office of Personnel Management Healthcare and Insurance, https://www.opm.gov/healthcare-insurance/carriers/fehb/2023/2023-12.pdf.

131 "Enabling All Qualified Americans to Serve Their Country in Uniform," Federal Register, https://www.federalregister.gov/documents/2021/01/28/2021-02034/enabling-all-qualified-americans-to-serve-their-country-in-uniform.

132 "DOD Revises Transgender Policies to Align with White House," U.S. Department of War, https://www.war.gov/News/News-Stories/Article/Article/2557118/dod-revises-transgender-policies-to-align-with-white-house/.

133 *See* "VA to Offer Gender Surgery to Transgender Vets for the First Time," Military Times, https://www.militarytimes.com/veterans/2021/06/19/va-to-offer-gender-surgery-to-transgender-vets-for-the-first-time/.

134 "Unaccompanied Children Program Foundational Rule," Federal Register, https://www.federalregister.gov/documents/2024/04/30/2024-08329/unaccompanied-children-program-foundational-rule. According to the final rule, "ORR shall ensure that all unaccompanied children in ORR custody will be provided with…access to medical services requiring heightened ORR involvement," defined as encompassing "[s]ignificant surgical or medical procedures" and "[m]edical services necessary to address threats to the life of or serious jeopardy to the health of an unaccompanied child." 45 CFR §§ 410.1001, 410.1307. Many sex-rejecting procedures are fairly characterized as "significant surgical or medical procedures" and would seem to qualify as "medical services necessary to address threats to the life of or serious jeopardy to the health of an unaccompanied child" under the Biden administration's view that sex-rejecting procedures are "life-saving" and "crucial to overall health and well-being." "Statement by HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth," HHS.gov, https://us.pagefreezer.com/en-US/wa/browse/0a7f82bb-be6e-448a-ae11-373d22c37842?find-by-timestamp=2023-01-01T06:35:59Z&url=https:%2F%2Fwww.hhs.gov%2Fabout%2Fnews%2F2022%2F03%2F02%2Fstatement-hhs-secretary-xavier-becerra-reaffirming-hhs-support-and-protection-for-lgbtqi-children-and-youth.html&timestamp=2023-01-01T03:43:25Z; "Gender-Affirming Care and Young People," OASH, https://opa.hhs.gov/sites/default/files/2023-08/gender-affirming-care-young-people.pdf. In response to public comments asking whether ORR considers sex-rejecting procedures as "medical services requiring heightened ORR involvement," ORR refused to answer the question, merely stating that it was not "changing the final rule to include provisions specific to gender-affirming healthcare." 89 Fed. Reg. at 34516-17.

puberty blockers and cross-sex hormones for youth.[135] Study data that was unfavorable towards the use of puberty blockers was intentionally suppressed by a researcher out of concern that the findings would support state laws prohibiting sex-rejecting procedures for minors.[136] Study data related to the use of sex-rejecting hormones was published, with the lead author misleadingly declaring that the results "provide a strong scientific basis that gender-affirming care is crucial for the psychological well-being of our patients."[137] The study's hypothesis was retroactively changed after inconsistent findings; the study failed to report findings for six of the eight variables in their original ("preregistered") hypothesis; the study contained many confounding variables, such as participant use of psychotherapy; and most significantly, two of the 315 study participants died by suicide after starting cross-sex hormones.[138]

***Trump Administration Reverses Course.*** The Trump administration rejected the Biden administration's promotion of sex-rejecting procedures. Upon taking office, President Trump issued a series of executive orders revoking Biden's gender ideology-related executive orders, reversing those policies, and seeking to protect children from the harms of sex-rejecting procedures.[139] Federal agencies responded.

For example, DOJ reversed the government's position in *Skrmetti*.[140] HHS rescinded its May 2021 notification and March 2022 guidance on Section 1557[141] and issued a clarification and a proposed rule rejecting the theory that individuals with gender dysphoria (not resulting from a physical impairment) are protected under laws prohibiting disability discrimination.[142] EEOC took the

135 "The Impact of Early Medical Treatment in Transgender Youth," NIH RePORT, https://reporter.nih.gov/search/HhwkFHSzBEGVng1Xv4dwog/project-details/9313704.

136 "U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says," The New York Times, https://www.nytimes.com/2024/10/23/science/puberty-blockers-olson-kennedy.html ; see also "McClain Probes §9.7 Million Taxpayer-Funded Study Buried by Activist Researcher on Puberty Blockers," House Committee on Oversight and Government Reform, https://oversight.house.gov/release/mcclain-probes-9-7-million-taxpayer-funded-study-buried-by-activist-researcher-on-puberty-blockers%ef%bf%bc/ (House Committee on Oversight and Accountability launches investigation into suppression of data).

137 "Study: Gender-Affirming Hormones Improve Mental Health In Transgender And Nonbinary Youth," EurekaAlert!, https://www.eurekalert.org/news-releases/976601.

138 See "On Scientific Transparency, Researcher Degrees of Freedom, and that NEJM Study on Youth Gender Medicine (Updated)," Singal-Minded Substack, https://jessesingal.substack.com/p/on-scientific-transparency-researcher; see also, "The New, Highly Touted Study On Hormones For Transgender Teens Doesn't Really Tell Us Much Of Anything," Singal-Minded Substack, https://jessesingal.substack.com/p/the-new-highly-touted-study-on-hormones (questioning the study's favorable interpretation of results for many reasons).

139 See, e.g., "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," Federal Register, https://www.federalregister.gov/documents/2025/01/30/2025-02090/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal. "Protecting Children From Chemical and Surgical Mutilation," Federal Register, https://www.federalregister.gov/d/2025-02194; "Prioritizing Military Excellence and Readiness, Federal Register, https://www.federalregister.gov/d/2025-02178.

140 Letter of Petitioner, *United States v. Skrmetti*, 605 U.S. 495 (2025) (No. 23-477).

141 "Notification of HHS Documents Identified for Rescission," Federal Register, https://www.federalregister.gov/d/2025-08393 (rescinding May 2021 notification); "Recission of "HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy" (issued March 2, 2022), HHS, Office of the Secretary, https://www.hhs.gov/sites/default/files/ocr-rescission-february-20-2025-notice-guidance.pdf (rescinding March 2022 guidance because it "no longer represents the views or policies of HHS [Office for Civil Rights]").

142 "Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; Clarification," Federal Register, https://www.federalregister.gov/d/2025-06127 (clarifying

position that it is not sex or disability discrimination for health insurance plans to exclude coverage of sex-rejecting procedures.[143]

CMS finalized a rule prohibiting health insurance coverage of sex-rejecting procedures as an essential health benefit[144] and proposed rules that would limit federal funding and provision of sex-rejecting procedures for children under Medicare, Medicaid, and the Children's Health Insurance Program (CHIP).[145] CMS also sent a letter to state Medicaid directors informing them that sex-rejecting procedures "lack reliable evidence of long-term benefits for minors" and, for some children, are "known to cause long-term and irreparable harm."[146] CMS Administrator Mehmet Oz requested an "urgent review" of hospitals' quality standards and financial data concerning sex-rejecting procedures for children.[147]

The Federal Trade Commission hosted a workshop on "the dangers" of sex-rejecting procedures for minors[148] and launched a public inquiry "to evaluate whether consumers (in particular,

---

that "the Department interprets the statutory exclusion of 'gender identity disorders not resulting from physical impairments' from the definitions of 'individual with a disability' and 'disability'…to encompass 'gender dysphoria not resulting from a physical impairment.'"); "Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance," Federal Register, https://www.federalregister.gov/d/2025-23484 (proposing regulation to clarify that "the term 'gender identity disorders not resulting from physical impairments' includes gender dysphoria not resulting from physical impairments").

143 *"Sam T. v. Kupor*, EEOC Appeal Nos. 0120172750, 0120172751 2020000643, 2021005019," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/sites/default/files/2026-03/0120172750%200120172751%202020000643%202021005019%20decision_Redacted_0.pdf, at 18, (holding in an administrative decision that "less than full coverage for sex-rejecting services and procedures" in federal employee health benefits plans "was not unlawful sex or disability discrimination" and that *United States v. Skrmetti* requires overruling EEOC's prior "erroneous decision in *Lawrence*").

144 "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability," Federal Register, https://www.federalregister.gov/d/2025-11606.

145 "Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children," Federal Register, https://www.federalregister.gov/documents/2025/12/19/2025-23464/medicaid-program-prohibition-on-federal-medicaid-and-childrens-health-insurance-program-funding-for (proposing that state Medicaid and CHIP plans must provide that the Medicaid and CHIP agency will not make payment under the plan for sex-rejecting procedures for children under 18 (for Medicaid) or under age 18 (for CHIP); also proposing to prohibit federal Medicaid and CHIP payments to states for sex-rejecting procedures for children under 18 (for Medicaid) and 19 (for CHIP)); 'Medicare and Medicaid Programs; Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children," Federal Register, https://www.federalregister.gov/d/2025-23465 (proposing prohibition on Medicare and Medicaid certified hospitals from performing sex-rejecting procedures on children as a condition of participation).

146 "Letter from Drew Snyder, Deputy Administrator and Director, CMS, to State Medicaid Director re Puberty Blockers, Cross-Sex Hormones, and Surgery Related to Gender Dysphoria," CMS, https://www.cms.gov/files/document/letter-stm.pdf (reminding states of their obligations under Medicaid to provide quality care in the best interests of the beneficiaries).

147 Letter from Mehmet Oz, Administrator, "Subject: Urgent Review of Quality Standards and Gender Transition Procedures," Centers for Medicare & Medicaid Services, https://www.cms.gov/files/document/hospital-oversight-letter-generic.pdf ("Our primary concern is ensuring that vulnerable pediatric populations receive evidence-based care that meets the highest quality standards while ensuring appropriate stewardship of federal healthcare resources.").

148 "The Dangers of 'Gender-Affirming Care' for Minors," Federal Trade Commission, https://www.ftc.gov/news-events/events/2025/07/dangers-gender-affirming-care-minors.

minors) have been harmed by" sex-rejecting procedures and whether medical professionals may have violated federal law.[149]

HHS commissioned a peer-reviewed report by independent authors to conduct an "umbrella review" of evidence and best practices for the treatment of pediatric gender dysphoria.[150] The report found that sex-rejecting procedures "carry risk of significant harms."[151]

HHS issued guidance for whistleblowers on the "chemical and surgical mutilation of children"[152] and opened investigations into hospitals, health centers, and state health departments for violating federal laws, operating "outside recognized standards of health care," and failing to protect children from sex-rejecting procedures.[153] The FBI also solicited tips regarding any hospitals, clinics, or practitioners performing sex-rejecting procedures.[154] DOJ prioritized

---

149 "FTC Requests Public Comment Regarding 'Gender-Affirming Care' for Minors," Federal Trade Commission, https://www.ftc.gov/news-events/news/press-releases/2025/07/ftc-requests-public-comment-regarding-gender-affirming-care-minors . Specifically, the FTC sought to evaluate "whether medical professionals or others may have violated [the Federal Trade Commission] Act by failing to disclose material risks associated with [sex-rejecting procedures] or making false or unsubstantiated claims about the benefits or effectiveness of [sex-rejecting procedures]."

150 "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices," OASH, https://opa.hhs.gov/gender-dysphoria-report ("summariz[ing], synthesiz[ing], and critically evaluat[ing] the existing literature on best practices for promoting the health and well-being of children and adolescents with distress related to their sex or to social expectations associated with their sex").

151 "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices," OASH, https://opa.hhs.gov/gender-dysphoria-report, at 10.

152 "Guidance for Whistleblowers on the Chemical and Surgical Mutilation of Children," HHS, https://www.hhs.gov/sites/default/files/eo-14187-whistleblower-guidance.pdf. HHS also launched a new online portal for whistleblower tips and complaints, see "Whistleblower Tips and Complaints Regarding the Chemical and Surgical Mutilation of Children," HHS, https://www.hhs.gov/protect-kids/index.html .

153 *See* "HHS Takes Action to Protect Whistleblowers Who Defend Children and Launches First Conscience Investigation," HHS, https://www.hhs.gov/press-room/hhs-launches-whistleblower-form-to-protect-kids.html (announcing conscience rights investigation into a "major pediatric teaching hospital" for allegedly terminating a nurse who requested a religious accommodation to avoid providing children with sex-rejecting drugs); "HHS Investigates State Health Department to Protect Conscience Rights and Ensure Equal Treatment of Faith-Based Organizations," HHS, https://www.hhs.gov/press-room/ocr-investigates-state-to-protect-conscience-and-faith-based-organizations.html (launching "a major investigation" into a state health department to determine whether "its licensing policies, interpretations, or enforcement practices for behavioral health residential facilities and licensed behavioral health personnel" violate federal conscience and equal treatment laws and regulations, including by requiring facilitation, performance of, or assistance with sex-rejecting procedures and female genital mutilation).

154 FBI (@FBI), "Help the FBI protect Children. As the Attorney General has made clear, we will protect our children and hold accountable those who mutilate them under the guise of gender-affirming care. Report tips of any hospitals, clinics, or practitioners performing these surgical procedures on children at 1-800-CALL-FBI or tips.fbi.gov." Twitter (now X), June 2, 2025, 1:15 PM, https://x.com/FBI/status/1929587710894739567 .

investigations and enforcement actions related to sex-rejecting procedures[155] and has subpoenaed doctors and clinics involved in performing such procedures on children.[156]

Under President Trump's direction, the federal government took actions to stop funding sex-rejecting procedures for federal employees,[157] prisoners,[158] military service members,[159] and veterans,[160] and limit the provision and promotion of sex-rejecting procedures in NIH grants[161] and foreign assistance.[162]

---

155 *See* "Memorandum from Pam Bondi, Attorney General, DOJ, to Select Component Heads, re Preventing the Mutilation of American Children," Office of the Attorney General, https://perma.cc/NRK7-2TLQ, (issuing a memorandum to all DOJ employees (i) directing investigation of all suspected cases of female genital mutilation, violations of the Food, Drug and Cosmetic Act, and violations of the False Claims Act; (ii) launching the "Attorney General's Coalition Against Child Mutilation"; and (iii) promoting legislation to protect children from sex-rejecting procedures); "Memorandum from Brett A. Shumate, Assistant Attorney General, DOJ, to All Civil Division Employees, re Civil Division Enforcement Priorities," U.S. Department of Justice, Civil Division, https://www.justice.gov/ag/media/1402396/dl (directing DOJ Civil Division attorneys to "prioritize investigations and enforcement actions" outlined in the Attorney General's memorandum).

156 "Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children," Office of Public Affairs, U.S. Department of Justice, https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical (announcing DOJ issued "more than 20 subpoenas to doctors and clinics involved in performing" sex-rejecting procedures on children).

157 "FEHB Program Carrier Letter, Subject: Chemical and Surgical Sex-Trait Modification Services for Plan Year 2026 Proposals," U.S. Office of Personnel Management Healthcare and Insurance, https://www.opm.gov/healthcare-insurance/carriers/fehb/2025/2025-01b.pdf (superseding conflicting carrier letters and informing Federal Employee Health Benefits program and Postal Service Health Benefit program carriers that sex-rejecting procedures will no longer be covered within the health benefit programs for plan year 2026 (except for gender dysphoria-related counseling services and for those who "are mid-treatment within a surgical and/or hormonal regimen for diagnosed gender dysphoria")).

158 "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," Federal Register, https://www.federalregister.gov/d/2025-02090 (directing the Bureau of Prisons to revise its policies so that federal funds are not "expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex"). The Executive Order's prohibition on the use of federal grant funds to promote gender ideology has been preliminarily enjoined in certain circumstances. HHS remains in compliance with these injunctions and other applicable injunctions relating to the termination of NIH grants based on gender ideology.

159 "Subject: Additional Guidance on Priority Military Excellence and Readiness," Office of the Under Secretary of Defense, https://www.esd.whs.mil/Portals/54/Documents/FOID/Reading%20Room/Administration_and_Management/25-F-2299_Prioritizing_military_excellence_readiness.pdf (reversing Department of Defense policy providing taxpayer-funded coverage of sex-rejecting procedures for military service members).

160 "Rescission of VHA Directive 1341(4), Providing Health Care for Transgender and Intersex Veterans," Department of Veterans Affairs, https://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=12188, (rescinding prior Department of Veterans Affairs directive to provide cross-sex hormone therapy to treat gender dysphoria, (except if a veteran has already received hormone therapy or hormone therapy was provided "as part of and upon separation from military service")).

161 "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," Federal Register, https://www.federalregister.gov/d/2025-02090 (directing agencies to end federal funding of gender ideology).

162 "Combatting Gender Ideology in Foreign Assistance," Federal Register, https://www.federalregister.gov/d/2026-01516 (adding a new award term for grants, cooperative agreements, and voluntary contributions that imposes certain requirements related to gender ideology, including the provision and promotion of sex-rejecting procedures, on foreign and U.S. nongovernmental organizations, international organizations, foreign governments, and parastatals).

## Chapter 4: Elite Professional Society Bias Infected Hospital Personnel

This chapter explores the ways in which professional organizations have become infused with bias in favor of sex-rejecting interventions for minors.

Sex-rejecting interventions are a relatively modern phenomenon. Modern guidelines can be traced back to the work of Dr. Harry Benjamin, a New York internist who, in the twentieth century, "became curious about the therapeutic possibilities of the endocrine glands." [163] "Until the 1940s, Benjamin's professional activities had little or nothing to do with transgender people."[164] That changed in 1949 when "sexologist Alfred Kinsey" referred a patient to Benjamin. The patient, known by the pseudonym Val Barry, was a male "who had been raised as a girl since childhood and urgently wished to find a doctor who would help [him] rid [him]self of all physical signs of maleness."[165] While most physicians would assume that Barry needed psychiatric care, Benjamin believed that hormone treatment would be reasonable.[166] In the years that followed, he worked with other patients. But because no one knew "the long-term implicates for the health and well-being" of patients treated with hormones, Benjamin "urged them to proceed slowly and only change the body as a last resort."[167]

Benjamin's "cautious approach…became codified in the earliest standards of care."[168] The Harry Benjamin International Gender Dysphoria Association published its first set of interventional guidelines in 1979.[169] And that organization—now known as the World Professional Association of Transgender Health, or "WPATH"—updated its guidelines repeatedly in the years that followed.

WPATH'S early guidelines "provided that hormonal and surgical sex reassignment treatments should be administered *only* to adults."[170] And WPATH continued to take a relatively cautious approach in subsequent editions of its guidelines. It first endorsed the so-called "Dutch Protocol" in 1998, "permit[ing] puberty blockers at the onset of puberty, cross-sex hormones for those 16 or older, and sex-change surgery only for adults."[171] But WPATH began relaxing these recommendations in 2012, "permitting cross-sex hormones for children under the age of 16."[172] And it relaxed

---

[163] Alison Li, "Harry Benjamin and the birth of transgender medicine," *Humanities, Medicine, and Society* 48: E1665 – E1667.
[164] Alison Li, "Harry Benjamin and the birth of transgender medicine," *Humanities, Medicine, and Society* 48: E1665.
[165] Alison Li, "Harry Benjamin and the birth of transgender medicine," *Humanities, Medicine, and Society* 48: E1666.
[166] Alison Li, "Harry Benjamin and the birth of transgender medicine," *Humanities, Medicine, and Society* 48: E1666.
[167] Alison Li, "Harry Benjamin and the birth of transgender medicine," Humanities, Medicine, and Society 48: E1666.
[168] Alison Li, "Harry Benjamin and the birth of transgender medicine," Humanities, Medicine, and Society 48: E1666.
[169] Jill Pilgrim et. al., Far from the Finish Line: Transsexualism & Athletic Competition, Fordham Intell. Prop. Media & Ent. L.J. (2003): 495, 526.
[170] "United States v. Skrmetti," Supremecourt.gov, https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf. 495, 504 (emphasis added).
[171] "United States v. Skrmetti," Supremecourt.gov, https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf. 537 (Thomas J, Concurring).
[172] "Applying and Understanding the WPATH Standards of Care (SOC) Through the Healthcare Providers Lens," WPATH, World Professional Association for Transgender Health, accessed March 2, 2026, https://wpath.org/wp-content/uploads/2024/11/Combined_Handouts.pd.

the guidelines still more in 2022: those guidelines (version 8)[173] "endorse using puberty blockers and cross-sex hormones at the onset of puberty and allowing children to receive many surgical treatments previously reserved for adults."[174] To illustrate just how extreme these guidelines are, under-oath testimony established that "WPATH's official position is that castration may be a medically necessary procedure" even "in the case of a physically healthy [man] with no recognized mental health conditions who presents as a eunuch seeking castration."[175] As explored in other chapters, WPATH adopted these changes in light of pressure from President Biden's administration, which "pressed WPATH to remove age limits for adolescent surgeries from guidelines for care of transgender minors on the theory that specific listings of ages, under 18, will result in devastating legislation for trans care."[176] Later-uncovered emails show that authors of the guidelines hoped they would "land in such a way as to have serious effect[s] in the law and policy settings."[177] And one of the authors testified under oath that it is "ethically justifiable" to "advocate for language changes to strengthen" the positions of litigants "in court."[178]

All told, WPATH is not, and does not seriously pretend to be, a neutral arbiter of the evidence for and against sex-rejecting interventions. Rather, its "lodestar is ideology, not science."[179] Other groups have followed WPATH's course, often at the urging of a minority of WPATH-aligned members.

Take the Endocrine Society. In 2017, it published its own set of revised guidelines for the treatment of "gender-dysphoric/gender-incongruent persons." [180] The guidelines identify ten authors, at least seven of whom appear to have been affiliated with WPATH and one of whom is listed as an author on WPATH's 2022 guidelines.[181] The Endocrine Society's guidelines foreshadowed WPATH's relaxed standards, "suggest[ing]" the "suppress[ion] of puberty" for "adolescents to

---

173 E. Coleman, et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int'l J. of Transgender Health 51 (No. 23) (2022) ("SOC-8").
174 "United States v. Skrmetti," Supremecourt.gov, https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf. 537 (Thomas J, Concurring).
175 "Boe v. Marshall, 2:22-cv-00184 (M.D. Ala.)," Attorney General Steve Marshall, https://www.alabamaag.gov/boe-v-marshall/.
176 "United States v. Skrmetti," Supremecourt.gov, https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf. 546 (brackets and quotation marks omitted).
177 Exhibit to Defendants' Notice of Filing Redacted Summary Judgment and *Daubert* Submissions, ECF. 700-13 at 25, *Boe v. Marshall*, No. 22-cv-00184 (M.D. Ala.) (Oct. 9, 2024).
178 "United States v. Skrmetti," Supremecourt.gov, https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf. 605, 700 – 3 at 42.
179 *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring in the denial of rehearing en banc).
180 "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," JCEM, The Journal of Clinical Endocrinology & Metabolism, https://academic.oup.com/jcem/article/102/11/3869/4157558.
181 "WPATH Executive Committee and Board of Directors," WPATH, accessed March 11, 2026, https://wpath.org/about/ec-bod/#:~:text=Radix%2C%20the%20new%20WPATH%20executive,Marci%20L, (identifying "Stephen Rosenthal" as a member of WPATH's Executive Committee and "Joshua Safer" as a member of the Board of Directors); "History of the Association," WPATH, https://wpath.org/about/history/, (identifying Louis Gooren as a former member of WPATH's Board of Directors); "The World Professional Association for Transgender Health: Abstract Book ~ 2007," WPATH, accessed March 11, 2026, https://wpath.org/wp-content/uploads/2024/11/Abstract-Book-2007-Final-Version.pdf, (identifying "Peggy Cohen Kettenis," "Walter Meyer," "Vin Tangpricha," and "Guy T'Sjoen" as members of various WPATH committees on pg. 6); "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8," WPATH, https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644, at pg. 1 (identifying Guy G. T'Sjoen as an author).

meet diagnostic criteria for" gender dysphoria or gender incongruence, and stating "that there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years in some adolescents … *even though* there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years."[182] The guidelines do not disclose whether the drafters of this policy would stand to profit from an increase in such interventions. Nor do they address, in any sustained fashion, the risks and unknown aspects of the recommended interventions.

Yet the Endocrine Society is not the only medical association that has bias and political agendas to shape its recommendations. Consider also the American Psychological Association (APA).[183] In 2015, the APA published its Guidelines for Psychological Practice with Transgender and Gender Nonconforming People, which has the stated purpose of "assist[ing] psychologists in the provision of culturally competent, developmentally appropriate, and *trans-affirmative* psychological practice."[184] The "Task Force" that assembled these guidelines consists of only eight individuals,[185] at least seven of whom are WPATH members or otherwise affiliated with the organization.[186]

Then there's the American Academy of Pediatrics (AAP). In 2016, the Human Rights Campaign, a prominent LGBT advocacy organization, partnered with the AAP to create a guide for families with transgender children.[187] A modification of this guideline was created by Jason Rafferty to craft a Policy Statement regarding care of transgender children and adolescents for the AAP – which has 67,000 members.[188] The policy mirrored the 2009 Endocrine Society Guidelines, but specifically labeled any kind of mental health evaluation or treatment as unethical. It was subsequently approved by the 13-member Board of Directors of the AAP, without any input from general membership. 67,000 "supporters" of sex-rejecting procedures were supposedly created in September 2018, due to the publication of the AAP's Policy Statement. However, AAP's membership only became aware of the content of the Policy Statement after it was published.[189] A

[182] Gender Dysphoria/Gender Incongruence Guideline Resources," Endocrine Society, https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence.
[183] "About APA," American Psychological Association, accessed March 11, 2026, https://perma.cc/57LQ-6EEE?type=image.
[184] American Psychological Association, "Guidelines for psychological practice with transgender and gender nonconforming people," the American Psychologist, 70, no. 9 (2015): 832 – 864.
[185] American Psychological Association, "Guidelines for psychological practice with transgender and gender nonconforming people, the American Psychologist, 70, no. 9 (2015): pg. 832.
[186] "Member Search," WPATH, accessed March 11, 2026, https://app.wpath.org/member/search (now only accessible to WPATH members). Searches identified Walter Bockting, Sand Chang, Kelly Ducheny, Max Fuhrmann, and Michael Hendricks as WPATH members; "Dr. Laura Edwards-Leeper, PHD," accessed March 11, 2026, https://www.drlauraedwardsleeper.com/. Dr. Edwards-Leeper's personal website says that she "was the past Chair of the Child and Adolescent Committee for the World Professional Association for Transgender Health (WPATH) and was involved in the WPATH Standards of Care (SOC) 8 revision," and describes herself as "an ally to the LGBTQ community."; Randall D. Ehrbar, "Consensus form differences: Lack of Professional Consensus on the Retention of the Gender Identity Disorder Diagnosis," International Journal of Transgenderism, 60, no.12 (2010). Randall D. Ehrbar "served as cochair of the WPATH Adolescent Consensus Statement work group.
[187] Hruz, PW., Mayer, LS., and McHugh, PR. 2017. "Growing Pains: Problems with Puberty Suppression in Treating Gender Dysphoria." *The New Atlantis* 52: 3-36.
[188] Rafferty, J. AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. 2018. "Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents." *Pediatrics* 142(4): e20182162 doi:10.1542/peds.2018-2162.
[189] "Do 66,000 Pediatricians Really Support the AAP's 'Trans'-Affirmative Policy?" Illinoisfamily.org, https://illinoisfamily.org/homosexuality/66000-pediatricians-really-support-aaps-trans-affirmative-policy.

prominent LGBT-advocate psychologist, James Cantor, immediately took this position statement to task, pointing out the countless flaws within it.[190] In 2023, the Board of Directors of the AAP unanimously reaffirmed its 2018 policy statement promoting sex-rejecting procedures for children, without waiting for its own systematic review of the evidence which had yet to be written, and is still yet to be completed.[191]

[190] Cantor JM. 2020. "Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy." *Sex Marital Ther* 46(4): 307-313.
[191] "AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update," AAP News, accessed July 27, 2026, https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy.

## Chapter 5: First-Hand Accounts from Patients and Parents

Our report concludes with first-hand accounts of the ways in which activist groups and the medical establishment pressured sex-rejection interventions. These accounts—some by detransitioners and others by patients or the parents of patients who resisted the pressure to pursue sex-rejecting procedures—shed further light on the degree to which activists and providers have tried to force children to undergo potentially life-altering interventions. All accounts are derived from interviews with these individuals.

### I. Sydney Aviles

Sydney Aviles thought identifying as transgender would let her escape womanhood. She started puberty at the age of 9 and did not know what was happening to her. The rapid changes to her body made her feel "monstrous," and she struggled with her mental health because of a sexual assault and her parents' divorce. Beyond the mental shock caused by puberty's onset, she also experienced severe menstrual symptoms. Her doctor told her she might have premenstrual dysphoric disorder (PMDD), and that low-dose testosterone could be one treatment option.

At school, Sydney had already seen a news clip discussing transgender-identifying individuals using opposite-sex bathrooms. This planted a seed, leading Sydney to believe she could escape her female body. Sydney decided to go all-in.

At 14 years old, she searched online and found Karen V. Sutherland, a sex-rejecting therapist. In a series of appointments, Sutherland did not question Sydney's professed transgender identity. Instead, she simply reviewed Sydney's story before referring her to Lurie Children's Hospital in Chicago, where Sydney would be able to get hormones. Lurie gave Sydney a packet that listed some of the side effects of cross-sex hormones; but it failed to mention many of the side effects that Sydney would later experience. The practitioners told her that side effects should not deter her from starting testosterone. They also did not address how her medical history or her family history of heart disease could interact with the hormones.

Because Sydney was leaving the state for her appointments, her insurance would not cover the cost—over $1,000 per visit. She paid out of pocket with money she saved from her job, and with financial help she received from her mother. Because of the cost, she transferred to Howard Brown Health, an LGBTQ+ clinic system in Chicago. The doctors there referred her to Daniel A. Medalie, a plastic surgeon in Ohio, for a double mastectomy with a $10,000 price tag. And at 18 years old, she had her healthy breasts removed. After the anesthesia wore off, she struggled to use the bathroom and almost went to the emergency room with severe constipation.

Soon, the side effects from cross-sex hormones also began piling up. She developed sub-clinical hypothyroidism and had to start taking the thyroid hormone levothyroxine. She also developed a high red-blood-cell and hematocrit count. Her doctors recommended she stop taking testosterone to resume her menstrual cycle or undergo therapeutic blood draws to lower her red-blood-cell and hematocrit counts. But because she had developed vasovagal syncope, causing seizures with blood draws, her only option was going off of testosterone.

Meanwhile, thoughts about her quickly unraveling gender ideology worldview consumed Sydney's attention as she tried to navigate what was real and what was a lie. She had spent years and thousands of dollars to appear more masculine, but deep down, she knew she was—and had always been—a woman.

Sydney decided to quit testosterone "cold turkey," but her symptoms did not disappear overnight. Fortunately, her menstrual cycle returned, but this has meant the return of her PMDD symptoms. She takes birth control to help manage these, but she knows this is a short-term solution. She also still needs thyroid medication.

Because of gender ideology's grip on modern medicine, Sydney struggles to get the ongoing medical care and support she needs. No medical professional to whom Sydney has spoken knows how to help her because she is navigating uncharted medical waters. After all of the time and money she invested into her perceived identity, she is left with regret and unalterable consequences.

## II. Lily Burns[192]

Lily Burns knew something was wrong when her son began locking himself in the bathroom for half an hour with his phone. She and her husband thought they were protecting their children: they did not allow their sons unattended access to the internet and gave them only non-smart phones without apps. They thought that creation-focused video games like Roblox and Minecraft would be a safe activity, but they didn't know about these games' chat features. And it was through these chats that their oldest son, Michael, met a transgender-identifying man and was first exposed to transgender ideology.

When Michael officially "came out" to Lily, he announced that he was either gay or transgender. He also said he wanted to attend his homecoming dance in a dress. Michael had never acted as anything other than a typical boy, so Lily thought her son might be gay or simply wanted to dress more flamboyantly. But she did not know that Michael had started "socially transitioning." It was only later that she learned he had already been trying on a female friend's clothing and wearing one of this friend's dresses to the park.

Unsure of what to do, Lily brought Michael to a clinic, Kaiser Permanente in Denver. After just three appointments, a Kaiser psychologist told Lily that Michael had gender dysphoria and recommended cross-sex hormones, referencing the now-debunked World Professional Association for Transgender Health (WPATH) standards of care. Lily had recently read about the regret formerly trans-identifying children report, so she asked whether this was the right path for her son. The psychologist doubled down and referred Michael to a pediatric endocrinologist at Children's Hospital Colorado. There, at 17 years old, Michael began sex-rejecting hormones.

Soon, Michael was ready to attend college at the Colorado School of Mines where he was studying mathematics. Lily and her husband wanted him to have some additional support as he moved on from his familiar high school setting, so she found an LGBTQ-specializing therapist online. Lily trusted the mental-health professional, but her hopes for Michael's future were soon destroyed. As a child, Michael had been in his school's gifted-and-talented program and his IQ tested above 140. Yet after seeing the therapist, Michael developed a hopeless, victimhood mentality and failed out of college. He pushed his parents away and accused them of being controlling.

Now 24 years old, Michael still identifies as transgender and dresses androgynously. Lily and her husband no longer pretend that he is a woman, and it has taken them years to rebuild their relationship with their son. Michael has permanently altered his body with the hormones prescribed by Children's Hospital Colorado's pediatric endocrinologist. Lily bears the pain of a son lost to gender ideology, and their family will forever live with the suffering caused by ideologically captured children's hospitals.

---

[192] Pseudonyms have been assigned to protect the identities of individuals in Lily's story.

## III. Rose Marie

Rose Marie spent her teenage years in the tumult of foster care. In and out of unstable living situations, she was homeless at 16 years old. While sleeping on the street in Phoenix, Arizona, she heard about One·N·Ten, a nearby LGBTQ youth center. And there, she first heard about transgenderism.

One·N·Ten provided her with food and shelter. At such a vulnerable stage, Rose latched onto the community she found. However, LGBTQ identity affirmation underpinned everything there. The center hosted a drag queen who taught young children how to cross dress, and the center gave graphic presentations on sex and gender ideology. The center's clothing closet had a drawer of superhero-decorated breast binders. Rose was told that condoms and STD testing were also free via Prisma Community Care (formally known as the Southwest Medical Center), an LGBTQ clinic located in the same building as One·N·Ten.

Soon, One·N·Ten staff asked her if she felt comfortable in her female body. Rose had short hair and masculine clothing, and she considered herself a lesbian. She was unfamiliar with the concept of gender identity prior to coming to One·N·Ten, but she liked the idea of not being confined by a particular pronoun. First, she started identifying as nonbinary. Then, she started identifying as the opposite sex. She looked up to the older kids and staff, who had already taken on LGBTQ identities. And because she relied on One·N·Ten for housing and community, she felt socially pressured to conform to their example. She began binding her breasts to flatten their appearance. One·N·Ten staff introduced her to the idea of sex-rejecting hormones and referred her to Prisma Community Care. There, a therapist told Rose she had gender dysphoria. However, Rose was a ward of the state in the foster care system, and due to Arizona Department of Child Safety rules, she could not start sex-rejecting hormones without parent or guardian approval.

Rose waited until just before she turned 18 to obtain a hormone prescription. She used the Plume Clinic app, which provides cross-sex hormones to transgender-identifying individuals. The Clinic required only a 15-minute doctor's appointment via the app before giving her the prescription. Then, on her 18th birthday, she returned to the Prisma Community Care's pharmacy and took her first testosterone injection.

For four years, she injected herself weekly. Her voice deepened, she lost her menstrual cycle, and her body grew more hair. At the end of each week, she was tired and felt sick as the hormones wore off.

The memories of her time at One·N·Ten—and the children there—stayed with her. She had seen children as young as 6 years old begin the process of sex rejection, and she knew it was not right. At the same time, she started to become religious and questioned whether she could become a man.

In 2025, she stopped taking testosterone and began the process of detransitioning, but her body has not returned to its pre-testosterone health. Her voice is still deep, she suffers from fatigue and weakness, she has tingling in her limbs, she struggles to use the bathroom, and her menstrual cycle is irregular. She has yet to find medical help and has been told that she is in "uncharted territory."

Detransitioning also cost her all her friends. She spent the last year homeless again, living in her truck while struggling to find employment. And she's left with the lingering guilt that vulnerable youth who may have looked up to her also decided to undergo sex-rejecting interventions,

following the path of gender ideology that has permanently altered her health, safety, and life.

## IV. Clementine Breen

Clementine Breen was 12 years old when she first encountered the concept of "gender dysphoria" online. She had been sexually abused at age seven but had not processed the trauma. As puberty approached, she felt intense anxiety about her changing body and began searching the internet with questions like, "Why do I hate being a girl?"

The search results led her to gender ideology. "Transition" appeared to offer a way to escape puberty and the body that felt unsafe to her. Breen did not come out to her family on her own terms, however. After confiding in a school guidance counselor, her parents were contacted immediately. Within months, the counselor coordinated meetings at school to socially transition Breen, including explaining "transgenderism" to her classmates.

Breen describes the process as fast and externally orchestrated. Her parents, initially skeptical, were referred to Children's Hospital Los Angeles. At her first appointment—approximately one hour long—clinicians told her parents she was "100% trans" and at high risk of suicide if not affirmed. Breen was only 12.

She was placed on Lupron (a medication used to block puberty) shortly thereafter. At 13, she began testosterone, and by 14, she underwent a double mastectomy. Breen states that no comprehensive evaluation of her childhood sexual abuse was conducted prior to medicalization. Instead, her providers focused heavily on social functioning and peer comparison, reinforcing the idea that staying "on track" was essential.

Following her double mastectomy (known as top surgery), Breen's testosterone dosage was more than doubled from 30 mg to 70 mg weekly in an effort to "stabilize" her mental health. Within months, she experienced severe insomnia, obsessive exercise, disordered eating, escalating anger, and eventually a psychotic episode. Breen began self-harming shortly after surgery—a behavior she had not engaged in previously.

Her healthcare providers did not attribute these symptoms to testosterone use. Instead, she was prescribed multiple psychiatric medications simultaneously, including Zoloft, Seroquel, Guanfacine, and Hydroxyzine. No provider suggested that hormone therapy itself might be contributing to her deterioration.

Breen later entered Dialectical Behavioral Therapy (DBT) for trauma and began confronting her history of sexual abuse. As she processed that trauma, she realized her identity distress had been intertwined with unaddressed abuse. At 18, she stopped testosterone. Her psychosis resolved. Her first menstrual cycle occurred at nearly 19 years old, and she describes being emotionally overwhelmed and unprepared, having filtered out female puberty education during her period of sex rejection.

Detransitioning was not met with support. When she began stating plainly that she was a woman and regretted undergoing sex-rejecting interventions, providers became hesitant and evasive. Once her former doctors learned she was detransitioning, they ceased responding to emails and calls.

Breen continues to experience complications as a result of her medicalization. She has irregular, untrackable menstrual cycles, severe cramps and hormonal instability, chest pain during

menstruation, and vaginal atrophy requiring topical estrogen. An OB-GYN told her there is no established care plan for patients with her medical history.

She is currently pursuing breast reconstruction surgery, but during consultation, she reports being questioned repeatedly about her psychological stability. She did not face this same scrutiny when seeking a mastectomy at 14.

Breen later reviewed her medical records and found that her therapist's letters inaccurately described lifelong gender dysphoria and stability of identity. When she filed a lawsuit against her providers, her case was limited by California's statute of limitations.

Today, Breen studies theater at UCLA and describes herself as doing well. She views her past sex-rejecting interventions as a form of self-harm—an attempt to escape trauma through irreversible medical interventions. She is on track to graduate in the coming years and hopes to become a teacher and mother one day.

Her message to medical professionals is clear: "If I can't give you a reason why I'm doing something, you shouldn't be doing it. How can a child consent to losing fertility or the ability to breastfeed if no one checks whether she even understands what that means?"

### V. Layla Jane[193]

Layla Jane was 11 years old when she first began to experience discomfort with her sex. She had entered puberty earlier than the other girls in her class and felt deeply uncomfortable with the changes in her body. She was being bullied and struggled with undiagnosed autism, severe anxiety, and depression. She had even experienced suicidal ideation since elementary school.

Instead of receiving comprehensive mental health treatment, Jane found herself turning inward—and especially to the internet. Through Instagram and online fandom communities, Jane began seeing transgender content circulate in her feed. Around the same time, public coverage of Caitlyn Jenner's adult sex rejection dominated cultural discourse. To an 11-year-old girl who felt alienated from her peers, distressed by puberty, and frightened by attention from boys, becoming a "boy" felt like an escape.

In sixth grade, Jane pretended to be a boy at school, but her school did not inform her parents. School officials coordinated meetings with Pride Center adults on campus without parental knowledge, and by the time Jane told her parents she believed she was a boy, she had already begun living a double life. Her parents were confused and frightened, wanting their child to be safe.

When Jane began therapy through Kaiser Permanente, she was quickly diagnosed with gender dysphoria. Within just a few months—without a full diagnostic workup for her longstanding mental health conditions, Jane was recommended for medical intervention.

At age 12, Jane was prescribed Lupron as a puberty blocker. By June 2017, she began testosterone injections. In September 2017, one month after her 13th birthday, Jane underwent a double mastectomy at Kaiser San Francisco. Her parents were told that failing to allow this sex rejection could mean losing their child. The framing was stark: a "live son or a dead daughter." Trusting the doctors and desperate to protect their child, they consented.

[193] Jane speaks publicly under pseudonym.

In Jane's telling, the only medical advice she received was to reject her sex, through a series of interventions. She did not receive extended exploratory therapy. Her medical records later revealed minimal mental health diagnoses such as "social anxiety," and later "mood disorder not otherwise specified." Today, Jane knows differently, but at the time no comprehensive assessment of autism, trauma, or early-onset depression preceded irreversible interventions.

Jane was informed that testosterone would deepen her voice and increase body hair. She was not informed that it could damage her liver, cause genital atrophy, lead to urinary dysfunction, or create long-term joint instability. At age 14, abnormal liver labs raised concerns, but no one attributed the damage to testosterone.

As a teenager, Jane was trained to inject herself weekly with a Schedule III controlled substance. At age 13, she underwent a mastectomy described to her in softened language as "top surgery." She was told she would not be able to breastfeed, but she was not told that retained mammary tissue could still leave her at risk for breast cancer. She was not warned about the chronic nerve pain she now experiences daily—electric shocks, numbness, and phantom itching beneath grafted skin. Before becoming an adult, Jane began experiencing severe joint pain. She threw out her back without any strenuous activity.

At age 17, Jane began to question her "transition." She realized she had expected testosterone and surgery to bring relief and make her feel "truly happy." Instead, she felt she was maintaining a facade. So without guidance or medical supervision, she tapered herself off testosterone. When she stopped picking up prescriptions, no provider followed up. When she declined referral to an adult gender clinic, no one asked why.

Shortly after turning 18, Jane searched online for her former doctors and discovered that another young woman had filed a lawsuit against the same clinic. Jane contacted the same legal firm and filed a medical malpractice claim, but her case was ultimately dismissed. Because her parents had signed a Kaiser Permanente arbitration agreement on her behalf as part of her health care coverage, Jane was barred from a jury trial. An arbitrator ruled that the statute of limitations began running when she was 13—the year of her surgery—meaning she would have needed to sue by age 16. Jane did not detransition until nearly 18.

Jane never received a hearing before a jury, no doctor faced cross-examination, and no public record was created. Now in her early 20s, Jane lives with the lifelong consequences of sex-rejecting drugs and surgeries. She cannot undo her surgery, nor can she reverse the permanent changes to her voice. She lives with joint pain, urinary dysfunction, and daily nerve damage. To this day, her hips and knees crack painfully. She now manages her chronic pain with over-the-counter medication and hot baths. She missed out on formative teenage experiences, withdrawing socially and completing much of high school through independent study. Since speaking out publicly about her experience, Jane now advocates for extended statutes of limitations for minors, reform of forced arbitration agreements, and improved medical oversight.

## VI. Christy Davidson

Christy Davidson thought she could trust hospitals and medical providers. Her three sons all have autism and rare chromosomal disorders, so she has worked with teams of doctors over the years. When her middle son, Thomas,[194] declared he was a female at just 14-years-old, her world turned upside down.

---

194 A pseudonym has been assigned to protect the identity of Davidson's son.

The note Thomas wrote to his parents about his new identity was a shock to Christy and her husband. Unbeknownst to either of them, Thomas had been exposed to transgenderism when he was only 12 years old through online videogame chats. Playing Minecraft, he had chosen a pink-and-blue bandana for his character to wear. Before long, other players began praising him for being transgender. Thomas had never been introduced to gender ideology before, but now, other players were telling him about gender identity. The conversation went beyond just one game, however, and Christy later discovered her son had been further exposed to inappropriate exchanges on the messaging app Discord.

Alarmed by Thomas's sudden self-proclaimed identity, Christy took him to his pediatrician, who referred them to Phoenix Children's gender support program. There, Christy, her husband, and Thomas met with a "specialist." It was only after the appointment that Christy learned this specialist was a social worker, not a doctor. Right away, the social worker embraced Thomas's self-diagnosis and referred to Thomas with his self-identified female name, "Violet." The worker also asked about Thomas's feelings in his own body, and Thomas said he wanted a rounder face and smaller shoulders. That was enough for the worker to recommend cross-sex hormones, noting that Thomas was too old for puberty blockers. Christy was less certain. Concerned, she asked if hormones were safe for her son due to his rare chromosome disorder. But without explaining how the hormones could affect Thomas's health issues, the social worker said the hormones were necessary—without them, she said, Thomas would commit suicide. Then, the social worker insisted on speaking with Thomas alone. This set off alarms for Christy and her husband, who promptly ended the appointment.

Unfortunately, the damage had already been done. Thomas immediately latched onto transgenderism—and the idea of committing suicide.

The following months became a living nightmare for Christy and her husband. Like many autistic children, Thomas often fixated on topics. Usually, his interests were innocuous, such as trains and ancient Egypt. But this time, he was fixated on suicide. For over a year and a half, Christy and her husband watched Thomas around the clock to ensure he would not take his own life. It was not safe for him to be behind closed doors or left alone. Things escalated to a point where, during a cardiology appointment, Thomas proclaimed that he would kill himself. The cardiologist immediately called in a therapist, who sent Christy a box to lock up knives and any potentially dangerous objects.

Even as Christy was struggling to protect her son, the message from her son's medical providers was pro–gender ideology. She had to ensure the topic was not brought up in any of his appointments, or he would spiral into a suicidal episode. One doctor accused Christy of being a "gatekeeper," and Phoenix Children's gender support program gave her a handout from Children's Hospital Colorado with information on pronouns, gender ideology terminology, and hormonal interventions with references to the discredited World Professional Association for Transgender Health (WPATH) guidelines.[195]

With nowhere to turn amongst their once-trusted medical professionals, Christy and her husband have found a sex realist therapist in Sweden, at great financial expense. And though Thomas still believes he is a girl, he is no longer suicidal. He now has panic episodes only a few times a month, is finally able to have some time unsupervised, and is scoring in the top percentile for his age in school. The road ahead is a long one for Christy and her family, but Christy is hopeful. Above all

---

[195] "'Trust the Experts' Is Not Enough U.S. Medical Groups Get the Science Wrong on Pediatric 'Gender Affirming' Care," Leor Sapir, https://manhattan.institute/article/trust-the-experts-is-not-enough.

else, she will not give up on her son.

## VII. Soren Aldaco

While still an adolescent, Soren Aldaco began experiencing distress related to her body and identity. Like many adolescents, she turned to online communities for explanations. Those communities did more than present “transition” as one option among many; rather, they framed sex rejection as *the* appropriate response.

Soren entered the medical system as a gender-dysphoria patient and was placed on testosterone. Multiple providers attended to her. These included a therapist, prescribing clinicians, and surgical teams. The providers operated within a sex rejection model. Soren provided no indication that providers considered alternative options for treating her gender dysphoria.

And yet, within a relatively short period, Soren was approved for and underwent a double mastectomy through the Crane Center. The providers presented this surgery as a medically appropriate response to Soren’s gender dysphoria.

Following surgery, Soren remained on testosterone for six months. During this period, she experienced escalating physical symptoms, including gastrointestinal complications like reflux and gastritis, as well as broader systemic discomfort. Despite Soren’s experiencing these symptoms, doctors did not reassess the underlying course of treatment.

For Soren, the post-surgical recovery was more severe than anticipated. She reports complications associated with wound healing. For example, doctors had to reopen surgical sites to manually “drain three cups of blood” from her chest. They also had to expel post-operative hematoma “aggressively” with Q-Tips; Soren described the pain as “a feeling I don’t think I’ll ever forget.” Soren was never told of these potential complications before her surgery.

Despite these negative developments, providers did not initiate a structured reassessment of her treatment plan. The clinical framework continued to support ongoing hormone use and emphasized her maintaining progress in “transition.” Doctors did not, it seems, assess whether the initial interventions themselves were contributing to her deteriorating condition.

Soren eventually discontinued testosterone. She made this decision on her own, not in coordination with her providers. And she was not offered any formal detransition protocol or follow-up care plan.

Soren’s experience reflects the imbalance of care for cases like hers. While her pathway into sex rejection medicalization involved coordinated referrals, approvals, and interventions across multiple providers, the pathway out involved no comparable system of support.

Soren believes that the role of online environments in shaping adolescent identity is, unfortunately, overlooked by professionals. In her case, exposure to infectious online content preceded medical intervention and influenced how she interpreted distress in her personal life.

She also notes that surgical intervention has been far too quickly normalized within the clinical setting. Providers did not present mastectomy as a last-resort option to be pursued after a prolonged evaluation. Rather, this life-altering surgery was treated as a stepping stone within the affirmation treatment pathway.

Today, Soren speaks publicly about her experience. Her positions are not based on theory or secondary reporting alone, but on direct participation within the current model of care. From her perspective, the fact that minors are able to access irreversible medical interventions through a system that does not require a comprehensive diagnostic evaluation, does not mandate long-term outcome tracking, and does not currently provide structured care for those seeking to reverse course, is a problem. It must be addressed—and addressed quickly.

## VIII. Luke Healy

Luke Healy was only 10 years old when he first encountered transgender ideology online. What started with ordinary childhood interests—anime, fantasy, internet fandoms—quickly resulted in exposure to online communities where adults and older peers discussed sex, pornography, homosexuality, and transgender identity with children. According to Luke, some of those adults actively groomed him.

By 13, Luke believed he was a girl in the wrong body. When he told his parents, they were alarmed and sought help through Kaiser Permanente. Luke says the only people who seriously asked what might have caused his distress were his parents. Meanwhile, institutional figures (counselors and medical providers) treated his new identity as settled and moved quickly to affirm it. He says adults around him framed his discomfort with his masculinity and adolescence as proof that he was female.

Luke's parents refused to consent to puberty blockers or hormones while he was still a minor. Luke now describes their refusal as one of the bravest things they ever did.

At 18, however, Luke began obtaining estrogen through providers including Planned Parenthood and Kaiser. At first, he used the hormones inconsistently. But once he began receiving hormones consistently through an informed-consent telehealth-style provider, Luke remained on them for about two-and-a-half years. During that time, he also pursued surgical consultations for facial feminization surgery and a tracheal shave—neither of which he ultimately underwent.

Luke says the estrogen and medical process overall did not relieve his stress. The physical changes from estrogen—softened skin, fat redistribution, and other feminizing effects on a male body—made him feel increasingly like a stranger in his own skin. Each intervention led to pressure for further intervention, he says. In his view, the model was built around escalation rather than resolution.

The consultations themselves deepened his doubts. Luke says one doctor quoted him approximately $200,000 for facial feminization surgery. Another, he says, spoke to him like a car salesman while encouraging tracheal shave. Luke came to realize he was being sold procedures, not psychological help.

By then, he had already begun to realize the transgender identity was not resolving his emotional turmoil. He had stopped drinking and using substances and was rebuilding his life, but he recognized the same obsessive, destructive pattern in gender ideology that he had seen in addiction.

Luke began his detransition when those doubts became unavoidable. He says he knew he was not a woman before he knew how to stop living as one. After listening to the preaching of a Catholic priest online and confronting the spiritual and psychological reality of what he was doing, Luke cut his hair, reintroduced himself by his male name, and never looked back.

Luke says he has not doubted that decision at any point since. He reports lasting physical effects, including gynecomastia (enlarged breast tissue). He says the more serious damage, however, was the psychological, social, and spiritual damage arising from the fact that more than a decade of his life was consumed by an identity built through online grooming, institutional affirmation, and illogical medicalization.

Today, Luke argues that the institutions involved in his case did not investigate the causes of his distress, but instead pushed a false identity and directed him toward increasingly invasive interventions. His account raises serious concerns about online grooming, sex-rejection-only counseling, informed-consent hormone access for vulnerable young adults, and the broader medical and political system that treats these interventions as routine while dismissing those who later regret them.

## Conclusion

When a child is in distress, many parents will go to any length to find help and to relieve the pain. These parents count on America's pediatric hospitals, medical associations, and federal regulatory agencies to value science over ideology and people over profit when recommending medical procedures. Instead, parents encountered wolves in white lab coats who pushed vulnerable children down a path towards irreversible harm from sex-rejecting procedures. Financial incentives from the medical industry and lobby; political and ideological pressures; and failure of oversight at the local, state, and federal levels have all contributed to the rapid medicalization of these procedures and resulted in long-term physical and psychological consequences for many patients.

The research and first-hand stories in this report demonstrates potential large-scale fraud, and a critical need for more accountability and rigorous oversight of the medical providers, insurers, advocacy organizations, and government agencies that not only allowed, but often encouraged it. Because of the dangerous combination of ideology and financial incentives, we believe the potential fraud exposed in this report is only the tip of the iceberg.

## Appendix: Nationwide Claims-Based Analysis of Signals in Sex-Rejecting Procedures on Minors

**Data Note:** Patient age is estimated using birth year only, with July 1 assigned as the default birthdate; therefore, all age values should be considered approximate.

**Attribution Notes:** Rows billed under an individual provider National Provider Identifier (NPI) with no organization name are excluded. Each organization listed billed at least one qualifying claim in the cohort; this roster does not indicate volume. Names are shown as recorded on the claim and the same NPI may appear under more than one spelling.

**Cohort A -** Claims for Puberty Blockers with **Endocrine Disorder Diagnosis** (E34x) on the Same Claim with No Gender Diagnosis (F64x) and No Precocious Puberty (E301) Diagnosis on Claim (2015-2025; Patient Age 9-17).

***In plain terms:*** *Each organization below billed for puberty-blocking drugs given to a patient aged 9 to 17, where the only medical reason listed on that* bill was a general, non-specific hormone disorder. The bill did not list either of the two conditions that usually explain this treatment in children: a gender-related diagnosis, or puberty starting unusually early.

### By Organization

| Organization NPI | Organization Name |
|---|---|
| 1073569034 | ACCREDO HLTH GRP |
| 1346208949 | ACCREDO HLTH GRP |
| 1861506560 | AKRON CHILDREN'S HOSPITAL |
| 1245773191 | ANCHOR HLTH INITIATIVE |
| 1184260416 | ANIL PIYA MD, LLC |
| 1508809427 | BANNER -- UNIVERSITY MEDICAL GROUP |
| 1295738409 | BIOSCRIP INFUSION SERVICE |
| 1710087127 | BOSTON CHILDREN'S HOSPITAL |
| 1669095808 | BRAZILIAN CLINIC |
| 1669095808 | BRAZILIAN CLINIC LLC |
| 1962514877 | BRIOVARX |
| 1518948413 | CAREMARK |
| 1982643003 | CAREMOUNT MEDICAL, P.C. |
| 1033166244 | CHARTWELL PENNSYLVANIA LP |
| 1588606305 | CHASE BREXTON HLTH SERVICE |
| 1003961251 | CHILDREN'S CLINIC PHARMACY |
| 1336245828 | CHILDREN’S HOSPITAL COLORADO |
| 1124073366 | CHILDRENS HOSP LOS ANGELES |
| 1124073366 | CHILDREN'S HOSPITAL LOS ANGELES |
| 1265530653 | CHILDREN'S HOSPITAL LOS ANGELES MEDICAL GROUP, INC. |
| 1548212988 | CHILDREN'S HOSPITAL MEDICAL CENTER |
| 1811080526 | CHILDREN'S HOSPITAL OF ORANGE COUNTY |
| 1194743013 | CHILDREN'S MEDICAL CENTER |
| 1336229517 | CHILDREN’S HOSPITAL OF PHILADELPHIA |
| 1598708513 | CHIPPENHAM JOHNSTONWILLIS HOSP |
| 1275975104 | CHOC CHILDREN'S SPECIALISTS |

| | |
|---|---|
| 1275735011 | COASTAL COMMUNITIES PHYSICIAN NETWORK |
| 1396125399 | CREDENA HLTH |
| 1821210402 | CROWN HEIGHTS MED |
| 1821210402 | CROWN HEIGHTS MEDICAL, P.C. |
| 1386180404 | DAP HEALTH, INC. |
| 1386180404 | DAP HLTH |
| 1457379448 | DAYTON CHILDRENS HOSP |
| 1457379448 | DAYTON CHILDREN'S HOSPITAL - SOUTH CAMPUS |
| 1427166305 | DIABETES AND GLANDULAR DISEASE CLINIC PA |
| 1376508788 | DOTHAN PEDIATRIC CLINIC, P. A. |
| 1013994359 | FAIRVIEW HLTH SERVICE |
| 1003804725 | FENWAY COMMUNITY HLTH CTR |
| 1447352836 | GILLETTE CHILDRENS SPECIALTY HLTH |
| 1619390879 | GPM PEDIATRICS PC |
| 1407897309 | HENNEPIN COUNTY MEDICAL CENTER |
| 1407897309 | HENNEPIN HLTH SYSTEM |
| 1457456279 | HMH HOSP |
| 1821024910 | HURLEYPEDIATRIC RESEARCH & EDUCATION |
| 1134553068 | JOHN PHOENIX APRN |
| 1568598993 | KATHERINE J ATKINSON |
| 1417907940 | LUCILE PACKARD CHILDREN'S HOSPITAL |
| 1467442749 | LUCILE PACKARD CHILDREN'S HOSPITAL |
| 1497179303 | MONTEFIORE NEW ROCHELLE HOSPITAL |
| 1598992554 | MOUNT NITTANY PHYSICIAN GROUP |
| 1134152986 | NATIONWIDE CHILDREN'S HOSPITAL |
| 1053688572 | NHPP CARDIOLOGY AT GREAT NECK |
| 1174649040 | NORTH ARLINGTON PEDIATRICS S.C. |
| 1669578324 | NYU LANGONE HOSP |
| 1801992631 | NYU LANGONE HOSP |
| 1801992631 | NYU LANGONE HOSPITALS |
| 1720364532 | OPTUM FRONTIER THERAPIES II |
| 1609824010 | OREGON HEALTH & SCIENCE UNIVERSITY |
| 1316213531 | PANTHERX SPECIALTY |
| 1932536810 | PEDIATRIC ENDOCRINOLOGY OF NEW YORK P.C |
| 1104819366 | PEDIATRIC PULMONARY & CRITICAL CARE ASSOC. |
| 1770539066 | PEDIATRIC SERVICE GROUP |
| 1699700526 | PEDIATRICARE ASSOCIATES |
| 1437562642 | PERFORMSPECIALTY |
| 1508300765 | PHYSICIAN PLAZA PHARMACY |
| 1457618555 | PRIME THERAPEUTICS SPECIALTY PHARMACY |
| 1043382302 | PROCARE PHARMACY DIRECT |
| 1427132265 | PROVIDENCE HLTH SERVICE OREGON |
| 1710065933 | RADY CHILDREN'S HOSPITAL SAN DIEGO |
| 1003878539 | REGENTS OF THE UNIVERSITY OF MICHIGAN |
| 1003878539 | REGENTS THE UNIVERSITY MICHIGAN |
| 1477516466 | SCOTT WHITE MEMORIAL HOSP |

| | |
|---|---|
| 1174693592 | SENTARA ENTERPRISES |
| 1689606196 | SOUTHERN CALIFORNIA PERMANENTE MED GRP |
| 1235188673 | SPECTRUM HEALTH PRIMARY CARE PARTNERS |
| 1922090554 | SPECTRUM HLTH HOSP |
| 1396024683 | SPECTRUM HLTH PRIMARY CARE PARTNERS |
| 1942510078 | SPECTRUM HLTH PRIMARY CARE PARTNERS |
| 1194306647 | ST. LUKE'S PHYSICIAN GROUP, INC. |
| 1215032503 | ST. LUKE'S PHYSICIAN GROUP, INC. |
| 1346285657 | STRONG MEMORIAL HOSPITAL |
| 1003824038 | TEXAS TECH UNIVERSITY HEALTH SCIENCES |
| 1295837250 | THE CHILDRENS CLINIC PC |
| 1174594634 | THE POLYCLINIC |
| 1588691620 | THUNDERMIST HEALTH CENTER |
| 1376708560 | THUNDERMIST HLTH CTR |
| 1689608150 | UC IRVINE MEDICAL CENTER |
| 1164512851 | UCSF MEDICAL CENTER |
| 1639278369 | UCSF MEDICAL CENTER |
| 1013994359 | UNIVERSITY OF MINNESOTA |
| 1396882205 | VANDERBILT UNIVERSITY MEDICAL CENTER |
| 1851463087 | WALGREENS |
| 1942303110 | WALGREENS |
| 1780801050 | WESTERN NORTH CAROLINA COMMUNITY HLTH SERVICE |
| 1689914756 | WOMENS CHILDRENS SPECIALISTS |

**Cohort B -** Claims for Puberty Blockers with **Precocious Puberty Diagnosis** (E301) on the Same Claim (2015-2025; Patient Age 13-17).

***In plain terms:*** *Each organization below billed for puberty-blocking drugs given to a patient aged 13 to 17, where the medical reason listed on the bill* was puberty starting unusually early. That diagnosis normally applies to much younger children, so it is an unexpected reason to see at these ages.

**By Organization**

| Organization NPI | Organization Name |
|---|---|
| 1326042870 | ABBVIE ENDOCRINOLOGY |
| 1811206071 | ACARIAHEALTH PHARMACY 12 INC |
| 1043309735 | ACCREDO HLTH GRP |
| 1346208949 | ACCREDO HLTH GRP |
| 1639375066 | ACCREDO HLTH GRP |
| 1053384776 | AHS HOSP |
| 1548290455 | ALBANY MED COLLEGE |
| 1023314804 | ALLINA HEALTH BANDANA SQUARE CLINIC |
| 1235234535 | ANN ROBERT H LURIE CHILDRENS HOSP CHICAGO |
| 1720011810 | BANNER PAYSON MEDICAL CENTER |
| 1487655064 | BAYSTATE MEDICAL CENTER |
| 1619970845 | BIOSCRIP PHARMACY SERVICE |
| 1154385730 | BOARD OF REGENTS OF THE UNIVERSITY OF OKLAHOMA OU PHYSICIANS TULSA |
| 1467454967 | BOSTON CHILDREN'S HEALTH PHYSICIANS, LLP |
| 1710087127 | BOSTON CHILDREN'S HOSPITAL |
| 1962514877 | BRIOVARX |
| 1982754594 | BURLINGTON PEDIATRICS, LLC |
| 1013998913 | CAREMARK |
| 1518948413 | CAREMARK |
| 1982643003 | CAREMOUNT MEDICAL, P.C. |
| 1588045215 | CENTERWELL PHARMACY |
| 1942441886 | CENTERWELL PHARMACY |
| 1124073366 | CHILDRENS HOSP LOS ANGELES |
| 1548212988 | CHILDRENS HOSP MED CTR |
| 1811080526 | CHILDRENS HOSP ORANGE COUNTY |
| 1003102781 | CHILDREN'S HOSPITAL LOS ANGELES |
| 1124073366 | CHILDREN'S HOSPITAL LOS ANGELES |
| 1548212988 | CHILDREN'S HOSPITAL MEDICAL CENTER |
| 1811080526 | CHILDREN'S HOSPITAL OF ORANGE COUNTY |
| 1750358297 | CITY HOPE NATIONAL MED CTR |
| 1750358297 | CITY OF HOPE NATIONAL MEDICAL CENTER |
| 1720067358 | CLINICS OF NORTH TEXAS LLP |
| 1760798540 | COLLEGE PARK FAMILY CARE CENTER PHYSICIANS GROUP |
| 1003908930 | COMMUNITY ACTION COMMITTEE PIKE COUNTY |
| 1952371239 | COOK CHILDRENS HOME HLTH |
| 1891765178 | COOK CHILDRENS MED CTR |
| 1336330588 | CORE PHYSICIANS, LLC |
| 1457379448 | DAYTON CHILDRENS HOSP |

| | |
|---|---|
| 1548286172 | DRISCOLL CHILDRENS HOSP |
| 1366739088 | ELITE HEALTHCARE |
| 1053738765 | ELLSWORTH MUNICIPAL HOSP |
| 1447352836 | GILLETTE CHILDRENS SPECIALTY HLTH |
| 1851450894 | GILLETTE CHILDRENS SPECIALTY HLTH |
| 1689918377 | GUNDERSEN LUTHERAN MED CTR |
| 1831296052 | HANSEN FAMILY HOSPITAL |
| 1023055126 | HCA HLTH SERVICE TENNESSEE |
| 1396849303 | HUDSON HOSP |
| 1467422733 | INTERMED PA |
| 1043229735 | IOWA FALLS CLINIC |
| 1710057500 | JOHNS HOPKINS PHARMAQUIP |
| 1801900576 | KAISER FOUNDATION HLTH PLAN COLORADO |
| 1073811378 | KAISER FOUNDATION HOSPITAL - ROSEVILLE |
| 1992873319 | LEE MEMORIAL HEALTH SYSTEM |
| 1124853122 | LITTLE PALMS BY THE SEA |
| 1467442749 | LUCILE PACKARD CHILDREN'S HOSPITAL |
| 1467442749 | LUCILE SALTER PACKARD CHILDRENS HOSP STANFORD |
| 1710179445 | MARIAN TAN MED GRP LLP |
| 1063545119 | MCCORMICK FAMILY PRACTICE |
| 1639135643 | MCFARLAND CLINIC PC |
| 1174582050 | MDACC |
| 1891797148 | MGMC, LLC |
| 1407975675 | MILFORD PEDIATRIC GROUP |
| 1053688572 | NHPP CARDIOLOGY AT GREAT NECK |
| 1053688572 | NORTH SHORE LIJ MED |
| 1497701882 | NORTHSHORE UNIVERSITY HEALTHSYSTEM FACULTY PRACTICE ASSOCIATES |
| 1386164051 | NOVANT HEALTH PEDIATRIC ENDOCRINOLOGY |
| 1801992631 | NYU LANGONE HOSP |
| 1285826438 | NYU SCHOOL OF MEDICINE PROFESSIONAL SERVICES |
| 1982643003 | OPTUM MED CARE |
| 1669429577 | ORLANDO HEALTH MEDICAL GROUP INC |
| 1053384776 | OVERLOOK HOSPITAL |
| 1316213531 | PANTHERX SPECIALTY |
| 1659762524 | PANTHERX SPECIALTY |
| 1932536810 | PEDIATRIC ENDOCRINOLOGY NEW YORK |
| 1932536810 | PEDIATRIC ENDOCRINOLOGY OF NEW YORK P.C |
| 1699119818 | PEDIATRIC SPECIALISTS OF VIRGINIA, LLC |
| 1790080448 | PEDIATRICS ON HUDSON, LLC |
| 1336222397 | PERMANENTE MEDICAL GROUP INC |
| 1215124797 | PHARMEDQUEST PHARMACY SERVICE |
| 1003908658 | PHELPS MEMORIAL HOSP ASSOCIATION |
| 1417904574 | PREMIER INFUSION HLTH SERVICE |
| 1457618555 | PRIME THERAPEUTICS SPECIALTY PHARMACY |
| 1518039858 | PROCARE PHARMACY |
| 1043382302 | PROCARE PHARMACY DIRECT |

| | |
|---|---|
| 1144471715 | PROVIDENCE HEALTH & SERVICES - WA |
| 1144471715 | PROVIDENCE REDWOOD MEMORIAL HOSPITAL |
| 1710065933 | RADY CHILDREN'S HOSPITAL - SAN DIEGO |
| 1710065933 | RADY CHILDREN'S HOSPITAL SAN DIEGO |
| 1669617197 | RADY CHILDREN'S SPECIALISTS OF SAN DIEGO, A MEDICAL FOUNDATION |
| 1669470019 | REFUAH HLTH CTR |
| 1003878539 | REGENTS THE UNIVERSITY MICHIGAN |
| 1457337313 | SCRIPPS CLINIC MED GRP |
| 1457337313 | SCRIPPS CLINIC MEDICAL GROUP |
| 1467536276 | SEATTLE CHILDREN’S HOSPITAL |
| 1174693592 | SENTARA ENTERPRISES |
| 1285616177 | SHARP REES-STEALY MEDICAL GROUP, INC |
| 1043242555 | SOUTHERN CALIFORNIA PERMANENTE MED GRP |
| 1396287082 | SOUTHERN CALIFORNIA PERMANENTE MED GRP |
| 1952333478 | SOUTHERN CALIFORNIA PERMANENTE MED GRP |
| 1235148594 | ST GEORGE REGIONAL HOSPITAL |
| 1730328279 | SUN RIVER HLTH |
| 1750347647 | TENAFLY PEDIATRICS |
| 1841224508 | THE CHILDRENS MEDICAL GROUP |
| 1093894990 | THE UNIVERSITY OF CHICAGO MEDICAL CENTER |
| 1750832283 | TMC MEDICAL NETWORK |
| 1154418218 | TWELVESTONE MED |
| 1174660120 | UNIVERSITY MARYLAND MED CTR |
| 1639278369 | UNIVERSITY OF CALIFORNIA SAN FRANCISCO MEDICAL CENTER |
| 1619016854 | UPTOWN PEDIATRICS |
| 1942303110 | WALGREENS |
| 1972560688 | WALGREENS |
| 1245310242 | WASHINGTON AVENUE PEDIATRIC |
| 1750318705 | WATERTOWN PEDIATRICS, PC |
| 1790871994 | WATERVILLE PEDIATRICS, PA |
| 1487794814 | WEST CAMBRIDGE PEDIATRIC ADOLESCENT MEDICIN |
| 1639116726 | WEST FLORIDA REGIONAL MED CTR |
| 1386188647 | WESTCHESTER HEALTH MEDICAL, P.C. |
| 1689914756 | WOMENS AND CHILDRENS SPECIALISTS, LLC |
| 1689914756 | WOMENS CHILDRENS SPECIALISTS |
| 1902875966 | WOMEN'S HEALTH OF AUGUSTA, P.C. |
| 1902875966 | WOMENS HLTH AUGUSTA |

Cohort C - **Nationwide Claims-Based Analysis on Signals of Cross-Sex Hormone Treatment of Minors**

**Overall:** While investigating potential fraud, we also explored cross-sex hormone treatment of minors. We did not pursue that line further, focusing instead on puberty blockers, because of the scale of research it would require. We do want to flag, however, that potential fraud and criminal activity related to this protocol warrant much more study. We offer the following as a small example.

**Limitations:** Only interventions billed through insurance appears in our dataset. Cash pay, or otherwise billed outside insurance, is not captured, so the lists are not exhaustive.

**Claims for a Primary Gender Dysphoria Diagnosis (F64x) with a Cross-Sex Hormone Prescription Written the Same Day, in a State Prohibiting Sex Rejecting Procedures for Minors, on a Date the Prohibition Was in Force (2023–2026; Patient Age 17 or Younger)**

**In plain terms:** Insurance billing records show that the organizations listed below diagnosed gender dysphoria in patients who were minors at the time, and that those patients received a prescription for a cross-sex hormone on the same date. Each diagnosis took place at a facility in a state where sex-rejecting procedures for minors was outlawed or restricted. Further investigation is required to determine potential wrongdoing.

**By Organization**

| Organization NPI | Organization Name |
|---|---|
| 1356883839 | BAPTIST PRIMARY CARE INC |
| 1548212988, 1609915784 | CHILDREN'S HOSPITAL MEDICAL CENTER |
| 1679128599 | FLOURISH THERAPY INC |
| 1891743092 | PLANNED PARENTHOOD GREAT NORTHWEST, HAWAI'I, ALASKA, INDIANA, KENTUCKY* |
| 1629057146 | PLANNED PARENTHOOD MINNESOTA, NORTH DAKOTA, SOUTH DAKOTA* |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS* |
| 1144260027, 1295775260, 1538109889, 1548282833, 1710927066, 1811937881, 1992745244 | PLANNED PARENTHOOD OF THE HEARTLAND |
| 1811033210 | PLANNED PARENTHOOD SOUTH ATLANTIC* |
| 1174731806 | PLANNED PARENTHOOD SOUTHWEST OHIO REGION* |
| 1043245178 | TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER AMARILLO |
| 1245520386 | THE NEMOURS FOUNDATION |

*Rows marked * were identified by matching the organization's address to the address where the visit took place, rather than by the organization NPI that submitted the bill.*

**Attribution Notes:** An organization is listed if a qualifying visit took place at one of its locations. The state used is where the visit happened, not where the patient lives; visits whose location could not be determined are excluded. The list shows which organizations appear, not how many patients each had. Many organizations bill under several NPI numbers; all of an organization's numbers are shown on one line. Where a state permits patients already in treatment to continue, we include a patient only when the records indicate that treatment began after the restriction took effect. That determination rests on the earliest prescription visible in this data.

**States Included and Exclusions Applied:** Included: Alabama, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, North Carolina, North

Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia and Wyoming. Arizona and New Hampshire were excluded because their laws restrict surgery only, so a hormone prescription falls outside their scope. Montana and Arkansas were excluded because their restrictions were never in force during the considered period. A visit counts only if the restriction was in force on the day of the visit, not merely passed. Several laws were blocked by courts for long stretches; Alabama, Indiana, Idaho, Kansas and Ohio each count only from the date their injunction lifted. We also honored each state's own rule for patients already in treatment. Where a law lets existing patients continue, either permanently or until a set deadline, those continued procedures are lawful, and those patients were removed from these lists. Only patients whose treatment began after the restriction took effect are counted.

**How a Cross-Sex Hormone Patient Was Defined:** A prescription counted as cross-sex when the hormone was the opposite of the patient's recorded sex: testosterone for a female patient, or estrogen for a male patient. Testosterone for a male or estrogen for a female was not counted, since that is standard treatment for a range of conditions and carries no implication of gender-related interventions. Only paid, dispensed prescriptions were included.

Several scenarios fall outside this definition. Patients whose recorded sex is missing are not included. Anti-androgens and similar supporting medications were also excluded, because they have no directional test (such as male with estrogen or female with testosterone). We also did not examine each patient's diagnosis history when classifying a pre-scription: a hormone was judged on its direction alone, without reference to whether a gender diagnosis appeared elsewhere in the record. This keeps the definition simple and independent of coding practice, and it means the cross-sex determination rests only on the relationship between the prescription and the recorded sex. Each of these is an area where further study is warranted.

### Planned Parenthood Affiliates Identified Through Prescriber Affiliation

**Why these organizations appear:** In each case a prescriber wrote a cross-sex hormone prescription for a patient recorded as a minor, in a state restricting sex-rejecting procedures for minors. No claim connects that patient to a visit at a Planned Parenthood facility on any date. These affiliates appear because the prescriber billed at least 95% of their claims to the affiliate in the year of the prescription and is registered at one of its addresses. The connection is therefore the prescriber's billing pattern, not a record of the encounter. This list should not be combined with the roster on the previous page, because some organizations appear on both.

**In plain terms:** A prescriber wrote a prescription for a cross-sex hormone for a patient recorded as being under 18, in a state where that treatment is restricted for minors. Unlike the roster on the previous page, the billing records do not show that any organization listed below diagnosed or treated that patient on that day. Each one appears because the prescriber sends almost all their billing through that organization and is registered at one of its addresses. Further investigation is required to determine potential wrongdoing.

**By Affiliate**

| Main Billing NPI | Planned Parenthood Affiliate |
|---|---|
| 1033477062 | PLANNED PARENTHOOD OF GREATER OHIO |
| 1528147204 | PLANNED PARENTHOOD OF GREATER TEXAS |
| 1811033210, 1801932199 | PLANNED PARENTHOOD SOUTH ATLANTIC (NC / VA / WV / SC) |
| 1023221546 | PLANNED PARENTHOOD OF SOUTHWEST AND CENTRAL FLORIDA |
| 1144260027 | PLANNED PARENTHOOD OF THE HEARTLAND |

| Main Billing NPI | Planned Parenthood Affiliate |
|---|---|
| 1851438147 | PLANNED PARENTHOOD HEALTH SYSTEMS |
| 1245322577 | PLANNED PARENTHOOD GULF COAST |
| 1285898445 | PLANNED PARENTHOOD OF FLORIDA |
| 1417959701 | PLANNED PARENTHOOD OF GREATER NEW YORK |